# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| **DAVID JAROSLAWICZ, individually and on behalf of all others similarly situated,** <br><br>           **Plaintiff,** <br><br>    v. <br><br> **M&T BANK CORPORATION, HUDSON CITY BANCORP, INC., ROBERT G. WILMERS, RENÉ F. JONES, MARK J. CZARNECKI, BRENT D. BAIRD, C. ANGELA BONTEMPO, ROBERT T. BRADY, T. JEFFERSON CUNNINGHAM III, GARY N. GEISEL, JOHN D. HAWKE, JR., PATRICK W.E. HODGSON, RICHARD G. KING, JORGE G. PEREIRA, MELINDA R. RICH, ROBERT E. SADLER, JR., HERBERT L. WASHINGTON, DENIS J. SALAMONE, MICHAEL W. AZZARA, VICTORIA H. BRUNI, DONALD O. QUEST, JOSEPH G. SPONHOLZ, CORNELIUS E. GOLDING, WILLIAM G. BARDEL, and SCOTT A. BELAIR,** <br><br>           **Defendants.** | Civ. No. <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br> **FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff David Jaroslawicz ("Plaintiff"), by his attorneys, alleges this class action against the individual defendants (the "Individual Defendants") and the corporate defendants, M&T Bank Corporation ("M&T") and Hudson City Bancorp, Inc. ("Hudson City"), named herein. The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiff and his own acts, which are asserted on personal knowledge.

**NATURE OF THE CLAIMS**

1.      Plaintiff is a longtime holder of Hudson City shares.  Hudson City is a community bank that was founded in 1868, and has grown to become the largest thrift institution headquartered in New Jersey.  It is a publicly-traded company, and is incorporated in Delaware.

2.      On August 27, 2012, Hudson City announced that it would merge with defendant M&T, a bank located in Buffalo, New York whose focus is different than that of Hudson City (the "Merger"). M&T mainly focuses on commercial banking, and trust services.

3.      The Merger was to be effected pursuant to a merger agreement dated August 27, 2012 (the "Merger Agreement").  Before it could close, the Merger required approval of the shareholders of Hudson City at a meeting which was scheduled to be held on April 18, 2013.  At that meeting the Merger was approved, but did not close for two and a half years, due to regulatory concerns and legal compliance issues affecting M&T.  These legal compliance issues were not fully and fairly disclosed prior to the Merger vote.   It was not until September 30, 2015 that federal regulators approved the Merger, which is now expected to close by November 1, 2015.

4.      What has recently become clear is that M&T was grossly out of compliance with the Bank Secrecy Act and the Anti-Money Laundering regulations"("BSA/AML") in connection with millions of customer accounts, and that M&T was also out of compliance with consumer disclosure laws (the "Consumer Violations").  These legal compliance issues delayed the Merger, and have harmed Hudson City shareholders.

5.      As to BSA/AML compliance, it was only in early 2015 that M&T revealed that it was in the process of validating and verifying the identities of those millions of customers,

1

something it should have done fully in compliance with the law well before it signed the Merger

Agreement—a document that warranted and promised that there were no such violations.

6.      As to the Consumer Violations, it was not until October 9, 2014 that the

Consumer Financial Protection Bureau ("CFPB") announced that it had taken action against

M&T for offering free checking, but then switching customers to accounts which carried fees.

This practice was still in place, according to the CFPB, at the time the Merger Agreement was

signed.  The Merger Agreement, which was reproduced in the Joint Proxy (as defined herein),

warranted that there were no legal violations of any type. This was materially untrue.

7.      Because of these defalcations and the apparent ire of regulators towards M&T, the

transaction at issue was the longest-pending bank merger in history.  Indeed, in a Statement

issued by Federal Reserve Board on September 30, 2015 (the "Federal Reserve Statement"),

regulators cited the BSA/AML violations and the Consumer Violations as the factors which

delayed the approval of the Merger.

8.      Due to M&T's unlawful acts, the full nature of which has been concealed until

recently, Hudson City's shareholders have suffered material damages.  Thus, Plaintiff brings this

class action to recover those damages on behalf of a class (the "Class") of all persons who were

eligible to vote their shares at the April 18, 2013 shareholders' meeting, pursuant to a materially

false and omissive Joint Proxy.

9.      As detailed herein, both companies, and their directors, violated section 14(a) of

the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 which encompass

the federal proxy laws.  In order to obtain the desired shareholder approval, each company was

required by law to issue a full and complete proxy statement, setting forth all material facts.

Hudson City and M&T opted to draft a joint proxy statement (the "Joint Proxy") which was filed

00211217

in preliminary form with the SEC on October 15, 2012.  When parties to a merger decide to proceed in this way, the companies involved, and their directors, become virtual guarantors of the accuracy and completeness of the Proxy Statement.   The standard for liability under section 14(a) and Rule 14a-9 is simple negligence.

10.     The Joint Proxy contained the Merger Agreement, which included a representation that M&T was not in violation of "any applicable law," including the Bank Secrecy Act.  Merger Agreement, § 4.9 ("M&T and each of its Subsidiaries have complied in all material respects with, and are not in default or violation in any material respect of, (i) any applicable law, including all laws related …the USA PATRIOT Act, the Bank Secrecy Act… and any other law relating to…money laundering prevention….").

11.     The Joint Proxy was dated February 22, 2013, and mailed to shareholders on or about February 27, 2013.  By April 12, 2013, many shareholders would have already cast their ballots, and only four business days remained until the formal meeting in April 18, 2013.  On that date, however, Hudson City and M&T jointly announced that regulators had expressed "concerns" with M&T's procedures, systems and processes related to BSA/AML.  This was followed by a Proxy Supplement which was completely vague regarding these matters, omitted all particulars, and in any event provided proxy voters with insufficient time to evaluate the situation.

12.     The materially incomplete and inadequate Proxy Supplement was followed by a public conference call convened by M&T on Monday, April 15, 2013 which was designed to ensure concerned shareholders that M&T had violated no laws (an assertion that has turned out to be incorrect) and that the matter was not a very serious one.  M&T CFO Jones stated on that call that the regulatory issues would delay the close of the Merger in the "near term", and that the

3

close had been postponed only five months while "M&T works hard to resolve these issues." Jones also assured that: "We have no reason to believe that the issues involve any wrong doing or illegal conduct by anyone at M&T….".  This, too, would turn out later to be inaccurate, as M&T has conceded it has not complied with the Bank Secrecy Act as to millions of accounts. Jones also downplayed the work ahead, by asserting that the regulatory issues could be addressed "quickly", and might involve hiring 100 people.  This proved to be a grossly inaccurate representation of the troubles M&T had with compliance, and the resources and time needed to fix them. Jones also indicated he could not provide full details, as "we have obligations to keep supervisory information confidential…."

13.     Analysts who followed Hudson City and M&T were quoted that day as saying M&T's issues were likely immaterial.  But as one analyst from Raymond James & Co. presciently predicted:  "I don't believe we are going to find out exactly what happened.  I think they are hardly going to say anything."

