UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

DAVID JAROSLAWICZ, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

M & T BANK CORPORATION, HUDSON CITY
BANCORP, ROBERT G. WILMERS, RENÉ F.
JONES, MARK J. CZARNECKI, BRENT D.
BAIRD, C. ANGELA BONTEMPO, ROBERT T.
BRADY, T. JEFFERSON CUNNINGHAM III,
GARY N. GEISEL, JOHN D. HAWKE, JR.,
PATRICK W.E. HODGSON, RICHARD G.
KING, JORGE G. PEREIRA, MELINDA R.
RICH, ROBERT E. SADLER, JR., HERBERT L.
WASHINGTON, DENIS J. SALAMONE,
MICHAEL W. AZZARA, VICTORIA H. BRUNI,
DONALD O. QUEST, JOSEPH G. SPONHOLZ,
CORNELIUS E. GOLDING, WILLIAM G.
BARDEL, and SCOTT A. BELAIR,

Defendants.

Civ. No. 15-cv-00897 RGA

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS

**MURPHY & LANDON**
Francis J. Murphy, Jr. (DE Bar No. 223)
Jonathan L. Parshall (DE Bar No. 3247)
1011 Centre Road, Suite 21 0
Wilmington DE, 19805
Telephone: (302) 472-8100
*Local Counsel for Lead Plaintiff*

**KAUFMAN, COREN & RESS, P.C.**
Deborah R. Gross
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Telephone: (215) 735-8700
*Lead Counsel for Lead Plaintiff*

**PASKOWITZ LAW FIRM P.C.**
Laurence D. Paskowitz
208 East 51st Street, Suite 380
New York, NY 1 0022
Telephone: (212) 685-0969
*Lead Counsel for Lead Plaintiff*

**ROY JACOBS & ASSOCIATES**
Roy Jacobs
420 Lexington Avenue, Suite 2440
New York, NY 10170
Telephone: (212) 867-1156
*Additional Plaintiffs' Counsel*

Dated: June 20, 2016

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

    A.  Introduction ......................................................................................................... 1

    B.   Summary of Argument ...................................................................................... 3

        1.   The Joint Proxy Statement Omitted and Misrepresented Facts About M&T's Legal Compliance with BSA Regulations and Other Legal Obligations ........................................................................................... 3

        2.   The April Disclosures Were Incomplete and Inaccurate .................... 4

        3.   The April Disclosures Were Untimely ............................................... 5

        4.   Defendants Violated Their Duties Under the Proxy laws .................... 6

        5.   Loss Causation is Adequately Pled .................................................... 8

        6.   Plaintiffs' State Law Breach of Fiduciary Duty Claims Against the Hudson Directors Are Well-Pled ...................................................... 9

II.  STATEMENT OF FACTS ............................................................................................. 10

III. ARGUMENT ................................................................................................................. 14

    A.  Relevant Pleading Standards ............................................................................. 14

        1.   The Complaint Must Be Evaluated Under Rule 12(b)(6) .................. 14

        2.   Pleading Standards as to Negligence and Due Diligence .................. 15

    B.  The Complaint States a Claim Under the Federal Proxy Laws ....................... 16

        1.   The Joint Proxy Violated Section 14(a) and Rule 14a-9 .................. 16

            a.   Defendants' Material Omissions Violated Section 14(a) ............. 16

            b.   The Merger Agreement's Representations and Other Statements Were Actionably False and Misleading .......................................... 17

       c.    Defendants' Liability for these Omissions and
            Misrepresentations ........................................................................21

       d.    The Joint Proxy's Purported Warnings and Disclaimers
            Provide No Defense ........................................................................22

       e.    Defendants' Authorities Are Inapposite .........................................28

  C.  The April Disclosures Violated the Federal Proxy Laws ...........................................28

    1.  The April 12, 2013 Supplemental Proxy .......................................................28

    2.  The April 12, 2013 Press Release and the April 15, 2013 Conference Call....29

    3.  The April Disclosures Were Untimely ..........................................................31

  D.  The Complaint Adequately Alleges Loss Causation ..................................................33

III.    The Delaware Breach of Fiduciary Duty Claims Should Be Upheld ...............................37

    CONCLUSION........................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Schwartz*, 947 F.2d 841 (7th Cir. 1991)................................................................... 19

*AstroPower Liquidating Trust v. KPMG LLP*, 2007 U.S. Dist. LEXIS 38222 (D. Del. May 25, 2007)......................................................................................................................................... 16

*Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........... 27

*Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) ........................................................................ 15

*Bartesch v. Cook*, 941 F. Supp. 2d 501 (D. Del. 2013) ................................................................. 28

*Berger v. Intelident Solutions, Inc.*, 911 A.2d 1164 (Del. Ch. 2006) ........................................... 34

*Berke v. Presstek, Inc.*, 188 F.R.D. 179 (D.N.H. 1998)................................................................. 26

*Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236 (D.P.R. 2015) ..................................................... 23

*Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27 (Del. 2006) ................. 38

*Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) ............................... 35

*Burges v. BancorpSouth, Inc.*, 2015 U.S. Dist. LEXIS 89822 (M.D. Tenn. July 10, 2015) ... 8, 21, 27

*Cal. Pub. Employees'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)............................ 15

*Cannon v. Clark*, 2015 U.S. Dist. LEXIS 124526 (S.D. Cal. Sept. 17, 2015) ............................. 34

*Caruso v. Metex Corp.*, 1992 U.S. Dist. LEXIS 14556 (E.D.N.Y. July 30, 1992) ............... 32, 33

*Chen v. Howard-Anderson*, 87 A.3d 648 (Del. Ch. 2014)...................................................... 39, 40

*City of Hialeah Emples. Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros.*, 2008 U.S. Dist. LEXIS 66906 (E.D. Pa. Aug. 29, 2008)........................................................... 32

*Clearone Communs., Inc. v. Lumbermens Mut. Cas. Co.*, 2005 U.S. Dist. LEXIS 26187 (D. Utah Oct. 21, 2005)............................................................................................................................. 26

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ..................................................... 15

*EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000) ................................... 24, 31

*Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968) ................................... 21, 38

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ................... 16

*Glazer Capital Management L.P. v. Magistri*, 549 F.3d 736 (9th Cir. 2008) ........................ 4, 19

*Goldkrantz v. Griffin*, 1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. Apr. 5, 1999) ............................. 36

*Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761 (3d Cir. 1976) ............................ 2, 35

*Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015) ......................................................... 25

*Herd v. Major Realty Corp.*, 1990 Del. Ch. LEXIS 211 (Del. Ch. Dec. 21, 1990) ..................... 34

*In re Am. Apparel, Inc. S'holder Litig.*, 2013 U.S. Dist. LEXIS 6977 (C.D. Cal. Jan. 16, 2013) 28

*In re Amarin Corp. PLC Secs. Litig.*, 2016 U.S. Dist. LEXIS 55568 (D.N.J. Apr. 26, 2016) ..... 23

*In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669 (Del. Ch. 1986) ................................... 34

*In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) .............. 34

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................................................................................................... 15, 20

*In re Computer Scis. Corp. Erisa Litig.*, 635 F. Supp. 2d 1128 (C.D. Cal. 2009) ....................... 18

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........... 27

*In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813 (Del. Ch. 2011) ............................... 6, 32

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543 (D.N.J. 1992) ................................ 28

*In re Enzymotec Secs. Litig.*, 2015 U.S. Dist. LEXIS 167403 (D.N.J. Dec. 14, 2015) .......... 17, 23

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. 2012) ................................. 26

*In re Heckmann*, 869 F. Supp. 2d 519 (D. Del. 2012) ................................................. 9, 15, 35, 37

*In re Heckmann Corp. Secs. Litig.*, 2013 U.S. Dist. LEXIS 79345 (D. Del. June 6, 2013) ......... 35

*In re Lear Corp. S'holder Litig.*, 967 A.2d 640 (Del. Ch. 2008).................................................. 39

*In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................ 8

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 U.S. Dist. LEXIS 77097 (D.N.J. May 29, 2013) ................................................................................................................... 25

*In re Nutrisystem Sec. Litig.*, 653 F. Supp. 2d 563 (E.D. Pa. 2009) ........................................... 31

*In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142 (C.D. Cal. 2002)............ 34, 35

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014) ........................................................................................................... 37

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ................................... 14

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)............................................... 40

*In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) ...................................... 6

*Ingram v. Warden*, 2011 U.S. Dist. LEXIS 7033 (D.N.J. Jan. 24, 2011)..................................... 25

*La. Mun. Police Employees' Ret. Sys. v. Crawford*, 2007 Del. Ch. LEXIS 28 (Del. Ch. Feb. 13, 2007)................................................................................................................................. 32

*Kickflip, Inc. v. Facebook, Inc.*, 2015 U.S. Dist. LEXIS 41049, *16 (D. Del. Mar. 31, 2015)...37

*Lazzaro v. Manber*, 701 F. Supp. 353 (E.D.N.Y. 1988) .............................................................. 36

*Lebhar Friedman, Inc. v. Movielab, Inc.*, 1987 U.S. Dist. LEXIS 127 (S.D.N.Y. Jan. 12, 1987). ......................................................................................................................................... 19

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) .................................... 25, 26

*Mason v. Coca-Cola Co.*, 2010 U.S. Dist. LEXIS 65107 (D.N.J. June 30, 2010) ....................... 31

*Mass. Mut. Life Ins. Co. v. DB Structured Prods.*, 110 F. Supp. 3d 288 (D. Mass. 2015).......... 16

*Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037 (S.D.N.Y. 1992).............. 33, 34

*McMullin v. Beran*, 765 A.2d 910 (Del. 2000)............................................................................. 39

*Mennen v. Wilmington Trust Co.*, 2015 Del. Ch. LEXIS 122 (Del. Ch. Apr. 24, 2015).............. 38

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) ..................................................... 34

*Nagy v. Bistricer*, 770 A.2d 43 (Del. Ch. 2000) ............................................................. 40

*New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273 (D. Kan. 2008) ................................. 27

*OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 2015 U.S. Dist. LEXIS 85510 (D. Del. July 1, 2015) .......................................................................................................... 20, 21, 24

*Omanoff v. Patrizio & Zhao LLC,* 2015 U.S. Dist. LEXIS 43086 (D.N.J. Mar. 31, 2015) .......... 37

*Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 937 (Del. 2003) ...................... 39

*Pension Trust Fund for Operating Eng'rs v. Mortgage Asset Securitization Transactions, Inc.,* 730 F.3d 263 (3d Cir. 2013) ................................................................................... 16

*Resnik v Woertz,* 774 F.Supp. 2d 614 (D. Del. 2011) ..................................................... 26

*Rubenstein v. IU Int'l Corp.,* 506 F. Supp. 311 (E.D. Pa. 1980) .................................... 36

*Seinfeld v. Becherer*, 461 F.3d 365 (3d Cir. 2006) ......................................................... 17

*Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850 (S.D. Ohio 2013) ...................... 37

*Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719 (D. Del. 2014) ................ 36

