IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DAVID JAROSLAWICZ, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

M&T BANK CORPORATION, HUDSON
CITY BANCORP INC., ROBERT G.
WILMERS, RENE F. JONES, MARK J.
CZARNECKI, BRENT D. BAIRD, ANGELA
C. BONTEMPO, ROBERT T. BRADY, T.
JEFFERSON CUNNINGHAM, III, GARY N.
GEISEL, JOHN D. HAWKE, JR., PATRICK
W.E. HODGSON, RICHARD G. KING,
JORGE G. PEREIRA, MELINDA R. RICH,
ROBERT E. SADLER, JR., HERBERT L.
WASHINGTON, DENIS J. SALAMONE,
MICHAEL W. AZZARA, VICTORIA H.
BRUNI, DONALD O. QUEST, JOSEPH G.
SPONHOLZ, CORNELIUS E. GOLDING,
WILLIAM G. BARDEL, and SCOTT A.
BELAIR,

Defendants.

Civil Action No. 15-897-RGA

## MEMORANDUM ORDER

The Defendants are M&T Bank Corporation, Hudson City Bancorp Inc., Robert G.

Wilmers, Rene F. Jones, Mark J. Czarnecki, Brent D. Baird, Angela C. Bontempo, Robert T.

Brady, T. Jefferson Cunningham, III, Gary N. Geisel, John D. Hawke, Jr., Patrick W.E.

Hodgson, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler, Jr., Herbert L.

Washington, Denis J. Salamone, Michael W. Azzara, Victoria H. Bruni, Donald O. Quest,

Joseph G. Sponholz, Cornelius E. Golding, William G. Bardel, and Scott A. Belair (collectively,

"Defendants"). Presently before me is Defendants' Motion to Dismiss the Amended Complaint

1

(D.I. 61). The individual defendants were either directors of M&T or Hudson City at the relevant time, with the exception of Rene F. Jones, who was the CFO at M&T. The complaint asserts the following claims: (1) a claim for negligent violation of Section 14(a) of the Exchange Act and Rule 14a-9 against M&T, the M&T directors and Rene F. Jones; (2) a claim for negligent violation of Section 14(a) of the Exchange Act and Rule 14a-9 against Hudson City and the Hudson City directors; (3) a claim against the M&T directors, Rene F. Jones, and the Hudson City directors as "control persons" under Section 20(a) of the Exchange Act; and (4) a state law claim for breach of fiduciary duty against the Hudson City directors. (D.I. 54). The briefing is complete. (D.I. 62; D.I. 66; D.I. 67). I held oral argument on October 26, 2016. (D.I. 69).

## I. BACKGROUND

The following allegations are highly relevant. To bolster and improve its business, Hudson City needed to explore new strategies. (D.I. 54 ¶ 55). Around June 2012, Hudson City explored possible acquisition by M&T. (*Id.* ¶¶ 56–57). M&T conducted intensive due diligence regarding Hudson City's operations from June 2012 through the August 27, 2012 signing of the merger agreement. (*Id.*). Hudson City and its Board did not conduct its reverse due diligence until the week beginning August 20, 2012. (*Id.*).

Defendants issued a Joint Proxy in February 2013 in connection with the merger between Hudson City and M&T. (*Id.* ¶ 2). The merger agreement which was in the Joint Proxy contains a provision which stated that "M&T and each of its Subsidiaries have complied in all material respects with, and are not in default or violation in any material respect of, (i) any applicable law, including . . . the Bank Secrecy Act . . . and any other law relating to . . . money laundering prevention . . . ." (D.I. 63-1 ("Joint Proxy"), App. A § 4.9). The Joint Proxy also contains

2

various disclaimers relating to this provision. (*See, e.g.*, Joint Proxy at 112–13). The merger agreement also represented that there were no legal violations of consumer disclosure laws (the "Consumer Violations"). (D.I. 54 ¶¶ 5, 7). This relates to M&T offering customers free checking, but then switching customers to accounts which carried fees. (*Id.*).

On April 12, 2013, Hudson City and M&T jointly announced via press release, which was accompanied by a proxy supplement, that regulators had expressed "concerns" with M&T's Bank Secrecy Act ("BSA")/Anti-Money Laundering regulations ("AML") procedures, systems, and processes. (*Id.* ¶ 11). On April 15, 2013, M&T convened a public conference call which had the effect of assuring concerned shareholders that M&T had violated no rules and regulations and that the matter was not a very serious one. (*Id.* ¶ 12).

