## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

DAVID JAROSLAWICZ, individually and on
behalf of all others similarly situated,

$\qquad$ **Plaintiffs,**

v.

M&T BANK CORPORATION, HUDSON CITY
BANCORP, INC., ROBERT G. WILMERS, RENÉ
F. JONES, MARK J. CZARNECKI, BRENT D.
BAIRD, C. ANGELA BONTEMPO, ROBERT T.
BRADY, T. JEFFERSON CUNNINGHAM III,
GARY N. GEISEL, JOHN D. HAWKE, JR.,
PATRICK W.E. HODGSON, RICHARD G. KING,
JORGE G. PEREIRA, MELINDA R. RICH,
ROBERT E. SADLER, JR., HERBERT L.
WASHINGTON, DENIS J. SALAMONE,
MICHAEL W. AZZARA, VICTORIA H. BRUNI,
DONALD O. QUEST, JOSEPH G. SPONHOLZ,
CORNELIUS E. GOLDING, WILLIAM G.
BARDEL, and SCOTT A. BELAIR,

$\qquad$ **Defendants.**

Civ. No. 1:15-cv-00897-RGA

Honorable Richard G. Andrews

SECOND AMENDED CLASS
ACTION COMPLAINT

FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

JURY TRIAL DEMANDED

Lead Plaintiffs, the Belina Family ("Lead Plaintiffs") and additional plaintiff Jeff Krublit (collectively, "Plaintiffs") by their attorneys, allege this Second Amended Class Action Complaint against the individual defendants (the "Individual Defendants") and the corporate defendants, M&T Bank Corporation ("M&T") and Hudson City Bancorp ("Hudson City"), named herein.

## NATURE OF THE CLAIMS

1.     Lead Plaintiffs and additional plaintiff Krublit were longtime holders of Hudson City shares.  Hudson City was a community bank that was founded in 1868, and by 2012 grew to

become the largest thrift institution headquartered in New Jersey.  It was a publicly-traded company, and was incorporated in Delaware.

2.     This action alleges that the defendants violated the federal proxy laws by issuing a joint proxy ("Joint Proxy" or "Proxy Statement") in February 2013 that was used to gain approval of a merger (the "Merger") between Hudson City and M&T, another publicly-traded bank.  By this Merger, M&T was to acquire Hudson City.  The defendants had a legal duty to conduct due diligence, so as to uncover all facts shareholders would find material to a Merger vote.  This duty extended to M&T's legal compliance with all state and federal laws, especially those whose violation could delay the Merger, affect its approval, or harm M&T's business going forward.

3.     However, the Joint Proxy—due to defendants' negligence-- was false, misleading and materially omissive both when issued, and when supplemented in April 2013 (the "April Disclosures") a few days prior to the Merger approval vote.  The Joint Proxy omitted to reveal that M&T had failed to comply with important federal consumer protection and Bank Secrecy Act laws and Anti-Money Laundering regulations, and the serious extent of such non-compliance.   Instead of discussing M &T's substantial compliance issues, the Joint Proxy contained affirmative representations that M&T was in full legal compliance via its incorporation by reference of annual reports on Form 10-K, stating: "The Registrant and its impacted subsidiaries have approved policies and procedures that are believed to be ***compliant with the USA Patriot Act*** [of which the relevant Bank Secrecy Act provisions are a part]." *See* M&T Bank Corp Annual Report on Form 10-K, filed Feb. 25, 2013, at p. 20; M&T Bank Corp., Annual Report on Form 10-K, filed Feb. 23, 2012, at p. 21.

00220909

4.      In truth, M&T had serious regulatory deficiencies with which it would struggle for many years to correct. Moreover, the Joint Proxy at p. 15 conveyed the impression that the Merger would close in a timely manner, a statement that would have been materially undermined by revelation of the true state of affairs, and the true regulatory picture.   M&T's regulatory deficiencies were partially disclosed in an untimely manner on the very brink of the Merger vote. Because of these issues, regulators refused to approve the Merger's close, which was delayed for an unprecedented two and a half years while M&T got its regulatory house in order, causing damages to Hudson City shareholders (who, among other things, approved a merger with an entity whose value was diminished by uncertainty, long delays and--ultimately--regulatory penalties). Plaintiffs were harmed by this course of events, and seek recompense for themselves and a class of similarly situated Hudson City shareholders for the damages they have suffered.

5.      The background of the Merger is as follows: Hudson City was in the midst of executing a promising new strategic plan when, on August 27, 2012, it announced that it would merge with defendant M&T, a bank located in Buffalo, New York.   M&T's focus was different from that of Hudson City, which was primarily a consumer bank.    By contrast, M&T concentrated on commercial banking and trust services.

6.      The Merger was to be effected pursuant to a Merger Agreement dated August 27, 2012 (the "Merger Agreement").   Hudson City shareholders were to receive a mixture of cash and M&T stock.   Before it could close, the Merger required approval of the shareholders of Hudson City at a meeting which was scheduled to be held on April 18, 2013.   At that meeting, the Merger was approved but, as noted, did not close until two and a half years later, due to regulatory concerns and legal compliance issues affecting M&T.   These legal compliance issues were not fully and fairly disclosed prior to the Merger vote.   It was not until September 30, 2015

00220909

that federal regulators approved the Merger, and not until November 1, 2015 that the Merger closed.

7.      After years of denying any major problems, M&T was finally forced to reveal that it was seriously out of compliance with the Bank Secrecy Act and the Anti-Money Laundering regulations ("BSA/AML Violations") in connection with millions of customer accounts, and that it was also out of compliance with consumer disclosure laws (the "Consumer Violations"). These legal compliance issues, which pre-dated the Merger vote, delayed the Merger, and harmed Hudson City shareholders.

8.      Beginning in early 2015, M&T finally disclosed that it was in the process of validating and verifying the identities of those millions of customers, something it should have done as a routine matter of course in order to be fully in compliance with the law.  It was legally obligated to do this well before it issued the Joint Proxy—a document that incorporated assertions in annual reports that there were no such violations.  As to the Consumer Violations, it was not until October 9, 2014 that the Consumer Financial Protection Board ("CPFB") announced that it had taken action against M&T for offering free checking, but then switching customers to accounts which carried fees.  This practice was still in place, according to the CPFB, at the time the Merger Agreement was signed.  The Joint Proxy disclosed no legal violations of any type, rendering it materially omissive and misleading.

9.      Because of these defalcations and the apparent ire of regulators towards M&T, the transaction at issue was the longest-pending bank merger in history.  Indeed, in a statement issued by Federal Reserve Board on September 30, 2015 (the "Federal Reserve Statement"), regulators cited the BSA/AML Violations and the Consumer Violations as the factors which delayed the approval of the Merger.  Regulators also announced new restrictions on M&T's

00220909

business.   Upon this announcement, M&T shares fell significantly.   These restrictions have continued into 2017.

10.     As detailed herein, both companies, and their directors, as well as the M&T Chief Financial Officer, violated Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 which encompass the federal proxy laws.   In order to obtain the desired shareholder approval, each company was required by law to issue a truthful, non-misleading and complete proxy statement, setting forth all material facts.   Hudson City and M&T opted to file the Joint Proxy with the SEC.   When parties to a merger decide to proceed in this way, the companies involved, and their directors and officers who solicit the proxy, become virtual guarantors of the accuracy and completeness of the Proxy Statement.    The standard for liability under section 14(a) and Rule 14a-9 is simple negligence.

11.     A Preliminary Proxy statement and prospectus on SEC Form S-4 was filed with the SEC on October 15, 2012.  Subsequently, the Joint Proxy was declared effective on February 22, 2013, and mailed to shareholders on or about February 27, 2013.   This Joint Proxy announced a special meeting of Hudson shareholders on April 18, 2013 and of M&T shareholders on April 16, 2013, to vote on the Merger. However, less than one week before the shareholders' meetings, but in all likelihood after most shareholders had already cast their ballots, on April 12, 2013, Hudson City and M&T jointly announced via a press release that regulators had expressed "concerns" with M&T's procedures, systems and processes related to BSA/AML.  These issues would require some work to be done, according to the press release, but this work only required an extension of a few short months in the Merger closing date.  No detail was provided as to the exact type of work that would be required, or the precise issues that had prompted this regulatory action.    This announcement was accompanied by a Proxy

5

00220909

Supplement which was completely vague regarding these matters, omitted all particulars, and in any event, provided proxy voters with insufficient time to evaluate the situation. Having issued the Proxy Supplement, Defendants were under an obligation under the federal proxy laws to perform due diligence regarding the matters addressed therein, and to fully report all material facts. Defendants failed to do so.

12.     The materially incomplete and inadequate Proxy Supplement was followed by a public conference call convened by M&T on Monday, April 15, 2013 which had the effect of assuring concerned shareholders that M&T had violated no rules and regulations (an assertion that has turned out to be incorrect) and that the matter was not a very serious one. M&T's CFO Jones stated on that call that the regulatory issues would delay the close of the Merger in the "near term", and that the close had been postponed only five months while "M&T works hard to resolve these issues." Jones also assured that: "We have no reason to believe that the issues involve any wrongdoing or illegal conduct by anyone at M&T….". This, too, was inaccurate, as M&T has conceded it has not complied with the Bank Secrecy Act as to millions of accounts, and regulatory violations constitute illegal conduct. Jones also made statements that inaccurately minimized the work ahead, asserting that the regulatory issues could be addressed "quickly", and might involve hiring 100 people. This was an erroneous representation of the troubles M&T had with compliance, and the resources and time needed to fix them. In actuality, over 900 employees, consultants and contractors would be needed to address the issues over several years. Jones also asserted he could not provide full details, as "we have obligations to keep supervisory information confidential…." These April Disclosures were made between 2 and 4 business days prior to the April 18, 2013 vote.

6

00220909

13.     Analysts who followed Hudson City and M&T, and who were reliant on CFO Jones for informing them as to the particulars of the situation, were quoted that day as saying M&T's issues were likely immaterial.   But as one analyst from Raymond James & Co. presciently predicted: "I don't believe we are going to find out exactly what happened.  I think they are hardly going to say anything."

14.     Neither M&T nor Hudson City sought to adjourn the April 18, 2013 meeting in light of this development so that they might do adequate due diligence regarding M&T's practices and ensure a Proxy Statement that fully and completely disclosed all the facts.  Had any of the defendants at that time performed adequate due diligence, they would have discovered, among other things, that M&T's "Know Your Customer" obligations as to millions of customer files were non-compliant, and that years of delay and huge expenditures were very likely ahead. They also would have discovered the Consumer Violations, which had been quietly curtailed by M&T just *four weeks* after the execution of the Merger Agreement, but which still posed a serious threat of adverse regulatory action that could delay the Merger.

