## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID JAROSLAWICZ, Individually, and on behalf of all others similarly situated,

                    *Plaintiffs*,

        v.

M&T BANK CORPORATION, HUDSON CITY BANCORP, INC., ROBERT G. WILMERS, RENÉ F. JONES, MARK J. CZARNECKI, BRENT D. BAIRD, C. ANGELA BONTEMPO, ROBERT T. BRADY, T. JEFFERSON CUNNINGHAM III, GARY N. GEISEL, JOHN D. HAWKE, JR., PATRICK W.E. HODGSON, RICHARD G. KING, JORGE G. PEREIRA, MELINDA R. RICH, ROBERT E. SADLER, JR., HERBERT L. WASHINGTON, DENIS J. SALAMONE, MICHAEL W. AZZARA, VICTORIA H. BRUNI, DONALD O. QUEST, JOSEPH G. SPONHOLZ, CORNELIUS E. GOLDING, WILLIAM G. BARDEL, and SCOTT A. BELAIR,

                    *Defendants*.

Civil Action No. 15–897–RGA

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Kevin R. Shannon (DE Bar No. 3137)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19899
(302) 984–6000

Tracy Richelle High (*admitted pro hac vice*)
Christen M. Martosella (*admitted pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558–4000

*Attorneys for Defendants Hudson City Bancorp, Inc., Denis J. Salamone, Victoria H. Bruni, Donald O. Quest, Joseph G. Sponholz, Scott A. Belair, Michael W. Azzara, William G. Bardel and Cornelius E. Golding*

May 30, 2017

John C. Cordrey (DE Bar No. 5324)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778–7500

George T. Conway III (*admitted pro hac vice*)
Bradley R. Wilson (*admitted pro hac vice*)
Jordan L. Pietzsch (*admitted pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403–1000

*Attorneys for Defendants M&T Bank Corporation, Robert G. Wilmers, René F. Jones, Mark J. Czarnecki, Brent D. Baird, C. Angela Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Gary N. Geisel, John D. Hawke, Jr., Patrick W.E. Hodgson, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler, Jr. and Herbert L. Washington*

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

STATEMENT OF FACTS .........................................................................................................5

ARGUMENT ............................................................................................................................8

I.   THE PSLRA'S HEIGHTENED PLEADING STANDARD. ................................................8

II.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 14(a) AND
     RULE 14a–9. ...............................................................................................................11

     A.  The complaint fails to plead a material misrepresentation or omission.............................11

     B.  The complaint fails to plead loss causation. ....................................................18

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 8

*Beck* v. *Dobrowski*,
    559 F.3d 680 (7th Cir. 2009) ............................................... 9 n.4, 9 n.6, 17

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ................................................................................. 8

*Brown* v. *Brewer*,
    No. CV 06–3731–GHK, 2010 WL 2472182 (C.D. Cal. June 17, 2010) .......... 19 n.14

*Cal. Pub. Empls.' Ret. Sys.* v. *Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) .................................................................. 10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
    No. 14-16814, 2017 WL 1753276 (9th Cir. May 5, 2017) ................... 12 n.9, 14

*City of Edinburgh Council* v. *Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) ..................................................................... 8

*Gabelli & Co.* v. *Liggett Grp., Inc.*,
    479 A.2d 276 (Del. 1984) ...................................................................... 19

*Gen. Elec. Co.* v. *Cathcart*,
    980 F.2d 927 (3d Cir. 1992) ............................................................... 18–20

*Giarraputo* v. *UNUMProvident Corp.*,
    No. Civ. 99-301-PC, 2000 WL 1701294 (D. Me. Nov. 8, 2000) ................ 19

*Goldkrantz* v. *Griffin*,
    No. 97 Civ. 9075 (DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999),
    *aff'd*, 201 F.3d 431 (2d Cir. 1999) .................................................. 19 n.14

*Gould* v. *Am.-Hawaiian S.S. Co.*,
    535 F.2d 761 (3d Cir. 1976) ........................................................ 13 n.10, 18

*Hayes* v. *Crown Cent. Petroleum Corp.*,
    78 F. App'x. 857 (4th Cir. 2003) ............................................................ 9 n.6

*Hurwitz* v. *LRR Energy, L.P.*,
    Civ. No. 15-711-SLR, 2017 WL 962906 (D. Del. Mar. 13, 2017) .............. 10

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................... 9 n.5

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .............................................................. 5 n.2

*In re DaimlerChrysler AG Sec. Litig.*,
    294 F. Supp. 2d 616 (D. Del. 2003) ........................................................ 18

*In re Heckmann Corp. Sec. Litig.*,
    869 F. Supp. 2d 519 (D. Del. 2012) ..................................................... 9 n.5

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................... 16

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002) ................................................................. 5 n.2, 10

*In re U.S. West, Inc. Sec. Litig.*,
  201 F. Supp. 2d 302 (D. Del. 2002),
  *aff'd*, 65 F. App'x 856 (3d Cir. 2003) ................................................. 9 n.4, 9 n.5, 10

*In re U.S. West, Inc. Sec. Litig.*,
  65 F. App'x 856 (3d Cir. 2003) ..................................................................... 10

*Knollenberg* v. *Harmonic, Inc.*,
  152 F. App'x 674 (9th Cir. 2005) ................................................................ 9 n.6

*Krieger* v. *Atheros Commc'ns, Inc.*,
  No. 11-CV-00640-LHK, 2012 WL 1933559 (N.D. Cal. May 29, 2012) ........................... 9 n.6

*Lane* v. *Page*,
  581 F. Supp. 2d 1094 (D.N.M. 2008) ........................................................... 9 n.6

*Little Gem Life Scis. LLC* v. *Orphan Med., Inc.*,
  Civ. No. 06-1377 ADM/AJB, 2007 WL 2695787 (D. Minn. Sept. 13, 2007) ................... 9 n.6

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ...................................................................... *passim*

*Ridler* v. *Hutchinson Tech. Inc.*,
  No. 15-CV-4261-DSD-LIB, 2016 WL 6246767 (D. Minn. Oct. 25, 2016) ................... 12 n.9

*Rubenstein* v. *IU Int'l Corp.*,
  506 F. Supp. 311 (E.D. Pa. 1980) ........................................................... 19 n.14

*Savior Assocs.* v. *Goncalves*,
  No. 13-60492-Civ, 2013 WL 3026257 (S.D. Fla. Apr. 8, 2013) ............................ 16

