IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID JAROSLAWICZ., Individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>M&T BANK CORPORATION, HUDSON CITY BANCORP, INC., ROBERT G. WILMERS, RENÉ F. JONES, MARK J. CZARNECKI, BRENT D. BAIRD, C. ANGELA BONTEMPO, ROBERT T. BRADY, T. JEFFERSON CUNNINGHAM III, GARY N. GEISEL, JOHN D. HAWKE, JR., PATRICK W.E. HODGSON, RICHARD G. KING, JORGE G. PEREIRA, MELINDA R. RICH, ROBERT E. SADLER, JR., HERBERT L. WASHINGTON, DENIS J. SALAMONE, MICHAEL W. AZZARA, VICTORIA H. BRUNI, DONALD O. QUEST, JOSEPH G. SPONHOLZ, CORNELIUS E. GOLDING, WILLIAM G. BARDEL, and SCOTT A. BELAIR,<br><br>*Defendants*. | Civ. No. 15-897-RGA |

**MEMORANDUM OPINION**

Francis J. Murphy, Jr., Esq. and Jonathan L. Parshall, Esq. of Murphy & Landon, Wilmington, DE; Laurence D. Paskowitz, Esq. of Paskowitz Law Firm P.C., New York, NY; Deborah R. Gross, Esq. of Kaufman, Coren & Ress, P.C., Philadelphia, PA; Roy Jacobs, Esq. of Roy Jacobs & Associates, New York, NY. Counsel for Plaintiffs.

John C. Cordrey, Esq. of Reed Smith LLP, Wilmington, DE; Geroge T. Conway III, Esq., Bradley R. Wilson, Esq., and Jordan L. Pietzsch, Esq. of Watchtell, Lipton, Rosen & Katz, New York, NY. Counsel for Defendants M&T Bank Corporation, Robert G. Wilmers, René F. Jones, Mark J. Czarnecki, Brent D. Baird, C. Angela Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Gary N. Geisel, John D. Hawke, Jr., Patrick W.E. Hodgson, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler, Jr., and Herbert L. Washington.

Kevin R. Shannon, Esq. of Potter Anderson & Corroon, Wilmington, DE; Tracy Richelle High, Esq. and Christen M. Martosella, Esq. of Sullivan & Cromwell LLP, New York, NY. Counsel for Defendants Hudson City Bancorp, Inc., Denis J. Salamone, Victoria H. Bruni, Donald O. Quest,

Joseph G. Sponholz, Scott A. Belair, Michael W. Azzara, William G. Bardel, and Cornelius E. Golding.

October 27, 2017

*signature*
ANDREWS, U.S. District Judge:

Plaintiffs are former stockholders of Hudson City Bancorp before it merged with M&T Bank Corporation. (D.I. 72 ¶ 26). Defendants are Hudson City, M&T, and their directors and officers at the time of the merger. (*Id.* at ¶¶ 27-53). Pending before the court is Defendants' motion to dismiss Plaintiffs' second amended class action complaint (the "complaint"). (D.I. 75). The complaint alleges that Defendants violated Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act") by failing to make mandatory disclosures and making misleading disclosures in the proxy statement (the "Proxy") issued in connection with the merger. (D.I. 72 ¶¶ 129-54). For the reasons discussed below, Defendants' motion is granted and the complaint is dismissed without prejudice.

## I. BACKGROUND

Plaintiffs argue that Defendants violated Section 14(a) by failing to disclose that M&T was not in compliance with certain banking regulations, which would delay regulatory approval and consequently the closing of the merger. Plaintiffs' arguments are based on disclosures in the Proxy, an April 12, 2013 press release, and an April 15, 2013 earnings conference call, the last two items referred to by Plaintiffs as the "April Disclosures." This section provides a rough timeline of events before discussing in more detail the contents of the Proxy and the April Disclosures.