14.     Neither  M&T nor Hudson City sought to adjourn the April 18, 2013 meeting in light of this development so that they might do adequate due diligence regarding M&T's practices and ensure a Proxy Statement that fully and completely disclosed all the facts.  Had any of the defendants at that time performed adequate due diligence, they would have discovered, among other things,  that M&T's "Know Your Customer" obligations as to millions of customer files were non-compliant, and that years of delay and huge expenditures were very likely ahead. They also would have discovered the Consumer Violations, which had been quietly curtailed by M&T just *four weeks* after the execution of the Merger Agreement, but which still posed a serious threat of adverse regulatory action that could delay the Merger.

00211217

15.     As the new deadline of January 2014 to close the Merger approached, it became evident that this deadline would not be met.  On December 18, 2013, the parties extended the deadline to December 31, 2014.

16.     In conference calls during that year, usually hosted by M&T CFO Jones, Jones doled out dribs and drabs of information, which was never enough to determine exactly what issues M&T was facing, and exactly what it was doing to satisfy regulators.  Instead, M&T provided vague generalities, usually with an emphasis on conveying that M&T was enhancing its systems so that, going forward, M&T would be in compliance with supposedly new regulatory requirements.  To the extent M&T needed to look at any historical data or customers, M&T minimized the work that needed to be done.

17.     It was not until October 17, 2014 that M&T admitted through CFO Jones that: "we have *sort of* implemented a review by a third party to *sort of* determine whether certain *transactions undertaken in the past* by our customers were properly identified and reported and of course that's ongoing." And Jones also revealed that M&T was now: "getting customer information *on all of our customers*. So not just the high risk ones. We then have got to get them [sic] on the medium risk and the low risk customers; have all got to go through sort of a refresh of information."   Thus, Jones left the impression (which was inaccurate) that what M&T was focusing on was an updating process, a "refresh"—and not on anything M&T might have done wrong in the past.  Thus, the plain message—which had been the consistent message since April 2013-- was that M&T was not aware of anything it had historically done wrong, but was endeavoring to simply update its records, as any bank might.

18.     The Merger again failed to close on December 31, 2014, and a new closing date was established of April 30, 2015.  By April 2015, it was clear that this deadline, too, would not

00211217

be met.  Yet Hudson City seemed to be as in the dark as to what was going on at M&T as the general public. On April 6, 2015, Hudson City said it was "unexpectedly" advised by M&T "late in the afternoon on April 3, 2015" that the Merger was not going to close.  Hudson City CEO Denis Salomone added that:  "given the unexpected notice of delay over a holiday weekend, the Board of Hudson City needs more time to understand the nature and timing of the delay and its potential impact on the transaction before the Board can determine its course of action."  Hudson City was so sure the merger would close that it had even begun asking shareholders whether they would prefer cash or stock consideration upon the Merger's close.

19.     M&T was now under great pressure to explain to its investors exactly what was going on internally.  Thus, on April 22, 2015, at its annual shareholders meeting, M&T, which had repeatedly cited the secrecy of regulatory proceedings for its failure to provide detailed information over the years, and had denied any violations of law, revealed that millions of accounts which were in existence at the time of the Merger Agreement and Proxy Statement were presently undergoing a lengthy remedial process.  M&T was obligated, according to M&T Chairman Wilmers, to "verify and validate" the identities of those 3.5 million customers.  It had only done so as to one million customers to date.  But M&T had a responsibility under federal law to have done so adequately as to those millions of customers since at least issuance of the 2003 "Know your Customer" regulations promulgated under the Patriot Act.

20.     That millions of accounts were so deficient would have been highly material to Hudson City shareholders who were entitled to vote in the April 18, 2013 election.  This shocking fact would have indicated that: (a) the M&T warranty that all BSA/AML laws had been obeyed was false; (b) M&T was at high risk of regulatory action, which could take years, and hundreds of millions of dollars to resolve; (c) Hudson City was at great risk proceeding as it was

required to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) the merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (e) Hudson City's dividend was at risk during the time period it would take for a merger to be completed.[1]

21.     By September 30, 2015, after two and a half years of effort, M&T had finally made enough progress that regulators felt comfortable in approving the Merger.  Unfortunately for Hudson City shareholders, they had suffered diminished dividend payouts in the meantime. They also were now stuck with acquiring shares in a bank with a spotty regulatory record, and which is now barred by regulators from any "expansionary activities" until regulators are satisfied that all the aforementioned legal issues are fixed.  Federal Reserve Statement, at 13-14. This is a blow to M&T, and its value, as M&T has traditionally grown through expansionary activities.

22.     Based on the foregoing, Plaintiff asserts herein the following claims on behalf of the Class: (a) a claim for negligent violation of the Section 14(a) of the Exchange Act and Rule 14a-9 against M&T and its directors and CFO; (b) a claim for negligent violation of these proxy laws against Hudson City and its directors; (c-d) claims against the directors of M&T and Hudson City as "control persons" under Section 20(a) of the Exchange Act; and (e) a claim for breach of fiduciary duty against Hudson City's directors.

**JURISDICTION AND VENUE**

---

[1]  When the Merger was approved on September 30, 2015, *Buffalo Business First* observed as to M&T's BSA/AML issues: "The details of those weaknesses **have never been fully disclosed**…" *Buffalo Business First*, "A Look at What's Next for M&T After the Hudson Deal," Oct. 1, 2015.

23.     The claims asserted herein arise under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a) and the rules and regulations promulgated thereunder, including SEC Rule 14a-9, 17 C.F.R. 12 §240.14a-9.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa. This Court has jurisdiction over the pendent claims under Delaware law pursuant to 28 U.S.C. § 1367.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Hudson City is incorporated in this District and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

25.     Plaintiff is a holder of Hudson City shares, and was a holder of shares entitled to vote on the Merger via a Joint Proxy disseminated on or about February 22, 2013.

26.     Defendant M&T is a New York corporation, with principal executive offices at One M&T Plaza, Buffalo, New York 14203.  M&T may be deemed a solicitor of the Proxy in question as the corporate filer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted its name to be used in connection with a proxy solicitation.

27.     Defendant Hudson City is a Delaware corporation, with principal executive offices at West 80 Century Road, Paramus, New Jersey 07652.  Hudson City may be deemed a

00211217

solicitor of the Proxy in question as a corporate filer and drafter of the Joint Proxy and as the issuer who directly solicited proxies from its shareholders.

28.     Defendant Robert G. Wilmers ("Wilmers") was, at the time of the Proxy, chairman of the board and chief executive officer of M&T Bank, chairman of its Executive Committee and a member of its Trust and Investment Committee.  Wilmers has been a director since 1982.  Wilmers may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

29.     Defendant René F. Jones ("Jones") was, at the time of the Proxy, Chief Financial Officer and Executive Vice president of M&T.  Jones may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.