*State of Wis. Inv. Bd. v. Bartlett,* 2002 Del. Ch. LEXIS 42 (Del. Ch. Feb. 9, 2000) ............ 33, 34

*Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.),* 294 F. Supp. 2d 616 (D. Del. 2003) ...................................................................................................... 35

*Tse v. Ventana Med. Sys.,* 1998 U.S. Dist. LEXIS 16760 (D. Del. Sept. 23, 1998) .................... 35

*Tse v. Ventana Sys. Inc.,* 123 F. Supp. 2d 213 (D. Del. 2000) *aff'd,* 297 F.3d 210 (3d Cir. 2002) ............................................................................................................................. 35, 37

*Werner v. Werner*, 267 F.3d 288 (3d Cir. 2001) .............................................................. 6

**Statutes**

15 USC §78n(a) ................................................................................................ 2

15 USC §77k .................................................................................................... 2

Sections 11 and 12(a)(2) of the Securities Act of 1933 ................................. 15

**Rules**

Rule 9(b) ......................................................................................................... 14

**Rules**

Rule 9(b) ......................................................................................................... 14

Rule 12(b)(6) ................................................................................................... 14

Rule 12(f) ......................................................................................................... 27

**Regulations**

17 C.F.R. § 240.14a-101 ................................................................................ 20

17 CFR 229.503 .............................................................................................. 20

**Other Authorities**

Levenberg, Read My Lipsky: Reliance on Consent Orders in Pleadings, 162 U. Pa. L. Rev. 421, 424 (2014) ................................................................................................. 27

*SEC Release* No. 34-23789, 1986 WL 722059, *5 (SEC Nov. 10, 1986) .................................... 19

*SEC Release* No. 34-16343, 1979 WL 173161, at *4 (SEC Nov. 27, 1979) ................... 19, 33, 34

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

## A.   Introduction

This case centers on an allegedly incomplete, false and misleading joint proxy statement dated February 22, 2013 (the "Joint Proxy"). The Joint Proxy was prepared by defendants Hudson City Bancorp ("Hudson"), M&T Bancorp ("M&T"), the members of their respective boards of directors, and M&T's CFO, defendant Jones. The Joint Proxy concerned a proposed Hudson-M&T merger (the "Merger"). In addition to the Joint Proxy, three disclosures concerning M&T were filed by Defendants on the very brink of the April 18, 2013 Merger vote (the "April Disclosures"). Plaintiffs assert that these various proxy-related disclosures were omissive, false and misleading and, in the case of the April Disclosures, untimely. The various disclosures omitted crucial facts about M&T's non-compliance with both consumer protection laws, and the Bank Secrecy Act and Anti-Money Laundering laws ("BSA"). The Joint Proxy said nothing at all about the consumer and BSA violations. The April Disclosures finally revealed some limited information regarding the BSA violations, but were silent regarding the consumer law violations. As to the BSA matters, the April Disclosures misleadingly minimized the issues, and the threat they posed to the closing of the Merger.[1]

The federal claims herein are brought pursuant to Section 14(a) of the Securities Exchange Act, and SEC Rule 14a-9. The parties agree that the standard for liability is negligence. It is thus not required that the Defendants knew the proxy disclosures to be incomplete, false or misleading. It is enough that they failed to ascertain and disclose information they could have learned through

---

[1] To the extent the April Disclosures are deemed untimely under pertinent legal precedents, they cannot help Defendants, because even if they contained adequate disclosures (which they surely did not), providing untimely disclosure violates the federal proxy laws. *See infra,* pp. 31-33.

due diligence.[2]  Plaintiffs also assert breach of fiduciary duty claims against the Hudson directors under Delaware law.

The purpose of the Joint Proxy was to obtain approval of the Merger whereby Hudson's shareholders would receive cash and M&T stock, making Hudson shareholders M& T shareholders upon the Merger's close. Cplt. ¶¶ 2, 11, 58.[3]  In the year prior to the time the Joint Proxy was issued, banks had come under severe regulatory scrutiny regarding compliance with the BSA. The BSA, as amended by the PATRIOT Act, requires each bank to prevent money-laundering by terror groups and others by complying with certain regulations.  These regulations, which have been in place for many years, establish guidelines banks must follow to gain a sufficient understanding of all of their customers (the "Know Your Customer" regulations or "KYC").  Like all regulations, KYC had the force of law.  Although regulators were greatly distracted by the financial crisis beginning in 2008, they returned to scrupulous enforcement of the BSA in 2012, citing many banks as deficient. Cplt. ¶¶ 63-74.

Regulators' 2012 reviews found that many banks had failed to maintain their BSA compliance, and had accumulated years of violations. Cplt. ¶¶ 70-71. Penalties for violations could be severe.  In the case of the Hudson-M&T Merger, an adverse regulatory action could severely delay the Merger, cause it to be rejected, or result in its going forward with M&T in a weakened competitive position due to regulatory sanctions and restrictions.  Hudson shareholders voted to

---

[2] *Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761, 778 (3d Cir. 1976) held that "the imposition of a standard of due diligence as opposed to actual knowledge or gross negligence is quite appropriate", and upheld the liability of corporate directors on the basis of simple negligence. For example, Director Casey was deemed liable even though there was "no proof that Casey was consciously aware of the alleged misstatements and omissions or their materiality." *See id.* at 786. In interpreting Section 14(a), 15 USC §78n(a), the Third Circuit and subsequent courts have looked for guidance to decisions interpreting the analogous Section 11 of the Securities Act of 1933, 15 USC §77k, which also holds directors and others to a standard of due diligence. *Id.* at 777.
[3] Citations are to the Amended Class Action Complaint dated February 19, 2016.

approve the Merger, but were unaware of M&T's serious BSA violations (and other potential serious legal problems) because Defendants failed to inform them properly. On the cusp of the Merger, Defendants revealed some facts about the vast non-compliance at M&T, but the disclosures were incomplete, misleading and untimely. The Merger vote was not postponed to allow shareholders adequate time to review the information, and to allow for adequate due diligence as to the impact of the regulatory action. Thus, the shareholder's meeting proceeded despite faulty and belated proxy disclosures, and the Defendants announced that (based on votes received at various times) the Merger was approved. The Merger's close was thereafter delayed for two and half years by regulators, and was at serious risk of never receiving regulatory approval at all.

Defendants neglected their basic investigatory duties. They were required to have engaged in vigorous due diligence to discover all pertinent risks to the Merger well *prior* to the vote. Having negligently failed to do so, they violated the federal proxy laws and, in the case of the Hudson directors, state law as well.

### B.    Summary of Argument

#### 1.    The Joint Proxy Statement Omitted and Misrepresented Facts About M&T's Legal Compliance with BSA Regulations and Other Legal Obligations

All proxy statements are required to have a "risk factors" section. *See infra*, pp. 16-17. The proxy laws mandate that this section be full and complete--it must include "the most significant factors that make the offering speculative or risky."[4] *See id.*, p. 17. The Joint Proxy here had an extensive risk factors section, but it omitted *any mention whatsoever* of the crucial

---

[4] Failure to include information specified in the proxy laws is a violation of Section 14(a) of the Securities Exchange Act. *See infra*, pp. 16-17.

issue of BSA compliance, or indeed any worries regarding legal compliance. This was inexcusable under the proxy laws. In truth, as was to be revealed over the next two and half years, M&T had not only violated consumer protection laws but also failed in its BSA obligations, requiring M&T to "remediate" millions of accounts for deficient KYC compliance. The KYC requirements M&T violated had been in existence for years under the BSA, and were nothing new to M&T. Cplt. ¶¶ 6, 12, 14, 20-21, 92, 94, 109, *passim*.

The Joint Proxy's only reference to BSA or consumer law compliance is found in the Merger Agreement dated August 27, 2012, and attached to the Joint Proxy. In that document at Para. 4.9, M&T represents that it was compliant with the BSA and all other laws. But this was untrue. M&T was grossly out of compliance, and had been for years, as regulators detected. Cplt. ¶¶ 17, 87, 92, *passim*.

As discussed *infra*, pp. 6 n.5, 17-20, Defendants attempted on p. 112-13 of the Joint Proxy to tell Hudson shareholders that they should not believe or rely upon anything represented as true by M&T fiduciaries in the Merger Agreement. Defendants assert that this absolves them from liability, but they are incorrect—courts and the Securities and Exchange Commission ("SEC") have held such disclaimers to be invalid. *See id.* These courts, and the SEC, have recognized that shareholders are being asked to approve a merger based on such representations and (absent anything to the contrary in the Proxy) they will rely on them to have been true both when made, and at the time of the proxy solicitation. *See e.g., Glazer Capital Management L.P v. Magistri,* 549 F.3d 736, 741 (9th Cir. 2008). *See infra,* pp. 17-20.

## 2.    The April Disclosures Were Incomplete and Inaccurate.

Just a few days prior to the April 18, 2013 shareholders' meeting, Defendants stated that M&T had been called out by regulators for BSA issues, and that the Merger's close would be

delayed in the "near term." Cplt. ¶¶ 12, 88.  The April Disclosures came out between 2 and 4 business days prior to April 18, 2013.  As discussed below, and as alleged in the Complaint, such disclosures even if accurate (which they certainly were not), were untimely. Cplt. ¶ 11.

The April Disclosures were materially deficient for a number of reasons: (a) they said nothing about the material consumer violations; (b) they failed to reveal that M&T had been out of BSA compliance for years as to millions of accounts; (c) they downplayed quite inaccurately the amount of time and money that would be needed to resolve the BSA issues; (d) they understated the personnel needed to remedy the violations by almost 90%; (e) they implied that the BSA issues could be resolved in the "near term" when they could not; and (f) they falsely stated that there was *no illegal conduct* when the Compliance Agreement signed less than two months later with the Federal Reserve indicated that there were legal violations—*i.e.,* M&T had failed to comply with the BSA's know your customer rules. Cplt. ¶¶12, 90.

Thus, plainly, the Joint Proxy was both omissive and misleading and the April Disclosures were misleading and untimely.  Even if the April Disclosures had been timely, they would have misled any Hudson shareholder to believe that the issues were minor, soon and easily to be remedied, and that there was nothing about which to be alarmed.  Nothing could have been further from the truth.   In truth, Hudson and its shareholders were in serious jeopardy, as Hudson suspended and modified its standalone Strategic Plan and was financially reliant on the Merger closing in the near term. Cplt. ¶¶ 21, 98; Proxy, at 68-69.

### 3.     The April Disclosures Were Untimely

Courts that have considered the issue of the timeliness of proxy disclosures hold, apparently without exception, that belated disclosures within a few days of a vote are simply too close to that vote for voters to fairly learn of them and analyze them. *See* Cplt. ¶¶ 11, 85. *See*

*infra*, pp 31-33. *See e.g., In re Del Monte Foods Co. S'holders Litig.*, 2011 Del. Ch. LEXIS 94, *5, 43-44 (Del. Ch. June 27, 2011)(where company voluntarily issued proxy supplement 10 days prior to court order, it was ordered to give shareholders *20 additional days* to consider it before voting). Thus, the April Disclosures cannot be said to have provided reasonable notice, and a reasonable opportunity to cast a well-informed vote.