Shareholders approved the merger at a meeting on April 18, 2013. (*Id.* ¶ 4). Regulators delayed the close of the merger for two and a half years while M&T got its regulatory house in order. (*Id.* ¶ 2). On October 9, 2014, the Consumer Financial Protection Board announced that it had taken action against M&T for the Consumer Violations. (*Id.* ¶ 7). According to the CFPB, these violations were occurring at the time the merger agreement was signed. (*Id.*). On September 30, 2015, regulators approved the merger. (*Id.* ¶ 4). A statement issued by regulators cited violations of the BSA/AML and violations with consumer disclosure laws (the "Consumer Violations") by M&T as factors delaying merger approval. (*Id.* ¶ 8). Defendants concede that M&T reached a settlement with the Consumer financial Protection Bureau which required M&T pay "redress to Affected Consumers" of $2.045 million. (D.I. 62 at p. 15). On November 1, 2015, the merger closed. (D.I. 54 ¶ 4).

Plaintiffs allege that the disclosures in the Joint Proxy were inadequate as they provided a misleading picture of M&T's business practices, its business risks, and its regulatory risks. (*Id.* ¶

3

77). They allege that M&T was not compliant with consumer protection laws and were weak in M&T internal controls and compliance regiments. (*Id.* ¶ 130). As to the press release and proxy supplement, they allege that no detail was provided as to the exact type of work that would be required to address the concerns of regulators, or the precise issues that prompted regulatory action. (*Id.* ¶ 11). They allege that this disclosure was deficient, incomplete, misleading, and untimely. (*Id.* ¶ 85). As to the public conference call, Plaintiffs allege that it failed to adequately represent the troubles M&T had with compliance, and the resources and time needed to fix them. (*Id.* ¶ 12). Plaintiffs allege that the Hudson City board conducted inadequate due diligence as to M&T's BSA/AML compliance. (*Id.* ¶ 79). Plaintiffs allege the Joint Proxy was an essential link in a chain of events leading to the merger, and proximately caused losses to Class members. (*Id.* ¶¶ 114–17).

## II. LEGAL STANDARD

### A. Rule 12(b)(6) Standard Generally

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*,

550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 347. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## B.    Section 14(a) of the Securities Exchange Act of 1934

15 U.S.C. § 78n(a)(1) ("Section 14(a) of the Securities Exchange Act of 1934") provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

15 U.S.C. § 78n(a)(1). "[Section] 14(a) of the Securities Exchange Act was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976) (internal quotations marks omitted). Rule 14a-9 is "issued pursuant to Section 14(a) of the Securities

5

Exchange Act of 1934." *Nat'l Home Prod., Inc. v. Gray*, 416 F. Supp. 1293, 1312 (D. Del.

1976). Rule 14a-9 provides:

> No solicitation subject to this regulation shall be made by means of any proxy
> statement, form of proxy, notice of meeting or other communication, written or
> oral, containing any statement which, at the time and in the light of the
> circumstances under which it is made, is false or misleading with respect to any
> material fact, or which omits to state any material fact necessary in order to make
> the statements therein not false or misleading or necessary to correct any
> statement in any earlier communication with respect to the solicitation of a proxy
> for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9. "To prevail on a § 14(a) claim, a plaintiff must show that '(1) a proxy

statement contained a material misrepresentation or omission which (2) caused the plaintiff

injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation

materials, was an essential link in the accomplishment of the transaction.'" *Tracinda Corp. v.

DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007).

## C.   Effect of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 on Pleading Section 14(a) Negligence Claims

"[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of

fraud with the requisite particularity mandated by Rule 9(b) and the Reform Act [PSLRA], they

may not benefit from inferences flowing from vague or unspecific allegations—inferences that

may arguably have been justified under a traditional Rule 12(b)(6) analysis." *California Pub.

Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004). "While claims brought

pursuant to section 14(a) of the 1934 Act do not require that scienter be pleaded, any claims

brought under the 1934 Act must meet the PSLRA particularity requirements . . . if a plaintiff

elects to ground such claims in fraud." *Id.* at 144–45. It is possible for Section 14(a) claims to

be pled and proved in terms of negligence. *Gould v. Am.-Hawaiian S. S. Co.*, 535 F.2d 761, 777

(3d Cir. 1976). It further appears to be an open question as to whether Section 14(a) claims pled

in terms of negligence are subject to Rule 9(b) or PSLRA particularity requirements.