15.     Following the shareholder vote approving the Merger, the deadlines for completing the Merger were repeatedly extended.  Thus, as the new deadline of January 2014 to close the Merger approached, M&T reported that this deadline could not be met.  On December 16, 2013, the parties extended the deadline to December 31, 2014.

16.     In conference calls during 2013 and 2014, usually hosted by M&T CFO Jones, Jones doled out dribs and drabs of information, which was never enough to determine exactly what issues M&T was facing, and exactly what it was doing to satisfy regulators.  Instead, M&T provided vague generalities, usually with an emphasis on conveying that M&T was enhancing its systems so that, going forward, M&T would be in compliance with supposedly new regulatory

7

00220909

requirements.  To the extent M&T needed to look at any historical data or customers, M&T minimizes the work that needed to be done.

17.     For example, in the December 2013 announcement of the extension of the deadline, specifics were lacking and generalities were aplenty:

> As previously disclosed, the Federal Reserve identified certain regulatory concerns with M&T's procedures, systems and processes relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program.  Early in 2013, M&T commenced a major initiative to fully address the Federal Reserve's concerns.  M&T is devoting substantial resources towards this initiative and believes that it is making significant progress.  Based upon discussions with the Federal Reserve, M&T expects that additional time will be required for the Federal Reserve to act on the merger application, and that any such action is not likely to occur before the latter part of 2014.

18.     It was not until October 17, 2014 that M&T admitted through CFO Jones that: "we have *sort of* implemented a review by a third party to *sort of* determine whether certain *transactions undertaken in the past* by our customers were properly identified and reported and of course that's ongoing."   And Jones also revealed that M&T was now: "getting customer information *on all of our customers*.  So not just the high risk ones.  We then have got to get them [sic] on the medium risk and the low risk customers; have all got to go through sort of a refresh of information."   Even though this statement edged closer to revealing what was actually going on, Jones still left the impression (which was inaccurate) that what M&T was focusing on was merely an updating process, a "refresh"—and not on anything M&T might have done wrong in the past.  Thus, the plain message—which had been the consistent message since April 2013-- was that M&T was not aware of anything it had historically done wrong, but was endeavoring to simply update its records, as any bank might.

19.     The Merger again failed to close on December 31, 2014, and a new closing date was established of April 30, 2015.  By April 2015, it was disclosed that this deadline, too, would

00220909

not be met.  Yet Hudson City seemed to be as in the dark as what was going on at M&T as the general public. On April 6, 2015, Hudson City said it was "unexpectedly" advised by M&T "late in the afternoon on April 3, 2015" that the Federal Reserve Board would not act on the application before April 30, 2015.  Hudson City CEO Denis Salamone added that: "given the unexpected notice of delay over a holiday weekend, the Board of Hudson City *needs more time to understand the nature and timing of the delay* and its potential impact on the transaction before the Board can determine its course of action."  Hudson City was so sure the merger would close that it had even begun asking shareholders whether they would prefer cash or stock consideration upon the Merger's close.  The deadline was extended to October 31, 2015.

20.     M&T was now under great pressure to explain to its investors exactly what was going on internally.  Thus, on April 22, 2015, at its annual shareholders meeting, M&T, which had repeatedly cited the secrecy of regulatory proceedings for its failure to provide detailed information over the years, and had denied any violations of law, revealed that millions of accounts which were in existence at the time of the Joint Proxy  were presently undergoing a lengthy remedial process.  M&T was obligated, according to M&T Chairman Wilmers, to "verify and validate" the identities of those 3.5 million customers.  It had only done so as to one million customers to date.  But M&T had a responsibility under federal law to have done so adequately as to those millions of customers since at least issuance of the 2003 "Know your Customer" regulations promulgated under the PATRIOT Act.  On November 6, 2015, at an industry conference, M&T CFO Jones finally conceded the true nature of the colossal work that had to be done, stating: "[M&T] had to go through a look back and look at all of our customers and review *quite literally every single customer* that we have in the bank and go back and relook through that process."

21.     That millions of accounts were so deficient would have been highly material to Hudson City shareholders who were entitled to vote at the April 18, 2013 meeting.  This shocking fact would have indicated: (a) that the M&T assertions in the incorporated Form 10-Ks as to BSA/AML compliance were omissive, inaccurate and materially misleading; (b) that M&T was at high risk of regulatory action, which could threaten or delay Merger approval and/or take years, and hundreds of millions of dollars to resolve, and damage M&T prospects going forward; (c) that Hudson City was at great risk proceeding as it needed to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) that the merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (e) that Hudson City's dividend was at risk during the time period it would take for a merger to be completed.[1]

22.     By September 30, 2015, after two and a half years of effort, M&T had finally made enough progress that regulators decided to approve the Merger.  Unfortunately for Hudson City shareholders, they had suffered diminished dividend payouts; held or sold shares at prices reflecting M &T's diminished value; and/or were now stuck with acquiring shares in a bank with a spotty regulatory record, and now barred by regulators from any "expansionary activities" until regulators are satisfied that all the aforementioned legal issues are fixed.  Federal Reserve Statement, at 13-14.  This was a further blow to M&T, and a further blow to its value, as M&T has traditionally grown through expansionary activities.  Indeed, as recently as January 2017, M&T's current CFO, Darren King, confirmed that M &T was still being negatively affected by the expansion bar.

---

[1] When the Merger was approved on September 30, 2015, *Buffalo Business First* observed as to M&T's BSA/AML issues: "The details of those weaknesses **have never been fully disclosed**…" *Buffalo Business First*, "A Look at What's Next for M&T After the Hudson Deal," Oct. 1, 2015.

00220909

23.     Based on the foregoing, Plaintiffs assert the following claims on behalf of themselves and the Class: (a) a claim for negligent violation of Section 14(a) of the Exchange Act and Rule 14a-9 against M&T, its directors and its CFO; and (b) a claim for negligent violation of the Section 14(a) of the Exchange Act and Rule 14a-9 against Hudson City and its directors.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a) and the rules and regulations promulgated thereunder, including SEC Rule 14a-9, 17 C.F.R. 12 §240.14a-9.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Hudson City is incorporated in this District and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

26.     Lead Plaintiffs, the Belina Family, was a holder of Hudson City shares entitled to vote on the Merger via a Joint Proxy disseminated on February 22, 2013 and as set forth in the certification attached to the motion for appointment as Lead Plaintiffs, and did vote on the Merger. They held such shares until on or about May 7, 2015.  Additional Plaintiff Jeff Krublit

11

00220909

was likewise a holder of Hudson City shares entitled to vote on the Merger via a Joint Proxy disseminated on February 22, 2013, and held such shares through the close of the Merger.

27.    Defendant M&T is a New York corporation, with principal executive offices at One M&T Plaza, Buffalo, New York 14203.  M&T may be deemed a solicitor of the Joint Proxy in question as the corporate filer of the October 15, 2012 Registration Statement containing the Joint Proxy, as the disseminator of the Joint Proxy, and as a person who permitted its name to be used in connection with a proxy solicitation.

28.    Defendant Hudson City is a Delaware corporation, with principal executive offices at West 80 Century Road, Paramus, New Jersey 07652.  Hudson City may be deemed a solicitor of the Proxy in question as a corporate filer and drafter of the Joint Proxy and as the issuer who directly solicited proxies from its shareholders.

29.    Defendant Robert G. Wilmers ("Wilmers") was, at the time of the Joint Proxy, chairman of the board and chief executive officer of M&T Bank, chairman of its Executive Committee and a member of its Trust and Investment Committee.  Wilmers was a director since 1982.  Wilmers may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

30.    Defendant René F. Jones ("Jones") was, at the time of the Joint Proxy, Chief Financial Officer and Executive Vice President of M&T.  Jones may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.

00220909

31.     Defendant Mark J. Czarnecki ("Czarnecki") was, at the time of the Joint Proxy, President of M&T and a director since 2007.   Czarnecki may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation. In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders." Mr. Czarnecki passed away in February 2017, and his estate will be substituted in due course.

32.     Defendant Brent D. Baird ("Baird") was, at the time of the Joint Proxy, a member of M&T's Executive Committee and a director since 2007.   Baird may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

33.     Defendant C. Angela Bontempo ("Bontempo") was, at the time of the Joint Proxy, a member of M&T's Audit and Risk Committee and a director since 1991.  Bontempo may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted her name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

34.     Defendant Robert T. Brady ("Brady") was, at the time of the Joint Proxy, a member of M&T's Board of Directors since 2007.  Brady may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint

00220909

Proxy and as a person who permitted his name to be used in connection with a proxy solicitation. In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

35.     Defendant T. Jefferson Cunningham, III ("Cunningham") was, at the time of the Joint Proxy, a member of the Risk Committee and a director since 2001.  Cunningham may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

36.     Defendant Gary N. Geisel ("Geisel") was, at the time of the Joint Proxy, a member of M&T's Risk Committee and a director since 2009.   Geisel may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

37.     Defendant John D. Hawke, Jr. ("Hawke") was, at the time of the Joint Proxy, a member of the Board of Directors since his appointment thereto on June 8, 2012.  Hawke may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the

00220909

boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

38.    Defendant Patrick W.E. Hodgson ("Hodgson") was, at the time of the Joint Proxy, a member of M&T's Executive Committee and Audit and Risk Committee and a director since 1987.  Hodgson may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."  Mr. Hodgson passed away in December 2016, and his estate will be substituted in due course.

39.    Defendant Richard G. King ("King") was, at the time of the Joint Proxy, a member of M&T's Audit and Risk Committee and a director since 2000.   King may be deemed a solicitor of the Joint Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

40.    Defendant Jorge G. Pereira ("Pereira") was, at the time of the Proxy, Vice Chairman of M&T's Board and a director since 1982. Pereira may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

00220909

41.     Defendant Melina R. Rich ("Rich") was, at the time of the Proxy, an M&T director since 2009.  Rich may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

42.     Defendant Robert E. Sadler, Jr. ("Sadler") was, at the time of the Proxy, a member of M&T's Risk Committee and a director since 1999.  Sadler may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

43.     Defendant Herbert L. Washington ("Washington") was, at the time of the Proxy, a member of M&T's Audit and Risk Committee and a director since 1996.  Baird may be deemed a solicitor of the Proxy in question as a signer of the October 15, 2012 Registration Statement containing the Joint Proxy and as a person who permitted his name to be used in connection with a proxy solicitation.  In addition, the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

44.     Defendants Wilmers, Czarnecki, Baird, Bontempo, Brady, Cunningham, Geisel, Hawke, Hodgson, King, Pereira, Rich, Sadler, and Washington shall sometimes be referred to herein as the M&T Directors.