*Silverstrand Invs.* v. *AMAG Pharm. Inc.*,
  707 F.3d 95 (1st Cir. 2013) ................................................................ 17

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ............................................................... 12 n.9

*Tracinda Corp.* v. *DaimlerChrysler AG*,
  502 F.3d 212 (3d Cir. 2007) ............................................................... 11

*Tse* v. *Ventana Med. Sys., Inc.*,
  123 F. Supp. 2d 213 (D. Del. 2000),
  *aff'd*, 297 F.3d 210 (3d Cir. 2002) ....................................................... 18

*Tse* v. *Ventana Med. Sys., Inc.*,
  297 F.3d 210 (3d Cir. 2002) ............................................................... 19

**Statutes, Rules and Regulations**

15 U.S.C. § 78a ............................................................................... 8

15 U.S.C. § 78n ......................................................................... *passim*

15 U.S.C. § 78u–4 ...................................................................... *passim*

17 C.F.R. § 240.14a–9 ........................................................... *passim*

Fᴇᴅ R. Cɪᴠ. P. 12(b)(6) ..............................................................8

# STATEMENT OF THE NATURE AND
# STAGE OF THE PROCEEDINGS

On October 7, 2015, David Jaroslawicz, a purported former shareholder of Hudson City Bancorp, Inc., filed the original complaint in this action.  Lead plaintiff, the Belina Family, along with additional plaintiff Jeff Krublit, filed an amended complaint on February 19, 2016, which asserted violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a–9 promulgated thereunder and a state law claim for breach of fiduciary duty.  On March 30, 2017, the Court issued a Memorandum and Order (the "Order") dismissing the amended complaint but granting plaintiffs leave to amend as to certain claims.  Plaintiffs thereafter filed a Second Amended Complaint ("SAC"), which defendants now move to dismiss.

# INTRODUCTION AND SUMMARY OF ARGUMENT

The amendments to plaintiffs' complaint do not save it from dismissal.  As the Court is aware, the prior complaint sought to premise a federal securities law violation solely on a provision in the merger agreement between Hudson City and M&T in which M&T represented that "M&T ... [has] complied in all material respects with … (i) any applicable law, including ... the Bank Secrecy Act ... and any other law relating to ... money laundering prevention ...."  Ex. A (the "Proxy") at App. A § 4.9.[1]  M&T and Hudson City were required to disclose the terms of their merger agreement in the Proxy.  Plaintiffs alleged that the recitation of the terms of the merger agreement constituted an actionable misrepresentation because subsequent events showed that M&T was required to enhance its Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance programs to get the merger approved, suggesting that it must not have been in compliance with "applicable law" at the time of the Proxy.  AC ¶¶ 2, 4, 10.  But that theory was foreclosed by the case law and the Proxy's express disclaimer that investors should not rely on the parties' representations to each other in the merger agreement as though they were factual statements.  As this Court ruled, "[n]o reasonable

---

[1] Documents cited herein as "Ex. __" are exhibits to the accompanying declaration of Jordan L. Pietzsch.

shareholder would look at [the Proxy's] disclaimer and then rely on the representations and warranties contained in section 4.9 to understand the actual condition of M&T." *Order* at 10.

Plaintiffs have now changed tack. The new bases for their Section 14(a) claim are two statements included in (or incorporated by reference into) the Proxy that plaintiffs characterize as "assurance[s]" that M&T was in compliance with BSA/AML and consumer protection laws and that the merger would close promptly. *E.g.*, SAC ¶¶ 135–37, 140, 149–50. But the challenged statements were plainly not assurances of anything, but rather subjective statements of opinion:

> ➢ "The Registrant and its impacted subsidiaries have approved policies and procedures that are *believed to be compliant* with the USA Patriot Act." Ex. B at 21 (emphasis added).

> ➢ "Although we currently *believe we should be able to obtain* all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to or have a material adverse effect on M&T or its subsidiaries after the completion of the merger." Proxy at 15 (emphasis added).

It is reasonable to infer that plaintiffs did not rely on these statements in their prior complaint because they well understood that expressions of opinion or belief are incapable of being untrue statements of fact under the federal securities laws, except in the rarest of cases, and establishing that opinion statements were materially misleading is almost equally challenging.

As the Supreme Court recently held in *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, "a statement of opinion is not misleading just because external facts show the opinion to be incorrect," because "[r]easonable investors do not understand such statements as guarantees." 135 S. Ct. 1318, 1328 (2015). After *Omnicare*, statements of opinion or belief are actionable in only three narrow circumstances: *first*, if the speaker did not actually hold the stated opinion when it was made; *second*, if the opinion statement contained "embedded statements of fact" that were untrue; and, *third*, if the speaker omitted material facts "about the inquiry [it] did or did not conduct or the knowledge it did or did not have," "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1327, 1332.

**1.**  Plaintiffs here have not pleaded facts that would support a claim under any of these prongs, much less with the particularity that the PSLRA requires.  Plaintiffs expressly disavow making any allegation that defendants acted with scienter (SAC ¶¶ 130, 144), which is fatal under prong one, and neither of the opinion statements at issue contain embedded statements of fact—*i.e.*, specific facts provided in support of the opinion—rendering prong two inapplicable.

Plaintiffs also cannot proceed under *Omnicare* prong three, which the Supreme Court emphasized is "no small task for an investor."  135 S. Ct. at 1332.  It is certainly not enough to allege that a speaker's opinions were wrong, or that a non-negligent speaker would have formed a better opinion.  What must be pleaded instead are specific (and material) facts about the speaker's inquiry or knowledge that were not disclosed and that would have mattered to a reasonable investor considering what weight to attach to the opinion.  While plaintiffs plead the conclusion that Hudson City's "reverse due diligence" into M&T's business was inadequate (SAC ¶¶ 57, 79), they do not allege that investors were misled about the extent of the due diligence that Hudson City performed.  To the contrary, plaintiffs attack the quality of the diligence that was conducted, based exclusively on information gleaned from the Proxy itself.  This does not state a claim under *Omnicare*.