### A. Timeline of Events

On August 27, 2012, Defendants executed a merger agreement pursuant to which M&T would acquire Hudson City, and Hudson City stockholders could elect to receive either shares of M&T stock or cash having a roughly equivalent value. (D.I. 72 ¶ 58). Hudson City filed a preliminary Proxy with the SEC on October 15, 2012 that became effective on February 22, 2013. (*Id.* at ¶ 11). At the time the Proxy became effective, Defendants expected the merger to close in the second quarter of 2013. (D.I. 77-1 at 103). On April 12, 2013, Defendants issued a press

1

release announcing delays in closing the merger due to additional time needed to obtain regulatory approval from the Federal Reserve Board. (D.I. 72 ¶ 90). According to the press release, the Federal Reserve had raised "concerns" about "M&T's procedures, systems and processes relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program." (*Id.* at ¶ 11). M&T would need additional time to "demonstrate its efficacy to the satisfaction of the Federal Reserve and otherwise meet any other regulatory requirements that may be imposed in connection with these matters." (*Id.* at ¶ 90). On April 15, 2013, M&T had its first quarter 2013 earnings conference call during which it discussed the contents of the press release. (*Id.* at ¶ 91).

On April 18, 2013, Hudson City stockholders voted to approve the merger. (*Id.* at ¶ 6). Over a year later, on October 9, 2014, the Consumer Financial Protection Bureau ("CFPB") announced that it had taken action against M&T for violating consumer disclosure laws by offering free checking, but then switching customers to accounts which carried fees. (*Id.* at ¶¶ 7-8). A year after that, on September 30, 2015, the Federal Reserve approved the merger. (*Id.* at ¶ 117). The complaint alleges that the Federal Reserve delayed its approval due to M&T's non-compliance with the Bank Secrecy Act and anti-money-laundering regulations ("BSA/AML Regulations") and violations of the consumer disclosure laws (the "Consumer Regulations") addressed by the CFPB. (*Id.* at ¶¶ 4, 117). The merger closed on November 1, 2015. (*Id.* at ¶ 6).

### B. The Proxy Disclosures

The complaint alleges that the italicized portions of the following statements were misleading. The first statement discusses compliance and appears in M&T's annual report on Form 10-K for the year ended December 31, 2011, which was incorporated into the Proxy by reference. The second statement discusses timing and appears in the Proxy.

> [The USA Patriot Act] imposes obligations on U.S. financial institutions, including banks and broker dealer subsidiaries, to implement and maintain

2

appropriate policies, procedures and controls which are reasonably designed to prevent, detect and report instances of money laundering .... In addition, provisions of the USA Patriot Act require the federal financial institution regulatory agencies to consider the effectiveness of a financial institution's anti-money laundering activities when reviewing bank mergers and BHC acquisitions. Failure of a financial institution to maintain and implement adequate programs to combat money laundering and terrorist financing could have serious legal and reputational consequences for the institution. *The Registrant and its impacted subsidiaries have approved policies and procedures that are believed to be compliant with the USA Patriot Act.*

(D.I. 72 ¶ 80 (alterations and emphasis in original)).

*Although we currently believe we should be able to obtain all required regulatory approvals in a timely manner*, we cannot be certain when or if we will obtain them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to or have a material adverse effect on M&T or its subsidiaries after the completion of the merger.

(*Id.* at ¶ 81 (emphasis in original)). Several other sections of the Proxy discussed timing for closing the merger. For example, the section quoted by Plaintiffs refers to another section of the Proxy, titled "The Merger—Regulatory Approvals Required," for more details. That section states:

There can be no assurances that the regulatory approvals discussed above will be received on a timely basis .... In recent similar transactions, the Federal Reserve Board has taken a longer time to render a decision on applications than the typical time period for approval set forth in the Federal Reserve Board's regulations.

(D.I. 77-1 at 101). In addition, the section titled "Effective Time of the Merger" warns "there can be no assurance as to when or if the merger will occur." (*Id.* at 103).

### C. The April Disclosures

The April Disclosures discussed the seriousness of the Federal Reserve's concerns and the timing of the merger close. In the earnings conference call on April 15, 2013, M&T's CFO René Jones had the following dialogue with a caller about the Federal Reserve's findings:

[Caller Question]: Has there been [an] MOU or cease-and-desist order or any other form of written agreement established with the Fed regarding the BSA or the anti-money-laundering issue?

3

[M&T Answer]: ... if you think about how it works as an industry matter, formal enforcement actions are disclosed by the appropriate regulator, while some informal regulatory matters such as MOUs and so forth are disclosed by the institution if they're material from a securities law perspective. We didn't wait to receive any formal findings before disclosing this issue last Friday. And as such, we're not really aware of any sort of final outcomes or conclusions from the regulators. We did this in part because of its impact on Hudson City and we tried to be as proactive as we possibly could.