30.     Defendant Mark J. Czarnecki ("Czarnecki") was, at the time of the Proxy, President of M&T and a director since 2007.   Czarnecki may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

31.     Defendant Brent D. Baird ("Baird") was, at the time of the Proxy, a member of M&T's Executive Committee and a director since 2007.   Baird may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint

Proxy and as a person who permitted his name to be used in connection with a proxy solicitation. In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

32.     Defendant C. Angela Bontempo ("Bontempo") was, at the time of the Proxy, a member of M&T's Audit and Risk Committee and a director since 1991.   Bontempo may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted her name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

33.     Defendant Robert T. Brady ("Brady") was, at the time of the Proxy, a member of M&T's Board of Directors since 2007.   Brady may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

34.     Defendant T. Jefferson Cunningham, III ("Cunningham") was, at the time of the Proxy, a member of Risk Committee and a director since 2001.   Cunningham may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

00211217

35.     Defendant Gary N. Geisel ("Geisel") was, at the time of the Proxy, a member of M&T's Risk Committee and a director since 2009.   Geisel may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation. In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

36.     Defendant John D. Hawke, Jr. ("Hawke") was, at the time of the Proxy, a member of the Board of Directors of M&T since his appointment thereto on June 8, 2012.   Hawke may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

37.     Defendant Patrick W.E. Hodgson ("Hodgson") was, at the time of the Proxy, a member of M&T's Executive Committee and Audit and Risk Committee and a director since 1987.   Hodgson may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

38.     Defendant Richard G. King ("King") was, at the time of the Proxy, a member of M&T's Audit and Risk Committee and a director since 2000.   King may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing

00211217

the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

39.     Defendant Jorge G. Pereira ("Pereira") was, at the time of the Proxy, Vice Chairman of the M&T's Board and a director since 1982.   Pereira may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

40.     Defendant Melina R. Rich ("Rich") was, at the time of the Proxy, an M&T director, and had been an M&T director since 2009.   Rich may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation. In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

41.     Defendant Robert E. Sadler, Jr. ("Sadler") was, at the time of the Proxy, a member of M&T's Risk Committee and a director since 1999.   Sadler may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

42.     Defendant Herbert L. Washington ("Washington") was, at the time of the Proxy, a member of M&T's Audit and Risk Committee and a director since 1996.   Washington may be

00211217

deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration

Statement containing the Joint Proxy and as a person who permitted his name to be used in

connection with a proxy solicitation.  In addition, the Joint Proxy states at p.1 "each of the boards

of directors of M&T and Hudson City is soliciting proxies using this document from their

respective shareholders."

43.     Defendants Wilmers, Czarnecki, Baird, Bontempo, Brady, Cunningham, Geisel,

Hawke, Hodgson, King, Pereira, Rich, Sadler, and Washington shall sometimes be referred to

herein as the M&T Directors.

44.     Defendant Denis J. Salomone ("Salomone") was, at the time of the Proxy, a

Hudson City director since 2001, Acting Chairman, CEO and COO.  Salamone may be deemed a

solicitor of the Proxy as the Joint Proxy states at p.1 "each of the boards of directors of M&T and

Hudson City is soliciting proxies using this document from their respective shareholders."

45.     Defendant Michael W. Azzara ("Azzara") was, at the time of the Proxy, a Hudson

City director since 2002.  Azzara may be deemed a solicitor of the Proxy as the Joint Proxy

states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using

this document from their respective shareholders."

46.     Defendant Victoria H. Bruni ("Bruni") was, at the time of the Proxy, a Hudson

City director since 1996.  Bruni may be deemed a solicitor of the Proxy as the Joint Proxy states

at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this

document from their respective shareholders."

47.     Defendant Donald O. Quest ("Quest") was, at the time of the Proxy, a Hudson

City director since 1983.  Quest may be deemed a solicitor of the Proxy as the Joint Proxy states

00211217

at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

48.     Defendant Joseph G. Sponholz ("Sponholz") was, at the time of the Proxy, a Hudson City director since 2002.  Sponholz may be deemed a solicitor of the Proxy as the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

49.     Defendant Cornelius E. Golding ("Golding") was, at the time of the Proxy, a Hudson City director since 2010.  Golding may be deemed a solicitor of the Proxy as the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

50.     Defendant William G. Bardel ("Bardel") was, at the time of the Proxy, a Hudson City director since 2003.  Bardel may be deemed a solicitor of the Proxy as the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

51.     Defendant Scott A. Belair ("Belair") was, at the time of the Proxy, a Hudson City director since 2004.  Belair may be deemed a solicitor of the Proxy as the Joint Proxy states at p.1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

52.     Defendants Salamone, Azzara, Bruni, Quest, Sponholz, Golding, Bardel and Belair shall sometimes be referred to herein as the "Hudson Directors."

## FACTUAL ALLEGATIONS

**A.     Hudson City Adopts a Strategic Plan and Explores Merger Opportunities**

53.     As described in the Joint Proxy: "Hudson City has long maintained a traditional residential mortgage lending business model, retaining substantially all the residential mortgage loans it originates in its portfolio. Beginning in 2008 and continuing through 2009, the economy fell into a deep recession, and there was turmoil in the financial marketplace. The recession and the weak economic conditions that prevailed following the recession had an adverse impact on Hudson City. However, as a result of Hudson City's conservative mortgage underwriting process and traditional mortgage lending business model, these economic conditions did not affect Hudson City to the same extent and in the same manner as many other financial institutions, and Hudson City fared relatively well compared to other financial institutions."

54.     In 2011 and 2012, Hudson City held exploratory talks with potential merger partners, but no transaction resulted.  Finding an acquisition partner was not an emergency.  In 2011 and early 2012, Hudson City was able to pay dividends at a rate of 32 cents per year, for a yield of about 5%.  But in order to bolster and improve its business, Hudson City needed to explore new strategies.  In the first quarter of 2012, Hudson City retained a leading international consulting firm, McKinsey & Co. ("the Consultant") to perform a strategic review of its existing business and to assess the feasibility of a diversification of its business and the resources that would be required to implement the new strategic initiatives.

55.     At the June 2012 meeting of the Hudson City board of directors, the Consultant presented a strategic plan (the "Strategic Plan") based on its strategic review of the company. The strategic plan presented a variety of options ranging from short-term tactical opportunities to long-term changes to Hudson City's business model.  The Board approved the Strategic Plan, with some modifications.

00211217

56.     At about the same time, however, Hudson City explored a possible acquisition by M&T.  After several weeks of negotiations, an agreement to merge was reached by August 27, 2012.  The Merger consideration was negotiated to be a mix—60% cash, and 40% stock.  As stated in the Joint Proxy Statement: "If the merger is completed, you will receive, at your election (but subject to proration and adjustment procedures set forth in the merger agreement), either 0.08403 of a share of M&T common stock or cash having a value equal to 0.08403 multiplied by the average closing price of M&T common stock for the ten trading days immediately preceding the completion of the merger, for each share of Hudson City common stock you hold immediately prior to the completion date of the merger."