### 4. Defendants Violated Their Duties Under the Proxy laws.

Defendants had a duty to discover and disclose all significant risks. If they negligently failed to do so, they are liable. There is no way they can escape their legal duties. Defendants' apparent suggestion that vague, boilerplate disclaimers and warnings can substitute for disclosure of the *existing risks* that could be discovered through due diligence is legally baseless.

When two companies merge, those companies and their directors are obligated under federal law to draft a proxy that contains all existing risks shareholders would find important. They cannot say "we don't know" or "we haven't looked into the matter." They cannot say worrisome things *may* happen, when worrisome things have already happened. Rather, they are required to exercise "due diligence" in ferreting out the truth. What due diligence demanded of M&T, Hudson and their directors was a "thorough or searching" inquiry. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 678 (S.D.N.Y. 2004).

But Hudson shareholders did not receive the benefits of a thorough and searching inquiry. Rather, instead of the full truth, voters were presented with a Joint Proxy which outrageously sought to *disclaim* statements made in the Merger Agreement that M&T was in full compliance with all applicable laws.[5]

---

[5] This disclaimer does not appear until pages 112-13 of the Proxy, while shareholders are encouraged to read the Merger Agreement on Page 11 of that document. This raises a factual issue as to whether such a "buried" disclaimer has any force and effect. *See Werner v. Werner*, 267 F.3d

6

This improper disclaimer should have placed Hudson and its directors on high alert that M&T's directors had failed to warrant or represent (or apparently even investigate) whether M&T was in full compliance with the law. But, as alleged, the Hudson directors did almost no due diligence, relying instead on M&T and its Board. Cplt. ¶149. For their part, M&T and its directors signed off on a Joint Proxy that failed to specifically discuss M&T's legal compliance *except for a warning to investors not to rely upon anything M&T had previously said regarding the issue!*

This left Hudson voters with a Joint Proxy whose risk factors section was devoid of information on a matter that was highly critical to them. Nothing could have been more material, as any lengthy delay in the Merger while M&T addressed legal compliance issues would have been devastating to Hudson, as would an outright regulatory refusal to approve the Merger. Indeed, Hudson only entered into the Merger (after refusing another suitor due to fears of a regulatory delay) because its directors believed "that there would be *a likelihood of approval on a timely basis* for a transaction with M&T." Cplt. ¶59; Joint Proxy, at 67, 110. The Joint Proxy contained nothing to suggest that the Hudson directors did not still hold this belief. Indeed, the proxy stated that, as of the Proxy's date, the Hudson directors felt there was a "likelihood" of approval in a reasonably timely manner. Joint Proxy, at 69.

Defendants make an attempt to salvage the omissive and misleading Joint Proxy by arguing they warned of "likelihood of a delay" but the Joint Proxy never says there was a "likelihood of a delay", let alone a multi-year delay due to legal problems. *See* Defts. Br. at 2.[6]  Next, they point

---

288, 297 (3d Cir. 2001)("a disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed. The doctrine applies when the fact in question is hidden in a voluminous document or is disclosed in a piecemeal fashion which prevents a reasonable shareholder from realizing the 'correlation and overall import of the various facts interspersed throughout' the document.").

[6] What they did say was that lately regulators in *similar* situations were taking longer than the "typical time period" (whatever that was) to review and approve applications. Defts. Br. at 2. In

to several statements wherein they provided "no assurance" that the Merger would timely close and that there was no certainty as to regulatory approval. *Id.* This is true of every merger, and is meaningless boilerplate. *See infra*, pp. 20, 22, 24; *see also, Burges v. BancorpSouth, Inc.,* 2015 U.S. Dist. LEXIS 89822, *2-3, 8 (M.D. Tenn. July 10, 2015)(warnings in fraud case did not insulate defendants from liability where they made unfounded affirmative statements regarding BSA issues).[7]

As to the April Disclosures, even in the unlikely event they are deemed timely, Defendants had no lesser duty of due diligence. They plainly, in their rush to get the vote behind them, failed to undertake the due diligence that was required to determine the true scope of the issues faced by M&T.

### 5.    Loss Causation is Adequately Pled

The Complaint clearly alleges numerous theories of loss causation, all of which have been recognized in the law to suffice at the pleading stage (*see infra*, pp. 33-37):

- **Lack of Promised Value:** Hudson holders "received shares in an entity whose value was diminished by regulatory penalties" with regulatory sanctions being a "blow to M &T and its value", as partially evidenced by a $4.78 per share stock drop when the Federal reserve issued its opinion. (*See* Cplt. ¶¶ 2, 117).

- **Lost Opportunity for Higher Merger Premium:** Revelation of true facts in a timely manner would have resulted in a more generous merger premium due to the

---

proxy-related materials, M&T CFO Jones explained this was because regulators were distracted by the purported need to write new regulations. *See infra*, pp. 23-24. The need to write new regulations obviously had nothing to do with the adverse consequences that might flow from a discovery by regulators of important compliance issues at M&T. *See id.* Moreover, the Proxy stated at p.3: "the parties currently expect that the merger will be completed during the second quarter of 2013." Thus, voters were led to believe that any delays were expected to be quite short—the Merger was expected to close no more than a few weeks from the date of the vote.

[7] The duty of full disclosure may require revelation of unlawful corporate acts, or other types of legal non-compliance. *See e.g., In re Marsh & McLennan Cos. Sec. Litig.,* 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006)(the duty of full disclosure "applies to the disclosure of criminal conduct to the same extent it applies to the disclosure of any other material information").

high risk nature of the Merger. The violations would have changed the perceptions of the value of M & T, and would have to have affected the fairness opinion. (*See* Cplt. ¶ 115).

- **Reduced Dividends:** Hudson omitted that the Merger delay caused poor earnings which led to a material dividend reduction. This reduction constitutes damages. (*See* Cplt. ¶ 116).[8]

In contending otherwise, Defendants err in several respects. Most significantly, they confuse a proxy claim with a Section 10(b) and Rule 10b-5 claim where a plaintiff usually must show that the shares he bought declined in value. Here, by contrast, there is no requirement that Hudson shares have declined in value. It is sufficient under the proxy laws for Hudson holders to allege that dividends were cut, the Merger premium was affected, and that they did not receive the full expected value of the Merger due to the omissions or misrepresentations. *See infra, pp.* 33-37.[9]

Finally, loss causation is highly fact sensitive, and rarely suitable for determination on the pleadings. Indeed, the general rule in proxy cases is that: "The parties' dispute over loss causation cannot be resolved at the pleadings stage." *In re Heckmann*, 869 F. Supp. 2d 519, 526 (D. Del. 2012).

6. **Plaintiffs' State Law Breach of Fiduciary Duty Claims against the Hudson Directors Are Well-Pled.**

---

[8] Defendants' arguments that the dividend cuts had nothing to do with the Merger delay or that the Hudson Board simply made a "business judgment" to cut dividends constitute "testimony" and "evidence" offered in an attempt to create factual disputes. Such disputes cannot be resolved on this motion. *See* Defts. Br. at 5, 30-31.

[9] Defendants' "lost opportunity" authorities are inapposite—they were decided at the summary judgment stage, not at the initial pleading stage. *See infra,* p. 35. Plaintiffs' theories have repeatedly been deemed adequate at the pleading stage. *See id.*

The Complaint details how the Hudson Directors, faced with a legal obligation to investigate a wide multitude of issues, did at most five days of "reverse" due diligence while busy with other matters. Cplt. ¶¶ 57, 79, 149. This is a mockery of due diligence, and a plain abdication of a legal duty. Moreover, it is undisputed that the Hudson directors were satisfied with the Joint Proxy's saying nothing about legal compliance, other than the disclaimer that M&T's previous warranty of legal compliance should not be relied upon. When the April Disclosures were made, the Hudson directors made an immediate decision to proceed, without proper due diligence, after briefly discussing the issue with M&T. In the proxy context, a director's reliance upon a potentially conflicted merger partner to tell him what the facts are is *not* due diligence (*see Escott, infra*, p. 21). At this stage, the allegations as to these directors' legal "bad faith" (*i.e.*, a conscious abdication of a positive legal duty) suffice to state a Delaware claim. *See infra*, pp. 39-40.

## II.    STATEMENT OF FACTS

This class action for violations of the federal proxy laws is brought on behalf of the former shareholders of Hudson, which was acquired by defendant M&T in November 2015, after an unprecedented two and a half year regulatory delay. Cplt. ¶¶ 1, 2, 5, 118. When the Merger was finally approved, regulators cited two factors leading to the delay--M&T's violations of federal consumer laws and M&T's violations of regulations promulgated under the BSA and the Anti-Money Laundering laws. Cplt. ¶¶ 8, 22, 113. M&T was sanctioned for these violations—it was barred from "expansionary activities" except in limited circumstances. Cplt. ¶113.

When the Merger Agreement was signed and announced on August 27, 2012, there was no disclosure that M&T had violated any laws. In fact, the Merger Agreement between the parties contained a representation that M&T was in full compliance with all laws, including the BSA. Cplt. ¶¶ 7, 10, 80. To effectuate the Merger, M&T and Hudson undertook to draft a Joint Proxy

("Joint Proxy") that was dated February 22, 2013 and mailed to Hudson shareholders on or about February 27, 2013.  Cplt. ¶¶ 2, 9, 11, 75.

The Joint Proxy contained extensive "risk" disclosure sections, but omitted the most important existing risk: that M&T could be found to be drastically out of compliance with the federal consumer laws and the BSA. Cplt. ¶¶ 2, 5, 80, 123, *passim*.  The Joint Proxy did, however, republish the Merger Agreement which asserted that M&T was in compliance with all material laws, stating: "M&T and each of its Subsidiaries have complied in all material respects with, and are not in default or violation in any material respect of, (i) any applicable law, including all laws related …the USA PATRIOT Act, the Bank Secrecy Act … and any other law relating to … money laundering prevention…." Cplt. ¶10.  The Joint Proxy further states that "the Hudson City board of directors believed that there would be a likelihood of approval on a timely basis for a transaction with M&T", and that the Hudson directors turned away another proposal because of fears the deal would be extensively delayed. Cplt. ¶10; Proxy at 67.

The truth of the matter, which Defendants would have known had they exercised due diligence was that M&T had engaged in serious consumer law violations that were curtailed just after the Merger Agreement was signed, and that M&T had for years been in violation of the BSA's "KYC" rules as to millions of accounts.   Cplt. ¶¶ 5, 12, 14, 20-21, 76, 89, 99, 109 and *passim*. M&T was called out because bank regulators had returned to vigorous BSA enforcement after years of dealing with the financial crisis.  The regulations violated were not new, and the Defendants could have detected them through established due diligence techniques.  Cplt. ¶¶ 20, 66, 69-74.