As to Rule 9(b), *Chubb* implies that claims not grounded in fraud are not subject to Rule 9(b). *See Chubb*, 394 F.3d at 144–45. Furthermore, Section 14(a) can be "closely analogized" to Section 11 of the Securities Act of 1933, as amended. *Gould*, 535 F.2d at 777. Heightened pleading requirements under Rule 9(b) do not apply to Section 11 claims sounding in negligence and not fraud. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 (3d Cir. 2006). Thus, I do not see why Rule 9(b) should extend to Section 14(a) claims sounding in negligence. *See In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 321–22 (S.D.N.Y. 2010) (holding that Rule 9(b) does not apply to Section 14(a) claims sounding in negligence).

As to the PSLRA, *Chubb* also implies that claims not grounded in fraud are not subject to PSLRA. *See Chubb*, 394 F.3d at 144–45; *see also Chubb*, 394 F.3d at 170 (Sloviter, J., dissenting-in-part) ("We need not resolve the issue raised in the above cases because Plaintiffs should be able to file an amended complaint based on § 11 and § 14(a) that, if divorced from any allegations of fraud, would not be subject to heightened pleading requirements of the PSLRA."); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 538 (D. Del. 2012) (declining to apply heightened pleading under the PSLRA to negligence claims brought under § 14(a)); *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 321–22 (holding the same). Thus, because Plaintiffs' Section 14(a) claims sound in negligence (*see generally* D.I. 54),[1] they are not subject to heightened pleading requirements.[2]

///

---

[1] Plaintiffs' Brief states, "[H]ere, the federal claims are grounded solely in negligence." (D.I. 66 at 22).

[2] Defendants cite to *In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007 (E.D. Pa. Oct. 17, 2001) for the proposition that PSLRA applies to Section 14(a) negligence claims. (Tr. 8:5–14). Upon review of that case, it is unclear whether the court applied the PSLRA to a Section 14(a) negligence or fraud claim. *In re NAHC*, 2001 WL 1241007 at *21.

## III.   DISCUSSION

### A.   Section 14(a) of the Securities Exchange Act and Rule 14a-9

"As the Supreme Court has defined it, a misrepresentation or omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (internal quotations marks omitted). "[F]or a misrepresentation or omission to be material[,] there must be a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable shareholder as having significantly altered the total mix of information made available." *Id.* (internal quotations marks omitted). "The omission of information from a proxy statement will violate [§ 14(a) and Rule 14a–9] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (internal quotations marks omitted). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.*

Here, the alleged omission is essentially that M&T failed to comply with BSA/AML or the consumer disclosure laws or, at least, had substantial issues with compliance. This omission is material because it is plausible that a reasonable shareholder would consider information about the troubles M&T had with these issues and the resources and time needed to fix these issues, important in deciding how to act. It is plausible that there is a substantial likelihood that had the information been disclosed, it would have been viewed by the reasonable shareholder as having significantly altered the total mix of information made available. Even assuming the timeliness of the April disclosures, it is still plausible that a reasonable shareholder would have considered additional disclosure regarding BSA/AML or consumer disclosure law compliance material. I

8

note that Defendants do not argue that the Joint Proxy or the April disclosures disclose the

Consumer Violations. (D.I. 62; D.I. 67).

Although the alleged omission is material, no reasonable shareholder would find the

alleged omission renders section 4.9 of the merger agreement misleading because there is

adequate disclaimer of reliance on section 4.9. As noted previously, section 4.9 provides: "M&T

and each of its Subsidiaries have complied in all material respects with, and are not in default or

violation in any material respect of, (i) any applicable law, including . . . the Bank Secrecy Act . .

. and any other law relating to . . . money laundering prevention . . . ." The most relevant

disclaimer is found on pages 111 to 113 of the Joint Proxy. It provides:

> The merger agreement also contains representations and warranties made by
> M&T to Hudson City relating to a number of matters, including the following: . . .
> compliance with applicable law . . . .
>
> . . .
>
> This summary and the copy of the merger agreement attached to this document as
> Appendix A are included solely to provide investors with information regarding
> the terms of the merger agreement. They are not intended to provide factual
> information about the parties or any of their respective subsidiaries or affiliates.
>
> . . .
>
> The representations, warranties and covenants in the merger agreement were
> made solely for the benefit of the parties to the merger agreement, may be subject
> to limitations agreed upon by the contracting parties, including being qualified by
> confidential disclosures made for the purposes of allocating contractual risk
> between the parties to the merger agreement instead of establishing these matters
> as facts . . . . Investors are not third-party beneficiaries under the merger
> agreement, and in reviewing the representations, warranties and covenants
> contained in the merger agreement or any descriptions thereof in this summary, it
> is important to bear in mind that such representations, warranties and covenants or
> any descriptions thereof were not intended by the parties to the merger agreement
> to be characterizations of the actual state of facts or condition of M&T, Hudson
> City or any of their respective subsidiaries or affiliates.