00220909

45.     Defendant Denis J. Salamone ("Salamone") was, at the time of the Proxy, a Hudson City director since 2001, Acting Chairman, CEO and COO.  Salamone may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

46.     Defendant Michael W. Azzara ("Azzara") was, at the time of the Proxy, a Hudson City director since 2002.  Azzara may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

47.     Defendant Victoria H. Bruni ("Bruni") was, at the time of the Proxy, a Hudson City director since 1996.  Bruni may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

48.     Defendant Donald O. Quest ("Quest") was, at the time of the Proxy, a Hudson City director since 1983.  Quest may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

49.     Defendant Joseph G. Sponholz ("Sponholz") was, at the time of the Proxy, a Hudson City director since 2002.  Sponholz may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

50.     Defendant Cornelius E. Golding ("Golding") was, at the time of the Proxy, a Hudson City director since 2010.  Golding may be deemed a solicitor of the Proxy as the Joint

Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

51.     Defendant William G. Bardel ("Bardel") was, at the time of the Proxy, a Hudson City director since 2003.  Bardel may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

52.     Defendant Scott A. Belair ("Belair") was, at the time of the Proxy, a Hudson City director since 2004.  Belair may be deemed a solicitor of the Proxy as the Joint Proxy states at p. 1 "each of the boards of directors of M&T and Hudson City is soliciting proxies using this document from their respective shareholders."

53.     Defendants Salamone, Azzara, Bruni, Quest, Sponholz, Golding, Bardel and Belair shall sometimes be referred to herein as the "Hudson Directors."

## FACTUAL ALLEGATIONS

### A.  Hudson City Adopts a Strategic Plan and Explores Merger Opportunities

54.     As described in the Joint Proxy: "Hudson City has long maintained a traditional residential mortgage lending business model, retaining substantially all the residential mortgage loans it originates in its portfolio.  Beginning in 2008 and continuing through 2009, the economy fell into a deep recession, and there was turmoil in the financial marketplace.  The recession and the weak economic conditions that prevailed following the recession had an adverse impact on Hudson City.  However, as a result of Hudson City's conservative mortgage underwriting process and traditional mortgage lending business model, these economic conditions did not affect Hudson City to the same extent and in the same manner as many other financial institutions, and Hudson City fared relatively well compared to other financial institutions."

00220909

55.     In 2011 and 2012, Hudson City held exploratory talks with potential merger partners, but no transaction resulted.  Finding an acquisition partner was not an emergency.  In 2011 and early 2012, Hudson City was able to pay dividends at a rate of 32 cents per year, for a yield of about 5%.  But in order to bolster and improve its business, Hudson City needed to explore new strategies.  In the first quarter of 2012, Hudson City retained a leading international consulting firm, McKinsey & Co. ("the Consultant") to perform a strategic review of its existing business and to assess the feasibility of a diversification of its business and the resources that would be required to implement the new strategic initiatives.

56.     At the June 2012 meeting of the Hudson City board of directors, the Consultant presented a strategic plan (the "Strategic Plan") based on its review of the company. The strategic plan presented a variety of options ranging from short-term tactical opportunities to long-term changes to Hudson City's business model.  The Board approved the Strategic Plan, with some modifications.

57.     At about the same time, however, Hudson City explored a possible acquisition by M&T.   The parties entered into a confidentiality agreement and "initiated exploratory discussions to determine whether a combination might be feasible and how that combination might be structured. M&T also commenced due diligence on Hudson City."  Proxy, p. 66.  The Joint Proxy contains a detailed chronology of the negotiations between Hudson City and M&T. Significantly, M&T conducted intensive due diligence regarding Hudson City's operations from June 2012 through the August 27, 2012 signing of the Merger Agreement.  By contrast, Hudson City and its Board, however, did not commence its "reverse due diligence" until the week beginning August 20, 2012, providing it with at most five business days for all due diligence concerning M&T's considerable business operations.  In this very short time span, with many

other things going on, it is inconceivable that Hudson City's Board could have conducted adequate due diligence. There is no mention in the Joint Proxy Statement of any due diligence M&T's Board conducted of M&T's operations, including its state of legal compliance.

58.     After several weeks of negotiations, an agreement to merge was reached by August 27, 2012. The Merger consideration was negotiated to be a mix—60% stock, and 40% cash. As stated in the Joint Proxy: "If the merger is completed, you will receive, at your election (but subject to proration and adjustment procedures set forth in the merger agreement), either 0.08403 of a share of M&T common stock or cash having a value equal to 0.08403 multiplied by the average closing price of M&T common stock for the ten trading days immediately preceding the completion of the merger, for each share of Hudson City common stock you hold immediately prior to the completion date of the merger."

59.     In explaining why the Hudson Board chose to merge with M&T as compared to other strategic alternatives or discussions with other potential interested parties, the Joint Proxy noted that (Joint Proxy at 67-68):

> The Hudson City board of directors considered the fact that various banking regulators have recently imposed more stringent requirements for regulatory approvals of acquisitions, including, as a result of new statutory requirements imposed by the Dodd-Frank Act, an evaluation of systemic risk in larger acquisition transactions and enhanced capital, liquidity and other requirements for financial institutions with more than $50 billion in assets, as well as M&T's record of acquisition approvals, its current status under the Dodd-Frank Act as a financial institution with more than $50 billion in assets, and its long-term strong financial results. *In addition, the Hudson City board of directors believed that there would be a likelihood of approval on a timely basis for a transaction with M&T.* The Hudson City board of directors also considered the fact that Hudson City did not have actionable proposals from Party A and Party B, the strong performance of M&T's stock, and other factors described under "Recommendation of the Hudson City Board of Directors and Reasons for the Merger," in making its determination. The Hudson City board of directors also considered the fact that its long-term, standalone strategic plan would require substantial management, financial and employee resources and would take an

00220909

extended period of time to implement, and the risks and challenges inherent in a successful execution of that plan.

**B.      Benefits The Merger Would Bring to M&T**

60.      The Joint Proxy listed a number of valuable benefits that would accrue to M&T from its union with Hudson City.  These benefits included improving M&T's capital ratios, providing M&T access to the valuable New Jersey market, and diversifying M&T's loan portfolio.  On the day the Merger was announced, the press release issued by both companies stated, in part:

> M&T expects to gain approximately $25 billion in deposits and $28 billion in loans from the merger (before acquisition accounting adjustments), giving M&T the fourth largest deposit share in New Jersey.

> "To the customers and communities now served by Hudson City, M&T brings a wider array of banking products and services," [said M&T Chairman] Wilmers. "As a thrift, Hudson City focused primarily on deposits and mortgages.  M&T will build on Hudson City's loyal customer base to create a comprehensive community banking franchise that provides a full range of checking and savings accounts, debit and credit cards, home equity loans and other lending options, plus small business and commercial banking services and our premier wealth management and corporate trust solutions through Wilmington Trust."

61.      In a late 2013 conference call, M&T's CFO, Jones, expounded on the benefits of the Merger:

> [W]e've always wanted to be in New Jersey, we have customer contact in New Jersey. But over the last 30 years we've never found a place that we could get into economically that had a good sizable enough franchise but at the same time happened at a place where we could add some strategic value, in essence which means that you could have some decent size returns.

> So, I think really what I think about that is that Hudson City had a goal of transforming itself into a commercial bank. We actually could make that happen much, much faster. *And so essentially what it does it gives us a free option on New Jersey, but it does it in an economical way. And I think without it would be very, very hard for us to sort of establish a strong enough market share position to operate a bank very effectively and efficiently over time.*

00220909

So, that's what we saw when we went in and we think we structured a deal that was good for both sides. That's clearly – I think that's really actually clearly been evident. So, that's our thought process. We have a bit to do on the building out of our sales force, but actually that part of the process was way ahead and is way ahead, so I think we'll try to work our way through, see if we can get regulatory approval, and I think if we do it'll probably be another nice strong transaction in the classic sense that you've seen from M&T before.

62. M&T's enthusiasm for the Merger did not wane with time. From its public statements, however, it appears that Hudson City's patience wore thin, as the delays were longer than it was led to believe, and it and its shareholders suffered economic harm from these delays (as further detailed below). Hudson City had bargained for, and had the right to withdraw from the Merger without paying the economic penalty for doing so originally set forth in the Merger Agreement. The vague, materially incomplete and materially misleading reassuring statements of M&T since the first Merger extension appear to have lulled Hudson City into exhibiting greater patience than it would have exhibited had it known the full truth.

**C.  The Regulatory Framework**

63. Both Hudson City and M&T were required to strictly comply with all federal rules and regulations, included those promulgated under the Bank Secrecy Act ("BSA"), as modified and amended by the USA PATRIOT Act. The collective body of rules and regulations designed to prevent money laundering is known as BSA/AML (*i.e.*, Bank Secrecy Act/Anti-Money Laundering). These rules and regulations were in place prior to 2012, and remained materially unchanged throughout the relevant period.

64. Money laundering is the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (i.e. "clean"). Money laundering can facilitate crimes such as drug trafficking and terrorism, and can adversely impact the global economy.

00220909

65.     The BSA was established in 1970 and has become one of the most important tools in the fight against money laundering. Since then, numerous other laws have enhanced and amended the BSA to provide law enforcement and regulatory agencies with the most effective tools to combat money laundering.

66.     The "Know Your Customer rules," which have been in place for well over a decade, are the cornerstone of a legally sufficient anti-money laundering program. Federal authorities take money laundering, and measures to detect it very seriously. Banks must have a written Customer Identification Program ("CIP"). "The CIP must be incorporated into the bank's BSA/AML compliance program, which is subject to approval by the bank's board of directors." FFIEC BSA/AML Examination Manual." See FFIEC BSA/AML Examination Manual, p. 47, www.occ.gov/publications/publications-by-type/other-publications-reports/ffiec-bsa-aml-examination.pdf. Regulated banks run afoul of the authorities when their written CIP is inadequate, or when it has not been properly followed. Determining whether a bank is in compliance with legal procedures does not require a complete review of its files; rather, compliance may be gauged through a "sampling" of procedures applied to a subset of customer accounts.

67.     The type and extent of BSA/AML efforts expected of a bank may also depend on its size and the nature of its banking activities. Banks know that growing their operations via a merger or acquisition may draw greater regulatory scrutiny--this fact enhances the need for the bank to detect problems ahead of the regulators, who are bound to take a closer look after a merger is announced.