Dismissal is further required because the Proxy included a number of relevant "hedges, disclaimers, [and] qualifications" that provided important context for the opinion statements at issue and emphasized their tentative nature.  *Omnicare*, 135 S. Ct. at 1333.  For example, the Proxy warned that scrutiny of the financial services industry was increasing, that the merger was subject to regulatory approvals from a number of government agencies, and that there could be "no assurances that the regulatory approvals discussed above will be received on a timely basis," particularly given recent precedents.  Proxy at 34–36, 100–01.  And when M&T became aware of additional information relevant to the merger timing prior to the shareholder vote, Hudson City and M&T filed supplemental proxy materials in which they reported that "the Federal Reserve has identified certain regulatory concerns ... relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program," that "the timeframe for closing the transaction will

be extended substantially beyond the date previously expected," and that "there can be no assurances that the merger will be completed" before its termination date.  SAC ¶ 90.

2.  Not only does the SAC fail to identify a false or misleading statement but, as in the prior complaint, it also fails to adequately plead loss causation.  Defendants recognize that the Court reached a contrary conclusion in its order granting the prior motion to dismiss, but they respectfully submit that, if necessary to the disposition of this motion—and it should not be for the reasons already stated—the Court should reconsider the issue.

Here, the relevant question is whether Hudson City's shareholders suffered a direct pecuniary harm as a result of their approval of the proposed merger with M&T.  The Court must therefore decide whether plaintiffs have pleaded facts capable of supporting a plausible inference that Hudson City's shareholders would have been better off if they had rejected the merger and caused Hudson City not to merge with M&T.

Defendants submit that plaintiffs have failed to satisfy this pleading requirement in view of the undisputed fact that the proposed class profited from this transaction by nearly $2 billion. Plaintiffs' allegations that Hudson City might have found a better deal had its shareholders rejected the M&T merger are not only entirely speculative and conclusory, but they are in fact contradicted by the SAC's allegations, which make clear that no other bidder emerged and that Hudson City's board stuck with the deal long after it had the right to walk away—thanks to amendments to the merger agreement that opened wide the door to potential competing bidders. And plaintiffs' other theories that shareholders were injured by the delayed closing and M&T's regulatory issues miss the point:  Hudson City's shareholders did not have the option to force a speedier closing or to merge with an alternate version of M&T.  All the shareholders were asked to do, and all they had the power to do, was to either approve or disapprove the merger that was on the table, and they profited handsomely by choosing the former course.

Before it merged with M&T, Hudson City was a regional bank that focused on residential mortgage lending. SAC ¶ 54. The 2008 recession led to struggles for Hudson City, and it eventually explored the possibility of a sale of the company. In June 2012, Hudson City began discussions with M&T about a potential transaction and continued discussions with two other potential transaction partners. *Id.* ¶ 57; Proxy at 66. Ultimately, only M&T made an "actionable proposal"; the other two parties did not. Proxy at 66. "[A]n agreement to merge was reached by August 27, 2012," under which Hudson City shareholders could elect to receive either shares of M&T stock (based on a fixed exchange ratio) or cash having a roughly equivalent value. *See* SAC ¶ 58. As evidenced by the stock price movement when the deal was announced, the proposed merger was an excellent deal for Hudson City shareholders.[3]

On February 22, 2013, Hudson City and M&T filed a joint proxy statement with the SEC. SAC ¶ 85. The proxy statement contained numerous disclosures regarding the regulatory environment for banks and emphasized that the transaction was conditioned on regulatory approval. Among other disclosures, the Proxy devoted an entire section to "*Risks Relating to the Regulatory Environment*," which noted recent "major reforms of the regulatory oversight structure of the financial services industry," and made clear that M&T "expects more intense scrutiny in the examination process and more aggressive enforcement of regulations." Proxy at 34–36. Critically, the proxy statement specifically warned that the merger was subject to regulatory approvals from a number of government agencies, *id.* at 100, and stressed that

---

[2] This statement of facts is taken from the allegations of the SAC as well as documents "integral to or explicitly relied upon in the complaint," including the Proxy, other SEC filings, and Hudson City's and M&T's publicly reported stock prices. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[3] On August 24, 2012, the last trading day before the merger was announced, Hudson City's stock closed at $6.44 per share, and M&T's stock closed at $85.87 per share. Exs. C, D. On August 27, 2012, the day the merger was announced, M&T's stock closed at $89.82 per share, meaning that the merger would entitle a Hudson City shareholder to receive either stock in M&T worth $7.55 per Hudson City share—a premium of 17 percent—or roughly the same amount of cash. Ex. C. Not surprisingly, Hudson City's stock jumped to a high of $7.54 per share on the day the merger was announced—up 17 percent. Ex. D.

"regulators ha[d] recently imposed more stringent requirements for regulatory approvals of acquisitions," *id.* at 67. Shareholders were told: "Although we currently believe we should be able to obtain all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them." *Id.* at 15. The Proxy added that there could be "no assurances that the regulatory approvals discussed above will be received on a timely basis," and reported that "the Federal Reserve Board has taken a longer time to render a decision on applications than the typical time period for approval set forth in the Federal Reserve Board's regulations." *Id.* at 101.

These risks began to materialize before the shareholder vote—as shareholders were told. On April 12, 2013, M&T and Hudson City specifically reported to investors that the merger would, in fact, be delayed by regulators as a result of regulators' concerns about M&T's compliance program related to the BSA and AML regulations. SAC ¶ 90; Ex. E. In a press release that was filed as additional proxy solicitation material, the banks announced their expectation that "additional time will be required to obtain a regulatory determination on the applications necessary to complete their proposed merger" and that they therefore "believe[d] that the timeframe for closing the transaction will be extended substantially beyond the date previously expected." Ex. E. The press release went on to say that M&T and Hudson City were extending the deadline after which either party could cancel the merger by more than *five months*, until January 31, 2014, "but there can be no assurances that the merger will be completed by that date." *Id.* That same day, M&T's CFO publicly confirmed that M&T "recently w[as] made aware" of the fact that the Federal Reserve had identified "certain deficiencies in [M&T's] BSA/AML compliance program," which "would impact our ability to close the merger ... in the near term." SAC ¶ 91; Ex. F.

On April 18, 2013, with full knowledge of the likely regulatory delays, Hudson City's shareholders voted overwhelmingly to approve the merger—with over 94 percent of shares represented at the meeting voting in favor of the deal. SAC ¶ 6; Ex. G. It was not until well after the vote, on June 17, 2013, that M&T entered into a written agreement with the Federal Reserve that established the steps M&T would need to take to remedy the "deficiencies" the

Federal Reserve had identified in its BSA/AML compliance programs. SAC ¶ 96; Ex. H. The written agreement did not accuse M&T of engaging in any illegal activity, much less find that it had done so; the agreement simply required M&T to improve its systems. *See* SAC ¶¶ 97, 103.