(D.I. 77-6 at 8). With respect to timing, the April 12, 2013 press release stated in relevant part:

M&T and Hudson City believe that the timeframe for closing the transaction will be extended substantially beyond the date previously expected. M&T and Hudson City intend to extend the date after which either party may elect to terminate the merger agreement if the merger has not yet been completed from August 27, 2013 to January 31, 2014, but there can be no assurances that the merger will be completed by that date.

(D.I. 72 ¶¶ 90). Jones made similar statements about timing in the conference call, including:

- "[I]f you look at recent merger activity in the banking sector, the trend seems to be that it's taking notably longer to get regulatory approvals. Said another way, we don't take regulatory approval for granted." (D.I. 77-6 at 4).

- "[T]o be able to complete the merger we'll need to obtain the regulatory approvals which by their nature are pretty uncertain. But if we can do so, we'll try to get them as soon as possible. But that said, we've not really provided you with a specific date at this time. And I would say that from our perspective it really seems prudent for us to really not to engage in that discussion until maybe later towards the end of the summer." (*Id.* at 9).

- "[I]n terms of talking about timing, you just can't do it." (*Id.* at 11).

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). The court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the Plaintiffs. *In re Fisker Auto. Holdings, Inc.*, 2017 WL 492996, at *2 (D. Del. Feb. 7, 2017). But the court need not accept as true allegations in the complaint contradicted by documents on which the complaint relies. *In re: Enzymotec Sec. Litig.*,

4

2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015). The court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, and items subject to judicial notice. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Defendants argue that the complaint is also subject to the heightened pleading standard of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") codified at 15 U.S.C. § 78u-4(b)(1). (D.I. 76 at 8). In resolving the motion to dismiss the prior complaint, the court ruled that Plaintiffs' claims were not subject to the PSLRA's heightened pleading standard, because the claims sounded in negligence. (D.I. 70 at 7). The court sees no reason to revisit this issue when Defendants do not rely on the heightened pleading standard to argue that Plaintiffs failed to state a claim, and the court finds that dismissal is warranted even under Fed. R. Civ. P. 8.

## III. DISCUSSION

Section 14(a), and Rule 14a-9 promulgated thereunder, prohibit a corporation from issuing a proxy "containing any statement which ... is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a–9(a). Plaintiffs argue that Defendants violated Section 14(a) in three ways: (1) by failing to disclose significant "risk factors" as required under Item 503 of Regulation S-K, (2) by making misleading opinion statements, and (3) by making "belated disclosures" a few days before the stockholder vote. (D.I. 78 at 10-13). Before addressing each of these theories, the court must first explain why it rejects Plaintiffs' various arguments that the motion to dismiss is procedurally improper.

### A. Procedural Arguments

Plaintiffs argue that this motion to dismiss is procedurally improper in various ways. (D.I. 78 at 6–10). First, Plaintiffs argue that the court should construe the motion to dismiss as an

5

untimely motion for reargument of the previous motion to dismiss the first amended complaint. (*Id.* at 6–7). But, there was no reason for Defendants to seek reargument. The court granted Defendants' previous motion. (D.I. 70). Second, Plaintiffs argue that the law of the case doctrine requires that the court to deny the motion to dismiss. (*Id.* at 9 n. 14) The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). But the doctrine "does not limit the power of trial judges to reconsider [its own] prior decisions." *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). In addition, "[i]nterlocutory orders remain open to trial court reconsideration, and do not constitute the law of the case." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) (internal punctuation omitted) (*quoting Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)).

Finally, Plaintiffs argue that this motion is barred by Fed. R. Civ. P. 12(g)(2), which prohibits a party from filing successive motions that "rais[e] a defense or objection that was available to the party but omitted from its earlier motion." (D.I. 78 at 9–10). Plaintiffs, however, run afoul of the requirements of Rule 12(g)(2), because the defenses raised on this motion were neither "available" nor "omitted" from the previous motion. Some of the defenses challenge the sufficiency of new allegations in the amended complaint, so those defenses were not previously available. Other defenses reiterate defenses raised in the previous motion, so they were not previously omitted. Accordingly, the court does not find Defendants' motion to dismiss to be procedurally improper.