57.     The Joint Proxy Statement contains a detailed chronology of the negotiations between Hudson City and M&T.  Significantly, M&T conducted intensive due diligence regarding Hudson City's operations from June 2012 through the August 27, 2012 signing of the Merger Agreement.  Hudson City and its Board, however, did not commence its "reverse due diligence" until August 20, 2012, providing it with five business days for all due diligence concerning M&T's considerable business operations.  In this very short time span, with many other things going on, it is inconceivable that Hudson City's Board could have conducted adequate due diligence.  There is no mention in the Joint Proxy Statement of any due diligence M&T's Board conducted of M&T's operations, including its state of legal compliance.

**B.     Benefits The Merger Would Bring to M&T**

58.      The Joint Proxy listed a number of valuable benefits that would accrue to M&T from its union with Hudson City.  These benefits included improving M&T's capital ratios, providing M&T access to the valuable New Jersey market, and diversifying M&T's loan

16

portfolio.  On the day the Merger was announced, the press release issued by both companies

stated, in part:

> M&T expects to gain approximately $25 billion in deposits and $28 billion in loans from the merger (before acquisition accounting adjustments), giving M&T the fourth largest deposit share in New Jersey.

> "To the customers and communities now served by Hudson City, M&T brings a wider array of banking products and services," [said M&T Chairman] Wilmers.  "As a thrift, Hudson City focused primarily on deposits and mortgages.  M&T will build on Hudson City's loyal customer base to create a comprehensive community banking franchise that provides a full range of checking and savings accounts, debit and credit cards, home equity loans and other lending options, plus small business and commercial banking services and our premier wealth management and corporate trust solutions through Wilmington Trust."

59.     In a late 2013 conference call, M&T's CFO, Jones, expounded on the benefits of

the Merger:

> [W]e've always wanted to be in New Jersey, we have customer contact in New Jersey. But over the last 30 years we've never found a place that we could get into economically that had a good sizable enough franchise but at the same time happened at a place where we could add some strategic value, in essence which means that you could have some decent size returns.

> So, I think really what I think about that is that Hudson City had a goal of transforming itself into a commercial bank. We actually could make that happen much, much faster. *And so essentially what it does it gives us a free option on New Jersey, but it does it in an economical way. And I think without it would be very, very hard for us to sort of establish a strong enough market share position to operate a bank very effectively and efficiently over time.*

> So, that's what we saw when we went in and we think we structured a deal that was good for both sides. That's clearly – I think that's really actually clearly been evident. So, that's our thought process. We have a bit to do on the building out of our sales force, but actually that part of the process was way ahead and is way ahead, so I think we'll try to work our way through, see if we can get regulatory approval, and I think if we

17

> do it'll probably be another nice strong transaction in the classic sense that you've seen from M&T before.

60.    M&T's enthusiasm for the Merger did not wane with time.  From its public statements, however, it appears that Hudson City's patience had worn thin, as the delays were longer than it was led to believe, and it and its shareholders have suffered economic harm (as further detailed below).  Hudson City had bargained for, and had the right to withdraw from the Merger without paying the economic penalty for doing so originally set forth in the Merger Agreement.  The vague, materially incomplete and materially misleading reassuring statements of M&T since the first Merger extension appear to have lulled Hudson City into exhibiting greater patience than it would have exhibited had it known the full truth.

### C.    M&T's Inaccurate Statements

61.    Due to their negligence and lack of due diligence, M&T and its officers and directors failed to detect that M&T failed to legally comply with BSA/AML requirements, and in particular, the Know Your Customer rules as to millions of its customer accounts. They also failed to detect the Consumer Violations, and to discuss them in the Joint Proxy.

62.    The Know Your Customer rules, which have been in place for over a decade, are the cornerstone of a legally sufficient anti-money laundering program.  Federal authorities take money laundering, and measures to detect it very seriously.

63.    Money laundering is the process of making illegally-gained proceeds (i.e. "dirty money") appear legal (i.e. "clean").  Money laundering can facilitate crimes such as drug trafficking and terrorism, and can adversely impact the global economy.

64.    The BSA was established in 1970 and has become one of the most important tools in the fight against money laundering. Since then, numerous other laws have enhanced and

amended the BSA to provide law enforcement and regulatory agencies with the most effective tools to combat money laundering.

65.     Federal regulators charged with ensuring that banks have sufficient BSA/AML systems are overburdened.  Some banks, such as HSBC, have been cited for BSA/AML deficiencies that existed for years without detection from regulators.  It is crucial for banks, even outside the context of a Merger, to conduct due diligence on their systems so as to detect deficiencies before regulators do.  If they do not, regulatory responses will be more severe, and the cost of remediation more expensive and time-consuming.

66.     The type and extent of BSA/AML efforts expected of a bank may also depend on its size and the nature of its banking activities.  Banks know that growing their operations via a merger or acquisition may draw greater regulatory scrutiny: this fact enhances the need for the bank to detect problems ahead of the regulators, who are bound to take a closer look after a merger is announced.

67.     Likewise, a greater focus on consumer rights has led to greater scrutiny of bank advertising and account management practices.  M&T's advertising of no strings attached free checking, and then switching customers to fee-based accounts, was a non-compliant practice that M&T should have both remedied and then *disclosed* when soliciting proxies.  The M&T-related defendants named herein failed in their legal duty to do so, as no disclosure was made.  Thus, Hudson City shareholders received a Joint Proxy revealing nothing at all about the Consumer Violations.

68.     M&T's acquisition was the biggest bank merger announced in 2012, involving a price of $3.7 billion.  A merger of that magnitude was bound to attract regulatory scrutiny of M&T's procedures.

19

69.     As noted, there is no mention in the Proxy materials of M&T's Board doing any due diligence of M&T's operations in connection with the Proxy.  For its part, Hudson City and its board assert in the Proxy that they devoted a few days to "reverse due diligence" amidst others things they were doing.  It is clear that neither party did adequate due diligence as to M&T's BSA/AML systems, or its consumer law compliance.  A trained, independent consultant would have been able to detect that M&T had not properly validated and verified customer identities as to millions of customers through accepted sampling techniques, similar to those employed by regulators.  The Consumer Violations were, it may be inferred, known to some executives within M&T, as they were quietly curtailed on Sept. 25, 2012, and proper due diligence could have uncovered these consumer law issues.

70.     The Proxy Statement contained the Merger Agreement, which included a representation that M&T was not in violation of "any applicable law," including the Bank Secrecy Act.  Merger Agreement, § 4.9 ("M&T and each of its Subsidiaries have complied in all material respects with, and are not in default or violation in any material respect of, (i) any applicable law, including all laws related …the USA PATRIOT Act, the Bank Secrecy Act… and any other law relating to…money laundering prevention….").

71.     The Joint Proxy urges shareholders to carefully review the materials:  "The Merger proposal and the Merger-Related Named Executive Officer Compensation proposal are described in more detail in this document, which you should read carefully in its entirety before you vote. A copy of the merger agreement is attached as Appendix A to this document."