These undisclosed legal violations created a risk that the Merger would be long delayed or perhaps never close.  While a risk of delay is worrisome in any merger, it would have been acutely

important to Hudson shareholders. To enter this Merger, Hudson had to curtail its promising new Strategic Plan. Cplt. ¶¶ 3, 21, 97-98, 111, 129, 138. Thus, a long delay could have dire consequences for Hudson and its shareholders. Moreover, it would have been important to Hudson shareholders –who were to partly receive M&T shares as consideration in the Merger—that M&T was as sound as represented.

Thus, that M&T's BSA compliance was so deficient that millions of accounts needed to be remediated (a fact finally revealed in 2015), would have been highly material to Hudson shareholders as it would have indicated: (a) that the M&T warranty that all BSA laws had been obeyed was false when made; (b) M&T was at high risk of regulatory action, which could take years, and hundreds of millions of dollars to resolve; (c) that Hudson was at great risk proceeding with the Merger, as it was required to put its standalone strategic plan on hold, and suffer stagnation or business reversals with no assurance that the Merger would ever close; (d) that the Merger ratio negotiated was likely unfair, as it did not account for these regulatory risks, M&T's misconduct, and the likely financial consequences of such misconduct; and (e) that Hudson's dividend was at risk during the time period it would take for a merger to be completed. Cplt. ¶ 21.

Hudson and its directors abdicated their duty to perform due diligence. Hudson and its Board did not commence its "reverse due diligence" until the week beginning August 20, 2012, providing it with at most five business days for all due diligence concerning M&T's considerable business operations. In this very short time span, with many other things going on, it is inconceivable that Hudson's Board could have conducted adequate due diligence. Cplt. ¶ 57. It

is not due diligence under established law to rely upon M&T, a conflicted party, or to acquiesce in a disclaimer that anything M&T has said regarding its legal compliance should be disregarded.[10]

On the brink of the proxy vote scheduled for April 18, 2013, Defendants stated that the Merger closing (but not the vote) would be delayed. These disclosures, coming on April 12, 2013 and April 16, 2013 ("the April Disclosures), were untimely and provided Hudson shareholders insufficient time to consider this development, assuming they learned of it at all.   Cplt. ¶¶ 11, 85. The April 12, 2013 disclosures, consisting of an 8-K Proxy Supplement and a press release, were limited in focus. They did not disclose that M&T had millions of customer accounts that need to be verified on an account-by-account basis. Nothing at all was said about the consumer violations which, with due diligence, should have been listed as an additional aggravating factor which could cause material delay.   Cplt. ¶¶ 85-86. Moreover, these disclosures failed to disclose the nature and extent of the violations, their costs to remediate, and the true threat to the Merger they represented.

M&T's CFO Jones made further disclosures on an April 15, 2013 conference call (filed in transcript form with the SEC on April 16) but these statements, too, had the goal of assuring concerned shareholders that M&T had violated no laws (an assertion that turned out to be incorrect) and that the matter was not a very serious one. M&T's CFO Jones stated on that call that the regulatory issues would delay the close of the Merger in the "near term", and that the close had been postponed only five months while "M&T works hard to resolve these issues." Jones also assured that: "We have no reason to believe that the issues involve any wrongdoing or illegal

---

[10] There is no mention in the Joint Proxy of any due diligence M&T's Board conducted of M&T's operations, including its state of legal compliance.  All M&T said about legal compliance in the Joint Proxy was in the Merger Agreement, which statements it attempted to disclaim.

conduct by anyone at M&T....". This, too, was inaccurate, as M&T has conceded it has not complied with the BSA as to millions of accounts. Jones also made statements that inaccurately minimized the work ahead, asserting that the regulatory issues could be addressed "quickly", and might involve hiring 100 people. This was an erroneous representation of the troubles M&T had with compliance, and the resources and time needed to fix them. In actuality, over 900 employees, consultants and contractors would be needed to address the issues over several years. Cplt. ¶¶ 13, 88-89.[11] Indeed, each and every one of the millions of accounts M&T had opened over the years needed to be reviewed and re-verified. Cplt. ¶¶ 6, 20, 99, 103, 109.

## III.   ARGUMENT

### A.   RELEVANT PLEADING STANDARDS

#### 1.   The Complaint Must Be Evaluated Under Rule 12(b)(6)

Although Defendants suggest the Complaint must meet the particularity standards of Rule 9(b) and the PSLRA (Defts. Br. at 17), the overwhelming majority of cases have refused to apply such exacting standards where, as here, the federal claims are grounded solely in negligence. The Third Circuit held this explicitly in construing negligence-only claims brought under the analogous Sections 11 and 12(a)(2) of the Securities Act of 1933. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 (3d Cir. 2006).

---

[11] It is relevant to note that CFO Jones stated on April 15, 2013 that the late 2012 or early 2013 federal reserve review found that "*certain deficiencies* in our BSA/AML compliance program *rose to a level of significance* such that they would impact our ability to close the merger with Hudson City in the near term and that we would have to implement the plan for improvement..." Defts. Exh. F, at 4. It may be inferred from this that the deficiencies existed well before April 15 and were known within M&T, had been progressively getting worse, and yet were not discovered or disclosed by Defendants. Cplt. ¶ 88. The existence of this issue, while it must await discovery, militates against a finding on this motion that the April Disclosures (even if timely) constituted full disclosure.

This reasoning applied in *Suprema* applies with equal force to Section 14(a) claims, both with regard to Rule 9(b) and the PSLRA particularity requirement, which was only meant to apply to a fraudulent "state of mind." *See e.g., Cal. Pub. Employees'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004)("While claims brought pursuant to section 14(a) of the 1934 Act do not require that scienter be pleaded, any claims brought under the 1934 Act must meet the PSLRA particularity requirements quoted above *if a plaintiff elects to ground such claims in fraud.*"); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 538 (D. Del. 2011) ("This court has declined to apply the PSLRA's heightened pleading requirements that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind' to claims brought under § 14(a).") (collecting cases).[12]

Thus, the standard to be applied to this motion is that under Rule 12(b)(6), as recently summarized in *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). All facts alleged are deemed to be true, but "[d]etailed pleading is not generally required. The Rules demand only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* There is no "probability" requirement—the complaint suffices if the facts, taken as true are permit a plausible inference of liability, that goes beyond a "sheer possibility" that any of the defendants could be liable. *Id.*

### 2.     Pleading Standards as to Negligence and Due Diligence

---

[12] *See also, Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (finding that heightened PSLRA pleading standard does not apply to Section 14(a) claims because "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care."); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litigation*, 757 F. Supp. 2d 260, 322 (neither Rule 9(b) nor the PSLRA found applicable to federal proxy claims grounded in negligence).

It is exceedingly rare for a negligence based claim to be dismissed on the pleadings. *See AstroPower Liquidating Trust v. KPMG LLP*, 2007 U.S. Dist. LEXIS 38222, *17-18 (D. Del. May 25, 2007)("Whether the facts alleged by Plaintiff ultimately amount to gross negligence is a fact question which cannot be resolved by the Court on a motion to dismiss."). This is especially true where, as here, reasonable due diligence is both an affirmative defense and a question of fact for the jury. *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.,* 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012)("As is true of all affirmative defenses, a Securities Act defendant generally bears the burden of demonstrating his due diligence, and, for that reason, due diligence cannot be asserted as a basis for dismissal pursuant to Rule 12(b)(6)."); *Mass. Mut. Life Ins. Co. v. DB Structured Prods.,* 110 F. Supp. 3d 288, 297 (D. Mass. 2015). It is well-settled that a plaintiff is not required to negate an affirmative defense in his Complaint. *See Pension Trust Fund for Operating Eng'rs v. Mortgage Asset Securitization Transactions, Inc.,* 730 F.3d 263, 271 (3d Cir. 2013).

Here, Plaintiffs have identified the documents at issue; detailed why they are incomplete or misleading; specified the information that should have been provided; detailed the extent of the legal violations; asserted plainly why these matters were important; explained why the omitted legal violations were of long duration and how they could have been detected sooner through due diligence. Nothing more is required.

## B.   THE COMPLAINT STATES A CLAIM UNDER THE FEDERAL PROXY LAWS

### 1.   The Joint Proxy Violated Section 14(a) and Rule14a-9

#### a.   Defendants' Material Omissions Violated Section 14(a)

*Seinfeld v. Becherer*, 461 F.3d 365 (3d Cir. 2006) makes clear that there are two alternative ways to violate Section 14(a). The first way is to fail to disclose information that is *mandated* to be disclosed in the proxy. What must be disclosed is set forth in Schedule 14A, 17 C.F.R. §

240.14a-101. *Id.* at 369. Schedule 14A states, in turn, that mergers involving the issuance of

securities trigger a requirement to file a Form S-4, which is a familiar form usually referred to as

a "Prospectus." Every Form S-4 must—as did the Joint Proxy here—have a section labeled "Risk"

or "Risk Factors." *See* Form S-4, Item 503, 17 CFR 229.503 ("Item 503"). The Joint Proxy here

had multiple such sections.   Under Item 503, the disclosure document, must:

> provide under the caption ''Risk Factors'' a discussion of the most significant
> factors that make the offering speculative or risky. This discussion must be concise
> and organized logically. Do not present risks that could apply to any issuer or any
> offering."

Accordingly, SEC regulations required Defendants to explore and discuss any significant

risks that due diligence could uncover, including issues of legal compliance that could spell trouble

for the Merger.   But nothing was said in the Joint Proxy as to the BSA and consumer violations,

and their attendant risks.   This violates Section 14(a), as there is no question that legal and

regulatory risks must be adequately disclosed and discussed in a Proxy/Prospectus. *See e.g., In re

Enzymotec Secs. Litig.,* 2015 U.S. Dist. LEXIS 167403, at *31, 35-36 (D.N.J. Dec. 14,

2015)(prospectus was actionably false and defendants could be held liable for negligence in failing

to ascertain the true regulatory situation; it was insufficient that "Defendants warned generally of

"significant and increasing government regulations").   Nor is there any question that Item 503

mandates disclosure of all "significant" risks.   Thus, Defendants violated Section 14(a) by reason

of their complete omission of the material risks Plaintiffs have identified from the Risk Factors

sections.

       b.    **The Merger Agreement's Representations and Other Statements
Were Actionably False and Misleading**

The second way Defendants violated the federal proxy laws, and specifically SEC Rule

14a-9, is by making a materially omissive or misleading statement. Here, Defendants chose to

speak regarding the issue of legal compliance both in the Merger Agreement, Para. 4.9, and in documents incorporated by reference into the Joint Proxy. M&T's Feb 25, 2013 Form 10-K, incorporated by reference into the Proxy (see Proxy, at 145), stated at p. 20: "The Registrant and its impacted subsidiaries have approved policies and procedures that are believed to be *compliant with the USA Patriot Act.*" (Paskowitz Dec., Exh. B). A document incorporated by reference into a Proxy may be deemed to be part of the Proxy. *See In re Computer Scis. Corp. Erisa Litig.*, 635 F. Supp. 2d 1128, 1140-1141 (C.D. Cal. 2009). *See also*, Form S-4, Instructions, Item 11(b), p. 9, available at: https://www.sec.gov/about/forms/forms-4.pdf. Despite these various assurances of legal compliance, M & T was not compliant. This violates Rule 14a-9.