(Joint Proxy at 111–13). This is more than mere boilerplate. No reasonable shareholder would

look at this disclaimer and then rely on the representations and warranties contained in section

4.9 to understand the actual condition of M&T.

Other provisions in the Joint Proxy are, however, rendered misleading by the alleged

omission. (*See* D.I. 66 at p. 21 (arguing that other disclosures trigger an independent obligation

to investigate and reveal the whole truth)). For example, in the "Summary" section of the Joint

Proxy, the relevant provision is as follows:

> Although we currently believe we should be able to obtain all required regulatory
> approvals in a timely manner, we cannot be certain when or if we will obtain them
> or, if obtained, whether they will contain terms, conditions or restrictions not
> currently contemplated that will be detrimental to or have a material adverse
> effect on M&T or its subsidiaries after the completion of the merger.

(Joint Proxy at 15). In the "Risk Factors" section of the Joint Proxy, the relevant provisions are

as follows:

> The United States government and others have recently undertaken major reforms
> of the regulatory oversight structure of the financial services industry. M&T
> expects to face increased regulation of its industry as a result of current and
> possible future initiatives. M&T also expects more intense scrutiny in the
> examination process and more aggressive enforcement of regulations on both the
> federal and state levels. . . . In addition to the reforms discussed in the
> immediately following risk factor, a number of reform provisions implemented
> pursuant to the Dodd-Frank Act and related regulations are likely to impact the
> ways in which banks and bank holding companies, including M&T, conduct their
> business . . . . Although it is difficult to predict the magnitude and extent of these
> effects, M&T believes compliance with the Dodd-Frank Act and its implementing
> regulations and other initiatives will likely negatively impact revenue and increase
> the cost of doing business, both in terms of transition expenses and on an ongoing
> basis, and may also limit M&T's ability to pursue certain desirable business
> opportunities. Any new regulatory requirements or changes to existing
> requirements could require changes to M&T's businesses, result in increased
> compliance costs and affect the profitability of such businesses.

(Joint Proxy at 34–36). In M&T's 10-K for the fiscal year ending December 31, 2011, the

relevant provision is as follows:

> The Uniting and Strengthening America by Providing Appropriate Tools
> Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot
> Act") imposes obligations on U.S. financial institutions, including banks and
> broker dealer subsidiaries, to implement and maintain appropriate policies,
> procedures and controls which are reasonably designed to prevent, detect and
> report instances of money laundering . . . . In addition, provisions of the USA
> Patriot Act require the federal financial institution regulatory agencies to consider
> the effectiveness of a financial institution's anti-money laundering activities when
> reviewing bank mergers and bank holding company acquisitions. Failure of a
> financial institution to maintain and implement adequate programs to combat
> money laundering and terrorist financing could have serious legal and reputational
> consequences for the institution. **The Registrant and its impacted subsidiaries
> have approved policies and procedures that are believed to be compliant with
> the USA Patriot Act.**

(M&T Bank Corp., Annual Report (Form 10-K) at p. 21 (Dec. 31, 2011) (emphasis added)).[3]

It is plausible that a reasonable shareholder would rely on these provisions and

reasonably find that the alleged omission renders these provisions misleading. These provisions

are misleading because at the time of the Joint Proxy, the complaint alleges that there were

compliance issues with BSA/AML and consumer disclosure rules. For example, the complaint

alleges that sometime in late-2012 to early-2013, bank regulators reviewed M&T's procedures,

expressed concern about them, required remedial efforts to be undertaken, and advised that the

merger would not be approved as scheduled. (D.I. 54 ¶ 83). This undermines the representation

in the Joint Proxy that Defendants "believe we should be able to obtain all required regulatory

approvals in a timely manner." (Joint Proxy at 15). It is plausible that the April disclosures,

again assuming their timeliness, did not adequately cure this deficiency, especially with respect

to the Consumer Violations. In contrast to section 4.9, which merely constitutes an allocation of

risk between M&T and Hudson City, these statements are not mere allocations of risk. Unlike

---

[3] Consideration of this form is appropriate. *See* Joint Proxy at 145 (incorporating by reference M&T's Annual
Report on Form 10-K for the year ended December 31, 2011)

11

with section 4.9, Defendants do not argue that there are disclaimers to these provisions. As such,
these statements are affirmative representations that need to be accurate, even assuming that they
are not "false." Given the allegations regarding the Consumer Violations and BSA/AML, it is
plausible that a reasonable shareholder would find these provisions misleading. It is plausible
that Defendants were at least negligent in failing to disclose the alleged omission. Plaintiffs have
also adequately pled loss causation. (*See* D.I. 54 ¶¶ 114–17).