68.     Compliance deficiencies can affect needed regulatory approvals, especially when the regulated bank seeks to change its activities, or expand its business. Here, numerous

00220909

regulatory approvals were needed to complete the Merger, including but not limited to approval

(i) from the Federal Reserve Board and the NYSDFS, (ii) under the Hart Scott Rodino Antitrust

Improvements Act of 1976, as amended (the "HSR Act").    As explained further in the Joint

Proxy, p. 99:

> *Federal Reserve Board.* Completion of the merger is subject, among other things, to approval by the Federal Reserve Board pursuant to Section 4 of the Bank Holding Company Act of 1956, as amended (the "BHC Act"). In considering the approval of an application under Section 4 of the BHC Act, the Federal Reserve Board reviews whether the proposed acquisition can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, unsound banking practices, or risk to the stability of the United States banking or financial system. As part of its evaluation of these factors, the Federal Reserve Board reviews: (1) the financial and managerial resources of the companies involved, including pro forma capital ratios of the combined company (both in terms of absolute capital ratios and capital ratios relative to peer groups determined by the regulators) (2) the effect of the proposal on competition in the relevant markets, (3) the risk to the stability of the United States banking or financial system, (4) the public benefits of the proposal and (5) *the effectiveness of the companies in combatting money laundering.*

> In addition, completion of the bank merger is subject to receipt of the approval of the Federal Reserve Board under Section 18(c) of the Federal Deposit Insurance Act (the "Bank Merger Act"). The Federal Reserve Board is prohibited from approving any merger transaction under the Bank Merger Act that would result in a monopoly or be in furtherance of any combination or conspiracy to monopolize, or to attempt to monopolize, the business of banking in any part of the United States, or whose effect in any section of the United States may be to substantially lessen competition, or to tend to create a monopoly or in any other manner restrain trade, unless the Federal Reserve Board finds that the anti-competitive effects of the merger transaction are clearly outweighed in the public interest by the probable effect of the merger transaction in meeting the convenience and needs of the communities to be served. In evaluating an application filed under the Bank Merger Act, the Federal Reserve Board considers: (1) the competitive impact of the transaction, (2) financial and managerial resources and future prospects of the existing and insured depository institutions which are parties to the bank merger, (3) the convenience and needs of the community to be served and the records of the insured depository institutions under the Community Reinvestment Act, (4) *the insured depository institutions' effectiveness in combating money-laundering activities* and (5) the extent to which the bank merger would result in greater or more concentrated risks to the stability of the

24

U.S. banking or financial system. M&T Bank's establishment and operation of branches at Hudson City Savings Bank's existing branch locations is also subject to approval under Section 9 of the Federal Reserve Act.

**D.**      <u>**Regulatory Scrutiny Intensifies in 2012**</u>

69.      In 2012, bank regulators began vigorous enforcement efforts. Among other things, they found that numerous banks had fallen behind in their BSA/AML compliance, often as a result of cost-cutting. In April 2012, the Office of the Comptroller of the Currency ("OCC") entered into a consent cease and desist order with a national bank, Citibank NA, based on deficiencies in that institution's BSA/AML compliance program. The regulators found that: "The Bank failed to adequately conduct customer due diligence and enhanced due diligence on its foreign correspondent customers, its retail banking customers, and its international personal banking customers and did not properly obtain and analyze information to ascertain the risk and expected activity of particular customers."

70.      Also in April 2012, articles began appearing in industry journals warning banks to get their BSA/AML due diligence systems in order. An article published in the April 17, 2012 edition of *American Banker* entitled, "Regulators Gear Up for New Bank Secrecy Push", noted as follows:

> Bankers may have addressed most credit and capital issues, but regulators are getting ready to ramp up oversight in other areas. Regulators are taking a fresh look at old compliance standards, including the Bank Secrecy Act, bankers say. The act, often known as BSA, has long been a common area for compliance violations and ever-evolving rules.

> "You still have banks that did very little 'know your customer' work so they didn't get three forms of ID, a drop of blood and two fingerprints," says Greg Mitchell, the president and chief executive of First PacTrust Bancorp (BANC). Banks that were "not ahead of the curve have to get in compliance and it's painful." BSA and Anti-Money Laundering (AML) violations dropped off from the double-digits in 2006 to just seven citations last year, according to BankersOnline.com, a website developed by bank consultants. Still, observers

expect violations to rise as regulators have more time to focus on banks' risk management and compliance functions. "Once we get past the worst of the crisis, compliance issues are going to come to the forefront," says Ann Graham, director of the Business Law Institute at Hamline University in St. Paul, Minn. "There's no area of the bank that this doesn't cover."

In early April, the largest bank BSA/AML violation in more than a year came against Citigroup's Citibank. It was the only citation so far this year, but the 29-page cease-and-desist order highlighting more than five years' of compliance violations and showed that regulators are taking an extensive look at operations.

"When it touches BSA, [regulators] are nothing short of tough," says Walter Moeling 4th, a partner at Bryan Cave. "It's not just the Citi folks that are getting it." Bankers mostly worry that the thrifts that were transferred to the Office of the Comptroller of the Currency last July may find that they, too, do not meet their new regulator's standards. Regulators are also looking for a more holistic approach to risk management, observers say….

"What we're seeing in the realm of BSA is that so much hinges on risk management," says Mary Beth Guard, outside general counsel at the Oklahoma Bankers Association and a co-founder of BankersOnline.com. "Instead of the cookie cutter approach" regulators "want to look at [BSA] based on your product mix, your geographical location, size," Guard says. "All those factors play into where are those risks and how are we controlling those risks."

Another concern is that many banks have been cutting costs, which likely included cuts in compliance departments. "As institutions looked at opportunities for cutting costs, certainly compliance was a victim," says John Soffronoff, president of the compliance practice at ICS Risk Advisors……

71.     Regulatory scrutiny accelerated in mid-2012 amid outrage over the discovery of years of lax BSA/AML procedures at regulated international bank, HSBC. Congressional hearings were convened at which regulators were pilloried for inadequate BSA/AML enforcement. On July 18, 2012, Reuters published an article entitled, "U.S. Bank Regulator Promises Better Enforcement Following Scathing Congressional Report Into HSBC AML Failures", which noted in relevant part:

After widespread anti-money laundering (AML) failures at HSBC that continued for years due to lax regulatory oversight, a U.S. bank regulator has vowed to take a broader view of institutions' compliance programs during examinations. "The agency was much too slow in responding and addressing what are significant

00220909

weaknesses or violations at this institution. Going forward, I would hope that we would be much more nimble and take into account the entire picture," Thomas Curry, who took over as Comptroller of the Currency less than four months ago, said on Tuesday during a hearing by the Senate Permanent Subcommittee on Investigations. The hearing came a day after the subcommittee released a 400-plus-page report detailing how the U.S. arm of the giant British bank acted as a financier to high-risk clients around the world while failing to address AML weaknesses in its correspondent banking and banknotes operations as well as other units.

Curry said that, in future, AML deficiencies would be "fully considered in a safety and soundness context" rather than as a matter of consumer protection. He added that the OCC was revising the operation of its Large Bank BSA Review Team "to enhance our ability to bring different perspectives to bear and react on a more timely basis to circumstances where a bank has multiple instances of matters requiring attention" or apparent AML failures.

Curry said the OCC would also seek to provide more flexibility in citing BSA violations and vowed to identify steps that can be taken during examinations to obtain a "holistic" view of a bank's AML compliance regime "more promptly." Finally, Curry said that the OCC would review its training, staffing, recruitment, policies, and interagency coordination, to improve its BSA supervision program. "That's our initial response to the report's findings. My hope is that we will have additional recommendations after we look at this matter further," Curry said.

72.     Other bank regulators followed the OCC's lead.  From just seven enforcement actions in 2011, the number grew to approximately 30 enforcement actions in 2012, which also included the imposition of civil money penalties in certain cases.  The entities cited in 2012 included HSBC, Standard Chartered plc, JP Morgan, Citigroup, Associated Banc Corp., First Bank of Miami, First Bank of Delaware, and Old National Bank.  HSBC announced in December 2012 that it would need to spend $700 million on "Know Your Customer" compliance efforts to satisfy regulatory requirements.  Old National, in its Consent Order, was required to follow: "the risk assessment expectations and logic set forth in the 2010 FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual (Rev. April 29, 2010)."  Thus, the guidelines being enforced were not new procedures, but ones which had been in place for several years. Indeed, although regulators had not initiated many enforcement actions in the years just prior to

00220909

2012, it was standard operating procedure for regulators to issues warnings to banks that were deficient that they needed to get into compliance.

73.     The focus on compliance continued in 2013, with the OCC entering into a consent cease and desist order with JPMorgan Chase to address deficiencies in its BSA/AML compliance program in January 2013.  While it did not impose fines, it required the bank to improve its BSA/AML compliance programs and practices providing much specificity with respect to the automation of its due diligence practice. Also required were development of an independent compliance staff, hiring of an independent consultant, and the creation of an independent compliance committee.  Shortly, thereafter in March 2013, Thomas Curry, Comptroller of the Currency, in several speeches and Congressional testimony, noted that the federal banking agencies were focusing greater attention on BSA/AML compliance.  Curry stated that too many banks had inappropriately cut staffing and spending for BSA/AML either due to the cost-cutting measures or a failure to keep pace with growth.  *See* www.occ.treas.gov/news-issuances/congressional-testimony/2013/pub-test-2013-41-written.pdf.   Before the Institute of International Bankers Annual Washington Conference on March 4, 2013, Curry also spoke of one of the most significant regulatory matters facing bankers, the issue of "operational risk, which we define as the risk of losses from the failure of people, processes, systems and external events."  He focused his speech on the need for sound BSA/AML programs, while emphasizing that "there's nothing new about BSA/AML compliance."  *See* www.occ.gov/news-issuance/speeches/2013/pub-speech-2013-39.pdf.

74.     The actions taken in 2012 and in the beginning of 2013, along with the positions espoused by the various federal banking regulatory agencies during that time period, reiterated the standards regulated banks must meet, and should have put defendants on alert as to the need

00220909

to fully determine before regulators took adverse action what deficiencies existed in M&T's BSA/AML compliance, and what resources were needed to remedy these deficiencies.

> ### E.     The Inaccurate and Materially Misleading Statements

75.     The information concerning M&T for consideration by Hudson City shareholders was provided by, and approved by, M&T and its Board members.  Section 4.11 of the Merger Agreement reflected M&T's established duties under the federal securities laws: "The information relating to M&T and its Subsidiaries that is provided by M&T or its representatives for inclusion in, or incorporation by reference into, the Joint Proxy Statement and Registration Statement, or in any application, notification or other document filed with any other Regulatory Agency or other Governmental Entity in connection with the transactions contemplated by this Agreement, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portions of the Joint Proxy Statement relating to M&T and its Subsidiaries and other portions within the reasonable control of M&T and its Subsidiaries will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder. The Registration Statement will comply in all material respects with the provisions of the Securities Act and the rules and regulations thereunder." Section 6.1 of the Merger Agreement reflects that the Joint Proxy was a joint effort and publication of both Hudson City and M&T.  Numerous documents filed (or yet to be filed) by Hudson and M &T were incorporated by reference into the Joint Proxy, as set forth at p.145 of the Joint Proxy.