Over the next two years, M&T diligently worked to enhance its compliance programs in accordance with the Federal Reserve's requirements, *see* SAC ¶¶ 104, 106–09, 112–13; Ex. I at 11–13, and the parties executed multiple amendments to the merger agreement to, among other things, extend the termination date to allow additional time to receive regulatory approval, SAC ¶¶ 101, 111. These amendments expanded Hudson City's right to terminate the merger if it received a superior proposal and to pursue its standalone business plan in the interim. *See id.* ¶¶ 101–02; Exs. J–M. And following the second amendment on December 16, 2013, Hudson City could terminate the merger "without paying [any] economic penalty" if it "reasonably determine[d]" that the transaction would not receive regulatory approval. Ex. K; *see also* SAC ¶ 62. These amendments to the merger agreement were all publicly disclosed at the time and thus well known to any third party that might have been considering a competing bid for Hudson City.

The Federal Reserve approved the merger on September 30, 2015. SAC ¶ 117; Ex. I. The order of approval noted "significant weaknesses in M&T's risk-management program," its "overall BSA/AML compliance management program," and its "consumer compliance program," Ex. I at 10–11, but it did not accuse M&T of any wrongdoing or illegal activity. After receiving regulatory approval, the parties promptly closed the merger on October 31, 2015, and it became effective the next day. SAC ¶ 117.

The deal was an excellent one for Hudson City's shareholders, because M&T's stock price rose consistently from the signing of the deal to the closing—from a closing price of $85.87 on the trading day immediately prior to the execution of the merger agreement to $120.27 on the first trading day after closing. Ex. C. For each share of their Hudson City stock, Hudson City shareholders received, at their election (subject to proration), either $10.11 worth of M&T stock, or $10.06 in cash—a significant improvement (56%, in fact) over Hudson City's $6.44 per share trading price just before the merger was announced. Exs. D, N. Given that Hudson City

had approximately 528 million shares of stock outstanding, Proxy at 44, that increase amounted to a total profit for Hudson City's stockholders resulting from the merger of around $1.9 billion.

## ARGUMENT

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). Moreover, because this is a private action arising under the Exchange Act, plaintiffs must also satisfy a heightened pleading standard that Congress established in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See* pp. 8–11, *infra.* This is an "[e]xacting" pleading requirement that "requires plaintiffs to plead the who, what, when, where and how[,] the first paragraph of any newspaper story," in order to establish that a statement was false or misleading. *City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 159, 168, 166 (3d Cir. 2014).

## I. THE PSLRA'S HEIGHTENED PLEADING STANDARD.

The SAC alleges that M&T (Count I) and Hudson City (Count II) and certain of their respective directors violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by making "materially misleading and inaccurate statements" in the Proxy. SAC ¶¶ 133, 147. The Exchange Act is codified as Chapter 2B of Title 15 of the United States Code. 15 U.S.C. §§ 78a, *et seq.* Section 14(a) of the Exchange Act is codified at 15 U.S.C. § 78n(a).

When Congress enacted the PSLRA, it added certain heightened pleading standards to the Exchange Act, which are codified at 15 U.S.C. § 78u–4(b)(1) and (b)(2). Relevant here is subsection (b)(1) of this statutory provision, which states:

(1)    <u>Misleading Statements and Omissions</u>. In any private action arising under this Chapter in which the plaintiff alleges that the defendant—

    (A)    made an untrue statement of a material fact; or

    (B)    omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

It is plain from the statutory text that this heightened pleading standard applies to plaintiffs' claims here. Their Section 14(a) claims "aris[e] under [the Exchange Act]" and are dependent on allegations that the Proxy was materially false or misleading. *See, e.g.*, SAC ¶¶ 24, 132, 135, 140, 142. Nothing more is required to trigger the pleading standard. In particular, unlike subsection (b)(2),[4] there is nothing in the text of subsection (b)(1) that suggests that its application is limited to scienter-based (as opposed to negligence-based) Exchange Act claims.[5]

The Fourth, Seventh, and Ninth Circuits, and many district courts, have squarely held that the heightened pleading standard in subsection (b)(1) applies to negligence-based claims under Section 14(a) of the Exchange Act.[6] Courts in this district have reached the same conclusion,

---

[4] Subsection (b)(2) requires plaintiffs that bring private actions under the Exchange Act that require "proof that the defendant acted with a particular state of mind" to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Although not firmly settled, courts have held that this provision is inapplicable to Section 14(a) claims alleging only negligence, because "negligence is not a state of mind." *See, e.g.*, *Beck* v. *Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009); *see also In re U.S. West, Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 306 (D. Del. 2002), *aff'd*, 65 F. App'x 856 (3d Cir. 2003) ("This court has previously expressed doubt that the provisions of subsection (b)(2) apply to … claims under § 14(a) … because such claims require only the allegation of negligence, and not scienter.").

[5] In its ruling on the prior motion to dismiss, the Court cited two cases in which district courts declined to apply the heightened pleading standard in subsection (b)(2) to negligence-based Section 14(a) claims. Importantly, however, neither case stands for the proposition that the heightened pleading standard in subsection (b)(1) does not apply to such claims. *See In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 538 & n.120 (D. Del. 2012); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 321–22 (S.D.N.Y. 2010). To the contrary, the case upon which the *Heckmann* court relied expressly holds that subsection (b)(1) "undoubtedly applies" to negligence-based Section 14(a) claims, *see U.S. West*, 201 F. Supp. 2d at 305–06, and *Bank of America* approvingly cites other cases holding that "Section 14(a) allegations must identify with precision any misleading statements or omitted material facts pursuant to the PSLRA," 757 F Supp. 2d at 287 (citing subsection (b)(1)).