## B. Mandatory Disclosures Under Item 503

Plaintiffs argue that Defendants violated Section 14(a) by omitting from the Proxy significant risk factors required under Item 503(c).[1] (D.I. 78 at 11). Item 503(c) requires the prospectus to provide under the caption "risk factors" a "concise discussion" of "the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). Plaintiffs argue that Defendants violated Item 503(c) by not disclosing that "the Merger would be delayed or denied (or that M&T would suffer sanctions) due to the Consumer Violations, and the substantial deficiencies in BSA/AML compliance." (D.I. 78 at 11). Plaintiffs' claim fails, however, because "[i]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed." *In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*, 2014 WL 4953554, at *17 (S.D.N.Y. Sept. 30, 2014). Here, there is a section of the Proxy titled "risk factors" (*see* D.I. 63-1 at 27) that concisely states in relevant part:

- "Regulatory Approvals May Not Be Received, May Take Longer than Expected or May Impose Conditions that Are Not Presently Anticipated or Cannot Be Met." (*Id.* at 29).

- "[G]overnmental entities may impose conditions on the granting of such approvals. Such conditions or changes and the process of obtaining regulatory approvals could have the effect of delaying completion of the merger .... The regulatory approvals may not be received at any time, [and] may not be received in a timely fashion...." (*Id.*).

- "M&T is subject to operational risk, which represents the risk of loss resulting from human error, inadequate or failed internal processes and systems, and external events. Operational risk also encompasses reputational risk and compliance and

---

[1] Item 503(c) does not always apply to proxy statements filed under the Securities Exchange Act of 1934. *See* Alan R. Bromberg et al., *Bromberg & Lowenfels on Securities Fraud* 5-401 (2d ed. 2017) ("By its terms, Item 503(c) is not applicable to filings under the 1934 Act."). The parties, however, agree that Item 503(c) applies here, because the merger consideration included securities registered under the Securities Act of 1933. (D.I. 83). As a result, the Proxy had to include information required by Form S-4. 17 C.F.R. § 240.14a-101, Item 14. Form S-4 incorporates the disclosure requirements of Item 503 of Regulation S-K. *See* Form S-4, p. 6 (Item 3).

7

> legal risk, which is the risk of loss from violations of, or noncompliance with, laws, rules, regulations, prescribed practices or ethical standards, as well as the risk of noncompliance with contractual and other obligations." (*Id.* at 40).

- "Although M&T seeks to mitigate operational risk through a system of internal controls which are reviewed and updated, no system of controls, however well designed and maintained, is infallible. Control weaknesses or failures or other operational risks could result in charges, increased operational costs, harm to M&T's reputation or foregone business opportunities." (*Id.* at 41).

Other sections of the Proxy provided more detail around the risks related to the Federal Reserve's review of M&T's compliance with BSA/AML in particular. (*See, e.g.*, D.I. 72 ¶ 68). There was no discussion in the Proxy of risks related to the CFPB or the Consumer Violations in particular. But Plaintiffs have not plausibly alleged that either posed a significant risk at the time the Proxy issued. Instead, Plaintiffs ask the court to infer from the CFPB action taken in October 2014 that those risks existed in February 2013. (*See, e.g.*, D.I. 78 at 17 ("If M&T did not have proper documentation as to millions of customers in 2015, it surely did not have such information in early 2013.")). "To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. Aug. 23, 2017) (stating that plaintiffs cannot rely "exclusively on hindsight" to show that the challenged statements were misleading when made).

For all of these reasons, Plaintiffs have failed to state a claim based on Item 503(c).

### C. Misleading Opinions Under *Omnicare*

The complaint alleges that the Proxy was materially misleading or incomplete when it stated that: (1) M&T had "approved policies and procedures that are believed to be compliant with the USA Patriot Act" (the "compliance opinion"); and (2) Defendants "currently believe we should be able to obtain all required regulatory approvals" and complete the merger "in a timely manner" (the "timing opinion"). (D.I. 72 ¶¶ 80–81). These statements are opinions and, therefore, not

8

actionable unless Plaintiffs' claims satisfy the standards set forth by the U.S. Supreme Court in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). Under *Omnicare*, an opinion is actionable only if: (1) the speaker did not actually hold the stated belief at the time made; (2) the opinion contains "embedded statements of fact" that were untrue; or (3) the speaker omitted material facts about its "inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself." *Id.* at 1318, 1326-29. Plaintiffs are proceeding under the third prong.[2] To state a claim under the omission prong "is no small task." *Id.* at 1332. "The investor must identify particular (and material) facts going to the basis for the issuer's opinion...whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.*