72.     The Joint Proxy, dated February 22, 2013, was mailed to shareholders on or about February 27, 2013.  Shareholders who received it, by mail or otherwise (many corporations send proxies by e-mail as well), and who were shareholders as of February 20, 2013, were able to vote

20

as soon as they received the materials and did not need to await the shareholders' meeting scheduled for April 18, 2013.  It is common for shareholders to cast their votes well in advance of the shareholders' meeting.

73.     It appears that sometime in late 2012 or early 2013, bank regulators reviewed M&T's procedures, and expressed concern about them, required new efforts to be undertaken, and advised that the Merger would not be approved as scheduled.  Despite the ongoing Proxy vote, M&T did not bother to reveal these facts to the public until the voting was almost over, and with scant time for shareholders to receive any new information, let alone consider it.

74.     By the time M&T and Hudson City issued a joint press release on April 12, 2013 regarding the regulatory concerns (with four business days left to the actual shareholders' meeting), M&T's efforts to address these concerns were, according to CFO Jones, "already underway."  Indeed, M&T had already hired an independent consultant, another fact possibly indicating that M&T had known of the problems for days or weeks prior to their disclosure.

75.     The April 12, 2013 press release stated as follows:

> BUFFALO, NEW YORK and PARAMUS, NEW JERSEY -- M&T Bank Corporation ("M&T") (NYSE:MTB) and Hudson City Bancorp, Inc. ("Hudson City") (NASDAQ:HCBK) announced today that they expect additional time will be required to obtain a regulatory determination on the applications necessary to complete their proposed merger. M&T filed its regulatory applications with its regulators in September, 2012. M&T has learned that the Federal Reserve has identified certain regulatory concerns with M&T's procedures, systems and processes relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program. M&T has already commenced a major initiative, including the hiring of an outside consulting firm, intended to fully address the Federal Reserve's concerns.

> In view of the potential timeframe required to implement this initiative, demonstrate its efficacy to the satisfaction of the Federal Reserve and otherwise meet any other regulatory requirements that may be imposed in connection with these matters, M&T and Hudson City believe that the timeframe for closing the transaction will be extended substantially

beyond the date previously expected. M&T and Hudson City intend to extend the date after which either party may elect to terminate the merger agreement if the merger has not yet been completed from August 27, 2013 to January 31, 2014, but there can be no assurances that the merger will be completed by that date. The consideration and exchange ratio as provided in the merger agreement will remain the same, *and both M&T and Hudson City will proceed with their special shareholders' meetings to consider the merger on April 16, 2013 and April 18, 2013, respectively*. M&T and Hudson City intend to close the merger as soon as possible following the receipt of all necessary regulatory and shareholder approvals and satisfaction of all other conditions to closing.

M&T plans to announce its first quarter 2013 earnings results in a press release that will be issued before the market opens on Monday, April 15, 2013. Following the release, M&T will conduct a conference call and webcast at 10:30 a.m. (ET) to discuss the earnings results and the status of the Hudson City transaction. The conference call and webcast may contain forward-looking statements and other material information.

76.     The April 15, 2013 conference call was aimed at damage control.  It began what would become a two year pattern of inaccurate and incomplete statements by M&T which conveyed: (a) that details as to what exact regulatory concerns were expressed could not be provided as this involved confidential regulatory matters; (b) that, in any event, M&T did not violate any laws; (c) that the regulatory requirements were focused on enhancing  M&T systems and reflected new, heightened requirements; and (d) that any work M&T needed to do as to its historical customer bases was minimal or incidental to other work.  In truth and in fact, M&T was grossly in violation of the BSA/AML laws as to millions of historical accounts, a fact not revealed until M&T was pressured to do so in April 2015.

77.     On the April 15, 2013 call, M&T CFO Jones stated that the regulatory issues would delay the close of the Merger in the "near term", and that the close had been postponed only five months while "M&T works hard to resolve these issues."  Jones also assured that: "We have no reason to believe that the issues involve any wrongdoing or illegal conduct by anyone at M&T…."  Jones minimized the expected burden by comparing M&T with other banks with

regulatory issues: "Compared to some other institutions that have had these issues, M&T is relatively uncomplicated and locally focused business." But, as would eventually be revealed, M&T's issues were anything but "uncomplicated." Jones downplayed the work ahead, by asserting that the regulatory issues could be addressed "quickly", and might involve hiring 100 people. These proved to be grossly inaccurate representations of the troubles M&T had with compliance, and the resources and time needed to fix them. Finally, Jones indicated that greater details could not be provided: "We definitely appreciate the fact that Hudson City has been a totally supportive and steadfast partner in this, *so what are the regulatory issues?* As you know, *we have obligations to keep supervisory information confidential*, so there is a limit to how expansive we can be today and we can only talk about what we know as we sit here today."

78.     As a results of these events, the Merger close date was extended five months, to January 31, 2014. This date suggested that the issues could be resolved in a few months. Anthony Polini, a bank analyst at Raymond James, came away with the impression that the regulatory matters were not serious:

> I don't believe we are going to find out exactly what happened. I think they are hardly going to say anything. I don't believe this is a breakdown of their policies and procedures. It was probably something specific that was discovered and likely emanated from a past acquisition. I think there is a 95% chance that this deal closes by the end of the year without any changes, M&T experiences some embarrassment and a few million [dollars] in expense and they move on.

79.     On June 17, 2013, M&T entered into a written agreement with the Federal Reserve Bank of New York (the "Compliance Agreement"). The Compliance Agreement noted "deficiencies" in BSA/AML compliance programs, including internal controls, Customer due diligence procedures, transaction monitoring, and supervision of foreign accounts. The Compliance Agreement required M&T to address these issues, and to provide timelines to do so.

00211217

The deficiencies noted were described in vague terms, with no details as to their duration, nature or scope.  If details were to be provided, they would have to come from M&T.  But M&T failed to provide accurate details as to the scope of the undertaking required (and the basic legal violations in which it had engaged) for almost two more years and then only did so under market pressure.

80.     Indeed, the Compliance Agreement did not alarm financial journalists or analysts. A June 19, 2013 article in the *Herald News* about the Compliance Agreement was entitled "Sale of Hudson City Closer."  One bank analyst read the Compliance Agreement as a good thing, indicating that only a few more months of work lay ahead before M&T could proceed with the Merger.  Analyst Brian Klock of banking specialist firm Keefe Bruyette & Woods stated: "The fact that we know now it's a written agreement and not the more severe form, that has actually laid the groundwork for the timing [of the merger]. It's removed some of the uncertainty. *I think there is a higher probability that it closes by the end of January."*  A business reporter from the *Newark Star-Ledger* took away from the Compliance Agreement the message that M&T had engaged in no wrongdoing, stressing in a June 19, 2013 article: "The order did not say any illegal activity occurred through the bank's systems, although it requires M&T to review six months' worth of transactions by high-risk customers."

81.     M&T, for its part, represented that this Compliance Agreement did not change the situation as M&T had previously described it.  M&T spokesman Michael Zabel said: "This is the next step in a process we started talking about in April. Other than the fact that there is a written agreement now in place, there is really no new developments here. It doesn't really change the timing one way or the other at this point."  This statement was grossly inaccurate. The work that

needed to be done, as M&T knew or should have known, would involve years of effort, and the Merger could not possibly close in a scant few months.