Defendants assert that the Merger Agreement was just a private agreement, not to be believed by anyone. But investors would not take it that way. Absent any contradiction in the "risk factors" sections, shareholders would rely on M&T and its directors to have made an accurate, well-supported representation in the Merger Agreement, and one that was *still true*. Defendants had a duty to ensure that the proxy was current and up-to-date and voters would assume that historical statements remain true, unless new proxy disclosures contradict them. To ensure that the Proxy is current is one of Defendants' legal obligations. *See Lebhar Friedman, Inc. v. Movielab, Inc.,* 1987 U.S. Dist. LEXIS 127, at *11-12 (S.D.N.Y. Jan. 12, 1987) (obligation to disclose before the shareholder vote "new information. . . which is material and whose omission would render the existing statement false or misleading"); SEC Release No. 34-23789, 1986 WL 722059, *5 (SEC Nov. 10, 1986) ("When there have been material changes in the proxy soliciting material or material subsequent events (in contrast to routine updating), an additional proxy card, along with revised or additional proxy soliciting material, should be furnished to security holders ... to permit security holders to assess the information and to change their voting decisions if

desired."); SEC Release No. 34-16343, 1979 WL 173161, at *4 (SEC Nov. 27, 1979)("Even in a situation wherein a statement when made was true and correct, and is rendered incorrect due to a change in circumstances or other subsequent event, appropriate action should be taken to correct the misstatement prior to the meeting."). *See also, Ackerman v. Schwartz*, 947 F.2d 841, 848-49 (7th Cir. 1991)(offering materials must be kept correct and up to date through the time of the "sale", not just be correct when they were written).

This is why courts and the SEC have refused to recognize the validity of disclaimers as to the accuracy of the Merger Agreement representations and warranties. *See e.g., Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008) (refusing to accept argument defendants make here, and holding: "that the merger agreement was a private document and included reference to a non-public disclosure schedule would not, as a matter of law, prevent a reasonable investor from relying on its terms."); SEC Release No. 51283, 2005 SEC LEXIS 448, at *4 (SEC March 1, 2005) ("Titan Report")("The issuer cannot avoid [its disclosure obligations] simply because the information published was contained in an agreement or other document not prepared as a disclosure document.").[13] *See also, Mass. Mut. Life Ins. Co. v. DB Structured Prods.*, 2015 U.S. Dist. LEXIS 87244, at *43, n. 14 (D. Mass. June 19, 2015)(same); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 299-300 (S.D.N.Y. 2010)("[T]he defendants' argument that the Merger Agreement merely constituted a private allocation of risk between BofA and Merrill is unavailing. According to the Joint Proxy, the Merger Agreement is

---

[13] The *Titan Report*, 2005 SEC LEXIS 448, further stated at *4: "[T]he shareholders...were not beneficiaries of the FCPA Representation *as it appeared in the Merger Agreement.* However, the inclusion of the FCPA Representation in a disclosure document filed with the Commission, whether by incorporation by reference or other inclusion, constitutes a disclosure to investors. ., *a reasonable investor could conclude that the statements made in the representation describe the actual state of affairs and the information could be material. ").*

'the legal document governing the merger,' and shareholders were advised in the Joint Proxy to 'read the merger agreement carefully and in its entirety . . . .'.. A reasonable investor would have understood the Merger Agreement to constitute a statement of fact."). Thus, the Merger Agreement representations are actionable.

This Court's opinion in *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.,* 2015 U.S. Dist. LEXIS 85510 (D. Del. July 1, 2015), upon which Defendants rely heavily, is distinguishable because there, unlike here, there was no allegation that the Merger Agreement's representations were inaccurate *when made. Id.* at *8. *Cf.* Cplt. ¶5 (asserting problems at M& T had persisted for years and involved millions of accounts opened over many years); ¶7 (consumer violations existed at time of Merger Agreement); ¶¶ 76-77(defendants failed to detect historical violations as to millions of accounts and consumer protection laws); ¶109 (remediation work required as to every single bank customer); ¶110 (summarizing prior allegations and concluding: "Thus, it was finally revealed that M&T's warranty of legal compliance in the Merger Agreement was inaccurate, and that *millions of accounts needed remediation.* Had Hudson City voters been told that, they would have viewed this fact as material.").[14]

A case closer in point than *Cooper Tire* is *Burges v. BancorpSouth, Inc.,* 2015 U.S. Dist. LEXIS 89822, *2-3, 8 (M.D. Tenn. July 10, 2015). There, a merger agreement incorrectly asserted that the corporate acquirer was in compliance with the BSA, when it was not. Plaintiffs were held to have stated a claim despite boilerplate disclaimers: "because defendants chose to speak on the issue of their compliance with banking laws and regulations, a reasonable juror could conclude

---

[14] In quoting *Cooper Tire,* Defendants' bracketed insertion of the words "merger representations" (Defts Br.at 4) into a quote is confusing, because the court's discussion at that juncture dealt with defendants' *projections* in the body of the proxy, not the representations or warranties in the merger agreement.

that those statements, without some qualification or accompanying disclosure of their non-compliance and/or the pending FDIC review, were misrepresentations because they were at a minimum, incomplete." *Id.* The same holds true here.

      c.    **Defendants' Liability for these Omissions and Misrepresentations**

Defendants argue that they are being asked to exercise "clairvoyance", but this is not the case. *See* Defts Br. at 27. Rather, what the securities laws require of them is to perform searching due diligence to identify fully and disclose all existing material facts, and all existing material risks. If they don't know of risks at the outset, they have a duty to find out what risks may exist. Here, it is alleged that Hudson and the Hudson directors simply took the word of others, skirting due diligence. Without due diligence, they couldn't determine in any way if the various proxy materials were true or not. M & T and the M& T directors, for their part, did not fulfill their duty to discuss legal compliance, relying instead on a disclaimer that anything previously said as to M & T's compliance should not be heeded.[15]

The case of *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968) remains the seminal authority on due diligence obligations under the securities laws. It establishes, quite strongly, that directors cannot sit back and "take the word" of others as to the accuracy of the prospectus. Thus, assurances by counsel that the document is fine are insufficient, *id.* at 683, and outside directors cannot rely on potentially conflicted inside directors. *Id.* at 688-89. Indeed,

---

[15] Defendants did not need to be clairvoyant as to the BSA violations. BSA violations can be detected by adequate due diligence, including sampling techniques. Cplt. ¶¶66, 79. *See also,* SEC Release Nos. 33-9176, at *14-15 (SEC Jan. 20, 2011) (final rule)(discussing sampling techniques as a method of conducting due diligence in appropriate situations and stating that, when used, the issuer should disclose the size of the sample and the selection criteria employed). Available at: https://www.sec.gov/rules/final/2011/33-9176.pdf

*Escott* warns specifically about the risks to directors who approve documents "in sole reliance upon representations of persons who are comparative strangers..." *Id.* at 688.

Thus, the standard for the Defendants was not clairvoyance, but rather due diligence, as to every important issue. Such due diligence would have led to the facts and risks that should have been disclosed in the Joint Proxy.[16] *See* Cplt. ¶ 79 (detailing how the various legal issues could have been identified through due diligence).

### d.   The Joint Proxy's Purported Warnings and Disclaimers Provide No Defense

Defendants claim they warned voters the Merger might be delayed. They assert the Joint Proxy warns of a "likelihood of a delay" but, as previously noted, there is no warning in the Joint Proxy of the likelihood of a delay. *See* Defts. Br. at 2. Indeed, Defendants negated any expectation of a material delay, as the Proxy states at p. 3: "the parties currently expect that the merger will be completed *during the second quarter of 2013*"—i.e., by June 30, 2013. Proxy, at 3. Thus, voters were led to believe that any "delays" were expected to be quite short—no more than a few weeks from the date of the vote. Voters were absolutely not on notice of a likelihood of a material delay.

---

[16] Due diligence would have enabled Defendants to disclose, not predict. For example, Defendants might have said: "The regulators may find that M&T's compliance with the Bank Secrecy Act and Anti-Money Laundering requirements are not sufficient and the Bank may be required to remediate accounts opened under its existing Know Your Customer Procedures. Should this occur, M & T may have to verify and validate all of its existed accounts, which number in the millions; the Merger may be very significantly delayed or the Merger rejected; M&T could be fined or otherwise sanctioned; and M & T might have to expend very substantial sums to remediate and improve its compliance programs. Such a delay poses the risk of substantial harm to Hudson as it will be deferring its Strategic Plan pending the Merger's close. Hudson may be forced to restrict its operations, cut its dividend, or withdraw from the Merger altogether."

There are other possible formulations that would disclose the existing risks, none of which require clairvoyance.

Next, Defendants point to several statements in the Joint Proxy providing "no assurance" that the Merger would timely close, and no certainty as to regulatory approval. *Id.* This is true of every merger, and is meaningless boilerplate. *See In re Enzymotec Secs. Litig.*, 2015 U.S. Dist. LEXIS 167403, *34-36 (D.N.J. Dec. 14, 2015)(boilerplate warning that there may be regulatory issues does not excuse failure to discuss specific regulatory issues); *Blue v. Doral Fin. Corp.,* 123 F. Supp. 3d 236, 261-262 (D.P.R. 2015)("no assurance" language insufficient where specific regulatory risks were not detailed).

To the extent the Defendants argue that the Joint Proxy's cautionary statements were so "specific" that they are protected by the PSLRA safe harbor, they are incorrect. *See* Defts. Br. at 23. "Under both the PSLRA and the bespeaks caution doctrine, cautionary language must be *extensive, specific, and directly related to the alleged misrepresentation* to provide a safe harbor." *In re Amarin Corp. PLC Secs. Litig.,* 2016 U.S. Dist. LEXIS 55568, *29 (D.N.J. Apr. 26, 2016). There was no cautionary language here that even hinted at the possibility of legal violations, while the Merger Agreement and the 2013 10-K incorporated by reference into the Joint Proxy both asserted compliance with the BSA. Moreover, where defendants have made specific positive assurances about a matter, vague cautionary language is not "sufficient to neutralize" these statements, and does not fall within the safe harbor. *See EP MedSystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 876-77 (3d Cir. 2000). Defendants cite *Cooper Tire,* but there is no comparison as the proxy at issue there specifically and extensively cautioned about "labor problems, including labor disruptions at the Company or at one or more of its large customers or suppliers." 2005 US Dist. LEXIS 85510, at *12-13.

Defendants also point to a disclaimer which states that:

In recent similar transactions, the Federal Reserve Board has taken a longer time to

render a decision on [merger] applications than the typical time period for approval
set forth in the ... regulations.