Defendants make a fair, but technical, argument that Plaintiffs did not specifically plead
the Form 10-K issue in the complaint. (D.I. 67 at p. 6 n.2). I also note that Plaintiffs did not
specifically plead the provisions I noted in the "Risk Factors" and "Summary" sections of the
Joint Proxy as misleading provisions. Instead, the Section 14(a) claims are based on the merger
agreement's section 4.9, which cannot form the basis of a claim. Plaintiff, of course, cannot
amend its complaint based on briefing and argument. Thus, I will dismiss Plaintiffs' Section
14(a) claims, but with leave to amend.

## B.    Section 20(a) of the Securities Exchange Act

Plaintiffs do not oppose the dismissal of the Section 20(a) claims. (D.I. 66 at 48 n.20).
Defendants' Motion as to Section 20(a) is granted.

## C.    State Law Breach of Fiduciary Duty

Plaintiffs argue that Hudson City directors failed to conduct adequate due diligence in the
events leading up to the shareholder vote. (D.I. 66 at 37–40). Plaintiffs do not dispute
Defendants' assertion that Hudson City has a 8 Del. C.§ 102(b)(7) provision. (*See generally* D.I.
62, D.I. 66). I assess whether Plaintiffs sufficiently allege that the Hudson City directors'
conduct violated the standard set forth in *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27
(Del. 2006).

12

Delaware law "presumes that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" *Disney*, 906 A.2d at 52. "Those presumptions can be rebutted if the plaintiff shows that the directors . . . acted in bad faith." *Id.* "[G]rossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith." *Id.* at 65. Conduct which amounts to "intentional dereliction of duty, a conscious disregard for one's responsibilities" is a "non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith." *Id.* at 66. "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009). In *Lyondell*, the court found no bad faith where the directors met several times to consider a merger proposal, and, the court assumed, did absolutely nothing to prepare for the merger offer and did not even consider conducting a market check before agreeing to the merger. *Id.* at 244.

Plaintiffs fail to sufficiently allege that Hudson City directors' due diligence efforts amounted to bad faith. The fact that Hudson City's directors conducted at most seven days of due diligence on M&T leading up to the signing of the merger agreement, at most implicates the duty of care and is not enough to amount to an intentional dereliction of duty. Plaintiffs' allegations essentially go to whether they should have done more under the circumstances. *See id.* at 243 ("[I]f the directors failed to do all that they should have under the circumstances, they breached their duty of care."). I cannot say that the complaint plausibly alleges that Hudson City's directors "utterly failed" in conducting due diligence leading up the signing of the merger agreement. The allegation that at most seven days of due diligence was conducted is not an

13

allegation of "utter failure." The same goes for the alleged inadequate due diligence conducted by Hudson City directors' in connection with the Joint Proxy and the April disclosures in the lead up to the shareholder vote. Without more, Plaintiffs have failed to allege an "extreme set of facts." *Id.* at 243. At best, Plaintiffs' allegations about the directors' efforts amount to negligent conduct, which falls short of stating a breach of fiduciary duty claim under *Disney*. *See Disney*, 906 A.3d at 65.

While I am doubtful that Plaintiff can amend the complaint to state a fiduciary duty claim, inasmuch as I am granting leave to amend on the Section 14(a) claims, I will also grant it on the state law fiduciary duty claims.

## IV. CONCLUSION

Defendants' Motion to Dismiss (D.I. 61) is **GRANTED** with leave to amend as to the Section 14(a) claims, **GRANTED** with prejudice as to the Section 20(a) claims, and **GRANTED** with leave to amend as to the state law fiduciary duty claims. Counts I and II are **DISMISSED** without prejudice. Count III is **DISMISSED** with prejudice. Count IV is **DISMISSED** without prejudice.

Any amended complaint should be filed not later than twenty-one days from the date of this Memorandum Order.

It is **SO ORDERED** this 30th day of March, 2017.

Richard G. Andrews
United States District Judge

14