76.     Due to their negligence and lack of due diligence, M&T and its officers and directors failed to detect and disclose that M&T failed to legally comply with BSA/AML and

00220909

PATRIOT Act requirements, and in particular, the Know Your Customer rules as to millions of its customer accounts.

77.     Likewise, M&T should have known that a greater focus on consumer rights had led to greater scrutiny of bank advertising and account management practices.   M&T's advertising of no strings attached free checking, and then switching customers to fee-based accounts, was a non-compliant practice that M&T should have both remedied and *disclosed* when soliciting proxies.  The M&T-related defendants named herein, failed in their legal duty to do so, as no disclosure was made.  Thus, Hudson City shareholders received a Joint Proxy revealing nothing at all about the Consumer Violations.  Instead, the Joint Proxy provided a misleading picture of M&T's business practices, its business risks, and its regulatory risks.

78.     M&T's acquisition of Hudson City was the biggest bank merger announced in 2012, involving a price of $3.7 billion.   A merger of that magnitude was bound to attract regulatory scrutiny of M&T's procedures.

79.     As noted, there is no mention in the Proxy materials of M&T's Board doing any due diligence of M&T's regulatory compliance in connection with the Proxy.  For its part, Hudson City and its board asserted in the Proxy that they devoted a few days to "reverse due diligence" amidst others things they were doing.  It is clear that neither party did adequate due diligence as to M&T's BSA/AML systems, or its consumer law compliance.   A trained, independent consultant would have been able to detect that M&T had not properly validated and verified customer identities as to millions of customers through accepted sampling techniques, similar to those employed by regulators.  The Consumer Law Violations were, it may be inferred, known to some executives within M&T, as they were quietly curtailed on September 25, 2012, and proper due diligence could have uncovered these consumer law issues.

00220909

80.     The Joint Proxy incorporated representations that M&T was compliant with the

Bank Secrecy Act, as modified and amended by the USA PATRIOT Act:

> The Uniting and Strengthening America by Providing Appropriate Tools
> Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA
> Patriot Act") imposes obligations on U.S. financial institutions, including
> banks and broker dealer subsidiaries, to implement and maintain
> appropriate policies, procedures and controls which are reasonably
> designed to prevent, detect and report instances of money laundering ....
> In addition, provisions of the USA Patriot Act require the federal
> financial institution regulatory agencies to consider the effectiveness of a
> financial institution's anti-money laundering activities when reviewing
> bank mergers and bank holding company acquisitions. Failure of a
> financial institution to maintain and implement adequate programs to
> combat money laundering and terrorist financing could have serious
> legal and reputational consequences for the institution. ***The Registrant
> and its impacted subsidiaries have approved policies and procedures
> that are believed to be compliant with the USA Patriot Act.***

See M&T Bank Corp Annual Report on Form 10-K, filed Feb. 25, 2013, at p. 20; M&T Bank
Corp., Annual Report on Form 10-K, filed Feb. 23, 2012, at p. 21.

81.     The Joint Proxy did not describe M&T's serious compliance issues, but rather

stated:

> ***Although we currently believe we should be able to obtain all required
> regulatory approvals in a timely manner,*** we cannot be certain when or
> if we will obtain them or, if obtained, whether they will contain terms,
> conditions or restrictions not currently contemplated that will be
> detrimental to or have a material adverse effect on M&T or its
> subsidiaries after the completion of the merger.

(Joint Proxy at 15).

82.     In the "Risk Factors" section of the Joint Proxy, the Joint Proxy stated as follows

(Joint Proxy, at 34-36):

> The United States government and others have recently undertaken major
> reforms of the regulatory oversight structure of the financial services
> industry. M&T expects to face increased regulation of its industry as a
> result of current and possible future initiatives. M&T also expects more

00220909

intense scrutiny in the examination process and more aggressive enforcement of regulations on both the federal and state levels. . . .

In addition to the reforms discussed in the immediately following risk factor, a number of reform provisions implemented pursuant to the Dodd-Frank Act and related regulations are likely to impact the ways in which banks and bank holding companies, including M&T, conduct their business .... Although it is difficult to predict the magnitude and extent of these effects, M&T believes compliance with the Dodd-Frank Act and its implementing regulations and other initiatives will likely negatively impact revenue and increase the cost of doing business, both in terms of transition expenses and on an ongoing basis, and may also limit M&T' s ability to pursue certain desirable business opportunities. Any new regulatory requirements or changes to existing requirements could require changes to M&T's businesses, result in increased compliance costs and affect the profitability of such businesses.

83.     These representations were omissive, and were misleading to reasonable shareholders.  These provisions were misleading because at the time of the Joint Proxy, there were compliance issues with BSA/AML and consumer disclosure rules.  As noted, in late-2012 to early-2013, bank regulators reviewed M&T's procedures, expressed concern about them, required remedial efforts to be undertaken, and advised that the merger would not be approved as scheduled. These deficiencies were of long-standing, and existed prior to their discovery by regulators.  These facts, and other facts as to compliance that should have been uncovered by adequate due diligence, undermine the representation in the Joint Proxy that defendants "believe we should be able to obtain all required regulatory approvals in a timely manner." (Joint Proxy at 15). The April disclosures, even assuming *arguendo* that they were timely (which they were not), did not adequately cure this deficiency, especially with respect to the Consumer Violations.

84.     Further confusion to shareholders was also caused by M&T CFO Jones stating in SEC filed proxy materials that if a merger delay occurred it would be because federal banking regulators *were busy writing new regulations*—something which has nothing to do specifically with M&T or its business. Mr. Jones stated: "I think deals have taken *longer to be approved*

00220909

*because people are very busy writing rules at a lot of the regulatory agencies." See* SEC Form 425 filed August 27, 2012 under Rule 14a-12.

85.     The Joint Proxy was dated February 22, 2013, and mailed to shareholders on or about February 27, 2013.   Shareholders who received it, by mail or otherwise (many corporations send proxies by e-mail as well), and who were shareholders as of February 20, 2013, were able to vote as soon as they received the materials and did not need to await the shareholders' meeting scheduled for April 18, 2013.  It is common for shareholders to cast their votes well in advance of the shareholders' meeting.

86.     In late 2012 or early 2013, bank regulators reviewed M&T's procedures, and expressed concern about them, required remedial efforts to be undertaken, and advised that the Merger would not be approved as scheduled.  Despite the ongoing Proxy vote, M&T did not bother to reveal this occurrence to the public until the voting was almost over, and with scant time for shareholders to receive any new information, let alone consider it.  In any event, the information provided on the brink of the meeting was not only untimely, but also incomplete, inaccurate and materially misleading.

87.     By the time M&T and Hudson City issued a joint press release on April 12, 2013 regarding the regulatory concerns (with four business days left to the actual shareholders' meeting), M&T's efforts to address these concerns were, according to CFO Jones, "already underway."  Indeed, M&T had already hired an independent consultant, another fact indicating that M&T had known of the problems for days or weeks prior to their disclosure.

88.     On April 12, 2013, Hudson on behalf of itself and M&T filed a Proxy Supplement, thus undertaking to speak on the issue of the Federal Reserve's action, the reasons

00220909

therefore, and the implications for the Merger.[2]  On all scores, this Supplement was woefully deficient, incomplete, and misleading.  In addition, the Proxy Supplement was untimely, coming just four days prior to the meeting.

89.     The Proxy Supplement's discussion of the regulatory issues was limited to two vague bullet points, which provided no material information.  It certainly did not disclose that M&T had millions of customer accounts that need to be verified on an account-by-account basis.  Nothing at all was said about the consumer violations which, with due diligence, should have been listed as an additional aggravating factor which would cause material delay.

90.     Also on April 12, 2013, Hudson City and M&T issued a press release that stated as follows:

> BUFFALO, NEW YORK and PARAMUS, NEW JERSEY -- M&T Bank Corporation ("M&T") (NYSE:MTB) and Hudson City Bancorp, Inc. ("Hudson City") (NASDAQ:HCBK) announced today that they expect additional time will be required to obtain a regulatory determination on the applications necessary to complete their proposed merger. M&T filed its regulatory applications with its regulators in September, 2012. M&T has learned that the Federal Reserve has identified certain regulatory concerns with M&T's procedures, systems and processes relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program. M&T has already commenced a major initiative, including the hiring of an outside consulting firm, intended to fully address the Federal Reserve's concerns.
>
> In view of the potential timeframe required to implement this initiative, demonstrate its efficacy to the satisfaction of the Federal Reserve and otherwise meet any other regulatory requirements that may be imposed in connection with these matters, M&T and Hudson City believe that the timeframe for closing the transaction will be extended substantially beyond the date previously expected. M&T and Hudson City intend to extend the date after which either party may elect to terminate the merger agreement if the merger has not yet been completed from August 27, 2013 to January 31, 2014, but there can be no assurances that the merger will be completed by that date. The consideration and exchange ratio as

---

[2]   The Proxy Supplement, as it indicates, was made at least in part in an attempt to settle shareholder litigation initiated in 2012 that did not involve Lead Plaintiffs or Plaintiff Krublit, their counsel or any of the claims asserted herein.  That settlement was never submitted to any Court for approval, and appears to have been abandoned.

provided in the merger agreement will remain the same, *and both M&T and Hudson City will proceed with their special shareholders' meetings to consider the merger on April 16, 2013 and April 18, 2013, respectively*. M&T and Hudson City intend to close the merger as soon as possible following the receipt of all necessary regulatory and shareholder approvals and satisfaction of all other conditions to closing.

M&T plans to announce its first quarter 2013 earnings results in a press release that will be issued before the market opens on Monday, April 15, 2013. Following the release, M&T will conduct a conference call and webcast at 10:30 a.m. (ET) to discuss the earnings results and the status of the Hudson City transaction. The conference call and webcast may contain forward-looking statements and other material information.[3]

91.     The April 15, 2013 conference call was aimed at damage control.  Thus, CFO

Jones started the call with the following statement:

As you may recall, we announced the merger in August of last year. Apart from any issues specific to M&T, in terms of context, the industry is already in a regulatory environment that seems clearly heightened in at least 2 relevant ways. First, if you look at recent merger activity in the banking sector, the trend seems to be that it's taking notably longer to get regulatory approvals. Said another way, we don't take regulatory approval for granted. Second, industry as a whole is subject to a heightened regulatory environment and expectations, including banks -- the Bank Secrecy Act and anti-money laundering compliance programs. So that's the context in which our Hudson City deal is taking place.

During the 7 months we've been working on the Hudson City merger, we, of course, were also involved in our normal ongoing discussions with our regulators as part of the continuous supervisory process. In addition, we have been continuously working on scaling up and strengthening the overall risk management infrastructure of our growing bank, along with planned improvements to the BSA/AML process.