[6] *See Hayes* v. *Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam); *Knollenberg* v. *Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005); *Beck*, 559 F.3d at 681–82; *Krieger* v. *Atheros Commc'ns, Inc.*, No. 11-CV-00640-LHK, 2012 WL 1933559, at *6 (N.D. Cal. May 29, 2012); *Lane* v. *Page*, 581 F. Supp. 2d 1094, 1115 (D.N.M. 2008); *Little Gem Life Scis. LLC* v. *Orphan Med., Inc.*, Civ. No. 06-1377 ADM/AJB, 2007 WL 2695787, at *3 (D. Minn. Sept. 13, 2007).

including in a case decided only two months ago. *See Hurwitz* v. *LRR Energy, L.P.*, Civ. No. 15-711-SLR, 2017 WL 962906, at *5 (D. Del. Mar. 13, 2017); *U.S. West*, 201 F. Supp. 2d at 305–06. The Third Circuit expressly agreed that subsection (b)(1) applies to negligence-based Section 14(a) claims in its non-precedential opinion affirming the latter decision, *In re U.S. West, Inc. Sec. Litig.*, 65 F. App'x 856 (3d Cir. 2003), and an earlier precedential opinion from the Third Circuit necessarily implies the same view, *see In re NAHC*, 306 F.3d at 1329.[7]

Against this wall of authority, plaintiffs have never cited a single case in which a court has declined to apply subsection (b)(1)'s pleading standard to a negligence-based Section 14(a) claim, and defendants respectfully submit that the Court should reconsider its prior ruling to that effect. In particular, the Third Circuit's decision in *California Public Employees' Retirement System* v. *Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004), does not establish that subsection (b)(1) of the PSLRA is inapplicable to a negligence-based Section 14(a) claim, nor could it, because the Court was not confronted with such a claim. *Chubb*'s relevant holding is that "if a plaintiff elects to ground [a Section 14(a) claim] in fraud," then it "must meet the PSLRA particularity requirements." *Id.* at 144–45 & n.8 (quoting 15 U.S.C. §§ 78u–4(b)(1) and (b)(2)). It does not logically follow from that holding that if a Section 14(a) claim is not grounded in fraud, then neither of the PSLRA's particularity requirements apply, and *Chubb* does not cite any statutory language or other authority that would support such a rule. Indeed, the only case cited in the relevant section of the opinion is *NAHC*, which, as noted, necessarily implies that subsection (b)(1) of the PSLRA *does* apply to negligence-based Section 14(a) claims.

---

[7] This Court stated in its ruling on the prior motion to dismiss that "it is unclear whether the [*NAHC*] court applied the PSLRA to a Section 14(a) negligence or fraud claim." Order at 7 n.2. To assist the Court's review, defendants are submitting the operative complaint in *NAHC*, which provides the missing information. As the Court will see, the *NAHC* complaint alleged that "[t]he defendants ... were *negligent* in disseminating the Proxy Statement with these materially false and misleading statements." Ex. O ¶ 141 (emphasis added); *see also id.* ¶ 138 ("[A]ll allegations of scienter are specifically excluded."). Thus, in *NAHC*, the Third Circuit affirmed the dismissal of a negligence-based Section 14(a) claim based on an application of the heightened pleading standard established by subsection (b)(1) of the PSLRA.

Thus, at the very most, *Chubb* leaves open the question of whether subsection (b)(1) of the PSLRA applies to negligence-based claims under Section 14(a). Courts that have considered the question have consistently answered that question in the affirmative, based on the plain language of the relevant statutory provision. This Court should reach the same conclusion here and measure the SAC against the heightened pleading requirements of PSLRA subsection (b)(1).

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 14(a) AND RULE 14a–9.

Section 14(a) of the Exchange Act makes it "unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe ... to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security." 15 U.S.C. § 78n(a)(1). SEC Rule 14a–9, in turn, prohibits any solicitation via a proxy statement that "contain[s] any statement which … is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a–9(a). To state a claim under these provisions, a plaintiff must plead sufficient facts to establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp.* v. *DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007). Plaintiff has failed to do so with respect to the first two elements.

### A.    The complaint fails to plead a material misrepresentation or omission.

Plaintiffs have abandoned their argument that M&T's representation to Hudson City in the merger agreement regarding BSA/AML compliance was actionably false under the securities laws. Their claims are now premised on two other statements, the first of which was incorporated by reference from M&T's 2011 Form 10-K with the other set forth in the Proxy itself:

➢  "The Registrant and its impacted subsidiaries have approved policies and procedures that are *believed to be compliant* with the USA Patriot Act." Ex. B at 21 (emphasis added).

➢  "Although we currently *believe we should be able to obtain* all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them or, if

obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to or have a material adverse effect on M&T or its subsidiaries after the completion of the merger." Proxy at 15 (emphasis added).

According to plaintiffs, the first of these statements was an "affirmative representation[] that M&T was in full legal compliance" with applicable BSA/AML laws and regulations, and the second "conveyed the impression that the Merger would close in a timely manner." SAC ¶¶ 3–4. Plaintiffs allege these statements were materially false or misleading because the merger closing was delayed by "two and a half years … due to regulatory concerns and legal compliance issues affecting M&T" that later came to light. *Id.* ¶ 6. But contrary to plaintiffs' characterizations, these statements were not "assurance[s]" or "representations that M&T was in compliance with BSA/AML laws" (SAC ¶¶ 135, 149) or that the merger would close in any particular timeframe. They were statements of opinion or belief, which, by definition, "convey some lack of certainty" about their subject matter and which "[r]easonable investors do not understand" to be "guarantees." *Omnicare*, 135 S. Ct. at 1325, 1328.[8]

The Supreme Court's decision in *Omnicare* substantially cabins the possibility of liability for statements of opinion under the securities laws.[9] The plaintiff in *Omnicare* alleged that the issuer had violated Section 11 of the Securities Act of 1933, a strict liability provision, by stating

---

[8] The SAC also quotes a third statement from the risk factors section of the Proxy, which stated, among other things, that M&T "expect[ed] to face increased regulation" and "more aggressive enforcement of regulations on both the federal and state levels," and that "M&T believes compliance with the Dodd-Frank Act and its implementing regulations … will likely negatively impact revenue and increase the cost of doing business." SAC ¶ 82 (quoting Proxy at 34, 36). On its face, this statement does not provide any assurances about M&T's compliance with any particular regulations, nor does it address the timing of the merger, and the SAC does not even attempt to explain why the statement is supposedly false or misleading. If anything, this statement was an additional clear warning to investors of the increased regulatory risks ahead.