*Omnicare* describes two ways that an omission can make an opinion misleading. One is based on knowledge and the other is based on process. First, a speaker may be liable where the proxy omits information "in the [speaker's] possession at the time" that did not "fairly align" with the opinion. *Id.* at 1329. For example, if the speaker opines that it was compliant with the law "in the face of its lawyers' contrary advice or with knowledge that the Federal Government was taking the opposite view," and the speaker does not also disclose those contrary views, then the omission could be misleading. *Id.* Here, the complaint does not allege that Defendants had material information in their possession at the time the Proxy issued that did not fairly align with the compliance opinion. Instead, it alleges the opposite. (*See, e.g.*, D.I. 72 ¶ 76 ("M&T ... failed to

---

2     The claims are grounded in negligence, not fraud, meaning the complaint does not allege that Defendants did not actually hold the stated beliefs. (D.I. 72 ¶¶ 130 & 144). In addition, plaintiffs have not disputed Defendants' assertion that the opinions do not contain embedded statements of fact. (D.I. 76 at 13; D.I. 78).

9

detect and disclose that M&T failed to legally comply with BSA/AML and PATRIOT Act requirements"); *id.* at ¶ 92 (stating that the deficiencies "were not discovered" by Defendants)).[3]

Second, a speaker may be liable if the proxy omits material facts about "how the speaker has formed the opinion" and those facts conflict with what a reasonable investor would expect from reading the opinion "fairly and in context." *Omnicare*, 135 S.Ct. at 1328-29, 1332. For example, a reasonable investor usually expects a speaker to consult with a lawyer before opining that its conduct is lawful. *Id.* at 1328. If the speaker did not consult with a lawyer and the proxy omits that fact, then the speaker may be liable. *Id.* Similarly, if a CEO opines that her company's TV had the highest resolution available on the market, then a reasonable investor expects that the CEO would have reviewed her competitor' product specifications. *Id.* at 1329 n. 6. If the CEO did not review her competitors' product specifications and this information was not disclosed, then the omission could be misleading. *Id.*

Here, the complaint does not plead, as required by *Omnicare*, particular facts about what Defendants did or did not do in forming the compliance opinion. Instead, the complaint pleads hypotheticals. (*See, e.g.*, D.I. 72 ¶ 14 ("Had any of the defendants at that time performed adequate

---

[3] Plaintiffs allege that "some executives" within M&T must have been aware of the consumer violations because these violations "were intentionally curtailed prior to the drafting of the [Proxy]." (D.I. 78 at 15). But the court cannot reasonably infer from this vague allegation that Defendants were aware of the consumer violations when plaintiffs assert in the same sentence that these violations "could have been discovered by M&T and the other Defendants." (*Id.*). The complaint also alleges that the Federal Reserve expressed "concern" before the Proxy issued, but bare allegations of concern do not plausibly show that Defendants had in their possession information that did not fairly align with the compliance opinion. *See, e.g., Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) ("[F]atal to Plaintiffs' case is the absence of any serious conflict between the FDA's interim, albeit repeated, concerns about methodology and Defendants' optimism about FDA approval."); *Cf. In re Westinghouse Sec. Litig.*, 90 F.3d 696, 711 (3d Cir. 1996) ("The fact that internal auditors also recommended improvements in valuation methods and tighter standards for internal valuations does not support plaintiffs' claim that …[the company] fraudulently or even inaccurately represented its internal controls as adequate.").

10

due diligence, they would have discovered ... that M&T's 'Know Your Customer' obligations ... were non-compliant"); *id.* at ¶ 79 ("A trained, independent consultant would have been able to detect that M&T had not properly validated and verified customer identities as to millions of customers through accepted sampling techniques, similar to those employed by regulators.")). Hypotheticals are not sufficient to state a claim. *See Omnicare*, 135 S.Ct. at 1333 (explaining that the complaint must allege "particular" facts not a "conclusory allegation" that defendants "lacked reasonable grounds for the belief it stated"); *Southeast Pa. Transp. Auth. v. Orrstown Fin. Serv., Inc.*, 2016 WL 7117455, at *14 (M.D. Pa. Dec. 7, 2016) (dismissing *Omnicare* claim where plaintiffs alleged that the auditor "should have known," and "any reasonable auditor would have 'discovered,'" the material weaknesses in company's internal controls because plaintiff failed to "identify actual and material steps taken or not taken" by the auditor).[4]