82.     Through the remainder of 2013, M&T remained tight lipped concerning the details of its deficiencies.  An article in the Sept. 10, 2013 edition of *SNL Bank and Thrift Daily* reported that:

> [M&T CFO] Jones said Sept. 9 at the Barclays Global Financial Services Conference that it *was not possible for him to talk about the regulatory approval process,* but he noted that M&T has made significant investments related to BSA/AML systems ....Jones further noted that the company has trained its people and intends to eventually have a BSA/AML system that is "second to none" in the banking industry. He said the company has hit all the dates it planned to meet and has hit its milestones thus far, *but it is "hard" for the company to share a lot of information at this point in time.*

83.     In an Oct. 17, 2013 conference call, M&T CFO Jones again stated that the bank was trying to adhere to new and changing requirements. Referring to the efforts M&T was undertaking, Jones stated: "*this is probably the new requirement across the industry* just to be in the game. So we figured we better get that done quickly. I hate to be behind in that respect." Jones also stated that he could simply not address the question of what percentage of the work had been completed. In fact, that percentage was small as M&T had not reviewed its historical accounts, a multi-year process.  Nor did M& conceded such a task was even on the agenda.

84.     On December 17, 2013 the Merger deadline was extended to December 31, 2014. Because Hudson City was suffering severely because of the delay (it had already cut its quarterly dividend from 8 cents to 4 cents), Amendment No. 2 to the Merger Agreement signed that day permitted Hudson City to take certain interim actions, including with respect to Hudson City's conduct of business, implementation of its strategic plan, retention incentives and certain other matters with respect to Hudson City personnel, prior to the completion of the Merger.

00211217

85.     In a press release issued by Hudson City that day, it was made clear that Hudson City needed to take steps to preserve its business while awaiting the Merger:

> Our Board of Directors continues to believe that the M&T transaction is ultimately in the best interest of the company and our shareholders, but is also committed to diversifying our business model by continuing to pursue our Strategic Plan. Prior to the announcement of the merger, Hudson City retained an outside consultant to assist management in developing a strategic plan. The operational core of the Strategic Plan is the expansion of our loan and deposit product offerings over time to create more balanced sources of revenue and funding. We believe that the markets in which we operate provide significant opportunities for the Hudson City brand to capture market share in products and services that we have not actively pursued previously. The Strategic Plan includes initiatives such as secondary mortgage market operations, commercial real estate lending, the introduction of small business banking products and developing a more robust suite of consumer banking products. When we announced in April that additional time would be required to obtain regulatory approval, we charted a dual path for Hudson City.
>
> We continued to plan for the completion of the merger, but we also refreshed the Strategic Plan, prioritizing the matters that we could achieve during the pendency of the merger....Given the further delay in closing the transaction, Hudson City and M&T have agreed that Hudson City will be permitted to proceed with its Strategic Plan as noted above. Many of the initiatives require significant lead time for full implementation and roll out to our customers. We expect commencement of the roll out of the prioritized initiatives during 2014.

86.     Hudson City's annual shareholders' meeting was held on December 19, 2013. Based on what he had been told by M&T, Hudson City's then-Chairman Ronald Hermance, Jr. stressed that the issue was simply a matter of M&T improving its detection systems.  Hermance stated: "No one has been accused of money laundering, but what they really have is a need to develop a better detection system, and then validate that system, and then have the Federal Reserve come in and audit the validated system."  M&T also had to conduct a "look-back" review of past activity on "a number of accounts for a number of months," he said. In actuality,

M&T's task was far greater: it had to validate and verify identities as to millions of historical

accounts. But this would not be revealed until April 2015.

87.     On January 17, 2014 M&T held a conference call during which CFO Jones again

addressed BSA/AML issues. He described M&T's efforts as focused on a forward-looking,

predictive system:

> But think of, for example, as we achieved, whatever time period, what we're doing with the BSA/AML and building out the system, that's a process that's almost pure 100% leverageable, right, *as we bring in new accounts, new volume and so forth*...So if you think about it, what we're doing -- one of the first -- one of the most fundamental things is we're building a risk rating system that allows us to be very sensitive and knowledgeable about when patterns change, and that might indicate that someone's engaging in some illicit activity or money-laundering. And to do that equally across all of our footprints and actually through each of the channels in which we interact with our customers. So to do that, on the system side, there's a fair amount of just data capture. And capturing that information is not necessarily just standard information, you're trying to make sure that you have access to information *that allows you to do a great job of being predictive*. So it's not a onetime thing. Predicting customer behavior is sort of changing all the time and so these models are relatively complex. So in order to do that, what you've got to do is you've got to identify the information you need, you've got to train your customer-facing employees on exactly what that information is and how to go about capturing it. And then you've got to interact with all of your customers, both the existing customers and the new ones through the account opening process to begin to capture that information....we're trying to sort of aggressively be sort of best-in-class in terms of having *predictive models* that will allow us to monitor for illicit behavior.

88.     When pressed for more detail, Jones said he could provide none, citing back to the

Compliance Agreement: "The only thing that's out there that is public is our written agreement

and it kind of lays out everything that we've got to do."  In fact, the Compliance Agreement was

general, and did not lay out everything M&T had to do.  Much that M&T had to do to fix

historical legal violations was not set out anywhere, and not disclosed by M&T until 2015.

89.     On April 14, 2014 another conference call was held in which M&T CFO Jones

alluded for the first time to any need to examine historical records. He stated that M&T had to

put in place its new system, and then "sort of understand"  whether the new process as to the

existing customer base  "would have come out with any different answer and whether there's

anything in that book that we would uncover now that we have a new enhanced process."

Although this statement is quite vague, it appears to refer to finding illegal activity in the base of

existing customers.

90.     In a conference call held on July 17, 2014 Jones mentioned the Know Your

Customer rules:  "A new 'Know Your Customer' program has been implemented. All new

customers are being brought into the Bank through this new set of Bank-wide procedures,

customer due diligence and the risk weighting process. Application of the new 'Know Your

Customer' protocol to existing customers continues."  This vague reference concealed the very

material fact that M&T had to go through millions of existing accounts to validate and verify

even such basic information as the identities of millions of customers.  And by stressing that

what was involved was just a "new" protocol, this statement masked the fact that existing

protocols had not been followed as to millions of customers, a violation of law that existed at the

time of the Proxy Statement.

91.     As M&T analysts continued to press for greater information, precisely what M&T

needed to do to remediate its systems began to filter out.  Even so, the detail was provided in

equivocal terms, and masked the grossly deficient state of historical data.  On an Oct. 17, 2014

conference call, Jones stated:

> we have *sort of* begun a bank wide effort to *update o*ur customer information
> to better understand our customers *and how they plan to use the product and
> services* and we have made substantial progress there. Of course that has
> been going on for almost a year now, maybe just over a year. We have made
> some substantial progress there.