This assertion says nothing about how long the Federal Reserve took in those cases, what
the "typical time" is, and what makes those transactions "similar" to this one. There is nothing
said here as to M&T's multiple legal violations, which would cause voters to doubt whether the
other instances cited were truly "similar." Nor does the Proxy contain any explanation of *why* the
Merger might be delayed. Mergers can be delayed for any one of a thousand reasons. Indeed,
M&T CFO Jones stated in SEC filed proxy materials that if a delay occurred it would be because
federal banking regulators *were busy writing new regulations*—something which has nothing to
do specifically with M&T or its business. Mr. Jones stated: "I think deals have taken *longer to be*
*approved because people are very busy writing rules at a lot of the regulatory agencies*" *See*
Paskowitz Dec., Exh. A, p. 28, SEC Form 425 filed August 27, 2012 under Rule 14a-12. Thus,
any discussion of approvals taking longer than usual has to be placed in the innocuous context
provided by Mr. Jones, and by Defendants' express expectation of a closing by June 30, 2013. All
of this, taken together, conveys the possibility and expectation of a very minor, untroublesome
delay.

To the extent any of Defendants' vague boilerplate warnings can even be considered
"partial" disclosures (which is doubtful), they would then trigger an independent obligation to
investigate and reveal the whole truth. *See e.g., In re Merck & Co.,* 2013 U.S. Dist. LEXIS 77097,
*47 (D.N.J. May 29, 2013) ("Securities law requires that once a defendant speaks about a particular
subject, it must not omit material information required to convey accurate and *complete*
information to investors on that subject.). But the whole truth was not disclosed.

Thus, the affirmative obligation to disclose known risk factors in the Joint Proxy, as
required by Form S-4, was violated in this case. The Risk Section contained in the Joint Proxy

commences at p. 27, and is wholly generic, speaking of things that "may" happen to any regulated company seeking regulatory approval. *See* Joint Proxy, at 27-29.

Further, as a wholly separate omission, the Joint Proxy failed to disclose anything about M&T's questionable checking account practices. (the "Consumer Violations" (Cplt ¶¶ 14, 79, 106). The Consumer Violations were on-going at the time the Merger Agreement was signed and continued into the fall of 2012. They, too, made the Merger Agreement false when signed. They had the capacity to delay the Merger, and indeed they did so. They were surely material.

The Consumer Violations led to a long investigation and a CFPB Consent Order in 2014. Defendants assert that the CFPB Consent Order contains only allegations, not "evidence" of non-compliance. Defts. Br. at 26.   Plaintiffs are not required at this stage to plead evidence. *Hassan v. City of New York*, 804 F.3d 277, 295-296 (3d Cir. 2015); *Ingram v. Warden*, 2011 U.S. Dist. LEXIS 7033, *10 (D.N.J. Jan. 24, 2011)("at this pleading stage, Plaintiff is neither required nor expected to produce admissible evidence..."). Moreover, Defendants ignore that the Federal Reserve verified these allegations in a report which is anything but a consent decree. *See* Cplt. ¶ 8; Federal Reserve Statement, Defts. Exh. R, at 10-11 ("Examinations conducted by the Reserve Bank revealed weaknesses in M&T's consumer compliance risk assessment, complaint management, and compliance monitoring and testing. The identified weaknesses in M&T's BSA/AML *and consumer compliance programs* raised concerns about whether the company's managerial resources and the managerial resources of the proposed combined organization were consistent with approval.").

Defendants cite *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976) as support, but *Lipsky* held only that an SEC consent decree could not be pled because it could not be offered as *evidence,* especially where the SEC was available to provide testimony and

documents relating to the issues at hand. *Id.* at 894. In other situations, where evidence pleading is not required, courts permit *allegations* based on consent decrees. *See e.g., In re Fannie Mae 2008 Sec. Litig.,* 891 F. Supp.2d 458, 471 (S.D.N.Y. 2012)(complaint tracked earlier SEC complaint and statements made by defendant in a non-prosecution agreement)(explaining proper scope of *Lipsky); Clearone Communs., Inc. v. Lumbermens Mut. Cas. Co.,* 2005 U.S. Dist. LEXIS 26187, *26 n.10 (D. Utah Oct. 21, 2005) (consent decree could properly be used to provide the factual background of the case); *Berke v. Presstek, Inc.,* 188 F.R.D. 179, 180-181 (D.N.H. 1998)(refusing to strike references to SEC consent decrees as pleadings stage). *See also,* Levenberg, Read My Lipsky: Reliance on Consent Orders in Pleadings, 162 U. Pa. L. Rev. 421, 424 (2014)("Properly construed, *Lipsky*...and Rule 12(f) permit plaintiffs to rely on consent orders to allege facts establishing a claim of liability.").[17]

Finally, it is no defense that the risks to be disclosed may involve violations of the law. *See e.g., Burges, supra,* 2015 U.S. Dist. LEXIS 89822, at *14-15 ("Because Defendants chose to speak on the issue of their compliance with banking laws and regulations, a reasonable juror could conclude that those statements, without some qualification or accompanying disclosure of their non-compliance and/or the pending FDIC review, were misrepresentations because they were, at a minimum, incomplete."); *Atlas v. Accredited Home Lenders Holding Co.,* 556 F. Supp. 2d 1142, 1158-59(S.D. Cal. 2008)(warning that there could be "no assurance" that corporate policies would be followed by employees did not immunize defendant from proxy claim: "the Court agrees that the Proxy Statement nonetheless may have been false and misleading to the extent it omitted to

---

[17] Defendants also argue that the settlement only involved a payment of an immaterial amount. Defts. Br. at p. 25. But even if small sums were involved, they still created a risk as to the Merger's close. "[T]he materiality of the disclosure does not depend on the amount of money involved, but rather on its purpose of informing stockholders. *Resnik v Woertz,* 774 F.Supp 2d 614, 631 (D. Del. 2011).

disclose that Accredited already had begun to systematically violate its own lending policies."); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1076-77 (C.D. Cal. 2008)(Section 14 and Rule 14a-9 claims upheld where plaintiffs "allege that the proxy statements failed to disclose that Countrywide abandoned its underwriting standards, thus exposing itself to an undisclosed level of heightened risk."); *New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1287 (D. Kan. 2008)(federal proxy claim stated where proxy failed to disclose participation by top executives in unlawful tax scheme which would likely lead to their dismissal).

### e.   Defendants' Authorities Are Inapposite

Defendants' authorities involve completely different legal and factual scenarios.   For example, *Bartesch v. Cook,* 941 F. Supp. 2d 501 (D. Del. 2013) was a securities fraud action, in which members of the investing public were inundated with negative particulars concerning the Company's business, and cautionary warnings that discussed the inner workings and challenges facing the company's early stage geothermal projects. *Id.* at 508-09.   Thus, where "the alleged omissions are *contradicted* by the company's public disclosures...there can be no Section 10(b) claim." *Id.* at 508.   Here, Defendants' assertions in the Merger Agreement and 10-K that M&T was legally compliant were contrary to the undisclosed true state of affairs, and the public filings said *nothing at all* about the BSA and consumer violations, making this case the opposite of *Bartesch.*

Nor is this case similar to the "fraud by hindsight" cases Defendants cite.   First, this proxy negligence case is not a fraud case—it is not premised on an assertion that Defendants knew the Joint Proxy was omissive or deceptive. That is not required. Second, Plaintiffs have not demanded that Defendants engage in any predictions. Rather, the Complaint is premised on a failure to disclose ascertainable present risks.   Here, Plaintiffs assert that there was not enough cautionary

language, based on facts that may not have been known, but *could have been discovered* through due diligence. That differentiates this case from cases like *In re Donald J. Trump* Casino Sec. Litig., 793 F. Supp. 543, 557 (D.N.J. 1992), relied upon by Defendants, wherein Plaintiffs could not point to a single undisclosed fact that would have undermined defendants' hope that a casino project would be profitable.

To say that "Plaintiffs offer nothing but hindsight here" (Defts. Br. at 27), is unpersuasive given the pre-existing consumer violations that were not disclosed, and the long-standing BSA deficiencies that required years to fix, concerned millions of accounts, and merited the attention of hundreds of new employees. *Cf. In re Am. Apparel, Inc. S'holder Litig.,* 2013 U.S. Dist. LEXIS 6977, *69-70 (C.D. Cal. Jan. 16, 2013)(where corporate problems uncovered were extensive, an inference existed that they "reflected longstanding problems with its compliance regime."). Rather, Plaintiffs assert that Defendants negligently failed to discover what regulators soon were to discover—historical deficiencies and legal violations. This is certainly not "fraud by hindsight."

## C.    The April Disclosures Violated the Federal Proxy Laws

The April Disclosures violated the federal laws in two ways: (1) they were materially omissive and misleading; and (2) they were untimely. The April Disclosures consist of three documents, all filed as supplemental proxy materials under Rule 14a-12 or Rule 425: (a) a press release dated and filed April 12, 2013; (b) a Proxy "supplement", also dated and filed April 12, 2013; and (c) a transcript of a conference call conducted by CFO Jones on April 15, 2013, filed on April 16, 2013.

### 1.    The April 12, 2013 Supplemental Proxy

Just a few short days before the Merger vote, the Defendants began releasing limited information regarding BSA non-compliance issues as to which they had never previously warned.

The April 12, 2013 "Supplement to Joint Proxy Statement/Prospectus" (the "Supplemental Proxy") was one such belated filing. Defts. Exh. T. The Proxy Supplement's discussion of the regulatory issues was limited to two vague bullet points, which provided no material information. Cplt. ¶86. The Supplemental Proxy is not full disclosure, as it is omissive and misleading, and surely not the product of due diligence. Moreover, it was not timely disclosure.

2.      **The April 12, 2013 Press Release and the April 15, 2013 Conference Call**

As alleged in the Complaint (Cplt. ¶11):

> less than one week before the shareholders' meetings, but in all likelihood after most shareholders had already cast their ballots, on April 12, 2013, Hudson City and M&T jointly announced via a press release that regulators had expressed "concerns" with M&T's procedures, systems and processes related to BSA/AML. These issues would require some work to be done, according to the press release, but this work only required an extension of a few short months in the Merger closing date. No detail was provided as to the exact type of work that would be required, or the precise issues that had prompted this regulatory action.

While the press release did state that M&T was going to undertake a "major initiative", it did not reveal how major that was to be. *See* Defts. Exh. D. Answers were to come in a conference call conducted by CFO Jones on April 15, 2013 (the transcript of which was filed with the SEC on April 16, 2013). *See* Defts Ex. F. To the extent the press release was partly informative, Jones undermined this entirely by making assertions that falsely downplayed the seriousness of the situation, thereby providing false comfort to any voters who may have heard his words (Cplt. ¶12):

> [Jones] assuring concerned shareholders that M&T had violated no rules and regulations (an assertion that has turned out to be incorrect) and that the matter was not a very serious one. M&T's CFO Jones stated on that call that the regulatory issues would delay the close of the Merger in the "near term", and that the close had been postponed only five months while "M&T works hard to resolve these issues." Jones also assured that: "We have no reason to believe that the issues involve any wrongdoing or illegal conduct by anyone at M&T....". This, too, was inaccurate, as M&T has conceded it has not complied with the Bank Secrecy Act as to millions of accounts. Jones also made statements that inaccurately minimized the work ahead, asserting that the regulatory issues could be addressed "quickly", and might involve hiring 100 people. This was an erroneous representation of the

29

troubles M&T had with compliance, and the resources and time needed to fix them. In actuality, over 900 employees, consultants and contractors would be needed to address the issues over several years.