We recently were made aware of the fact that certain deficiencies in our BSA/AML compliance program rose to a level of significance such that they would impact our ability to close the merger with Hudson City *in the near term* and that we would have to implement the plan for improvement and demonstrate its efficacy [ph] to satisfaction of M&T management, our board and the regulators prior to obtaining regulatory approvals for the merger. Our ongoing investment

---

[3]  This press release was filed as a Rule 425 prospectus supplement.  It omitted many material facts that should have been obtained through due diligence and then disclosed, including the nature and extent of M&T violations, the remedial efforts needed and the years they would take to complete, and the details of the Consumer Violations.

includes bolstering internal staff and hiring an outside consultant to help us evaluate and improve our governance, people, processes, controls and systems. Fortunately, these efforts are already under way.

Of course, we then talked things over with Hudson City. Both companies remain strongly committed to this merger as it is a highly beneficial transaction for each of us for all the reasons we've discussed previously. So we mutually decided that we would proceed with our shareholder meetings on the merger and would also allow more time under our agreement, an additional 5 months, while M&T works hard to resolve these issues. We definitely appreciate the fact that Hudson City has been a totally supportive and steadfast partner in this.

So what are the regulatory issues? As you know, we have obligations to keep supervisory information confidential. ***So there is a limit to how expansive we can be today***. And we can only talk about what we know as we sit here today. While we don't anticipate any other material issues cropping up as we get into this, of course that can never be completely ruled out. We have no reason to believe that the issues involve any wrongdoing or illegal conduct by anyone in M&T or any identifiable instances of actual money laundering activity using our bank.

92.     That the late 2012 or early 2013 Federal Reserve review found that "*certain deficiencies* in our BSA/AML compliance program *rose to a level of significance* such that they would impact our ability to close the merger with Hudson City in the near term and that we would have to implement the plan for improvement…"  creates an inference the deficiencies existed well before April 15 and were known within M&T, had been progressively getting worse, and yet were not discovered or disclosed by defendants.

93.     What followed next was a two year pattern of inaccurate and incomplete statements by M&T which conveyed: (a) that details as to what exact regulatory concerns were expressed could not be provided as this involved confidential regulatory matters; (b) that, in any event, M&T did not violate any laws; (c) that the regulatory requirements were focused on enhancing  M&T systems and reflected new, heightened requirements rather than enforcement of pre-existing requirements; and (d) that any work M&T needed to do as to its historical customer bases was minimal or incidental to other work.  In truth and in fact, M&T was grossly in

36

violation of the BSA/AML laws as to millions of historical accounts, a fact not revealed until M&T was pressured to do so beginning in early 2015.

94.     As would eventually be revealed, M&T's issues were far greater and more complicated than disclosed.  Jones downplayed the work ahead, by asserting that the regulatory issues could be addressed quickly, and might involve hiring 100 people.  This proved to be a grossly inaccurate representation of the troubles M&T had with compliance, and the resources and time needed to fix them.  The remedial efforts would require in excess of *900* employees, contractors and consultants.

95.     As a result of these events, the Merger close date was extended five months, to January 31, 2014, but there was no corresponding extension to the date of the special shareholder meetings.  The short extension suggested that the issues could be resolved in a few months. Anthony Polini, a bank analyst at Raymond James, came away with the impression that the regulatory matters were not serious, and that there was no breakdown of M&T's procedures:

> I don't believe we are going to find out exactly what happened.  I think they are hardly going to say anything.  *I don't believe this is a breakdown of their policies and procedures*.  It was probably something specific that was discovered and likely emanated from a past acquisition.  I think there is a 95% chance that this deal closes by the end of the year without any changes, M&T experiences some embarrassment and a few million [dollars] in expense and they move on.

96.     On June 17, 2013, M&T entered into a written agreement with the Federal Reserve Bank of New York (the "Compliance Agreement").  The Compliance Agreement noted "deficiencies" in BSA/AML compliance programs, including internal controls, customer due diligence procedures, transaction monitoring, and supervision of foreign accounts.  The Compliance Agreement required M&T to address these issues, and to provide timelines to do so. The deficiencies noted were described in vague terms, with no details as to their duration, nature

or scope, or how these deficiencies would be specifically remedied.  If details were to be provided, they would have to come from M&T.  But M&T failed to provide accurate details as to the scope of the undertaking required (and the basic legal violations in which it had engaged) for almost two more years and then only did so under market pressure.

97.     Indeed, the Compliance Agreement was too vague to alarm financial journalists or analysts, or to alert them to the massive extent of M&T's issues.  A June 19, 2013 article in the *Herald News* about the Compliance Agreement was even entitled "Sale of Hudson City Closer." One bank analyst read the Compliance Agreement as a good thing, indicating that only a few more months of work lay ahead before M&T could proceed with the Merger.  Analyst Brian Klock of banking specialist firm Keefe Bruyette & Woods stated: "The fact that we know now it's a written agreement and not the more severe form, that has actually laid the groundwork for the timing [of the merger]. It's removed some of the uncertainty. *I think there is a higher probability that it closes by the end of January."*  A business reporter from the *Newark Star-Ledger* took away from the Compliance Agreement the message that M&T had engaged in no wrongdoing, stressing in a June 19, 2013 article: "The order did not say any illegal activity occurred through the bank's systems, although it requires M&T to review six months' worth of transactions by high-risk customers."

98.     M&T, for its part, represented that this Compliance Agreement did not change the situation as M&T had previously described it.  M&T spokesman Michael Zabel said: "This is the next step in a process we started talking about in April. Other than the fact that there is a written agreement now in place, there is really no new developments here. It doesn't really change the timing one way or the other at this point."  This statement was grossly inaccurate. The work that

needed to be done, as M&T should have known, would involve years of effort, and the Merger could not possibly close in a scant few months.

99.     Through the remainder of 2013, M&T remained tight lipped concerning the details of its deficiencies.  An article in the Sept. 10, 2013 edition of *SNL Bank and Thrift Daily* reported that:

> [M&T CFO] Jones said Sept. 9 at the Barclays Global Financial Services Conference that it *was not possible for him to talk about the regulatory approval process,* but he noted that M&T has made significant investments related to BSA/AML systems....Jones further noted that the company has trained its people and intends to eventually have a BSA/AML system that is "second to none" in the banking industry. He said the company has hit all the dates it planned to meet and has hit its milestones thus far, *but it is "hard" for the company to share a lot of information at this point in time.*

100.     In an Oct. 17, 2013 conference call, M&T CFO Jones again asserted that M&T was trying to adhere to new and changing requirements.  Referring to the efforts M&T was undertaking, Jones stated: "*this is probably the new requirement across the industry* just to be in the game. So we figured we better get that done quickly. I hate to be behind in that respect." Jones also stated that he could simply not address the question of what percentage of the work had been completed. In fact, that percentage was small as M&T had not yet reviewed its historical accounts, a multi-year process.  Nor did M&T concede such a task was even on the agenda.

101.     On December 17, 2013, the Merger deadline was extended to December 31, 2014. Because Hudson City was suffering severely because of the delay (it had already cut is quarterly dividend from 8 cents to 4 cents), Amendment No. 2 to the Merger Agreement signed that day permitted Hudson City to take certain interim actions, including with respect to Hudson City's conduct of business, implementation of its strategic plan, retention incentives and certain other matters with respect to Hudson City personnel, prior to the completion of the Merger.

00220909

102.    In a press release issued by Hudson City on December 17, 2013, it was made clear that Hudson City needed to take steps to preserve its business while awaiting the Merger:

> Our Board of Directors continues to believe that the M&T transaction is ultimately in the best interest of the company and our shareholders, but is also committed to diversifying our business model by continuing to pursue our Strategic Plan. Prior to the announcement of the merger, Hudson City retained an outside consultant to assist management in developing a strategic plan. The operational core of the Strategic Plan is the expansion of our loan and deposit product offerings over time to create more balanced sources of revenue and funding. We believe that the markets in which we operate provide significant opportunities for the Hudson City brand to capture market share in products and services that we have not actively pursued previously. The Strategic Plan includes initiatives such as secondary mortgage market operations, commercial real estate lending, the introduction of small business banking products and developing a more robust suite of consumer banking products. When we announced in April that additional time would be required to obtain regulatory approval, we charted a dual path for Hudson City.
>
> We continued to plan for the completion of the merger, but we also refreshed the Strategic Plan, prioritizing the matters that we could achieve during the pendency of the merger....Given the further delay in closing the transaction, Hudson City and M&T have agreed that Hudson City will be permitted to proceed with its Strategic Plan as noted above. Many of the initiatives require significant lead time for full implementation and roll out to our customers. We expect commencement of the roll out of the prioritized initiatives during 2014.

103.    Hudson City's annual shareholders' meeting was held on December 19, 2013. Based on what he had been told by M&T, Hudson City's then-Chairman Ronald Hermance, Jr. stressed that the issue was simply a matter of M&T improving its detection systems. Hermance stated: "No one has been accused of money laundering, but what they really have is a need to develop a better detection system, and then validate that system, and then have the Federal Reserve come in and audit the validated system."  M&T also had to conduct a "look-back" review of past activity on "a number of accounts for a number of months," he said.  In actuality, M&T's task was far greater: it had to validate and verify identities as to millions of historical accounts-indeed, *all* of its accounts. But this would not be revealed until 2015.

104.    On January 17, 2014 M&T held a conference call during which CFO Jones again addressed BSA/AML issues. He described M&T's efforts as focused on a forward-looking, predictive system:

> But think of, for example, as we achieved, whatever time period, what we're doing with the BSA/AML and building out the system, that's a process that's almost pure 100% leverageable, right, *as we bring in new accounts, new volume and so forth*...So if you think about it, what we're doing -- one of the first -- one of the most fundamental things is we're building a risk rating system that allows us to be very sensitive and knowledgeable about when patterns change, and that might indicate that someone's engaging in some illicit activity or money-laundering. And to do that equally across all of our footprints and actually through each of the channels in which we interact with our customers. So to do that, on the system side, there's a fair amount of just data capture. And capturing that information is not necessarily just standard information, you're trying to make sure that you have access to information *that allows you to do a great job of being predictive*. So it's not a onetime thing. Predicting customer behavior is sort of changing all the time and so these models are relatively complex. So in order to do that, what you've got to do is you've got to identify the information you need, you've got to train your customer-facing employees on exactly what that information is and how to go about capturing it. And then you've got to interact with all of your customers, both the existing customers and the new ones through the account opening process to begin to capture that information....we're trying to sort of aggressively be sort of best-in-class in terms of having *predictive models* that will allow us to monitor for illicit behavior.

105.    When pressed for more detail, Jones said he could provide none, citing back to the Compliance Agreement: "The only thing that's out there that is public is our written agreement and it kind of lays out everything that we've got to do."  In fact, the Compliance Agreement was general, and did not lay out everything M&T had to do.  Much that M&T had to do to fix historical legal violations was not publicly set out anywhere, and not disclosed by M&T until 2015.