[9] Courts have recognized that *Omnicare*'s holding properly extends to claims under Sections 10(b) and 14(a) of the Exchange Act. *See, e.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, No. 14-16814, 2017 WL 1753276, at *7 (9th Cir. May 5, 2017) (Section 10(b)); *Tongue* v. *Sanofi*, 816 F.3d 199, 209–14 (2d Cir. 2016) (same); *Ridler* v. *Hutchinson Tech. Inc.*, No. 15-CV-4261-DSD-LIB, 2016 WL 6246767, at *6 (D. Minn. Oct. 25, 2016) (Section 14(a)). This makes particular sense with respect to Section 14(a), given the similarities in language between Rule 14a–9 and Section 11 of the Securities Act (the statutory provision at issue in *Omnicare*). *See Omnicare*, 135 S. Ct. at 1326 n.2 (noting that Section 14(a) "bars conduct similar to that described in § 11").

opinions about legal compliance that allegedly turned out to be wrong. *See id.* at 1323–24. For example, the issuer stated: "We believe our contract arrangements … and our pharmacy practices are in compliance with applicable federal and state laws." *Id.* at 1323. In reversing the Sixth Circuit's holding that "a statement of opinion that is ultimately found incorrect—even if believed at the time made—may count as an 'untrue statement of material fact,'" the Supreme Court ruled that the Sixth Circuit had "wrongly conflate[d] facts and opinions." *Id.* at 1325. The Court held that "a sincere statement of pure opinion" would remain truthful "regardless of whether an investor can ultimately prove the belief wrong." *Id.* at 1327.

Here, as in *Omnicare*, plaintiffs have disclaimed any allegation that could be construed as sounding in fraud (SAC ¶¶ 130, 144), and therefore plaintiffs have conceded that the opinions expressed in the Proxy about M&T's BSA/AML compliance policies and the timing of regulatory approval were sincerely held. *See Omnicare*, 135 S. Ct. at 1327. Nor have plaintiffs identified what the Supreme Court described as "embedded statements of fact" within either of the opinion statements at issue. *See id.* at 1327. Plaintiffs may thus proceed, if at all, only under *Omnicare*'s third prong: the omission of material facts "about the [speaker's] inquiry into or knowledge concerning a statement of opinion" that make a genuine expression of belief misleading. *Id.* at 1329.[10]

Stating a claim under this prong of *Omnicare* is "no small task for an investor." *Id.* at 1332. Plaintiffs must "identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry [the speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* Even in non-PSLRA cases (like *Omnicare* itself), a conclusory allegation that the speaker "lacked 'reasonable grounds for the belief' it stated" would

---

[10] The Court may disregard any allegations about statements made after the date on which Hudson City's shareholders voted to approve the merger (April 18, 2013). Any post-vote statements could not have impacted any shareholder's vote, and thus may not serve as a basis for liability under Section 14(a) or Rule 14a–9. *See, e.g.*, *Gould* v. *Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 778 (3d Cir. 1976).

not suffice; what is required are "specific allegation[s]" about the "information available to [the speaker] at the time" that was omitted. *Id.* at 1333. But not every "fact cutting the other way" must be disclosed, because "a reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Id.* at 1329. And "context" matters a lot, because investors weighing a statement of opinion appropriately take into account its "surrounding text, including hedges, disclaimers, and apparently conflicting information," as well as "the customs and practices of the relevant industry." *Id.* at 1330.

Seizing on the fact that Section 14(a) establishes a negligence-based claim, plaintiffs fall into the trap of repeatedly alleging that Hudson City and M&T negligently failed to "uncover all facts" concerning "M&T's legal compliance with all state and federal laws." SAC ¶ 2; *see also, e.g., id.* ¶ 79 (alleging that "adequate due diligence" would have uncovered facts as to compliance). But these generalized attacks on the results of the underlying investigation are insufficient under *Omnicare*, not to mention the PSLRA. "[A]n investor cannot state a claim by alleging only that an opinion was wrong," *Omnicare*, 135 S. Ct. at 1332, or by pleading the conclusion that "no set of reasonable assumptions" could support the opinion, *Align Tech.*, 2017 WL 1753276, at *10, but that is precisely what plaintiffs have tried to do in the SAC. If simply being wrong about an opinion did not suffice to state a claim in *Omnicare*—a case that involved claims pleaded under a *strict liability* provision of the securities laws—then it certainly does not suffice here.

In *Omnicare*, the Supreme Court remanded the case with instructions to consider a "specific allegation" that might have sufficed to state a claim under prong three, depending on the specifics and the surrounding context: that "an attorney had warned Omnicare that a particular contract 'carrie[d] a heightened risk' of legal exposure." 135 S. Ct. at 1333. Nothing similar has been pleaded here. The closest that plaintiffs come is their allegation that Hudson City devoted "at most five business days for all due diligence concerning M&T's considerable business operations." SAC ¶ 57. But even if plaintiffs were correct that "it is inconceivable that Hudson City's Board could have conducted adequate due diligence" in that time period (*id.*)—a proposition that defendants sharply dispute—that would not be relevant under *Omnicare*. The

salient point is that the length of time that Hudson City devoted to reverse due diligence is disclosed in the Proxy (at p. 67). No further disclosure was required. *Omnicare*, 135 S. Ct. at 1332 ("[T]o avoid exposure for omissions," the speaker "need only divulge an opinion's basis, or else make clear the real tentativeness of its belief.").[11]

The fact that the opinion statements at issue were made against the backdrop of widespread public reports about increased regulatory scrutiny of BSA/AML compliance, and surrounded by multiple hedges and disclaimers in the Proxy itself, further dooms any possible claim under prong three of *Omnicare*. Plaintiffs themselves identify a number of news stories that documented regulators' increasing focus on BSA/AML compliance in 2012 and early 2013 (SAC ¶¶ 69–74), and entire sections of the Proxy are devoted to discussions of "Risks Relating to the Regulatory Environment" and "Regulatory Approvals Required for the Merger." Proxy at 34–36, 99–101. Most pertinently, the Proxy made clear that the Federal Reserve would review the merger, that "[a]s part of its evaluation" it would assess "the effectiveness of the companies in combatting money laundering," and that it had, "[i]n recent similar transactions … taken a longer time to render a decision on [merger] applications than the typical time period for approval set forth in the … regulations." *Id.* at 100–01. A reasonable investor considering the opinion statements at issue in the context of this "broader frame" would not have been misled to believe that defendants were guaranteeing a swift closing. *Omnicare*, 135 S. Ct. at 1330.