Finally, "whether an omission makes an expression of opinion misleading always depends on the context," including "all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare*, 135 S.Ct. at 1330. Taking context into account, no reasonable investor would have been misled by the timing opinion. Plaintiffs cherry-picked the phrase "timely manner" out of a caveat about timing: "*Although* we currently believe we should be able to obtain all required regulatory approvals in a timely manner, *we cannot be certain when or if we will obtain them....*" (D.I. 72 ¶ 81). This sentence was surrounded by other warnings in

---

[4] Plaintiffs also argue that securities law (as opposed to fiduciary duty law) imposes due diligence obligations that Defendants failed to fulfill. (D.I. 72 ¶¶ 11, 57). But the sole case they cite for their proposition is inapposite. (D.I. 78 at 14). *In re WorldCom, Inc. Securities Litigation* addressed the affirmative defense under Section 11(b) available to any defendant other than the issuer if the defendant had, "after reasonable investigation, reasonable ground to believe and did believe" there were no untrue statements or misleading omissions. 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) (*quoting* 15 U.S.C. § 77k(b)(3)(A)). The availability of an affirmative defense of due diligence does not create an affirmative duty to perform due diligence.

11

the Proxy that there were "no assurance as to when or if the merger will occur." (D.I. 77-1 at 103; *see also id*. at 101). Accordingly, the Proxy warned not only that regulatory approvals may take longer than expected, but that they may never come at all. For all of these reasons, the complaint fails to state a claim based on the compliance opinion, the timing opinion, or both.

### D. The April Disclosures

Plaintiffs argue in their brief that that the April disclosures were materially misleading and untimely, in violation of Section 14(a). (D.I. 78 at 10, 13, 18). There are, however, no counts in the complaint based on the April disclosures. (*See* D.I. 72 ¶¶ 129-54). Instead, the complaint alleges that the April disclosures "did not adequately cure" Defendants' Section 14(a) violations in the Proxy. This is an entirely different theory. (*Id*. at ¶¶ 140, 152). A plaintiff cannot amend its complaint through briefing. *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *6 (D. Del. Mar. 30, 2017). Accordingly, the court will not address the substance of the parties' argument on this claim, except to briefly address Plaintiffs' authorities regarding timing.

First, Plaintiffs' rely on SEC Release No. 34-33768 and SEC Release No. 34-24296 for the proposition that "proxy laws require ample time for voters to consider the information provided." (D.I. 78 at 13). But these releases do not support Plaintiffs' assertions. SEC Release No. 34-33768 addresses a registrant's obligation under Rule 14a-13(a)(4) to distribute proxy materials to banks and brokers sufficiently in advance of the meeting date to allow those banks and brokers to forward the proxy materials to beneficial owners. 1994 WL 83914, at *1 (SEC Mar. 16, 1994). Because Defendants were not acting as record holders of stock on behalf of beneficial owners, the release is inapplicable. SEC Release No. 34-24296 addresses requirements under Rules 14d-4(c), 14d-6(d), and 13e-4(d)(2) and (e)(2) to disseminate material changes to the terms of a tender offer

12

promptly. 1987 WL 847536, at *3 (SEC Apr. 3, 1987). M&T was not engaged in a tender offer, making this release inapplicable.

Second, Plaintiffs cite several cases where courts granted injunctions that delayed a stockholder vote for a certain number of days so that stockholders had time to receive and consider supplemental disclosures. (*See* D.I. 78 at 13). Plaintiffs argue that Defendants violated Section 14(a) by issuing the April Disclosures in less time than the length of those injunctions. (*Id.*). Plaintiffs, however, did not seek and are not seeking an injunction. The merger between M&T and Hudson City has already closed. Accordingly, the court is reluctant to find that remedies formed in the crucible of a preliminary injunction proceeding are the basis for an independent cause of action for damages under Section 14(a). If Plaintiffs want to pursue a claim based on the timing of the April Disclosures, Plaintiffs need to present authorities showing that securities law offers a post-closing remedy for this claim. *Cf. La. Mun. Police Employees' Ret. Sys. v. Crawford*, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007) (granting temporary restraining order where stockholder faced irreparable harm from not having "adequate time" to consider material information disclosed "almost upon the eve of a vote").

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (D.I. 75) is GRANTED. The second amended class action complaint (D.I. 72) is DISMISSED WITHOUT PREJUDICE. Plaintiffs are granted leave to amend. An appropriate order will be entered.