28

92.     And Jones also revealed that M&T was now: "getting customer information *on all of our customers*. So not just the high risk ones. We then have got to get them [sic] on the medium risk and the low risk customers; have all got to go through sort of a refresh of information."   Thus, Jones left the impression (which was inaccurate) that what M&T was focusing on was an updating process, a "refresh"—and not on anything M&T might have done wrong in the past.  Thus, the plain message—which had been the consistent message since April 2013-- was that M&T was not aware of anything it had historically done wrong, but was endeavoring to simply update its records, as any bank might.

93.     On October 9, 2014, the Consumer Financial Protection Bureau ("CFPB") announced that it had taken action against M&T for offering free checking, but then switching customers to accounts which carried fees. This practice was still in place, according to the CFPB, at the time the Merger Agreement was signed, and was not stopped until Sept. 25, 2012.  By then, M&T had unlawfully converted 80,093 accounts promised free checking to a fee-based checking account.  M&T was ordered to pay a civil penalty, and to provide customer compensation.  It was ordered to formulate a "Redress Plan." It is also under continuing regulatory scrutiny, and will remain so for many years.  This regulatory action, and the underlying violations, were a factor that caused the Federal Reserve to delay approval of the Merger (as was revealed in the Federal Reserve Report on Sept. 30, 2015, pp. 10-11).

94.     The Merger again failed to close on December 31, 2014, and a new closing date was established of April 30, 2015.  By April 2015, it was clear that this deadline, too, would not be met.  Yet Hudson City seemed to be as in the dark as to what was going on at M&T as the general public. On April 6, 2015, Hudson City said it was "unexpectedly" advised by M&T "late in the afternoon on April 3, 2015" that the Merger was not going to close.  Hudson City CEO

Denis Salomone added that: "given the unexpected notice of delay over a holiday weekend, the Board of Hudson City needs more time to understand the nature and timing of the delay and its potential impact on the transaction before the Board can determine its course of action." Hudson City was so sure the merger would close that it had even begun asking shareholders whether they would prefer cash or stock consideration upon the Merger's close. The deadline has now been extended to October 31, 2015.

95.     M&T was now under great pressure to explain to its investors exactly what was going on internally. Thus, on April 22, 2015, at its annual shareholders meeting, M&T, which had repeatedly cited the secrecy of regulatory proceedings for its failure to provide detailed information over the years, and had denied any violations of law, revealed that millions of accounts which were in existence at the time of the Merger Agreement and Proxy Statement were presently undergoing a lengthy remedial process. M&T would be obligated, according to M&T Chairman Wilmers, to "verify and validate" the identities of those 3.5 million customers. It had only done so as to one million customers to date. But M&T had a responsibility under federal law to have done so adequately as to those millions of customers since at least issuance of the 2003 "Know your Customer" regulations promulgated under the Patriot Act.

96.     Thus, it was finally revealed that M&T's warranty of legal compliance in the Merger Agreement was inaccurate, and that millions of accounts needed remediation. Had Hudson City voters been told that, they would have viewed this fact as material. The risk to merger closing or not closing, the legal compliance of the merger partner, and the delay that may be involved in gaining regulatory approvals is always a material matter. Indeed, in the supplement to the Proxy Supplement filed on April 12, 2013, Hudson City states that it rejected further merger efforts with a company identified only as "Party A" due to merger closing

00211217

concerns:  "Hudson City's board of directors believed that the prospects for obtaining regulatory approval of a transaction *with M&T* in a timely manner *were greater than those for a transaction with Party A.*"

97.     That millions of accounts were so deficient would have been highly material to Hudson City shareholders who were entitled to vote in the April 18, 2013 election.  This shocking fact would have indicated: (a) that the M&T warranty that all BSA/AML laws had been obeyed was false; (b) that M&T was at high risk of regulatory action, which could take years, and hundreds of millions of dollars to resolve; (c) that Hudson City was at great risk proceeding as it needed to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) that the merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (e) that Hudson City's dividend was at risk during the time period it would take for a merger to be completed.

98.     In addition, Hudson City shareholders would have found the Consumer Violations material, as they called into question M&T's controls and compliance systems, and could and did serve as an independent basis for the Merger's delay, as was revealed by the Federal Reserve on Sept. 30, 2015.

99.     On Sept, 30, 2015, the Federal Reserve finally approved the Merger.   In a 40 page report issued that day, the Federal Reserve confirmed that the various regulatory issues caused the Merger delay.  It stated that it expected M&T to continue towards perfecting its compliance.  It also barred M&T from "expansionary" activities, except in limited circumstances, pending a review of the success of the Merger and M&T's further compliance efforts.  The Merger is expected to close by November 1, 2015.

## LOSS CAUSATION

100.    The false and misleading Proxy proximately caused losses to Class members.

101.    Had M&T revealed the deficiencies in its legal compliance, Hudson City and its shareholders would have perceived the high risk nature of a Merger with M&T, the delays likely involved, and the potential damage to Hudson City's business.  Such factors would have resulted in a more favorable merger premium for Hudson City shareholders to compensate them for the extraordinary risks to which they would be subjected.  M&T's true condition would also have affected the analyses of M&T's value by Hudson City's financial advisors.  This, too, would have led to an adjustment of the merger ratio to terms more generous to Hudson City's shareholders.  It is unlikely, had the true risks been known, that a fairness opinion could have been rendered as to the current merger ratio.

102.    In addition, by reason of the unexpected delays, Hudson City's business has suffered and it has been forced to reduce dividends payable directly to its shareholders.  From a steady 8 cents per quarter per share, the dividend has been reduced to 4 cents per share, except for one quarter in which the Merger delay caused there to be no dividend at all. Cumulatively since 2013 dividends have been reduced by 44 cents per share, which means that Hudson City's approximately 501 million shares have lost approximately $200 million in the aggregate.

103.    Furthermore, Class members are now stuck with acquiring shares in a bank with a spotty regulatory record, and which has been barred by regulators from any "expansionary activities" until regulators are satisfied that all the aforementioned legal issues are fixed.  Federal Reserve Statement, at 13-14.  This is a blow to M&T, and its value, as M&T has traditionally grown through expansionary activities.

## CLASS ACTION ALLEGATIONS

00211217

104.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who were Hudson City shareholders and were entitled to vote on the Merger pursuant to the Joint Proxy dated February 22, 2013, and who suffered damages as a result (the "Class"). Excluded from the Class are: (i) the defendants; (ii) members of the family of any defendant; (iii) any person who was an officer or director of Hudson City or M&T during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any defendant has a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

105.     The Class is so numerous that joinder of all Class members is impracticable. Hudson City common stock was actively traded on the NasdaqGS, throughout the Class Period. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the tens of thousands.  At the time of the Proxy vote, there roughly 500 million shares of Hudson City common stock outstanding.

106.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all Class members sustained damages as a result of the wrongful conduct complained of herein.

107.     Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Plaintiff seeks to represent.