Thus, while Jones stated in passing that obtaining approval is generally "pretty uncertain", he painted the task facing M& T as far less difficult than it truly was. Instead of the massive investment required, he said the project would require "some additional investment." Defts Ex. F at 9-10. Instead of saying remediating the problems would take years or stating that the length of time was indeterminate, Jones said: "we're going to do so quickly." *Id.* at 9. But then, as part of this mishmash of conflicting disclosures, Jones stated that: "we're not really aware of any sort of final outcomes or conclusions from the regulators," *id.* at 8, which he immediately contradicted by assuring: "we do believe that we have the full understanding of what the issue is..." *Id.*

Jones stated that there were no violations of law. *Id.* at 4. But non-compliance with federal regulations is illegal conduct, rendering Jones' statement inaccurate at the time it was made. *See Mason v. Coca-Cola Co.,* 2010 U.S. Dist. LEXIS 65107, *8-9 (D.N.J. June 30, 2010)("Both federal statutes and regulations have the force of law...."). As to Jones' other statements, Defendants' assertion that Jones spoke honestly and conveyed all he knew is a question of fact for later resolution, and begs the question of whether Jones and the other Defendants performed adequate due diligence with regard to the April Disclosures. *See* Defts. Br at 13, 25.

Assuming *arguendo* that these statements, filed under Rule 14a-12 on April 16, 2013, constituted a timely proxy disclosure, they were wildly misleading concerning the true gravity of the underlying situation. To the extent these statements were accompanied by any cautionary language, such cautions were inadequate—they did not properly set forth the true risks, as required by the proxy laws. They were also undermined by the various dubious affirmative representations—that "we're going to do so [remediate] quickly" (*id.* at 9), that "we have a full understanding" of the issues (*id.* at 8), and that the project would take 100 new workers, a fraction

of what such a project would require. *Id.* at 10. Proper due diligence would have revealed the massive issues facing M&T, and would have precluded Defendants from endorsing such optimistic statements, as millions of accounts had not been properly processed under existing KYC regulations. Plaintiffs more than adequately allege that this was an ascertainable fact, which renders these misstatements actionable. *Cf. In re Nutrisystem Sec. Litig.*, 653 F. Supp. 2d 563, 579 (E.D. Pa. 2009)("A statement is not forward-looking if its accuracy can be determined at the time it is made"). The fact that millions of existing accounts did not meet KYC regulatory requirements was an historical one, not one which would occur in the future. This, too, precludes any application of the safe harbor. *City of Hialeah Emples. Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros.*, 2008 U.S. Dist. LEXIS 66906, *10-12 (E.D. Pa. Aug. 29, 2008)(no protection for failing to discuss matters that have "already transpired.").

In any event, the proxy laws do not permit the understating or undermining of risks, thus precluding Defendants from seeking protection under the PSLRA safe harbor. And Jones' numerous contradictions—constituting a mixture of cautious and affirmatively calming statements--bring this disclosure under the rule of *EP MedSystems*, 235 F.3d at 877 (3d Cir. 2000), discussed *supra*, p. 23. prohibiting a defendant from hiding behind mixed messages.

In sum, these statements bolster Plaintiffs' case for proxy misrepresentations, and whatever cautionary or informative language they contained was undercut by statements that were false, omissive, contradictory and contrary to existing conditions that were never discussed.

### 3.    The April Disclosures Were Untimely

The Complaint alleges that the April Disclosures came "in all likelihood after most shareholders had already cast their ballots", and "provided proxy voters with insufficient time to evaluate the situation." Cplt. ¶11. *See also*, Cplt. ¶ 85. The April Disclosures were filed 2-6

calendar days before the proxy vote, and 2-4 business days prior to the Proxy vote. Unlike the Joint Proxy, the April Disclosures were not mailed to voters. These very short time periods could not give voters sufficient time to learn of these complex matters, analyze and evaluate what was said (and what was not said), and reach a reasoned and unhurried investment decision. *See* Cplt. ¶¶ 11, 84-85. Plaintiffs have found no case holding that four business days is enough time for public shareholders to absorb and analyze new developments. Rather, the precedents hold that such a short time is insufficient. *See e.g., Caruso v. Metex Corp.,* 1992 U.S. Dist. LEXIS 14556, *31-34 (E.D.N.Y. July 30, 1992)("We find as a matter of law that the Supplemental Proxy Statement mailed to the Metex Shareholders only four business days before the proxy vote did not give the shareholders reasonable notice of the matters contained therein.")(collecting cases); *Maywalt v. Parker & Parsley Petroleum Co.,* 808 F. Supp. 1037, 1045 (S.D.N.Y. 1992) (holding that plaintiffs adequately pled claim where supplemental prospectus documents issued too late: eleven and five days before shareholder meeting); SEC Release No. 34-16343 (Nov. 27, 1979), 1979 WL 173161, at *14-15 (it is "of overriding importance . . . that shareholders be given timely and accurate information of material changes" occurring since the proxy was filed).

Useful guidance may also be gleaned from the Delaware courts, which have frequently dealt with this issue, and held that supplemental disclosures require much longer than four business days to be absorbed. *See e.g., In re Del Monte Foods Co. S'holders Litig.,* 2011 Del. Ch. LEXIS 94, *5, 43-44 (Del. Ch. June 27, 2011)(where company voluntarily issued proxy supplement 10 days prior to court order, it was ordered to give shareholders *20 additional days* to consider it before voting); *La. Mun. Police Emples. Ret. Sys. v. Crawford,* 2007 Del. Ch. LEXIS 28, *3-5 (Del. Ch. Feb. 13, 2007)(holding four business days from filing of supplemental information on Form 8-K to be insufficient, even for institutional investors: "Nor does Caremark's large

institutional investor base provide the Court with much comfort: even institutional clients require time to receive, absorb, and decide upon new information."); *Wis. Inv. Bd. v. Bartlett*, 2002 Del. Ch. LEXIS 42, *2-3 (Del. Ch. Apr. 9, 2002)(company which issued supplemental proxy materials on January 31 ordered on February 9 to give proxy voters 15 more days to consider them, for a total of 24 days); *Herd v. Major Realty Corp.*, 1990 Del. Ch. LEXIS 211, *36-37 (Del. Ch. Dec. 21, 1990)(one week insufficient for supplemental materials; motion to dismiss denied); *In re Anderson, Clayton Shareholders' Litig.*, 519 A.2d 669, 675 (Del. Ch. 1986) (solicitation period of three days not sufficient to allow security holders a reasonable opportunity to receive and consider additional soliciting material prior to the meeting). *See also, Cannon v. Clark*, 2015 U.S. Dist. LEXIS 124526, *4-6 (S.D. Cal. Sept. 17, 2015)(shareholders provided notice of federal settlements via the filing of a form 8-K usually provided 30 days to consider their options); *Berger v. Intelident Solutions, Inc.*, 911 A.2d 1164, 1174 (Del. Ch. 2006)(ten days to consider complex proxy statement disclosures raised questions of procedural fairness, precluding motion to dismiss).

Thus, the April Disclosures cannot be said to have provided reasonable notice, and a reasonable opportunity to cast a well-informed vote. They do not comport with Section 14's requirement of timely notice to shareholders of all material facts. *See Caruso; Maywalt; SEC Release* No. 34-16343, *supra*; *see also State of Wis. Inv. Bd. v. Bartlett*, 2000 Del. Ch. LEXIS 22, *5-8 (Del. Ch. Feb. 9, 2000)(requiring 15 days for absorption of supplemental disclosures and observing: "an otherwise candid proxy statement may be so untimely as to defeat its purpose of meeting the needs of a fully informed electorate").

## D.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiffs' federal claims are also sufficiently pled with regard the element of loss causation. *See* Cplt. ¶¶ 2, 144-17. Several theories are asserted, all of which have been accepted by federal courts at the pleading stage.

In asserting that loss causation is not properly pled, Defendants err is several respects. First, they confuse a proxy claim with a Section 10(b) and Rule 10b-5 claim where a plaintiff usually must show that the shares he bought declined in value. Here, by contrast, there is no requirement that Hudson shares declined in value. It is sufficient under the proxy laws for Hudson holders to allege, *inter alia,* that they did not receive the expected value in the Merger with M&T due to the omissions or misrepresentations. *See In re AOL Time Warner Sec. & "ERISA" Litig.,* 381 F. Supp. 2d 192, 231-232 (S.D.N.Y. 2004)(loss causation was properly pled as "the Amended Complaint quite clearly alleges losses caused by a disparity between the transaction price and the *true investment value* of [the acquiring company]"); *In re Real Estate Assocs. Ltd. P'ship Litig.,* 223 F. Supp. 2d 1142, 1152-1153 (C.D. Cal. 2002)(agreeing that plaintiffs "are not required to show a diminution in the value of *their* securities in order to show loss causation in a § 14(a) claim. Another measure of damages (at least in the context of attacking a controlled merger) under Rule 14a-9 is what would have been a fair exchange upon full disclosure.").

Second, an allegation that a different transaction might have been negotiated had the full truth been disclosed—known as the "lost opportunity" theory-- has repeatedly been upheld as sufficient at the pleading stage. *See e.g., See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386-89 (1970) (ruling that that trial court should apply remedial flexibility when crafting Section 14(a) remedies, which could include, *inter alia,* "an accounting to ensure that the shareholders *receive the value that was represented as coming to them*"); *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 781 (3d Cir. 1976) ("recovery is not limited to out of pocket

loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment, unless the loss is wholly speculative."); *In re Heckmann Corp. Sec. Litig.,* 869 F. Supp. 2d 519, 542 (D. Del. 2012) (allegations that plaintiffs suffered a "lost opportunity" meet plaintiff's "minimal burden" at the pleading stage and cannot be deemed overly speculative prior to discovery).[18]

Defendants' "lost opportunity" authorities are inapposite: they have not identified a single case where plaintiffs' theory was rejected at the pleading stage. Every decision cited is a summary judgment ruling, based upon a full evidentiary record. *See e.g., Tse v. Ventana,* 123 F. Supp. 2d 213 (D. Del. 2000) (case allowed to proceed on lost opportunity theory and only rejected on summary judgment based on full record), *aff'd,* 297 F.3d 210 (3d Cir. 2002);[19] *Brown v. Brewer,* 2010 U.S. Dist. LEXIS 60863, at *107-08 (C.D. Cal. June 17, 2010)(lost opportunity theory upheld at pleading stage, but did not survive summary judgment); *Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.),* 294 F. Supp. 2d 616 (D. Del. 2003)(summary judgment); *Goldkrantz v. Griffin,* 1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. Apr. 5, 1999)(summary judgment). *Rubenstein v. IU Int'l Corp.,* 506 F. Supp. 311, 316 (E.D. Pa. 1980)(summary judgment). *But cf. Lazzaro v. Manber,* 701 F. Supp. 353, 367-368 (E.D.N.Y. 1988) ("Plaintiffs' allegation that 'Lazzaro and Fiumano received Primages units and warrants for their Cabletech units at the

---

[18] In the later class certification opinion relied upon by Defendants, *In re Heckmann Corp. Secs. Litig.,* 2013 U.S. Dist. LEXIS 79345 (D. Del. June 6, 2013) the plaintiffs had apparently narrowed their theories to a "diminution" of stock value, but there is no ruling in that case that this is the only way to plead or prove loss causation under the proxy laws. Indeed, the Court specifically noted the Defendants' concession that: "Courts have recognized that in some cases, a Section 14(a) claim can allow a plaintiff to recover damages *other than out of pocket damages measured by the difference between the promised value and the actual value of a stock.*" *Id.* at *44 and n. 212. *Accord, Real Estate Assocs, supra,* 223 F. Supp. 2d at 1152.