106.    On April 14, 2014, another conference call was held in which M&T CFO Jones alluded for the first time to any need to examine historical records. He stated that M&T had to put in place its new system, and then "sort of understand" whether the new process as to the

41

existing customer base "would have come out with any different answer and whether there's anything in that book that we would uncover now that we have a new enhanced process." Although this statement is quite vague, it appears to refer to finding illegal activity in the base of existing customers.

107.    In a conference call held on July 17, 2014, Jones mentioned the Know Your Customer rules: "A new 'Know Your Customer' program has been implemented. All new customers are being brought into the Bank through this new set of Bank-wide procedures, customer due diligence and the risk weighting process. Application of the new 'Know Your Customer' protocol to existing customers continues."  There was no quantification as to how many existing customers were involved in this process—whether it was many or a few.  This vague reference concealed the very material fact that M&T had to go through *millions* of existing accounts to validate and verify even such basic information as the identities of millions of customers, and that this would be a multi-year process.  And by asserting that what was involved was just a "new" protocol, this statement masked the fact that existing protocols had not been followed as to *millions* of customers, a violation of law that existed both prior to and at the time of the Proxy Statement.

108.    As M&T analysts continued to press for greater information, precisely what M&T needed to do to remediate its systems began to filter out.  Even so, the detail was provided in equivocal terms, and masked the grossly deficient state of historical data.  On an October 17, 2014 conference call, Jones stated:

> we have *sort of* begun a bank wide effort to *update o*ur customer information to better understand our customers *and how they plan to use the product and services* and we have made substantial progress there. Of course that has been going on for almost a year now, maybe just over a year. We have made some substantial progress there.

42

00220909

109.   Then, partly plugging a material hole in the information he had previously provided, Jones also revealed that M&T was: "getting customer information *on all of our customers. So not just the high risk ones.* We then have got to get them [sic] on the medium risk and the low risk customers; have all got to go through sort of a refresh of information."  Thus, Jones left the impression (which was inaccurate) that what M&T was focusing on was an updating process, a "refresh"—and not on anything M&T might have done wrong in the past. The plain message—which had been the consistent message since April 2013—was that M&T was not aware of anything it had historically done wrong, but was endeavoring to simply update its records, as any bank might.

110.   On October 9, 2014, the Consumer Financial Protection Board ("CFPB") announced that it had taken action against M&T for offering free checking, but then switching customers to accounts which carried fees.  This practice was still in place, according to the CFPB, at the time the Merger Agreement was signed, and was not stopped until Sept. 25, 2012. By then, M&T had unlawfully converted 80,093 accounts promised free checking to a fee-based checking account.   M&T was ordered to pay a civil penalty, and to provide customer compensation.   It was ordered to formulate a "Redress Plan." It is also under continuing regulatory scrutiny, and will remain so for many years.   The regulatory action, and the underlying violations, were a factor that caused the Federal Reserve to delay approval of the Merger (as was revealed in the Federal Reserve Report on Sept. 30, 2015, pp. 10-11).

111.   The Merger again failed to close on December 31, 2014, and a new closing date was established of April 30, 2015.  By April 2015, it was clear that this deadline, too, would not be met.  Yet Hudson City seemed to be as in the dark as what was going on at M&T as the general public. On April 6, 2015, Hudson City said it was "unexpectedly" advised by M&T "late

Case 1:15-cv-00897-EJW   Document 72   Filed 04/20/17   Page 44 of 56 PageID #: 1343

in the afternoon on April 3, 2015" that the Merger was not going to close. Hudson City CEO Denis Salamone added that: "given the unexpected notice of delay over a holiday weekend, the Board of Hudson City needs more time to understand the nature and timing of the delay and its potential impact on the transaction before the Board can determine its course of action." Hudson City was so sure the merger would close that it had even begun asking shareholders whether they would prefer cash or stock consideration upon the Merger's close. The deadline was then extended to October 31, 2015.

112.    M&T was now under great pressure to explain to its investors exactly what was going on internally. In a March 5, 2015 annual message to shareholders, M&T Chairman Wilmers revealed that remedial efforts involved 630 employees, 300 contractors and consultants, and had cost $211 million. He also discussed the enormous scope of the work undertaken: "We have obtained appropriate additional information, or conducted remediation, as the jargon of BSA/AML would have it, on 671,502 customers and remediated 95% of the existing customers whom our models identified as requiring a higher level of scrutiny." But it was still unclear as to what more needed to be done.

113.    Then, on April 22, 2015, at its annual shareholders meeting, M&T, which had repeatedly cited the secrecy of regulatory proceedings for its failure to provide detailed information over the years, and had denied any violations of law, further revealed that millions of accounts which were in existence at the time of the Joint Proxy needed to undergo a lengthy remedial process. M&T would be obligated, according to M&T Chairman Wilmers, to "verify and validate" the identities of those **3.5 million customers**. It had only done so only as to one million customers to date. But M&T had a responsibility under federal law to have done so adequately as to those millions of customers since at least issuance of the 2003 "Know your

44

00220909

Customer" regulations promulgated under the PATRIOT Act.  Finally, on November 6, 2015, at an industry conference, M&T CFO Jones finally conceded the true nature of the colossal work that had to be done, stating: "[M&T] had to go through a look back and look at all of our customers and review *quite literally every single customer* that we have in the bank and go back and relook through that process."

114.     Thus, it was finally revealed that millions of accounts needed remediation.  Had Hudson City voters been told that, they would have viewed this fact as material.  The risk to a merger closing or not closing, the legal compliance of the merger partner, and the delay that may be involved in gaining regulatory approvals is always a material matter.  Indeed, in the Proxy Supplement filed on April 12, 2013, Hudson City stated that it rejected further merger efforts with a company identified only as "Party A" due to merger closing concerns: "Hudson City's board of directors believed that the prospects for obtaining regulatory approval of a transaction *with M&T* in a timely manner *were greater than those for a transaction with Party A."*

115.     That millions of accounts—indeed all accounts--were so deficient as to require fresh verification and validation would have been highly material to Hudson City shareholders who were entitled to vote in the April 18, 2013 election.  This shocking fact would have indicated: (a) that M&T was at high risk of regulatory action, which could take years, and hundreds of millions of dollars to resolve; (b) that Hudson City was at great risk proceeding as it needed to put its strategic plan at hold, and suffer stagnation or business reversals with no assurance that the Merger would ever close; (c) that the Merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (d) that Hudson City's dividend was at risk during the time period it would take for a Merger to be completed.

00220909

116.    In addition, Hudson City shareholders would have found the Consumer Violations material, as they called into question M&T's controls and compliance systems, and could and did serve as an independent basis for the Merger's delay, as was revealed by the Federal Reserve on Sept. 30, 2015.

117.    On Sept. 30, 2015, the Federal Reserve finally approved the Merger.  In a 40-page report issued that day, the Federal Reserve confirmed that the various regulatory issues caused the Merger delay.   It stated that it expected M&T to continue towards remediating its compliance.   It also barred M&T from "expansionary activities", except in limited circumstances, pending a review of the success of the Merger and M&T's further compliance activities.  The Merger closed on November 1, 2015.

## LOSS CAUSATION

118.    The false and misleading Proxy was an essential link in the chain of events leading to the Merger, and in proximately causing losses to Class members.

119.    Had M&T revealed the deficiencies in its legal compliance, Hudson City and its shareholders would have perceived the high risk nature of a Merger with M&T, the delays likely involved, and the potential damage to Hudson City's business.  Such factors would have resulted in a more favorable merger premium for Hudson City shareholders to compensate them for the extraordinary risks to which they would be subjected.  M&T's true condition would also have affected the analyses of M&T's value by Hudson City's financial advisors.  This, too, would have led to an adjustment of the merger ratio to terms more generous to Hudson City's shareholders.  Once the merger premium was set, Hudson City shares traded at prices affected by the merger ratio, and roughly in lockstep with the merger ratio.  Had the merger ratio been more favorable, the prices at which Hudson City shares traded would have been higher following the

Merger announcement and the Merger vote.   It is unlikely, had the true risks been known, that a fairness opinion could have been rendered as to the merger ratio, as that merger ratio reflected no legal and regulatory risk adjustment to account for the BSA/AML Violations and Consumer Violation issues.

120.     In addition, almost immediately after the merger delay was announced, Hudson City announced a reduction in dividends payable directly to its shareholders.   From a steady 8 cents per quarter per share, the dividend was reduced to 4 cents per share beginning with the dividend declared on April 30, 2013.   In one quarter, no dividend was paid at all.   On April 29, 2015, Hudson City announced it would declare no quarterly dividend, with CEO Salamone stating: "This has certainly been a challenging quarter for us. *The latest unexpected delay in the Merger contributed to the first quarter's weak earnings.* We believe future earnings can be improved significantly in the short-term by a balance sheet restructuring and in the longer-term by execution of the other strategic initiatives. However, *both of these actions are complicated by the pendency of the Merger.*"   Based on this report, *Buffalo Business First* in an April 30, 2015 article concluded: "The latest unexpected delay in M&T Bank's plans to acquire Hudson City Bancorp Inc. is being blamed for the latter's significant first-quarter earnings tumble."   Cumulatively since 2013 dividends were reduced by 44 cents per share, which means that Hudson City's approximately 501 million shares have lost as much as approximately $200 million in the aggregate, and Class members suffered damages by receiving, each quarter they held, diminished payouts.

121.     Furthermore, many Class members sold shares at a value diminished by M &T's prolonged regulatory issues and/or acquired shares in a bank with a spotty regulatory record, which has been barred by regulators from any "expansionary activities" until regulators are

00220909

satisfied that all the aforementioned legal issues are fixed.  Federal Reserve Statement, at 13-14.
This is a blow to M&T, and its value, as M&T has traditionally grown through expansionary
activities.  That such restrictions are expected to harm M&T is shown by, among others things,
the drop of $4.78 per share on October 1, 2015, the day after the Federal Reserve issued its
opinion.

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this action on their own behalf and as a class action pursuant to
Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or
entities who were Hudson City shareholders and were entitled to vote on the Merger pursuant to
the Joint Proxy dated February 22, 2013, and who suffered damages as a result (the "Class").
Excluded from the Class are: (i) the defendants; (ii) members of the family of any defendant;
(iii) any firm, trust, corporation, officer, or other entity in which any defendant has a controlling
interest; and (iv) the legal representatives, agents, affiliates, heirs, successors-in-interest or
assigns of any such excluded party.