Of course, when new facts emerged that bore upon the opinions expressed in the Proxy, defendants duly filed a supplement disclosing that information prior to the shareholder vote. On April 12, 2013, investors were told that the Federal Reserve had raised concerns with M&T's BSA/AML compliance program, and that, as a consequence, M&T and Hudson City were expecting delays in obtaining regulatory approval and extending the deadline for completing the

---

[11] Plaintiffs' related allegation that the Proxy makes "no mention ... of any due diligence" by M&T regarding the "state of legal compliance" (SAC ¶ 57) does not state a claim either. Under *Omnicare*, "an investor cannot ... just say that the [speaker] failed to reveal its basis." 135 S. Ct. at 1332.

merger, while emphasizing that there could be "no assurances" that the merger would close by the new deadline. Ex. E. To put these supplemental disclosures in terms of *Omnicare*, when there was "information in the [banks'] possession" that did not "fairly align[]" with the opinion statements in the Proxy, they disclosed that information to investors. 135 S. Ct. at 1329.[12]

Plaintiffs allege that the supplemental disclosure should be disregarded because it was allegedly made "in all likelihood after most shareholders had already cast their ballots." SAC ¶ 11. But even if that conclusory allegation were true, the Proxy made clear that shareholders could "change [their] vote" at "any time" before the April 18, 2013 meeting, including by "logging onto the Internet website specified on [the] proxy card[s]," "calling the telephone number," or attending the meeting in person. Proxy at 7. Given the "rise of the Internet" and the SEC's EDGAR system, which "ensure that information permeates the market faster than ever before," *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 376 (S.D.N.Y. 2003), shareholders had plenty of time to consider the supplemental disclosures before casting their votes, *see, e.g.*, *Savior Assocs.* v. *Goncalves*, No. 13-60492-Civ, 2013 WL 3026257, at *3 n.2 (S.D. Fla. Apr. 8, 2013) (finding older case law unpersuasive in light of the availability of SEC filings "on the internet" and fact that "shareholders can vote online using the internet or by telephone").

By arguing that the supplemental disclosures came too late, even though they were reporting information that had only just come to light, plaintiffs are asking the Court to fashion a rule that could actually discourage prompt disclosure of new developments by requiring parties to a proposed merger to adjourn shareholder meetings whenever potentially material developments occur within 14 days of the meeting. As the Seventh Circuit has recognized, "that

---

[12] Plaintiffs allege that even the supplemental disclosure was misleading because it "did not disclose that M&T had millions of customer accounts that need[ed] to be verified." SAC ¶ 89. But plaintiffs have pleaded exactly nothing to suggest that Hudson City or M&T knew about this alleged need to verify customer accounts when they made the supplemental disclosure. In fact, the written agreement between M&T and the Federal Reserve—which set forth the remedial actions that M&T needed to take to remedy the BSA/AML deficiencies identified by regulators—was not issued by the Federal Reserve until June 17, 2013, months after the supplemental disclosure. *See* SAC ¶ 96; Ex. H.

is not a rule for a court to impose," but is instead "a matter for the SEC to consider if it wants, because it involves a delicate tradeoff." *Beck*, 559 F.3d at 685. On one side of the scale is the risk that delaying the meeting will cause a premium deal to "fall apart" due to intervening stock price fluctuations or "because of the unwillingness or inability of one or both of the parties to remain in limbo." *Id.* And while delaying the meeting does provide "more time ... to consider the solicitation carefully," this consideration must take account of the "electronic revolution," following which "information spreads far more rapidly than it used to." *Id.*

In sum, applying the rule that plaintiffs sponsor—and pretending that defendants' supplemental disclosures did not exist—finds no support in the current SEC regulations or modern case law. Applying it would also disserve shareholders in the long run by making disclosure of current events more costly for issuers, even when there is more than adequate time for the disclosure to be absorbed and any alternative shareholder action taken.

Unable to state a claim under *Omnicare*, plaintiffs reference Item 503 of Regulation S-K (*see* SAC ¶¶ 133–34, 147–48) and suggest that defendants had an affirmative obligation to "explore and discuss any significant risks that due diligence could uncover, including issues of legal compliance that could spell trouble for the Merger." *Id.* ¶ 148. Not so. "[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item 503 risks needs to allege sufficient facts to infer that a registrant knew, as of the time of the offering, that (1) a risk factor existed; (2) the risk factor could adversely affect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor." *Silverstrand Invs.* v. *AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013). Nothing is pleaded in the SAC that suggests that Hudson City or M&T knew about the alleged compliance problems when they filed the Proxy, much less that the banks knew how regulators would react in this particular case—*i.e.*, what remedial actions regulators would select from the broad palette available to them—or that those problems would have a long-term, adverse effect on the combined entity's business. And in any event, the "risk" that came to pass—a delay of the merger's closing due to regulatory issues—was expressly disclosed to investors in the Proxy. *See, e.g.*, Proxy at 15, 99, 101, 103.

**B.      The complaint fails to plead loss causation.**

The Third Circuit has held that "damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization … are obtained by a false proxy statement, and *that transaction* was the direct cause of the pecuniary injury for which recovery is sought." *Gen. Elec. Co.* v. *Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) (emphasis added).  The most common measure of damages would be plaintiffs' "out of pocket loss as a result of the merger," or the extent to which the M&T shares and/or cash they received "had an intrinsic … market value that was less than the intrinsic … market value of the [Hudson City] common stock" that they gave up.  *Gould*, 535 F.2d at 781.  But that theory does not work in this case, because Hudson City's shareholders indisputably made a significant *profit* on their shares.[13]  Plaintiffs thus propose three alternative damages theories, but all of them are flawed.

*A "more favorable merger premium*.**"**  Plaintiffs first allege that "[h]ad M&T revealed the deficiencies in its legal compliance," Hudson City would have obtained a "more favorable merger premium" for its shareholders.  SAC ¶ 119.  This allegation is *extremely* speculative:  it assumes that Hudson City's shareholders would have rejected the merger, that M&T would have nonetheless reengaged to negotiate a new transaction, and that M&T would have agreed to pay more to acquire Hudson City at the end of that process.  No facts are pleaded which suggest that any of this is plausible.  Courts consistently refuse to allow cases to proceed on a "lost opportunity" theory like this one where the "loss of a possible profit or benefit" relates to something that is "wholly speculative."  *Tse* v. *Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 223 (D. Del. 2000), *aff'd*, 297 F.3d 210 (3d Cir. 2002).  "Lost opportunity damages are not 'wholly speculative' if they are based on 'certain, fixed and demonstrable profits thwarted'" by the alleged conduct.  *In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 627 (D. Del. 2003).