108.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

109.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether the Joint Proxy  contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(b)    whether defendants acted with the requisite negligent state of mind in omitting and/or misrepresenting or failing to discover through due diligence material facts required to be in the Joint Proxy.

(e)    whether the Class members have sustained damages and, if so, the appropriate measure thereof.

110.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Against M&T, the M&T Directors and Jones for Violations of the Federal Proxy Laws)

111.    Plaintiff repeats and realleges all previous allegations.

112.    The defendants named in this Count solicited a Joint Proxy dated February 22, 2013.

113.    Each of the defendants named in this Count had a duty under Section 14(a) and Rule 14a-9 under the Securities Exchange Act to perform due diligence to ascertain that the Joint Proxy was complete, accurate and not misleading.

00211217

114.   Each of the defendants named in this Count warranted and represented that M&T was in compliance with BSA/AML laws.

115.   In truth, M&T was not so compliant as to, at least, millions of accounts.  That millions of accounts were so deficient would have been highly material to Hudson City shareholders who were entitled to vote in the April 18, 2013 election.  This fact would have indicated: (a) that the M&T warranty that all BSA/AML laws had been obeyed was false; (b) that M&T was at high risk of regulatory action, which could take years, and hundreds of millions of dollars to resolve; (c) that Hudson City was at great risk proceeding as it needed to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) that the merger ratio negotiated was likely unfair, as it did not account for these regulatory risk and M&T's misconduct; and (e) that Hudson City's dividend was at risk during the time period it would take for a merger to be completed.

116.   Each of the defendants named in this Count warranted and represented that M&T was in compliance with all laws, which includes consumer protection laws.  In truth, M&T was not compliant with consumer protection laws, as adequate due diligence would have revealed.

117.   Each of the defendants named in this Count failed to conduct adequate due diligence, as required by the federal securities laws.

118.   Class members have suffered damages as a result of these actions

119.   For the foregoing reasons, each of the defendants named in this Count is liable for damages under Section 14(a) and Rule 14a-9 under the Securities Exchange Act.

## COUNT TWO
### (Against Hudson City and the Hudson City Directors for Violations of the Federal Proxy Laws)

120.   Plaintiff repeats and realleges all previous allegations.

121.     The defendants named in this Count solicited a Joint Proxy dated February 22, 2013.

122.     Each of the defendants named in this Count had a duty under Section 14(a) and Rule 14a-9 under the Securities Exchange Act to perform due diligence to ascertain that the Joint Proxy was complete, accurate and not misleading.

123.     Each of the defendants named in this Count accepted and republished a warranty and representation that M&T was in compliance with BSA/AML laws.

124.     In truth, M&T was not so compliant as to, at least, millions of accounts.  That millions of accounts were so deficient would have been highly material to Hudson City shareholders who were entitled to vote in the April 18, 2013 election.  This fact would have indicated: (a) that the M&T warranty that all BSA/AML laws had been obeyed was false; (b) that M&T was at high risk of regulatory action, which could take years, and hundreds of millions of dollars to resolve; (c) that Hudson City was at great risk proceeding as it needed to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) that the merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (e) that Hudson City's dividend was at risk during the time period it would take for a merger to be completed.

125.     Each of the defendants named in this Count failed to conduct adequate due diligence, as required by the federal securities laws.

126.      Class members have suffered damages as a result of these actions

127.     For the foregoing reasons, each of the defendants named in this Count is liable for damages under Section 14(a) and Rule 14a-9 under the Securities Exchange Act.

**COUNT THREE**
**(Against M&T, Jones and the Hudson City Directors as Control Persons)**

36

128.    Plaintiff repeats and realleges all previous allegations.

129.    Each director of M&T and each director of Hudson City, and CFO Jones, had the ability to "control" the company he or she served, within the meaning of Section 20(a) of the Exchange Act.  He or she, as a director or executive, had the power and influence, actual and potential, to cause Hudson City and M&T to comply with the federal securities laws as to the Joint Proxy.

130.    Class members have suffered damages as a result of these defendants' actions and inactions as alleged herein.

131.    Accordingly, the defendants named in this Count are liable as control persons, for any violations of the federal proxy laws by the company they served.

### COUNT FOUR
### (Against the Hudson City Directors For State Law Breach of Fiduciary Duty)

132.    Plaintiff repeats and realleges all previous allegations.

133.    Each of the Hudson City directors owed a fiduciary duty of disclosure to the shareholders. Such a duty flows from the duty of loyalty.  This standard of liability applies in this Count Four and is applicable to this Count alone and has no application beyond this Count.

134.    The defendants named in this Count failed to conduct appropriate due diligence so as to ensure a full and complete Joint Proxy.  The due diligence requirement is reflected in Delaware law through the requirement that directors always act on a fully informed basis.

135.    The defendants named in this Count, according to the Joint Proxy, only engaged in a week's worth of "reverse due diligence", if that much.  This was done while they were

attending to other matters, including negotiating for themselves consulting agreements, accelerated benefits, and indemnification as to certain liabilities.

136.    The defendants named in this Count knowingly and consciously acted without being fully informed, and thus consciously disregarded their duties under positive law.  The defendants named in this Count did not, and could not have conducted adequate due diligence in connection with the supplement to the Joint Proxy dated April 12, 2013, which has scant and insufficient mention of the BSA/AML issues.  Indeed, the defendants named in this Count exhibited a lack of understanding of the BSA/AML issues as late as the 2014 extension of the merger date.

137.    Class members have suffered damages as a result of these actions, which reflect "bad faith" as defined in Delaware law.

## <u>RELIEF REQUESTED</u>

**WHERFORE,** Plaintiff demands judgment in his favor and in favor of the Class and against the Defendants as follows:

A.    Certifying this case as a class action, certifying the proposed Class and designating Plaintiffs and the undersigned as representatives of the Class;

B.    Awarding Plaintiff and the Class appropriate compensatory damages, together with pre- and post-judgment interest;

C.    Awarding Plaintiff the costs, expenses and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

D.    Awarding Plaintiff and the Class such other relief as this Court deems just, equitable and proper.

00211217

Dated:  October 7, 2015

MURPHY & LANDON

/s/ Francis J. Murphy
Francis J. Murphy, DE Bar # 223
Jonathan L. Parshall, DE Bar # 3247
1011 Centre Road, Suite 210
Wilmington, Delaware  19805
(302) 472-8103
(302) 472-8135 (fax)
fmurphy@msllaw.com
jonp@msllaw.com

Of Counsel:

Deborah Gross
**LAW OFFICES BERNARD M. GROSS P.C.**
100 Penn Square East  Suite 450
Philadelphia PA 19107
215 561 3600
debbie@bernardmgross.com

Laurence D. Paskowitz
**THE PASKOWITZ LAW FIRM P.C.**
208 East 51st St., Ste. 380
New York, NY 10165
212-685-2306 (Fax)
lpaskowitz@pasklaw.com

Roy L. Jacobs
**ROY JACOBS & ASSOCIATES**
420 Lexington Avenue  Suite 2440
New York, NY 10170
212-867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com

00211217