[19] *Cf. Tse v. Ventana Med. Sys.,* 1998 U.S. Dist. LEXIS 16760, *24-26 (D. Del. Sept. 23, 1998)(denying motion to dismiss lost opportunity theory).

established exchange ratio of 1 to 5 and thereby suffered substantial damage' is sufficient to allege injury"), *citing Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d at 381, 384 (2d Cir. 1974) (economic loss alleged in that there was an unequal, unfair merger ratio).

The Third Circuit's affirmance in *Tse* was of the summary judgment decision, based upon all the evidence. But in so affirming, the Circuit Court reaffirmed that: "We have, however, recognized, at least in the context of claims brought pursuant to § 14(a) of the Securities Act of 1934 and Rule 14a-9 promulgated thereunder…that plaintiffs may proceed on a theory of 'lost opportunity' without demonstrating any actual loss." 297 F.3d at 218. The fatal flaw in the evidence the *Tse* plaintiffs adduced was that efforts *had actually been made* to negotiate a better merger ratio and had failed, thus negating plaintiff's theory. *Id.* at 220. Here, there is no such evidence as there has been no discovery.

Third, with respect to Plaintiff's claim of diminished Hudson dividends due to the prolonged Merger delay, Plaintiff plead quite plainly that this cut was due to the Merger delay, and quote Hudson management to that effect. *See* Cplt. ¶116 (Hudson CEO Salamone discussed omission of any dividend due to financial setbacks, and explained that: "This has certainly been a challenging quarter for us. The latest unexpected delay in the Merger contributed to the first quarter's weak earnings."). Defendants' contentions otherwise are mere argument with the Complaint, and are not properly before the Court on this motion.

Fourth, the Complaint alleges damages based upon a diminution in value of M &T due to its hidden troubles—*i.e,* M&T didn't have the value it would have had absent its legal issues, and the value Hudson holders expected and were entitled to receive. Cplt. ¶2, 117. This, too, is a valid loss causation theory. *See e.g., Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 729 (D. Del. 2014)(loss causation pled where, as here, acquired company had undisclosed

liabilities and expenses); *Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 868-869 (S.D. Ohio 2013)(where, as here, omissions led to a skewed merger ratio and allegedly affected the fairness opinion, loss causation was properly alleged).

Finally, loss causation is highly fact sensitive, and rarely suitable for determination on the pleadings. Indeed, the general rule in proxy cases is that: "The parties' dispute over loss causation cannot be resolved at the pleadings stage." *In re Heckmann*, 869 F. Supp. 2d 519, 526 (D. Del. 2012), *citing Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000) ("While we are mindful that the defendants may disprove that the Class suffered a loss...we disagree that the defendants may do so at this stage."). *See generally, Omanoff v. Patrizio & Zhao LLC,* 2015 U.S. Dist. LEXIS 43086, *14 (D.N.J. Mar. 31, 2015)("The Third Circuit has repeatedly cautioned that this determination is a fact-sensitive inquiry typically left to the trier of fact."); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014)("Finally, as to damages, the Third Circuit has been reluctant to grant motions to dismiss based on speculative or complex damages."); *Kickflip, Inc. v. Facebook, Inc.,* 2015 U.S. Dist. LEXIS 41049, *16 (D. Del. Mar. 31, 2015)(averments of damage resulting from user complaints, bad press, loss of reputation and goodwill not too speculative at pleading stage).

Thus, Plaintiffs have sufficiently pled loss causation at this early stage.

## II. THE DELAWARE BREACH OF FIDUCIARY DUTY CLAIMS SHOULD BE UPHELD

Defendants argue that principles of fairness, economy and comity counsel in favor of declining jurisdiction because different former Hudson City shareholders brought suits in other courts alleging "the same cause of action" for breach of fiduciary duty, "arising under the same law pertaining to the same disclosure document", i.e. the materially deficient proxy. Defts' Br. at 35. To the contrary, Plaintiffs' fiduciary duty claim focuses on a very different set of facts

37

involving a failure to investigate M &T's state of legal compliance. *See* Cplt. ¶ 150. Defendants do not demonstrate that any of the substantive facts alleged here were ever alleged in the state class action. Defendants also aver that the settlement process in the New Jersey action will afford Plaintiffs in this action an opportunity to be heard, ignoring the allegation that this settlement "appears to have been abandoned." Cplt. ¶ 85, n. 2. To Plaintiffs' knowledge, there has been no activity in that action for more than three years. Further, Defendants' jurisdiction-ousting arguments are predicated upon the dismissal of Plaintiffs' federal securities law claims, but these claims are well-pled and should be upheld.

Plaintiffs' state law breach of fiduciary duty claim details how the Hudson Directors, faced with a legal obligation to investigate a wide multitude of issues, did at most five days of "reverse" due diligence while busy with other matters. Cplt. ¶¶ 57, 79, 149. This is a plain abdication of a legal duty. Moreover, it is undisputed that the Hudson directors were satisfied with the Joint Proxy saying nothing about legal compliance, other than the *disclaimer* that M & T's previous warranty of legal compliance should be taken as true.

When the April Disclosures were made, the Hudson directors made a hasty decision to proceed, after discussing the issue with M & T. It is clear in the proxy context that a director's reliance upon a potentially conflicted merger partner to tell him what the facts are is *not* due diligence (*see Escott supra,* p. 21). At this stage, the allegations as to these directors' legal "bad faith" (*i.e.,* a conscious abdication of a positive legal duty) at all junctures suffice to state a Delaware claim. *See e.g., Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),* 906 A.2d 27, 67 (Del. 2006)(bad faith may be found where directors failed to carry out legal obligations of which they were aware, and failed to act in the face of a known duty to act); *Mennen v. Wilmington*

*Trust Co.,* 2015 Del. Ch. LEXIS 122, *85-87 (Del. Ch. Apr. 24, 2015)(bad faith found where, *inter alia,* defendant could not prove he performed sufficient due diligence).

In the context of a proposed merger, corporate directors possess a "fiduciary responsibility to make an informed and independent decision on whether to recommend" the transaction. *McMullin v. Beran,* 765 A.2d 910, 924 (Del. 2000). When a board consciously disregards its duty to adequately investigate important new developments, however, such dereliction may establish a breach of the duty of loyalty. Similarly, when a board's conduct lacks "any rationally conceivable basis", courts may infer an improper motive and a breach of the duty of loyalty. *Chen v. Howard-Anderson,* 87 A.3d 648, 684 (Del. Ch. 2014).

Here, in the face of new, critical revelations, the Hudson City directors consciously failed to conduct an independent investigation into the nature or extent of M&T's BSA violations, opting instead to accept M&T's misleading representations without further scrutiny. *Id.* at ¶¶ 11-14, 150. In doing so, they consciously disregarded their continuing obligation to make an informed and independent decision on whether to recommend the Merger, and therefore breached their duty of loyalty. *See, e.g., Omnicare,* 818 A.2d at 938.

None of the cases cited by Defendants say otherwise. Instead, they merely confirm the principle – which Plaintiffs do not dispute – that a board which *attempts,* yet fails, to fulfill its duties may only be liable for breaches of the duty of care. *See, e.g., In re Lear Corp. S'holder Litig.,* 967 A.2d 640, 654-55 (Del. Ch. 2008). Nor does the fact that the Hudson City directors purportedly engaged in a piddling week's worth of reverse due diligence, months before the BSA violations were brought to light, alter the fact that they consciously failed to investigate further when evolving circumstances proved their initial diligence efforts to be woefully inadequate. This

was a complete abdication of their continuing fiduciary obligations, not a good faith attempt that merely fell short.

Further, as there is no rationally conceivable explanation for the Hudson directors' failure to investigate M&T's BSA violations, this raises an inference of some improper motivation. It is settled that "further judicial scrutiny is warranted if the transaction results from the directors' 'reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders'". *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 at n. 11 (Del. 2006) (*quoting Allaun v. Consol. Oil Co.*, 147 A. 257, 261 (Del. Ch. 1929)); *see also Nagy v. Bistricer*, 770 A.2d 43, 49 (Del. Ch. 2000) ("a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest").

The Court need not speculate at this juncture as to what that improper motivation may be- -Delaware courts flexibly acknowledge that the full panoply of human emotions and motivations may cause a fiduciary breach of this nature, including even the directors' shame or embarrassment that such matters were not previously detected by them. *See Brehm,* at 754. Under the circumstances, an inference of bad faith arises, precluding dismissal of Plaintiffs' fiduciary duty claim. *See Chen*, 87 A.3d at 684.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court find any deficiencies in the Complaint, however, Plaintiffs respectfully request leave to re-plead.[20]

Dated: June 20, 2016                                        **MURPHY & LANDON**

---

[20] Plaintiffs believe that the direct claims pled against Defendants herein suffice, and therefore do not oppose dismissal of the "control person" claims asserted under Section 20(a) of the Securities Exchange Act.

/s/ Frank J. Murphy
Francis J. Murphy, Jr. Del. Bar I.D. No. 223
Jonathan L. Parshall
1011 Centre Road, Suite 210
Wilmington DE, 19805
Tel: 302-472-8100
Liaison Counsel

Deborah R. Gross
Kaufman, Coren & Ress, P.C.
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: 215-735-8700
Co-Lead Counsel

Laurence D. Paskowitz
Paskowitz Law Firm P.C.
208 East 51st Street, Suite 380
New York, NY 10022
Tel: 212-685-0969
Co-Lead Counsel

Roy Jacobs
Roy Jacobs & Associates
420 Lexington Avenue, Suite 2440
New York, NY 10170
Tel: 212-867-1156

## CERTIFICATE OF SERVICE

I, Francis J. Murphy, Esquire, certify that PLAINTIFFS' MEMORANDUM OF LAW IN

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS was filed electronically on June 20,

2016, and is available for viewing and downloading from the ECF system.  Defendants' counsel

are registered ECF uses; therefore, service is complete upon Notice of Electronic Case Filing

generated in connection with the electronic filing of this pleading.

**MURPHY & LANDON**

*/s/ Francis J. Murphy*
Francis J. Murphy, DE I.D. #223
1011 Centre Road, Suite 210
Wilmington, DE  19805
Tel: (302)472-8100
Fax: (302)472-8135
fmurphy@msllaw.com
*Liaison Counsel*

00215489