123.    The Class is so numerous that joinder of all Class members is impracticable.
Hudson City common stock was actively traded on the NasdaqGS, throughout the Class Period.
While the exact number of Class members can only be determined by appropriate discovery,
Plaintiffs believe that Class members number in the tens of thousands.  At the time of the Proxy
vote, there roughly 500 million shares of Hudson City common stock outstanding.

124.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs
and all Class members sustained damages as a result of the wrongful conduct complained of
herein.

125.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class members that Plaintiffs seek to represent.

126.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

127.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether the Joint Proxy contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether defendants acted with the requisite negligence in omitting and/or misrepresenting or failing to discover through due diligence material facts required to be in the Joint Proxy; and

(d)    whether the Class members have sustained damages and, if so, the appropriate measure thereof.

128.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

00220909

## COUNT ONE
## (Against M&T, the M&T Directors and Jones for Violations of the Federal Proxy Laws)

129.    Plaintiffs repeat and reallege all previous allegations.

130.    This claim is grounded solely in negligence.

131.    The defendants named in this Count solicited votes by means of a Joint Proxy dated February 22, 2013.

132.    Each of the defendants named in this Count had a duty under Section 14(a) and Rule 14a-9 under the Securities Exchange Act to perform due diligence to ascertain that the Joint Proxy was complete, accurate and not misleading.

133.    There are two alternative ways to violate Section 14(a).  One way is to make materially misleading and inaccurate statements.   The second way is to fail to disclose information that is mandated to be disclosed in the proxy.  What must be disclosed is set forth in Schedule 14A, 17 C.F.R. § 240.14a-101.  *Id.* at 369.  Schedule 14A states, in turn, that mergers involving the issuance of securities trigger a requirement to file a Form S-4, which is a familiar form usually referred to as a "Prospectus."  Every Form S-4 must—as did the Joint Proxy here— have a section labeled "Risk" or "Risk Factors."  *See* Form S-4, Item 503, 17 CFR 229.503 ("Item 503"). The Joint Proxy here had multiple such sections.   Under Item 503, the disclosure document, must:

> provide under the caption ''Risk Factors'' a discussion of the most significant factors that make the offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply to any issuer or any offering."

134.    Accordingly, SEC regulations required Defendants to explore and discuss any significant risks that due diligence could uncover, including issues of legal compliance that could spell trouble for the Merger.

00220909

135.    Each of the defendants named in this Count asserted a misleading and omissive belief and assurance regarding M&T's compliance with BSA/AML laws, and failed to disclose all Risk Factors that could undermine that belief and assurance, delay the Merger or threaten its approval, harm Hudson City during the pendency of Merger approval, and harm or restrict M&T even if approval was granted.

136.    Each of the defendants named in this Count incorporated, accepted and republished the Form 10-K representations that M&T was in compliance with BSA/AML laws, without due basis therefor, and without disclosing all material facts.

137.    In truth, M&T as to its BSA/AML compliance was materially deficient as to millions of accounts, which deficiency existed prior to the Joint Proxy.  That these millions of pre-existing accounts were so compliance-deficient would have been highly material to Hudson City shareholders who were to vote on whether to approve the Merger on April 18, 2013.  These facts would have indicated: (a) that the M&T assertion in the incorporated Form 10-Ks as to BSA/AML compliance were omissive, inaccurate and materially misleading; (b) M&T was at high risk of regulatory action, which could threaten or delay Merger approval and/or take years, and hundreds of millions of dollars to resolve, and damage M &T prospects going forward; (c) that Hudson City was at great risk proceeding as it needed to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) that the merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (e) that Hudson City's dividend was at risk during the time period it would take for a merger to be completed.

138.    M&T was not compliant with consumer protection laws, as adequate due diligence would have revealed.  That consumer laws were violated would have been highly

00220909

material to Hudson City shareholders who were entitled to vote in the April 18, 2013 election. This fact would have indicated weakness in M&T internal controls and compliance regimens, and would have threatened the Merger (as did occur) with substantial closing delays.  The absence of such disclosure rendered the Joint proxy materially omissive and misleading.

139.    Each of the defendants named in this Count failed to conduct adequate due diligence, as required by the federal securities laws.

140.    The Joint Proxy was omissive, and would be misleading to reasonable shareholders. These provisions were misleading because at the time of the Joint Proxy, there were compliance issues with BSA/AML and consumer disclosure rules.  In late-2012 to early-2013, bank regulators reviewed M&T's procedures, expressed concern about them, required remedial efforts to be undertaken, and advised that the merger would not be approved as scheduled. This undermines the representation in the Joint Proxy that Defendants "believe we should be able to obtain all required regulatory approvals in a timely manner." (Joint Proxy at 15). Moreover, the "Risk Factors" sections did not disclose all material risks, and as such were omissive and misleading.  (*See* Joint Proxy at 34-36).  The April Disclosures, even assuming *arguendo* that they were timely (which they were not), did not adequately cure these deficiencies, especially with respect to the Consumer Violations.

141.    Class members have suffered damages as a result of the above-alleged actions.

142.    For the foregoing reasons, each of the defendants named in this Count is liable for damages under Section 14(a) and Rule 14a-9 under the Securities Exchange Act.

**COUNT TWO**
**(Against Hudson City and the Hudson City Directors for Violations**
**of the Federal Proxy Laws)**

143.    Plaintiffs repeat and reallege all previous allegations.

144.    This claim is grounded solely in negligence.

145.    The defendants named in this Count solicited a Joint Proxy dated February 22, 2013.

146.    Each of the defendants named in this Count had a duty under Section 14(a) and Rule 14a-9 under the Securities Exchange Act to perform due diligence to ascertain that the Joint Proxy was complete, accurate and not misleading.

147.    There are two alternative ways to violate Section 14(a).  One way is to make materially misleading and inaccurate statements.  The second  way is to fail to disclose information that is mandated to be disclosed in the proxy.  What must be disclosed is set forth in Schedule 14A, 17 C.F.R. § 240.14a-101.  *Id.* at 369.  Schedule 14A states, in turn, that mergers involving the issuance of securities trigger a requirement to file a Form S-4, which is a familiar form usually referred to as a "Prospectus."  Every Form S-4 must—as did the Joint Proxy here— have a section labeled "Risk" or "Risk Factors."  *See* Form S-4, Item 503, 17 CFR 229.503 ("Item 503"). The Joint Proxy here had multiple such sections.   Under Item 503, the disclosure document, must:

> provide under the caption ''Risk Factors'' a discussion of the most significant factors that make the offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply to any issuer or any offering."

148.    Accordingly, SEC regulations required Defendants to explore and discuss any significant risks that due diligence could uncover, including issues of legal compliance that could spell trouble for the Merger.

00220909

149.    Each of the defendants named in this Count incorporated, accepted and republished the omissive Form 10-Ks representations that M&T was in compliance with BSA/AML laws, without having conducted adequate due diligence as to their completeness and veracity.    In addition, the Proxy asked shareholders to consider the belief of the Hudson City directors that there was a "likelihood" that approvals could be received in a reasonably timely manner and without the imposition of unacceptable conditions.  Joint Proxy, p. 70.  As there was no such likelihood, the Proxy was materially misleading, a fact which could have been determined by defendants herein through appropriate due diligence.

150.    In truth, M&T as to its BSA/AML compliance was materially deficient as to millions of accounts, which deficiency existed prior to the Joint Proxy.  That these millions of pre-existing accounts were so compliance-deficient would have been highly material to Hudson City shareholders who were to vote on whether to approve the Merger on April 18, 2013.  These facts would have indicated: (a) that the M&T assertions in the incorporated Form 10-Ks as to BSA/AML compliance were omissive, inaccurate and materially misleading; (b) M&T was at high risk of regulatory action, which could threaten or delay Merger approval and/or take years, and hundreds of millions of dollars to resolve, and damage M &T prospects going forward; (c) that Hudson City was at great risk proceeding as it needed to put its strategic plan on hold, and suffer stagnation or business reversals with no assurance that the merger would ever close; (d) that the merger ratio negotiated was likely unfair, as it did not account for these regulatory risks and M&T's misconduct; and (e) that Hudson City's dividend was at risk during the time period it would take for a merger to be completed.

00220909

151.    Each of the defendants named in this Count failed to conduct adequate due diligence, as required by the federal securities laws, but instead conducted minimal due diligence over a very short period while preoccupied with other task and issues.

152.    These representations were omissive, and would be misleading to reasonable shareholders.  These provisions were misleading because at the time of the Joint Proxy, there were compliance issues with BSA/AML and consumer disclosure rules. In late-2012 to early-2013, bank regulators reviewed M&T's procedures, expressed concern about them, required remedial efforts to be undertaken, and advised that the merger would not be approved as scheduled. This undermines the representation in the Joint Proxy that Defendants "believe we should be able to obtain all required regulatory approvals in a timely manner." (Joint Proxy at 15). Moreover, the "Risk Factors" sections did not disclose all material risks, and as such were omissive and misleading.  (*See* Joint Proxy at 34-36).  The April disclosures, even assuming *arguendo* that they were timely (which they were not), did not adequately cure this deficiency, especially with respect to the Consumer Violations.

153.    Class members have suffered damages as a result of these actions.

154.    For the foregoing reasons, each of the defendants named in this Count is liable for damages under Section 14(a) and Rule 14a-9 under the Securities Exchange Act.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs demand judgment in their favor and in favor of the Class and against the Defendants as follows:

A.    Certifying this case as a class action, certifying the proposed Class and designating Plaintiffs and the undersigned as representatives of the Class;

B.      Awarding Plaintiffs and the Class appropriate compensatory damages, together with pre- and post-judgment interest;

C.      Awarding Plaintiffs the costs, expenses and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

D.      Awarding Plaintiffs and the Class such other relief as this Court deems just, equitable and proper.

Dated:  April 20, 2017                         **MURPHY & LANDON**

                                               /s/*Francis J. Murphy*
                                               Francis J. Murphy (Bar ID#223)
                                               Jonathan L. Parshall (Bar ID# 3247)
                                               1011 Centre Road, Suite 201
                                               Wilmington DE, 19805
                                               Tel: 302-472-8100
                                               Liaison Counsel


Deborah R. Gross                               Laurence D. Paskowitz
Kaufman, Coren & Ress, P.C.                    Paskowitz Law Firm P.C.
2001 Market Street, Suite 3900                 208 East 51st Street, Suite 380
Philadelphia, PA 19103                         New York, NY 10022
Tel: 215-735-8700                              Tel: 212-685-0969
Co-Lead Counsel                                Co-Lead Counsel

Roy L. Jacobs                                  Kenneth A. Elan
Roy Jacobs & Associates                        Law Offices of Kenneth Elan
420 Lexington Avenue, Suite 2440               217 Broadway, Suite 603
New York, NY 10170                             New York, New York 10007
Tel: 212-867-1156                              Tel:  212-619-0261

00220909