---

[13] Shareholders who held their Hudson City shares through the closing of the merger were entitled to exchange them for either $10.11 worth of M&T stock or $10.06 in cash per Hudson City share (*see* p. 7, *supra*), which is at least $3.62 per share, or *56 percent*, above the pre-announcement price.  And the size of the premium they received, relative to the pre-announcement price, increased dramatically while the merger was delayed due to the steady improvement of M&T's share price.

The Third Circuit has cautioned courts not to "recreate a potential merger negotiation" on the theory that the seller's shareholders were entitled to "a more favorable merger deal" because that approach would be too "speculative" to support cognizable damages. *See Tse* v. *Ventana Medical Systems, Inc.*, 297 F.3d 210, 221–23 (3d Cir. 2002). Other courts that have considered the issue have similarly declined to displace actual arm's-length negotiations in favor of a hypothetical "better deal."[14] Plaintiffs here seek precisely what these courts have rejected. Even worse, their own allegations establish that the merger's delay gave Hudson City an opportunity to seek a better deal (*see* SAC ¶¶ 59, 62) but that its board chose to stick with the M&T merger even when there would have been no break fee to walk away (*see id.* ¶¶ 59–61). There is simply no plausible basis to infer that Hudson City could have gotten a better deal.

***Lower dividends.*** Plaintiffs' next argument—that they suffered damages because Hudson City paid lower dividends (as compared with its historical practice) during the period between the shareholder vote and the closing (*id.* ¶ 120)—suffers from the fundamental defect that the transaction the shareholders approved (*i.e.*, the merger) had not yet occurred and thus could not have been the "direct cause" of anything in this period. *Cathcart*, 980 F.2d at 933; *see also Giarraputo* v. *UNUMProvident Corp.*, No. Civ. 99-301-PC, 2000 WL 1701294, at *11 (D. Me. Nov. 8, 2000) ("[C]lass members must allege how they were injured by the transaction their votes authorized; in other words, how consummation of the merger caused them injury."). The losses that plaintiffs are complaining about instead resulted from the Hudson City board's decision to reduce the dividend, a decision it could have made for any number of overlapping reasons—*e.g.*, poor operating results, restrictions from banking regulators, or planned capital reinvestment—and that "rests in the discretion" of the board. *See Gabelli & Co.* v. *Liggett Grp., Inc.*, 479 A.2d 276, 280 (Del. 1984). Nor was there anything in the merger agreement that

---

[14] *See, e.g.*, *Brown* v. *Brewer*, No. CV 06–3731–GHK, 2010 WL 2472182, at *32–33 (C.D. Cal. June 17, 2010); *Goldkrantz* v. *Griffin*, No. 97 Civ. 9075 (DLC), 1999 WL 191540, at *8 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999); *Rubenstein* v. *IU Int'l Corp.*, 506 F. Supp. 311, 316 (E.D. Pa. 1980).

limited Hudson City's ability to pay dividends while the merger was pending; to the contrary, it was expressly permitted to maintain dividends at existing levels. *See* Proxy, App. A § 5.2.

Moreover, at the very most, plaintiffs have alleged that the board's decision as to certain dividend declarations was influenced, in part, by operational results that were in turn affected by the pending merger. *See* SAC ¶ 120. But the causal link between the shareholder vote and those board decisions is far too attenuated to establish loss causation. *See Cathcart*, 980 F.2d at 933 (holding that shareholders could not premise a Section 14(a) claim on losses caused by decisions made by directors elected pursuant to an allegedly misleading proxy statement).

***Investment with a "spotty regulatory record."*** Finally, plaintiffs implausibly allege that they were harmed because they received shares of a company (M&T) with a "spotty regulatory record." SAC ¶ 121. As set forth above, M&T's stock was trading more than $34 per share *higher* after the closing than when the merger was announced in 2012,[15] which meant that Hudson City's shareholders benefited from this significant surge in value given that the merger consideration was M&T stock or its cash equivalent. And because M&T trades on a public market, any Hudson City shareholder who was concerned about M&T's regulatory record could have promptly sold the M&T stock they received upon the closing—at a significant profit.

It bears reiterating that there was no set of circumstances in which Hudson City's shareholders could have acquired shares in a "better" M&T: their options were to approve the merger or to vote it down and continue to own Hudson City shares. And plaintiffs have not and cannot allege that the merger consideration that Hudson City's shareholders received in the deal was worth less than the Hudson City shares they gave up in exchange.

## CONCLUSION

For these reasons, the Second Amended Complaint should be dismissed with prejudice.

---

[15] M&T stock closed at $85.87 on the last day of trading before the merger was announced and at $120.27 on the first trading day after the merger took effect. Ex. C. And the amount used for the cash component —the average closing price during the ten trading days before the closing—was $119.75. Exs. C, N.

POTTER ANDERSON & CORROON LLP

REED SMITH LLP

/s/ Kevin R. Shannon
Kevin R. Shannon (DE Bar No. 3137)
Hercules Plaza
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19899
(302) 984–6000

Tracy Richelle High (*admitted pro hac vice*)
Christen M. Martosella (*admitted pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558–4000

*Attorneys for Defendants Hudson City
Bancorp, Inc., Denis J. Salamone, Victoria H.
Bruni, Donald O. Quest, Joseph G. Sponholz,
Scott A. Belair, Michael W. Azzara, William
G. Bardel and Cornelius E. Golding*

/s/ John C. Cordrey
John C. Cordrey (DE Bar No. 5324)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778–7500

George T. Conway III (*admitted pro hac vice*)
Bradley R. Wilson (*admitted pro hac vice*)
Jordan L. Pietzsch (*admitted pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403–1000

*Attorneys for Defendants M&T Bank
Corporation, Robert G. Wilmers, René F.
Jones, Mark J. Czarnecki, Brent D. Baird, C.
Angela Bontempo, Robert T. Brady, T.
Jefferson Cunningham III, Gary N. Geisel,
John D. Hawke, Jr., Patrick W.E. Hodgson,
Richard G. King, Jorge G. Pereira, Melinda
R. Rich, Robert E. Sadler, Jr., and Herbert L.
Washington*

May 30, 2017