IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DAVID JAROSLAWICZ, Individually and
on behalf of all others similarly situated,

        *Plaintiffs*,

v.

M&T BANK CORPORATION, HUDSON
CITY BANCORP INC., ROBERT G.
WILMERS, RENE F. JONES, MARK J.
CZARNECKI, BRENT D. BAIRD,
ANGELA C. BONTEMPO, ROBERT T.
BRADY, T. JEFFERSON CUNNINGHAM
III, GARY N. GEISEL, JOHN D. HAWKE,
JR., PATRICK W.E. HODGSON, RICHARD
G. KING, JORGE G. PEREIRA, MELINDA
R. RICH, ROBERT E. SADLER, JR.,
HERBERT L. WASHINGTON, DENIS J.
SALAMONE, MICHAEL W. AZZARA,
VICTORIA H. BRUNI, DONALD O.
QUEST, JOSEPH G. SPONHOLZ,
CORNELIUS E. GOLDING, WILLIAM G.
BARDEL, and SCOTT A. BELAIR,

        *Defendants*.

C.A. No. 15-00897-EJW

## MEMORANDUM OPINION and ORDER

Francis J. Murphy, Jr., Jonathan L. Parshall, MURPHY, SPADARO & LANDON, Wilmington, DE; Steven M. Coren, Benjamin M. Mather, Matthew R. Williams, KAUFFMAN, COREN & RESS, P.C, Philadelphia, PA.

        *Counsel for Plaintiffs.*

Brian M. Rostocki, Anne M. Steadman, Justin M. Forcier, REED SMITH LLP, Wilmington, DE; Jonathan K. Youngwood, Janet A. Gochman, Tyler A. Anger, Katherine A. Hardiman, SIMPSON, THACHER & BARTLETT, New York, NY.

        *Counsel for Defendants, M&T Bank Corporation, Brent D. Baird, Angela C. Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Mark J. Czarnecki, Gary N. Geisel, John D. Hawke, Jr., Patrick W.E. Hodgson, Rene F. Jones, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler Jr., Herbert L. Washington, and Robert G. Wilmers.*

Kevin R. Shannon, Jonathan A. Choa, Daniel Rusk, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Tracy Richelle High, Scott A. Foltz, SULLIVAN & CROMWELL LLP, New York, NY.

*Counsel for Defendants, Hudson City Bancorp Inc., Michael W. Azzara, William G. Bardel, Scott A. Belair, Victoria H. Bruni, Cornelius E. Golding, Donald O. Quest, Denis J. Salamone, and Joseph G. Sponholz.*

August 28, 2023
Wilmington, Delaware

**WALLACH, U.S. Circuit Judge, sitting by designation:**

# CONTENTS

I.     Introduction ................................................................................................................ 4

II.    Background ................................................................................................................. 5

III.   Procedural History ................................................................................................... 10

IV.    The Motion to Exclude the Keath/DeRosa Report ................................................. 12

   1.   Legal Standard ..................................................................................................... 12

      1.1   The Daubert Standard ................................................................................... 14

   2.   Plaintiffs Have Met Their Burden to Demonstrate that the Keath/DeRosa Report Is Admissible Under FRE 702 and *Daubert* ............................................................... 16

      2.1 Mr. Keath and Dr. DeRosa are Qualified ..................................................... 16

      2.2 The Keath/DeRosa Report Fits Plaintiffs' Claim ......................................... 16

      2.3 Plaintiffs Need Only Demonstrate the Reliability of the DeRosa Event Study Within the Keath/DeRosa Report ......................................................................... 19

      2.4 The DeRosa Event Study is Sufficiently Reliable ........................................ 22

   3.   The Keath/DeRosa Report is Admissible for Purposes of Class Certification ................. 24

V.     The Motion for Class Certification .......................................................................... 25

   1.   Legal Standard ..................................................................................................... 25

   2.   Numerosity and Superiority are Uncontested and Easily Satisfied ..................... 26

   3.   Commonality and Predominance .......................................................................... 28

      3.1 Legal Standard .............................................................................................. 28

      3.2 The Putative Class Satisfies the Requirements of Commonality and Predominance. ..... 33

      3.3 Commonality and Predominance Conclusion ................................................ 58

   4.   Typicality ............................................................................................................. 58

      4.1 Legal Standard .............................................................................................. 59

      4.2 Plaintiffs' Representatives' Claims Are Typical of Traditional Shareholders, But Not Typical of Merger Arbitrageurs ......................................................................... 60

   5.   Adequacy of Representation ................................................................................. 64

      5.1 Legal Standard .............................................................................................. 64

      5.2 Adequacy of the Class Representatives .......................................................... 64

      5.3 Plaintiffs Are Inadequate to Represent Merger Arbitrageurs ....................... 75

      5.4 Adequacy of Class Counsel ........................................................................... 77

   6.   Ascertainability, Class Definition, and "Fail-Safe" Language ......................... 81

VI.  Conclusion ...................................................................................................................... 84

## I.    __INTRODUCTION__

Presently before the Court are Plaintiffs' Motion for Class Certification ("Plaintiffs' Motion" or "Motion for Class Certification") and Defendants' Motion to Exclude ("Defendants' Motion" or "Motion to Exclude") the Expert Report and Opinions of M. Travis Keath and David DeRosa ("Keath/DeRosa Report" or "Report").  These motions come before the Court following from Plaintiffs' Second Amended Complaint as former shareholders of Hudson City Bancorp ("Hudson City" or "HCBK") alleging, inter alia, violations of provisions of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)" or "14(a)") by Defendants M&T Bank Corporation ("M&T") and Hudson City.  Section 14(a) protects the public against injuries caused by the issuance of negligently misleading or omissive proxy statements.

Plaintiffs submitted the Keath/DeRosa Report in support of their Motion for Class Certification to provide evidence of damages experienced by the putative class.  Pls.' Mot., Ex. 35 (D.I. 136).  Defendants filed their Motion to Exclude the Report concurrently with their Opposition to Class Certification, based on concerns about the methodologies used by both Mr. Keath and Dr. DeRosa.  *See* Defs.' Opp. (D.I. 144); Defs.' Mot. (D.I. 145, 146).  Given that the Keath/DeRosa Report is the only evidence put forward by Plaintiffs to support their alleged theories of damages, the Court must decide Defendants' Motion to Exclude prior to addressing Plaintiffs' Motion for Class Certification.  For the reasons that follow, Defendants' Motion to Exclude is DENIED, and Plaintiffs' Motion for Class Certification is GRANTED in part as to Plaintiffs' satisfaction of the requirements of Rule 23(a) and (b)(3), DENIED in part as to the inclusion of merger arbitrageurs in the proposed class definition.  The Court is prepared to certify the class, but only a determination regarding an appropriate definition of merger arbitrageurs to exclude from the class.

## II.   <u>BACKGROUND</u>

Plaintiffs' sole remaining claims are their two 14(a) claims against M&T and Hudson City, respectively.  The following summarizes Plaintiffs' alleged facts regarding these surviving claims.

On August 27, 2012, Hudson City and M&T entered into a merger agreement ("Merger Agreement"), whereby M&T would absorb Hudson City and Hudson City shareholders would receive a mixture of 40% cash and 60% M&T stock in exchange for their Hudson City stock. Second Am. Compl. ¶¶ 6, 58 (D. I. 72).  Hudson City was required to obtain shareholder approval before executing the Merger Agreement, and federal securities law requires each party to the merger to file proxy statements prior to any shareholder vote.  *Id.* ¶ 10.  Section 14(a) requires that proxy statements must not be materially misleading or omissive.  *Id.* ¶¶ 10, 75.  M&T and Hudson City opted to file a joint proxy statement in support of their merger ("Joint Proxy Statement"), which was declared effective February 22, 2013, and announced a special meeting of Hudson City shareholders on April 18, 2013, to vote on the merger.  *Id.* ¶ 11.  The special meeting occurred on April 18, 2013, where Hudson City shareholders approved the merger.  *Id.* ¶¶ 6, 14–15.

The merger was originally expected to close in August of 2013.  *Id.* ¶¶ 4, 6.  However, the merger did not close until more than two years later, on November 1, 2015, with a total period of pendency of the merger of two-and-a-half years.  *Id.*  As detailed below, Plaintiffs allege that the delay was caused by regulatory scrutiny over M&T's violations of Bank Secrecy Act/Anti Money Laundering ("BSA/AML") laws, that the regulatory risks were known at the time of the issuance of the Hudson City-M&T Joint Proxy Statement and were omitted, and that these omissions were material.

Federal law requires the Federal Reserve Board ("Federal Reserve") to approve bank mergers, and one criterion for such approval is the banks' effectiveness in combatting money

laundering.  *Id.* ¶ 68.  Plaintiffs note that bank regulators had increased scrutiny industry-wide throughout 2012 regarding compliance with BSA/AML laws, which should have put M&T and Hudson City on notice of regulatory risks to merger approval.  *Id.* ¶¶ 69–74.  Prior to the Hudson City shareholder vote on April 18, 2013, in late 2012 or early 2013 the Federal Reserve reviewed M&T's BSA/AML compliance procedures, expressed concern about them, required remedial efforts, and advised the merger could not be approved as scheduled.  *Id.* ¶¶ 86, 92.  The Federal Reserve's concerns involved M&T bank accounts which were advertised as "free" to customers, but for which M&T subsequently charged customers fees without their consent.  *Id.* ¶¶ 8, 77.  On October 9, 2014, the Consumer Financial Protection Bureau ("CFPB") announced that it was also taking regulatory action against M&T for these same practices.  *Id.* ¶ 110.  The agencies eventually required M&T to remediate approximately 3.5 million of its consumer accounts.  *Id.* ¶ 113.  The Federal Reserve withheld approval of the merger until September 30, 2015, citing the BSA/AML and consumer protection violations as the reasons for the delay.  *Id.* ¶ 9.

Between April 12, 2013, and September 30, 2015, both M&T and regulators made multiple public disclosures about increased regulatory scrutiny of M&T's BSA/AML and consumer protection violations and their effect on the merger.  *Id.* ¶¶ 11–12, 15–20.  Plaintiffs allege that Hudson City shareholders suffered injury when the value of M&T and Hudson City shares declined in response to these public disclosures because they caused merger delays and decreased share prices.  *Id.* ¶ 121.  These impacts allegedly deprived Hudson City shareholders of the benefit of the bargain they would have otherwise received from the Merger Agreement, including damages from reduced prices for Hudson City shares sold prior to the merger close, reduced cash consideration and value of M&T shares received at the merger close, and reduced Hudson City dividends during the entire pendency of the merger.  *Id.* ¶¶ 62, 120–21.

The putative class representatives, Mr. and Mrs. Belina ("Belina Family") and Mr. Krublit, represent putative class members with different postures and exposures to these alleged damages. Mr. Krublit held his Hudson City shares through the close of the merger, while the Belina Family sold their Hudson City shares on or about May 7, 2015, prior to the close of the merger, and thus were only exposed to the alleged damages that would have accrued as of the date of sale of their shares.  Second Am. Compl. ¶ 26 (D.I. 72).

Plaintiffs allege that the Joint Proxy Statement was materially misleading and omissive in its representations about M&T's compliance with federal laws, including BSA/AML laws.  *Id.* ¶¶ 79–83.  These deficiencies included affirmative statements about M&T's compliance with the USA Patriot Act and omissions regarding known regulatory risks to M&T and to approval of the merger by regulators.  *Id.*

Plaintiffs also allege that the regulatory risks to M&T were known or knowable by both M&T and Hudson City officers, that the above misleading Joint Proxy Statement was the proximate cause of the damages shareholders experienced, and that M&T and Hudson City therefore published a negligently materially misleading and omissive Joint Proxy Statement and should be liable to Plaintiffs for these damages under Section 14(a).  *Id.* ¶¶ 3, 75–79, 92, 98, 118–21.

Plaintiffs' theory of injury and liability is that shareholders did not receive "the benefit for which they bargained when voting in favor of the Merger" when they "received tainted M&T shares" as a result of share price reductions when news of M&T's regulatory problems became publicly known and restrictions imposed by regulators to comply with federal law and as penalties for non-compliance.  Pls.' Mot. 10, 26–27 (D.I. 136).

Plaintiffs assert a combination of "trading damages," "dividend damages," and "closing damages" associated with this injury, based on their expert report by Mr. M. Travis Keath and Dr. David F. DeRosa (the "Keath/DeRosa Report" or "Report").  Pls.' Mot., Ex. 35 (D.I. 136). Defendants' Motion to Exclude seeks to prevent admission of the Keath/DeRosa Report for class certification purposes.  *See generally* Defs.' Mot. (D.I. 146).  The Report is divided into two sections, a trading model written by Mr. Keath ("Keath Trading Model" or "Trading Model"), *see generally* Pls.' Mot., Ex. 35 12–23 (D.I. 136), and an event study written by Dr. DeRosa ("DeRosa Event Study" or "Event Study"), *see generally id.* at 24–35.  The Keath Trading Model is based on the application of a methodology attributed by Mr. Keath to an article published by Dr. Marcia Kramer Mayer in 2000 ("Mayer Study"), *id.* at ¶¶ 41–42, and purports to estimate the total number of Hudson City shares impacted by Plaintiffs' alleged damages on each day from the close of trading on February 20, 2013 (the date of record of the special meeting of shareholders to approve the merger) to October 30, 2015 (the last day of trading of Hudson City shares prior to the close of the merger), *see id.* at ¶¶ 35–36, 70, Appx. G–I.  The DeRosa Event Study uses what Dr. DeRosa asserts is a standard methodology that is a "workhorse of financial analysis" to "analyze the impact that M&T's serial disclosures had on [M&T] stock during the Measurement Period" and "demonstrates four instances[, i.e., 'events,'] where [M&T's] stock price declined significantly after M&T's negative disclosures and the drop can be explained by the market's incorporation of bad news specific to M&T."  *Id.* at ¶¶ 72–81.  The Event Study then estimates the per-share damages associated with each event based these stock price declines, presented as "trading damages" for those shareholders who sold their Hudson City shares prior to the close of the merger ("Trading Damages), *see id.* at 36–38, and "Closing Damages" for those shareholders who held their shares through the merger's close ("Closing Damages"), *see id.* at 40–42.  The Event Study

additionally estimates a separate type of damages unrelated to share price impacts from these four adverse events, that of "dividend damages."  The Event Study estimates the dividend damages by comparing Hudson City's quarterly dividends distributed to shareholders from April 12, 2013 to August 10, 2015 with the typical quarterly dividend of $0.08 per share prior to this period ("Dividend Damages").  *See id.* at 38–40.

Defendants have rebutted the Keath/DeRosa Report with two expert reports by Dr. David J. Denis and Dr. Wei Jiang, and a Declaration by Dr. Marcia Kramer Mayer.  Dr. Denis's report argues that the Event Study's Dividend Damages methodology is flawed and lacks a causal relationship between reduced dividends and the merger delay.  *See* Defs.' Opp., Ex. 1, 20–21 (D.I. 147).  Dr. Denis also criticizes the Event Study's methodology for choosing the dates of the events used to estimate Trading and Closing Damages.  *See id.* at 24–30 (D.I. 147).  Dr. Jiang's report critiques the Keath/DeRosa Report for failing to account for the presence of merger arbitrageurs in the putative class.  Dr. Jiang provides one definition of merger arbitrageurs in stock-for-stock deals as purchasing shares (i.e., a long position) in the target company and simultaneously shorting a number of shares of the acquiror's stock according to the exchange ratio of stock in the merger consideration. Defs.' Opp., Ex. 2 ¶ 33 (D.I. 147).  However, Dr. Jiang also notes that this definition "is just one approach" that merger arbitrageurs might take, and provides examples of alternative strategies that merger arbitrageurs might employ to hedge the long position in the target company, such as taking "a long position in put options on target stock or on a stock market index."  *Id.* at ¶ 33 n.37.  Dr. Jiang asserts that merger arbitrageurs are fundamentally different from non-arbitrage investors and that merger arbitrageurs could not have been harmed under Plaintiffs' theories of damages.  *See id.* at 22–35.  Dr. Jiang further utilizes a methodology to estimate that merger arbitrageurs might make up as much as 15–30% of Hudson City shares on the record date.  *See id.*

at ¶¶ 66–79.  Dr. Mayer's Declaration provides a variety of critiques of the Keath Trading Model and concludes that the Mayer Study's methodology has major limitations regarding its accuracy and reliability for the purposes of the Keath Trading Model, and that the Keath Trading Model made major implementation errors in applying the Mayer Study's methodology that further entirely undermine its reliability for Mr. Keath's purposes.  *See generally* Defs.' Post-Arg. Resp., Ex. 25 (D.I. 200).

### III.      PROCEDURAL HISTORY

Plaintiffs' Motion for Class Certification and Defendants' Motion to Exclude the Keath/DeRosa Report reach the Court after an extended procedural history.  Plaintiffs' initial Complaint was filed on October 7, 2015, (D.I. 1), and was amended on February 19, 2016, (D.I. 19).  The Amended Complaint included four counts, one count against M&T and its directors and one count against Hudson City and its directors, each alleging violation of Section 14(a), one count against Defendants collectively alleging violation of Section 20(a) of the Securities Exchange Act, and one count against Hudson City's directors alleging breach of fiduciary duty.  *Id.* at 47–51. Defendants filed a Motion to Dismiss the Amended Complaint on April 19, 2016, (D.I. 61), and the Court granted the Motion on March 30, 2017, (D.I. 70), with leave to amend the Section 14(a) claims.  Plaintiffs filed a Second Amended Complaint on April 20, 2017, (D.I. 72), and Defendants moved to dismiss the Second Amended Complaint on May 26, 2017, (D.I. 75).  The Court granted the Motion to Dismiss the Second Amended Complaint on October 27, 2017, with leave to amend. (D.I. 85).  Plaintiffs then provided notice of intent to stand upon their Second Amended Complaint and requested entry of judgment.  (D.I. 86).  The Court dismissed the Complaint with prejudice on November 21, 2017.  (D.I. 87).  Plaintiffs then appealed the Court's dismissal to the Third Circuit. (D.I. 88).

The Third Circuit initially affirmed the Court's dismissal on December 26, 2018.  *See generally Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96 (3d Cir. 2018) [hereinafter *Jaroslawicz I*].  Plaintiffs then petitioned for re-hearing, and the Third Circuit granted the rehearing and vacated its initial opinion.  *See Jaroslawicz v. M&T Bank Corp.*, 925 F.3d 605, 606 (3d Cir. 2019).  Upon rehearing, the Third Circuit issued its final opinion on Plaintiffs' appeal on June 18, 2020, vacating the Court's dismissal as to Plaintiffs' Section 14(a) claims and remanding for further proceedings.  *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 705, 717 (3d Cir. 2020) [hereinafter *Jaroslawicz II*].

Defendants answered the First and Second Amended Complaints on September 18, 2020.  (D.I. 102, 103).  After the initiation of discovery, but before its conclusion, Plaintiffs filed their Motion for Class Certification on April 13, 2022.  (D.I. 136).  Defendants filed their Memorandum in Opposition to the Motion for Class Certification on June 8, 2022, along with Defendants' Motion to Exclude.  (D.I. 144, 145, 146).  As of July 25, 2022, the Motion for Class Certification and Motion to Exclude were fully briefed.

On December 15, 2022, the Court held oral argument regarding the Motion for Class Certification and the Motion to Exclude.  During oral argument, the Court ordered supplemental briefing by the parties on ethical issues identified in the briefing and at oral argument as well as on legal authority addressing questions involving the Motion to Exclude.  On January 17, 2023, Plaintiffs filed their Post-Argument Memorandum, (D.I. 189), and after a status conference on January 19, 2023, Defendants filed their Memorandum in Opposition to Plaintiffs' Post-Argument Memorandum, (D.I. 200), on April 3, 2023.  On April 17, 2023, Plaintiffs filed their Reply to Defendants' Memorandum in Opposition.  (D.I. 203).  On June 1, 2023, the Court held oral argument regarding the Parties' supplemental briefing.  On June 28, 2023, Plaintiffs submitted

their Motion for Leave to File Supplemental Declarations and Memorandum in Support of the Appointment of Lead Class Counsel and Delaware Counsel under F.R.C.P. 23(g).  (D.I. 215).  On July 5, 2023, the Court held a telephonic conference and subsequently granted Plaintiffs' Motion for Leave to File on July 7, 2023.  (D.I. 217).

### IV.      THE MOTION TO EXCLUDE THE KEATH/DEROSA REPORT

Defendants have moved to exclude the Keath/DeRosa Report.  The Report is Plaintiffs' asserted proof for both the fact of injury according to their theories of damages and a viable methodology for determining the amounts of damages class-wide.  Defendants seek to exclude the Report pursuant to Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), based on asserted methodological problems with the development of the Keath Trading Model and the DeRosa Event Study.  *See* Defs.' Mot. 1–3 (D.I. 146).

The Court denies the Motion because Plaintiffs have shown by a preponderance of evidence that the Keath/DeRosa Report satisfies the *Daubert* standard for admissibility for purposes of class certification.

### 1.  Legal Standard

The *Daubert* standard applies to expert testimony submitted at class certification when it is "critical to class certification."  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).  Class certification requires that Plaintiffs establish by a preponderance of evidence that the requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") have been met.  *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020).  This includes demonstrating that the predominance prong of Rule 23(b)(3) is satisfied, which requires that questions of law and fact common to the class predominate over issues impacting only individual class members.  To assess the predominance of questions of law and fact, courts must broach the

12

merits of the case, but only to the extent necessary to determine whether common questions predominate, not to resolve the merits of the questions. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Proof of a plaintiff's injury is one of the three elements of the Section 14(a) claim at issue in this case. *See Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992). Defendants assert that the Report is Plaintiffs' sole means of proving a class-wide methodology for measuring damages. Defs.' Mot. 5 (D.I. 146). Plaintiffs do not contest this assertion. *See generally* Pls.' Opp. (D.I. 158).

When injury is an element of the claim in question, "'the putative class must first demonstrate economic loss'—that is, the fact of damage—'on a common basis'" in order to survive the predominance inquiry. *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 306 (3d Cir. 2016) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 189 (3d Cir. 2001). Thus, in order for the Court to certify their class, Plaintiffs must show via a preponderance of evidence that the question of injury-in-fact exists on a class-wide basis, even though they are not yet required to prove the amounts of damages. As this court has noted before, "plaintiffs . . . need only show that a 'viable method' is available to prove damages on a class-wide basis." *In re Heckmann Corp. Sec. Litig.*, C.A. No. 10-378-LPS-MPT, 2013 WL 2456104, at *10 (D. Del. June 6, 2013) (citing *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at *9 (D.N.J. Jan. 25, 2011) (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002))).[1]

---

[1]     This recommendation by a magistrate judge was never adopted because the parties settled before it could be adopted. *See In re Heckmann*, Case No. 10-378 (D. Del. Mar. 24, 2014) (D.I. 293). The Parties each cite to this magistrate's recommendation, which while non-binding is persuasive.

The Keath/DeRosa Report is Plaintiffs' sole evidence for a viable class-wide method to determine the amount of damages, so absent the Report there would be no evidence to support a finding of class-wide injury-in-fact.  Therefore, the Report is critical to the class certification analysis and it must satisfy the *Daubert* standard before being cognizable by the Court in support of class certification.

Decisions about whether to exclude expert evidence by trial courts are discretionary.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).  Courts need not exclude the entirety of an expert's testimony or evidence simply because a portion fails to satisfy *Daubert*.  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) ("But when the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad.") (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 (11th Cir. 1998)).  Therefore, if a portion of the Keath/DeRosa Report is reliable under *Daubert*, it should not be excluded.

### 1.1 The Daubert Standard

Under *Daubert*, FRE 702 creates "a gatekeeping role for the [trial] judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The proponent of evidence from an expert bears the burden of demonstrating its admissibility by a preponderance of evidence.  *United States v. Schiff*, 538 F. Supp. 2d 818, 834 (D. N.J. 2008); *see Daubert*, 509 U.S. at 592 n.10.

Expert evidence is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)–(d).  Rule 702(a) requires that expert evidence "help[s] the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  As such, Rule 702 "embodies a trilogy of restrictions on

expert testimony: qualification, reliability and fit." *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).

To be qualified under *Daubert*, an expert must "possess specialized expertise." *Schneider*, 320 F.3d at 404. The Third Circuit construes this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *In re Paoli*, 35 F.3d at 741 (citation omitted).

For the evidence to "fit" the case under *Daubert*, the expert's evidence "must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404.

An expert's evidence is "reliable under Rule 702 if it is based on 'good grounds,' i.e., if it is based on the methods and procedures of science." *In re Paoli*, 35 F.3d at 744. The grounds must not be mere "subjective belief or speculation." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). However, the grounds also need not be "the best methodology or unassailable research. Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *Id.* at 665 (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Plaintiffs "do not have to demonstrate . . . that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re TMI Litig.*, 193 F.3d at 665 (quoting *In re Paoli*, 35 F.3d at 744). "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *In re Paoli*, 35 F.3d at 744–45. "Hearing the expert's testimony and assessing its flaws [can be] an important part of assessing what conclusion was correct and [a

judge] may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *Id.* at 745.

The Third Circuit requires courts to evaluate the reliability of expert testimony by considering eight factors, based on the Supreme Court's four *Daubert* factors and four additional factors the Third Circuit emphasized in *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985). *See In re Paoli*, 35 F.3d at 742. These eight factors are:

> . . . (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8. Ultimately the decision of whether to exclude expert evidence is at a court's discretion. *Id.* at 749.

**2. Plaintiffs Have Met Their Burden to Demonstrate that the Keath/DeRosa Report Is Admissible Under FRE 702 and *Daubert***

### 2.1 Mr. Keath and Dr. DeRosa are Qualified

Defendants do not dispute that Mr. Keath and Dr. DeRosa are qualified. *See generally* Defs.' Mot. (D.I. 146). Plaintiffs cite to the summaries of the qualifications of Mr. Keath and Dr. DeRosa found in their report. Pls.' Opp. 4–5 (D.I. 158) (citing the Keath/DeRosa Report); Pls' Mot., Ex. 35, ¶¶ 19–22, ¶¶ 23–32 (D.I. 136). The Court finds these summaries of qualifications sufficient to establish that Mr. Keath and Dr. DeRosa possess sufficient specialized expertise in the disciplines of trading models and event studies, respectively, to be qualified as experts under *Daubert*.

### 2.2 The Keath/DeRosa Report Fits Plaintiffs' Claim

Defendants argue Plaintiffs' damages model does not fit their 14(a) claim because out-of-pocket damages are the only viable theory of damages available under a 14(a) claim in the Third Circuit, but none of Plaintiffs' three asserted types of damages are grounded in this theory.  Defs.' Mot. 12–13 (D.I. 146); Defs.' Reply 8 (D.I. 169); *see also* Defs.' Opp. 12–14 (D.I. 144). Defendants make no argument that the Keath/DeRosa Report is not relevant to the theories of damages Plaintiffs' *have* asserted.

Defendants' arguments addressing a lack of alignment between Plaintiffs' asserted damages and those legally available to them in the Third Circuit are directed at issues in the pleadings or in the merits, and such issues must be raised and adjudged through different procedural mechanisms than through their Motion to Exclude.  Defendants' assertion that there is only one cognizable theory of damages in a 14(a) claim in the Third Circuit is further addressed below in deciding Plaintiffs' Motion for Class Certification, specifically in the context of commonality of the loss causation element of 14(a).

Plaintiffs argue that the Keath/DeRosa Report is relevant to their theories of injury and damages because the Report contains testimony about the methodology and computation of Plaintiffs' damages and demonstrates that damages are calculable on a class-wide basis.  Pls.' Opp. 6–7 (D.I. 158).  Plaintiffs have asserted damages theories that require calculating how much Hudson City share prices declined after each of a series of discrete public disclosures (i.e., events) that eventually revealed the full extent of M&T's regulatory hazard.  *See* Pls.' Mot., Ex. 35 (Keath/DeRosa Report), ¶ 80 (D.I. 136).  The DeRosa Event Study portion of the Report purports to calculate the impact of these events while also accounting for market-wide movement in bank stock generally.  *Id*.

"An event study . . . 'is a statistical regression analysis that examines the effect of an event on a depend[e]nt variable, such as a corporation's stock price.'"  *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010) (quoting *In re Apollo Group Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D. Ariz. 2007)).  Event studies are considered "almost obligatory" in circumstances where an expert must "isolate[e] stock declines associated with market-wide and industry-wide downturns from those specific to the company itself" by "consider[ing] firm-specific events that might have caused those declines."  *In re DVI, Inc. Sec. Litig.*, Civ. A. No. 2:03-cv-05336, 2010 WL 3522090, at *13 (S.D.N.Y. Sept. 3, 2010) (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009); *see also In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d. 1005, 1014–15 (C.D. Cal. 2003) ("[A] number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.") (collecting cases).  Further, the Court notes that event studies are also a common and accepted methodology specifically in 14(a) securities cases for estimating event-based share impacts.  *See In re Heckman Corp. Sec. Litig.*, 2013 WL 2456104, at *5; *Goldkrantz v. Griffin*, No. 97 CIV. 9075(DLC), 1999 WL 191540, at *4–5 (S.D.N.Y. Apr. 6, 1999); *In re Willis Towers Watson PLC Proxy Litig.*, No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582, at *2–3 (E.D. Va. Sept. 4, 2020) (finding the event-study sufficed to raise adequate class-wide questions for purposes of class certification, despite disputes over its merits).  Therefore, an event study is a reasonable choice of methodology under Plaintiffs' alleged theories of damages because it purports to examine the effect of the public disclosure events on Hudson City share prices while also accounting for market-wide downturns in bank stocks.

In weighing the above relevance of the Keath/DeRosa Report to the questions of law and fact at issue in this case, the Report is clearly relevant and "fits" the case.  The Court's review of

the Report confirms that it contains detailed descriptions of its methodologies and its results. It puts forward trading model and event study methodologies that seek to both demonstrate the fact of damages and compute estimates of damages for each of the three theories of damages alleged by Plaintiffs. These methodologies can be helpful to the trier of fact in making determinations about Plaintiffs' alleged damages, including answering questions about the weight the fact-finder will give to them in light of Defendants' concerns about how Mr. Keath and Dr. DeRosa implemented them. Therefore, the Keath/DeRosa Report satisfies the fitness requirement under *Daubert* because the methodologies are relevant to the case and will be helpful to the trier of fact.

### 2.3 Plaintiffs Need Only Demonstrate the Reliability of the DeRosa Event Study Within the Keath/DeRosa Report

Defendants argue against the admissibility of the Trading Model developed by Mr. Keath because it: 1) is based on a methodology published by Marcia Kramer Mayer in 2000 (the "Mayer Study") that Defendants consider antiquated, 2) does not properly follow the Mayer Study's recommendation to use company-specific data, and 3) does not incorporate merger arbitrageurs as a class of traders or compensate for their presence among shareholders of Hudson City. Defs.' Mot. 2, 8–11 (D.I. 146). In supplemental briefing, Defendants also rebutted the reliability of the Keath Trading Model with a Declaration by Marcia Kramer Mayer critically analyzing Mr. Keath's application of her original Multi-Sector Multi-Trader ("MSMT") model methodology. Defs.' Post-Arg. Resp. 40–42, Ex. 25 (D.I. 200).

Plaintiffs present five arguments in response. First, they argue that while the Keath Trading Model is based on a particular study, multi-trader models like the one used by Mr. Keath are commonly used to determine damages in securities class actions and have evolved through a process of refinement, as evidenced by comparative studies. Pls.' Reply, Ex. 63, 1–3 (D.I. 157). Second, Plaintiffs argue that Mr. Keath used all the company-specific data that was publicly

available, and that he performed a sensitivity analysis to determine the Trading Model was not sensitive to changes in model parameters reflecting data that was not company-specific. Pls.' Opp. 9–10, 13 (D.I. 158) (citing Pls.' Mot., Ex. 35, ¶¶ 37, 43, 51–52, 61, 64–65 (D.I. 136); Pls.' Reply, Ex. 63, ¶¶ 7–10, 12 (D.I. 157)). Third, Plaintiffs assert that the Trading Model is not sensitive to the presence of merger arbitrageurs, that an underestimation of the number of merger arbitrageurs would actually result in an underestimation of trading damages rather than an overestimation, and that Defendants' initial expert report is flawed in its definitions of merger arbitrageurs and its methodology for estimating the proportion of Hudson City shareholders who were merger arbitrageurs. Pls.' Reply, Ex. 63 ¶¶ 12–14, 19–20 (D.I. 162). Fourth, Plaintiffs argue that Defendants' supplemental Declaration by Dr. Mayer is not properly before the Court because Dr. Mayer was not noticed to Plaintiffs as a potential witness before the close of expert discovery months prior to filing the supplemental Mayer Declaration. Pls.' Post-Arg. Reply 11–14 (D.I. 203). Finally, Plaintiffs argue that even if the Keath Trading Model fails to satisfy *Daubert*, this is no reason to exclude the entire report because the DeRosa Event Study portion of the report is sufficient to address their theories of damages on its own.

The Court finds the Keath Trading Model is unreliable for purposes of class certification. Dr. Mayer's supplemental Declaration is properly before the Court despite Defendants' lack of disclosure of her as a witness before the close of discovery, because the Declaration was offered in rebuttal to Plaintiffs' own rebuttal report by Mr. Keath. Further, Dr. Mayer's Declaration is devastating to the credibility of Mr. Keath's application of Dr. Mayer's MSMT methodology to

traders of Hudson City shares.[2]  In light of the rebuttal Declaration by Dr. Mayer, the Court cannot find Mr. Keath's trading model reliable under *Daubert* for purposes of class certification.

However, the Court is persuaded by Plaintiffs' argument that the DeRosa Event Study portion of the Keath/DeRosa Report is sufficient on its own to satisfy *Daubert*, and that a determination that the Keath Trading Model is unreliable under *Daubert* does not require exclusion of the entire Report.

The Keath Trading Model portion of the Report only serves to provide estimates as to the number of shares impacted by various events during the pendency of the merger.  These estimates are only useful in the Report when combined with the Event Study's estimates of per-share damages to produce an aggregate estimates of the total combined damages to all putative class members for each of Plaintiffs' three damages theories.  However, Rule 23 does not require such an aggregate estimate.  The Third Circuit was clear in *Neale* that "individual damages calculations do not preclude class certification under Rule 23(b)(3) . . . ." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 42 (2013) (Ginsberg, J. & Breyer, J., dissenting) (citing William B. Rubenstein, 2 *Newberg on Class Actions*

---

[2]     Plaintiffs represent Mr. Keath's multi-trader model ("MTM") as an implementation of an MTM designed by Dr. Marcia Kramer Mayer in a report she published in 2000 that Plaintiffs assert is widely recognized by courts and reliable as a trading model.  Pls.' Mot., Ex. 35, ¶¶ 41–42 (D.I. 136); Pls.' Reply, Ex. 63, ¶ 1 (Keath/DeRosa Rebuttal Report), Ex. 66 (Mayer (2000) Article) (D.I. 157); Pls.' Opp., 8–9, 12 (D.I. 158).  Dr. Mayer's opinion of Mr. Keath's implementation of her MSMT methodology is therefore highly probative as to its credibility.  Dr. Mayer's analysis provides extensive evidence that Mr. Keath's implementation of the MSMT methodology was flawed in, inter alia, its assumptions of institutional trading, Defs.' Post-Arg. Resp., Ex. 25, 4–6 (D.I. 200), its application of pool parameters from the original Mayer (2000) article to the Hudson City/M&T circumstances, *id.* at 6–8, and in errors it commits in implementing the MSMT for unidentified investors, *id.* at 8–10.  Dr. Mayer also provides evidence that Mr. Keath incorrectly performed sensitivity analysis in varying parameters of the model for unidentified investors.  *Id.* at ¶¶ 29–30.  The Court finds these critiques of Mr. Keath's implementation of the Mayer MSMT methodology credible and persuasive.

§ 4:54 (5th ed. 2012))). Also, "it is 'a misreading of *Comcast*' to interpret it as 'precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement.'" *Id.* (quoting *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014)).

The DeRosa Event Study portion is the exclusive source of the Report's methodology to estimate the *per-share* impacts from Plaintiffs' asserted trading, dividends, and closing damages, and these impacts are stated either in the body of the report or in Appendix K. *See* Pls.' Mot., Ex. 35 (Keath/DeRosa Report) ¶¶ 137, 146, Fig. 7–8, Appx. K (D.I. 136). The charts in Appendix K can be used to calculate Trading and Dividend Damages on an individualized per-share basis, based on the specific date when each individual share of HCBK was sold. *Id.* at Appx. K. Further, Dr. Mayer notes that "[s]ettlement plans of allocation in securities cases typically include a claims process, whereby investors submit documentation of actual holdings, purchases, and sales. Settlements are not allocated based on the MSMT." Defs.' Post-Arg. Opp., Ex. 25 ¶ 28 (D.I. 200). Plaintiffs suggest the award of damages after trial would be distributed by a similar claims process. *See* Pls.' Post-Arg. Reply 10 (D.I. 203). As a result, the Keath Trading Model estimates are not necessary to calculate damages on an individualized basis across the class for any of Plaintiffs' three damages theories. The DeRosa Event Study portion of the Keath/DeRosa Report is sufficient to satisfy Rule 23(b)(3)'s predominance inquiry as to damages, because it is sufficient on its own, without the Keath Trading Model estimates, to provide a basis for individualized calculation of damages on a class-wide basis.

### 2.4 The DeRosa Event Study is Sufficiently Reliable

Defendants argue against the admissibility of the DeRosa Event Study because it: 1) studies changes in M&T stock prices rather than Hudson City stock prices; 2) uses event dates that i) were cherry-picked based on the timing of significant "downdrafts" in the price of M&T stocks, ii)

occurred before the shareholder vote (April 13, 2013), iii) do not disaggregate merger news from other news or developments such as publication of earnings reports on the same dates (October 14, 2014 and April 5, 2015), and iv) occurred on the day after the relevant merger news release (October 1, 2015); and 3) does not factually support a causal connection between merger delays and the report's purported dividend damages. *See* Defs.' Mot. 13–20 (D.I. 146).

Plaintiffs counter each of these arguments. First, they argue that the Event Study provides sound reasons for studying M&T rather than Hudson City shares, including that M&T stock was easier to model because it had a bigger market with more shares and that Hudson City's share prices were highly correlated with M&T share prices after the merger was announced. Pls.' Opp. 15 (D.I. 158). Second, Plaintiffs state that the choice of event dates was based on first identifying statistically significant "downdrafts" in the stock price using an econometric regression analysis and only later cross-referencing those event dates with dates alleged in the Complaint. *Id.* at 16. Further, Plaintiffs argue that the issues Defendants raise regarding the selection of event dates are not appropriate at this stage of litigation, as they speak to the merits rather than the reliability of the Event Study methodology. *Id.* at 17–18. Finally, Plaintiffs argue that causation is a legal issue that Plaintiffs are not required to prove at the class certification stage. *Id.* at 19. They further argue that Defendants have attempted to establish a lack of causation with an expert report, and that it is inappropriate for such a report to assert legal conclusions. *Id.* at 19.

In evaluating the above arguments, the Court finds Dr. DeRosa has provided "good grounds" for his choice to evaluate M&T share prices instead of Hudson City share prices in the Event Study. Dr. DeRosa's justifications are credible and reasonable that the M&T shares provided a more robust market for the study of valuation trends and their share prices were strongly coupled to Hudson City share prices during the period in question. Dr. DeRosa also provided

"good grounds" for his choices of event dates in the Event Study. He stated he used an econometric regression analysis to identify event dates where "downdrafts" occurred in M&T stock throughout the pendency of the merger, while also compensating for market-wide trends in bank stocks. As discussed above regarding whether the Event Study fits the case, event studies of this type are "almost obligatory" in securities cases dealing with damages calculated based on share price reductions, so Dr. DeRosa's choice of conducting an event study involved the application of a reliable scientific method to the facts of this case. In addition, Dr. DeRosa has provided reasonable justifications for his particular applications of that general methodology. Consequently, Dr. DeRosa's choices were the product of reliable reasoning within the zone where experts might disagree, and questions about these choices can be resolved on the merits.

Again, the Court's role in a *Daubert* review is to determine whether the testimony is based on sufficient facts and data and on sound principles and methods, not to resolve whether its conclusions are correct. Fed. R. Evid. 702(b)–(d). Even if the conclusions are incorrect, "[a judge] may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *In re Paoli*, 35 F.3d at 745.

In sum, event studies are a generally accepted methodology for computing the value of stock price declines associated with adverse events, and Dr. DeRosa had "good grounds" for his choices in implementing his Event Study—the merits of which can be debated at a later stage. Therefore, the Court finds the DeRosa Event Study is reliable under *Daubert*.

### 3. The Keath/DeRosa Report is Admissible for Purposes of Class Certification

As set forth above, Plaintiffs have shown by a preponderance of evidence that the Keath/DeRosa Report satisfies the *Daubert* standard for admissibility because Mr. Keath and Dr. DeRosa are qualified and the Event Study portion of the Report both fits the case and is reliable.

Therefore, the Court denies Defendants' Motion to Exclude the Keath/DeRosa Report for purposes of class certification.

## V.   THE MOTION FOR CLASS CERTIFICATION

Plaintiffs have filed their Motion for Class Certification under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  As the following analysis explains, the Court finds that Plaintiffs have met their burden regarding the Rule 23 elements of numerosity, commonality, predominance, and superiority, but have not fully met their burden as to the elements of adequacy and typicality.  Additionally, the scope of the class must be amended to satisfy the ascertainability requirement for class certification.  Accordingly, the Court will certify the class upon a determination regarding an appropriate class definition that excludes merger arbitrageurs.

### 1.  Legal Standard

Rule 23 governs the requirements for class certification and requires plaintiffs to show that the class satisfies four elements: 1) numerosity, 2) commonality, 3) typicality, and 4) adequacy of representation.  Fed. R. Civ. P. 23(a).  Plaintiffs must also demonstrate the predominance of questions of law or fact common to class members over any questions affecting only individual members and the superiority of a class action over other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

In the Third Circuit, the class members must also be "currently and readily ascertainable based on objective criteria."  *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129 (3d Cir. 2023) (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020)).  To satisfy this requirement, Plaintiffs must show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Id.* at 130 (quoting *Hargrove*, 974 F.3d at 469–70); *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 163–65 (3d Cir. 2015) (discussing a quartet of Third

Circuit cases establishing these ascertainability requirements as implicit in Rule 23 and attempting to resolve confusion about the requirements). The ascertainability requirement is not satisfied where a court must resort to "mini-trials" in order to identify whether an individual is included in the class. *In re Niaspan*, 67 F.4th at 138.

Plaintiffs bear the burden of proof for each of the elements of Rule 23 by a preponderance of the evidence. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020). "[T]he requirements set out in Rule 23 are not mere pleading rules." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008). The court must perform a "rigorous analysis" to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (quoting *In re Hydrogen Peroxide*, 552 F.3d at 307); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) ("A party seeking class certification . . . must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. . . . Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."); *see generally In re Lamictal*, 957 F.3d at 191–95 (finding abuse of discretion by the district court for failure to rigorously analyze the plaintiffs' and defendants' competing expert reports in its injury and damages findings as part of its predominance analysis).

## 2. Numerosity and Superiority are Uncontested and Easily Satisfied

Proof of numerosity is not difficult to achieve, and Plaintiffs in this case meet that low bar. Rule 23(a) requires that the putative class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). District courts have "considerable discretion in making numerosity determinations." *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016), *as amended* (Sept. 29, 2016). "There is no minimum number of members needed for

a suit to proceed as a class action," *Marcus*, 687 F.3d at 595, but "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the [numerosity requirement] of Rule 23(a) has been met." *In re Modafinil*, 837 F.3d at 249–50 (quoting *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)).

As for superiority, Plaintiffs must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining superiority, a court may consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Defendants do not dispute that numerosity is met. The putative class members number in the thousands, with over 26,000 shareholders of Hudson City Bank as of the proxy statement publication date. Pls.' Mot. 15 (D.I. 136). This is orders of magnitude larger than the forty class members discussed by the Third Circuit as a rough threshold for numerosity in *Stewart*. Therefore, it is straightforward that joinder of all Hudson City shareholders that might have been injured by the Joint Proxy Statement would be impractical, so the numerosity requirement is met.

Defendants also do not dispute the superiority of the class action mechanism in this case. Given the size of the putative class, it is not difficult to conclude that the class action mechanism is the superior method for litigating Plaintiffs' claims. Lead Plaintiffs likely could not justify the expense of litigating their claims individually, and this would likely be the case for a significant number of the other class members. A class action allows them to seek justice by aggregating their claims with all other members of the putative class, which is one of the central justifications for

the class action mechanism itself.  A class action also allows Defendants to defend against a single lawsuit rather than against a potential multitude of individual suits.  The aggregation of such a multitude of suits into a single case also conserves judicial resources.  Therefore, in this case a class action is clearly superior to the alternatives.

### 3.  Commonality and Predominance

The commonality and predominance requirements of Rule 23 require engaging with the merits only to the degree necessary for class certification.  As the following discussion reveals, when limiting the Court's inquiry to this standard, Plaintiffs have met their burden of proof regarding commonality and predominance the putative class.

Defendants raise a number of concerns aimed at the commonality and predominance requirements of Rule 23.  First, Defendants argue that Plaintiffs have not offered a methodology for computing class-wide damages.  *See* Defs.' Opp. 12–14 (D.I. 144).  Second, they argue that the methodology Plaintiffs have offered for determining damages does not match their 14(a) claim, because it relies on a theory of injury that is not available to 14(a) claims.  *See Id.* at 14–17.  Third, they argue Plaintiffs' damages methodology cannot be reliably applied on a class-wide basis.  *See Id.* at 17–19.  Fourth, aside from their Motion to Exclude Plaintiffs' damages model, Defendants also argue that Plaintiffs' Motion fails to satisfy commonality because the Keath/DeRosa Report does not represent merger arbitrageurs who are members of the putative class.  *See Id.* at 19–23.

For purposes of this Motion, the Court disagrees with each of Defendants' arguments, and finds that the commonality and predominance requirements of Rule 23 are each satisfied for the putative class.

### 3.1 Legal Standard

The commonality element of Rule 23(a) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement is satisfied "if the

named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted)). "A court's focus must be on whether the *defendant's conduct* is common as to all of the class members." *Id.* at 486 (cleaned up) (emphasis added).

The predominance requirement of Rule 23(b)(3) builds on the commonality question by requiring that questions of law or fact common to class members predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). As with commonality, the predominance analysis does not ask "whether each plaintiff has a 'colorable' claim," but focuses on "whether the defendant's conduct [was] common as to all of the class members." *Reyes*, 802 F.3d at 486, 489 (quoting *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 298–99 (3d Cir. 2011)). Predominance does not require "the elimination of all individual circumstances." *Id.* at 489. Instead, "predominance is satisfied if common issues predominate." *Id.* For example, in the context of fraud claims under Section 10(b) of the Securities Act, even individualized reliance by class members on fraudulent misrepresentation need not defeat predominance when the Securities Act and the misrepresentation by defendants apply uniformly to the entire class. *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003).

Commonality is often analyzed in tandem with predominance, in that commonality is "subsumed" in the predominance analysis as the first step of such analysis. *Reyes*, 802 F.3d at 486. However, commonality and predominance are still distinct concepts. *Id.* at 489.

Multiple recent United States Supreme Court cases have clarified the legal standard for commonality and predominance for certification of class actions. First, analyzing commonality and predominance frequently requires substantial engagement with the merits of the claims

presented, especially because these requirements concern questions of law or fact common to the class. *Comcast*, 569 U.S. at 33–34.  Second, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.  Third, when considering predominance, "the pivotal inquiry is whether proof of [the element of the claim] is needed to ensure that the *questions* of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Id.* at 467 (quoting Fed. R. Civ. P. 23(b)(3)).

The Third Circuit has clarified that "predominance and commonality are satisfied if *each element* of the alleged [] violation involves common questions of law and fact capable of proof by evidence common to the class." *Reyes*, 802 F.3d at 489.  The elements of a 14(a) claim are: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *Gen. Elec.*, 980 F.2d at 932 (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970)).

The second element, which requires injury-in-fact, is often referred to as "loss causation." *See* 15 U.S.C. §78u-4(b)(4); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008); *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 235 (4th Cir. 2023); *In re Resolute Energy Corp. Sec. Litig.*, Civ. No. 19-77-RGA, 2021 WL 327385, at *2 (D. Del. Feb. 1, 2021).  The third element, requiring the proxy solicitation to be an essential link in the accomplishment of the transaction, is often referred to as "transaction causation." *See Gen. Elec.*, 980 F.2d at 932–33; *Karp*, 69 F.4th at 235.

Loss causation requires proving both economic loss and proximate causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (holding in the Section 10(b) securities fraud

context). Even though the Supreme Court has not separately held that loss causation must be proved under Section 14(a) as well as Section 10(b), there is growing consensus among circuit courts that the loss causation requirement of 15 U.S.C. §78u-4(b)(4) applies equally to Section 14(a) and 10(b) claims. *See Karp*, 69 F.4th at 235; *Kuebler v. Vectren Corp.*, 13 F.4th 631, 638 n.1, 646 (7th Cir. 2021); *N.Y.C. Emp.'s Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010) (overruled in part on other grounds by *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc)); *Grace v. Rosenstock*, 228 F.3d 40, 46–47 (2d Cir. 2000). In the context of Section 10(b) fraud claims, the Third Circuit has stated that loss causation is to be analyzed according to a substantial factor test entailing examination of the causal nexus through "general principles of causation, such as materiality, directness, foreseeability, and intervening causes." *Pure Earth, Inc. v. Call*, 618 F. App'x. 119, 123 (3d Cir. 2015) (citing *Dura Pharms., Inc.*, 544 U.S. at 341–42; *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 424 (3d Cir. 2007)). Accordingly, Plaintiffs in this 14(a) action must prove both economic loss and proximate causation under a substantial factor test for causal nexus involving analysis of materiality, directness, foreseeability, and intervening causes in order to satisfy the loss causation element of 14(a).

Plaintiffs argue that "[a]t the class certification stage, materiality and loss causation need not be considered." Pls.' Mot. 24 (D.I. 136) (quoting *City of Sterling Heights Gen. Emp.'s Ret. Sys. v. Prudential Fin. Inc.*, Civ. A. No. 12-5275, 2015 WL 5097883, at *5 (D.N.J. Aug. 31, 2015)). With respect to our sister court in New Jersey, the Court does not construe *Sterling Heights* as stating that the elements of materiality and loss causation are irrelevant at the class certification stage and need not be considered at all. The *Sterling Heights* court cited to the United States Supreme Court's *Amgen* and *Halliberton I* cases in support for its statement that materiality and loss causation need not be considered at the class certification stage. However, neither case

obviated the need to *consider* whether materiality and loss causation are amenable to class-wide proof by common evidence under Rule 23; rather, the cases concluded that materiality (*Amgen*) and loss causation (*Halliburton I*) need not be *proved* at the class certification stage.  *See Amgen*, 568 U.S. at 473–75 ("Because a failure of *proof* on the issue of materiality, unlike the issues of market efficiency and publicity, does not give rise to any prospect of individual questions overwhelming common ones, materiality need not be *proved* prior to Rule 23(b)(3) class certification" (emphasis added)); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811–15 (2011) ("we conclude the Court of Appeals erred by requiring EPJ Fund to *prove* loss causation at the certification stage" (emphasis added)).  Therefore, while Plaintiffs need not *prove* materiality or loss causation on the merits at this stage, they must at least demonstrate that these elements present live questions of law or fact and are amenable to proof on a common basis, as with all elements of 14(a).  *See Reyes*, 802 F.3d at 489.

In sum, Plaintiffs must provide sufficient evidence to support a finding by the preponderance of the evidence that the questions of law and fact for their 14(a) claims exist in common among all members of the putative class and that these common questions predominate over questions impacting putative class members on an individual basis.  The elements of their claim are: 1) whether the proxy solicitation was materially misleading or omissive, 2) loss causation—whether injury-in-fact (i.e., economic loss) exists class-wide and the proxy statement proximately caused these injuries, and 3) transaction causation—whether the proxy solicitation was an essential link in the accomplishment of the transaction shareholders were asked to authorize (i.e., the merger) and directly caused Plaintiffs' damages.  However, as discussed above regarding Defendants' Motion to Exclude, under *Neale*, 794 F.3d at 374–75, Plaintiffs need not provide an

aggregate damages model in order to support the loss causation element—evidence of individualized damages is sufficient for class certification.

### 3.2 The Putative Class Satisfies the Requirements of Commonality and Predominance.

While some questions may not survive summary judgment or succeed at trial, the Court finds that there is a preponderance of evidence demonstrating that Plaintiffs' Trading and Closing Damages present questions of law and fact common to both the Belina Family and Mr. Krublit, representing all members of the putative class.  The Court further finds that these common questions of law and fact predominate over questions implicating individual class members.  However, Plaintiffs' asserted Dividend Damages do not satisfy the transaction causation element as a matter of law, and therefore do not present common questions of law and fact.

### 3.2.1 Element 1: Materiality

The Third Circuit has already extensively reviewed the issue of the materiality of the allegedly misleading and omissive portions of the Joint Proxy Statement in its review of this Court's earlier dismissal of the case, so the Court will only briefly analyze the materiality question as to the allegedly misleading or omissive statements before turning to the more contested questions of transaction causation and loss causation.

The test for materiality of omitted proxy information is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (quoting *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003)); *see also Jaroslawicz II*, 962 F.3d at 710.  Determining materiality "involves an assessment of whether 'the disclosure of the omitted fact or misrepresentation would have been viewed by the reasonable investor as having significantly

altered the total mix of information made available.'" *Jaroslawicz II*, 962 F.3d at 710 (quoting *EP Medsystems, Inc., v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)).   Materiality of the statement or omission is to be assessed "at the time and in the light of the circumstances under which it is made." *Jaroslawicz II*, 962 F.3d at 710 (quoting *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006)).

Upon its rehearing of Defendants' Motion to Dismiss, the Third Circuit in *Jaroslawicz II* determined Plaintiffs had plausibly alleged a materially omissive Joint Proxy Statement.  Based on the plain language of the requirements SEC regulations and guidance documents for proxy statements to disclose "risk factors," the court found that "M&T's generic statement about money laundering compliance is not far from the risk statement offered in SEC guidance as *inadequate*." *Jaroslawicz II*, 962 F.3d at 715.  "M&T should have 'specifically link[ed]' its general statements to 'each risk to [its] industry, company, or investment' using details that connected the pending merger review to its existing and anticipated business lines." *Id.* (quoting SEC Legal Bulletin No. 7, "Plain English Disclosure," Release No. SLB-7, 1999 WL 34984247, *6 (June 7, 1999)) (alteration in original).  Because the Joint Proxy Statement failed to provide "such concise and plain discussions of the *significance of regulatory review*, framed in the context of M&T's *particular business and industry*" regarding its BSA/AML compliance problems, the Third Circuit held that Plaintiffs have plausibly alleged facts where "there is a substantial likelihood that a reasonable shareholder would [have] consider[ed] it important in deciding how to vote."  *Id.* (quoting *Seinfeld*, 461 F.3d at 369) (alteration in original).  The Third Circuit also held that Plaintiffs had met their pleading burden in asking this Court to infer that M&T's consumer compliance practices cast enough doubt on M&T's controls and compliance systems and posed

enough of an independent regulatory risk that a reasonable shareholder would consider it important in deciding how to vote.  *Id.*

Defendants offer no new evidence in their Opposition to Plaintiffs' Motion for Class Certification to contest the alleged omissions and misleading statements in their Joint Proxy Statement or the materiality these alleged omissions and misleading statements.  *See generally* Defs.' Opp. (D.I. 144).  They continue to assert that Defendants filed supplemental proxy disclosures on April 12, 2013, informing shareholders that the merger would be substantially delayed, that the Federal Reserve Board had identified concerns with M&T's BSA/AML compliance program, and that the merger's termination date was being extended to January 31, 2014.  Defs.' Opp. 1, 5–6 (D.I. 144).  Defendants state that shareholders were knowledgeable of these deficiencies when they voted to approve the merger on April 18, 2013, and argue that shareholders who sold their Hudson City shares prior to January 31, 2014 should be excluded from the class because they were on notice of the delay.  *Id.* at 19–22.  Plaintiffs' rebuttal is that the supplemental disclosures failed to fully disclose the seriousness of the BSA/AML violations and made no mention at all of the consumer violations, so were therefore not curative of the omissions in the original Joint Proxy Statement.  Pls.' Reply, 5 (D.I. 157).

The Third Circuit extensively analyzed the materiality issue in its opinion and held Plaintiffs had satisfied the pleading requirements for their 14(a) claims.  *Jaroslawicz II*, 962 F.3d at 715.  The above disagreements between the Parties regarding the effect of the supplemental disclosures only serve to further demonstrate that the questions of whether the Joint Proxy Statement contained misleading or omissive content, and the materiality of this content, are live questions for consideration on the merits.  Further, all members of the putative class held Hudson City shares with voting rights on the issuance of the Joint Proxy Statement.  Pls.' Mot. 4 n.4 (D.I.

136).  Therefore, the issue of the materiality of omissions in the Joint Proxy Statement is common among all putative class members and predominates over individual questions.

### 3.2.2 Element 2: Loss Causation

Plaintiffs allege that they suffered economic losses from the misstatements and omissions in the proxy statement that, once publicly revealed, injured them through "deductions [to their Hudson City share prices] along the way" to the merger, and "diminished value at the end" at the closing of the merger.  Pls.' Mot. 26 (D.I. 136).  This resulted in class members receiving "less than what was coming to them."  *Id.*  Plaintiffs further argue putative class members' economic losses were proximately caused by the misstatements and omissions in the proxy statement because they were within the ability of Defendants to know and were a foreseeable consequence within the zone of risk of Defendants' conduct.  Pls.' Second Am. Compl. ¶ 118 (D.I. 72); Pls.' Mot. 26–27 (D.I. 136).  Plaintiffs have advanced three theories of damages for their putative class members (Trading Damages, Dividend Damages, and Closing Damages) and have submitted an expert report with a methodology for calculating damages on a class-wide basis.  Pls.' Mot. 10, Ex. 35 (D.I. 136).  While Plaintiffs have argued that this methodology allows for damages calculations on a "formulaic basis and [does] not require individualized inquiries of Class members," *id.* at 9, Plaintiffs have also argued that a methodology of individualized damages calculations is sufficient for class certification, Pls.' Post-Arg. Reply 10 (D.I. 203) (citing *Neale*, 764. F.3d at 375).

At the outset, Defendants argue against Plaintiffs' entire benefit-of-the-bargain theory of injury.  Plaintiffs assert their damages under a theory of injury that they were entitled to the benefit of the bargain to which they agreed.  Defendants argue that benefit-of-the-bargain damages are unavailable under 14(a) claims, and Defendants' damages are limited only to out of pocket damages.  Defendants support this argument with their interpretation of the Delaware District Court's opinion in *In re Resolute Energy Corp. Sec. Litig,*, Civ. No. 19-77-RGA, 2021 WL 327385,

at *2 (D. Del. Feb. 1, 2021), *aff'd*, No. 21-1412, 2022 WL 260059 (3d Cir. Jan. 27, 2022) [hereinafter *In re Resolute*].  Defs.' Opp. 11–14 (D.I. 144).  Defendants further argue that Plaintiffs have not offered a methodology for computing class-wide damages consistent with their theory of legal liability.  *See* Defs.' Opp. 14–19 (D.I. 144).  Defendants ground this argument in their interpretation of the Supreme Court's opinion in *Comcast* and the Third Circuit's precedent in *Neale*.  Defs.' Opp. 15 (D.I. 144) (discussing *Comcast*, 569 U.S. at 33–34, and *Neale*, 794 F.3d at 374 n.10).

The Third Circuit has stated that *Comcast* does not stand for a general proposition that class certification requires a method of calculating class-wide damages.  *See Neale*, 794 F.3d at 374–75 ("[I]t is a misreading of *Comcast* to interpret it as precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." (cleaned up)).  The court also expressly stated that methodologies which only provide "individual[ized] damages calculations do not preclude class certification under Rule 23(b)(3)," consistent with several other circuit courts.  *Id.* at 375.  Consequently, Plaintiffs are not required to offer a methodology for computing aggregate class-wide damages at class certification. As described in the legal standard discussion above, for the loss causation analysis at class certification Plaintiffs merely need to demonstrate by a preponderance of evidence that the questions of law and fact regarding economic loss and proximate causation exist class-wide.

As for the range of potentially viable theories of damages in 14(a) claims, even if an opinion from another court in the District of Delaware were binding precedent, which it is not, the Court disagrees with Defendants' interpretation of *In re Resolute*.  The Court does not read either of the opinions of the district court or the Third Circuit in *In re Resolute* to conclude that out of

pocket damages are the only available damages for 14(a) claims.[3]  Instead, as Plaintiffs argue, the

Third Circuit has made clear that "recovery [in 14(a) actions] is not limited to out of pocket loss .

. . but may include loss of a possible profit or *benefit* . . . unless the loss is wholly speculative."

*Gould v. American-Hawaiian S. S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976) (emphasis added); *see*

Pls.' Mot. 11 n.3 (D.I. 136); *see also In re Heckmann*, 2013 WL 2456104, at *14.  Further, the

Third Circuit has already implicitly supported the viability of Plaintiffs' alleged dividend and

closing damages by not overturning this Court's earlier finding that the First Amended Complaint

plausibly pled these damages, irrespective of the Third Circuit's non-precedential affirmance in *In*

---

[3]     First, *In re Resolute* decided a motion to dismiss, whereas the instant case has already
survived a motion to dismiss.

        Second, the discussion in *In re Resolute* to which Defendants point does not analyze the
actual content of the complaint in that case, so amounts to dicta.  The *In re Resolute* court found
that the complaint "failed to plead, among other things, loss causation . . . [and] the original
complaint failed to offer any notice of what the relevant economic loss might have been."  *In re
Resolute*, 2021 WL 327385, at *2 (internal quotation marks omitted).  The court then took the
liberty of opining that "there were two possible economic loss theories Lead Plaintiff *could have*
argued, but both were insufficient."  *Id.* (emphasis added).  This all amounts to dicta that, in an
unpublished non-binding opinion that was reviewed by the Third Circuit, but that the Third Circuit
affirmed in a non-precedential opinion that did not discuss the relevant dicta at all, offers minimal
persuasive value.

        Third, the circumstances in *In re Resolute* are distinguishable from those alleged by
Plaintiffs.  The *In re Resolute* court's discussion of damages theories does not address the theories
alleged by Plaintiffs in the instant case, and thus is not persuasive authority regarding the legal or
logical impossibility of Plaintiffs' theories.  The district court in *In re Resolute* determined the
amended complaint at issue was alleging a theory of a merger premium that undervalued the target
company—that the board had failed to secure a better deal and not that a misleading or omissive
proxy statement caused the damages as required by a 14(a) claim.  *In re Resolute*, 2021 WL
327385, at *3–4.  However, in the instant case Plaintiffs allege they did not receive the full benefit
of their bargain, a very different theory of injury.  While the plaintiffs in *In re Resolute* wanted a
better deal, Plaintiffs in the instant case want the deal they say they agreed to, not the deal they
received.  Because the benefit-of-the-bargain theory of injury was not at issue by the *In re Resolute*
court, it would not have been briefed, and there is no language in *In re Resolute* analyzing the
possibility or impossibility of 14(a) damages under a benefit-of-the-bargain theory.  This is not a
sound foundation to read into the *In re Resolute* opinion that it conclusively states benefit-of-the-
bargain damages are unavailable as a matter of law for 14(a) claims.

*re Resolute*.[4]  Other circuits have also consistently agreed that benefit-of-the-bargain damages are

available for 14(a) actions.[5]  Further, the Second Circuit's "reasonable certainty" standard for

---

[4]      This case already survived a Motion to Dismiss as to loss causation when the Third Circuit vacated and remanded this Court's dismissal in a precedential opinion, where Defendants "waived the argument that the . . . Second Amended Complaint failed to plausibly allege loss causation" and where the Court found Plaintiffs' Dividend Damages and Closing Damages were pled sufficiently in its order granting the Motion to Dismiss.  *See Jaroslawicz II*, 962 F.3d at 708 n.7 (affirming D.I. 70 as to loss causation regarding Plaintiffs' 14(a) claim); Mem. Order 12 (D.I. 70) (finding that the Dividend Damages and Closing Damages pled in the First Amended Complaint (D.I. 54) were sufficient to survive Defendants' Motion to Dismiss).  While the Third Circuit's ultimate opinion did not analyze loss causation, given that Defendants waived that argument on en banc rehearing, the Third Circuit's original (now vacated) *Jaroslawizc I* opinion did analyze the issue and found the pleading standard satisfied based on a theory of "lost opportunity."  *See Jaroslawicz I*, 912 F.3d at 115; *see generally Jaroslawicz II*, 962 F.3d 701.  Therefore, the Court already explicitly, and the Third Circuit implicitly, determined that theories of damages other than the single out-of-pocket theory asserted by Defendants are plausible.

It should be noted that Plaintiffs' first assertion of their Trading Damages theory occurred in the Second Amended Complaint.  Pls' Second Am. Compl. ¶ 121 (D.I. 72) (*compare with* Pls.' First Am. Compl. ¶ 117 (D.I. 54)).  In addition, the Court's Order dismissing the Second Amended Complaint did not address the sufficiency of the loss causation pleadings, and thus did not analyze the viability of the new Trading Damages theory.  *See generally* Mem. Order (D.I. 84).  While the Third Circuit's *Jaroslawicz I* opinion did analyze loss causation, the court incorrectly stated that the loss causation pleadings in the First and Second Amended Complaints were identical, *Jaroslawicz I*, 912 F.3d at 115 (vacated on other grounds), when in fact Plaintiffs made a small addition to paragraph 121 in the Second Amended Complaint to reflect their Trading Damages theory, *compare* Pls.' Second Am. Compl ¶ 121 (D.I. 72), *with* Pls.' First Am. Compl. ¶ 117 (D.I. 54).  Therefore, the Court does not interpret the Third Circuit to have made any implicit determination regarding the viability of Plaintiffs' Trading Damages theory in *Jaroslawicz II*.  However, Plaintiffs' Dividend Damages and Closing Damages *were* identically pled between the First and Second Amended Complaints, so the Third Circuits reasoning in *Jaroslawicz I* pertinent to these damages theories.

In sum, this Court and the Third Circuit have already found that there can be plausible loss causation theories for 14(a) claims beyond the out-of-pocket loss theory espoused by Defendants.

[5]      In *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir. 1981), the Second Circuit analyzed Section 28(a) of the Securities Act, as did the Third Circuit in *Gould*, which authorizes damages for causes of action under the Act, to determine if benefit-of-the-bargain theories of damages are viable under its provisions.  The Second Circuit reasoned that Section 28(a) used broad language that did not limit damages to only out-of-pocket measures, and held that they were available where the damages "can be established with reasonable certainty," based upon a similar standard for application of the theory in common law fraud actions.  *Id.* at 114.  The court noted that "this result

damages under this theory is consistent with the comment in *Gould* that "wholly speculative" damages are unavailable for securities claims.  *See Gould*, 535 F.2d at 781.

Plaintiffs have argued that the risks to the merger and harm to the valuations of M&T and Hudson City from the BSA/AML and consumer violations were foreseeable.  *See* Pls.' Second Am. Compl. ¶ 118 (D.I. 72); Pls.' Mot. 26–27 (D.I. 136).  Defendants have not rebutted these arguments.  The Court or the fact-finder might be persuaded at later stages that these were foreseeable consequences.

As a result, Plaintiffs' damages trigger a multitude of questions of law and fact applicable class-wide, including at a minimum: 1) whether "reasonable certainty" should be the standard for benefit-of-the-bargain damages for a 14(a) claim, 2) whether Plaintiffs' damages theories and proof of damages are "wholly speculative" or satisfy the "reasonable certainty" standard,  and 3) whether these damages satisfy the traditional principles of proximate causation necessary to prove loss causation (i.e., "materiality, directness, foreseeability, and intervening causes").  *See Pure Earth*, 618 F. App'x at 123 (citing *Dura Pharms.*, 544 U.S. at 341–42); *McCabe*, 494 F.3d at 424.

---

furthers the purpose of sections 14(a) and 14(e) of the 1934 Act deterrence of misrepresentations in connection with mergers and tender offers and encourages private enforcement of the Act."  *Id.*

The Second Circuit elaborated about constraints to the application of benefit-of-the-bargain damages for Securities Act causes of action in *Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 59–60 (2d Cir. 1984), where the "proposed claim is based on the value the stock purportedly would have had if [the Defendant's] true financial condition had been publicly known at the time of the transaction, clearly a speculative proposition."  Instead, "[a] claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different."  *Id.* at 60.

The Second Circuit has continued to support viability of benefit-of-the-bargain damages under its *Osofsky* standard for Securities Act actions, including 14(a) claims.  *See Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924 (2d Cir. 1992); *Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608 (2d Cir. 1994); *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044 (2d Cir. 1995). The Ninth Circuit has also supported the *Osofsky* analysis, applying benefit-of-the-bargain damages in a Section 14(e) action.  *Plaine v. McCabe*, 797 F.2d 713, 722 (9th Cir. 1986).

Therefore, Plaintiffs have satisfied the requirements of commonality as to proximate causation for class certification by demonstrating that common class-wide questions of law and fact exist. Further, absent any individualized questions of law raised by Defendants as to proximate causation, the common questions predominate as well.

As to factual questions of economic loss, Plaintiffs have likewise met their burden to demonstrate commonality and predominance among the putative class. Plaintiffs' 14(a) claims against Hudson City and M&T articulate three theories of damages and have survived multiple motions to dismiss. Plaintiffs have supported their damages theories with the Keath/DeRosa Report as evidence of the existence of Trading Damages, Dividend Damages, and Closing Damages. *See* Pls.' Mot., Ex. 35 (D.I. 136). The Report articulates a Trading Model to estimate the number of shares owned by class members on each day throughout the pendency of the merger, *id.* at 12–23, followed by an Event Study which estimates the amount of damages for each share on each day of the pendency of the merger, *id.* at 24–35. The Event Study on its own provides common class-wide evidence of Trading Damages, Dividend Damages, and Closing Damages, even if the Trading Model portion is excluded. Pls.' Mot., Ex. 35 (Keath/DeRosa Report) ¶ 126–51 (D.I. 136). The Report concludes by combining the Trading Model and Event Study to estimate total aggregate Trading Damages, Dividend Damages, and Closing Damages for the putative class, consistent with Plaintiffs' alleged theories of damages. *Id.* at 36–42. Although the Court is denying Defendants' Motion to Exclude the Report, Defendants argue separately in opposition to Plaintiffs' Motion for Class Certification that the Keath/DeRosa Report is flawed and unreliable in its choice to measure reductions in value of M&T shares instead of Hudson City shares and choices of dates in the Report's Event Study, that it inappropriately aggregates damages class-

wide, and that the presence of merger arbitrageurs in the damages calculations overinflates the total aggregated damages.  Defs.' Opp. 17–18 (D.I. 144).

Defendants' arguments about the Report's reliability were important for the Court to weigh when considering Defendants' *Daubert* motion.  However, now that the Court has found the Event Study portion of the Report reliable under *Daubert* for class certification purposes, such reliability arguments can be reconsidered under any challenge to admissibility at trial or can be addressed by the fact-finder regarding the weight of the evidence.

Further, as described above, there is no requirement for a class-wide aggregate damages estimate at class certification under *Neale*.  *See also Harnish*, 833 F.3d at 306.  The *Harnish* court was clarifying *Neale*, 794 F.3d at 375 ("individual damages calculations do not preclude class certification under Rule 23(b)(3)"), and added that where injury is an element of the claim in question, "the putative class must first demonstrate economic loss – that is, the fact of damage – on a common basis" in order to survive the predominance inquiry.  *Harnish*, 833 F.3d at 306 (internal quotations omitted).  According to the *Harnish* court, the "fact of damage" is synonymous with "injury" or "impact," and is distinct from the measure of the amount of damages.  *Id.* at 305. Further, "only if the *fact* of damage is established does a court reach the question of remedy and the exact calculation of each plaintiff's damages."  *Id.* at 306.  So, to establish loss causation for class certification, Plaintiffs must demonstrate by a preponderance of the evidence that a fact-finder could conclude that economic loss (i.e., injury-in-fact) exists class-wide, even though they are not required to put forward a model at this stage that calculates those damages.  Here the DeRosa Event Study provides evidence that economic loss occurred through publicity events surrounding M&T's regulatory challenges that triggered share price downdrafts in both M&T shares and Hudson City shares, which it argues were linked through the force of the Merger

Agreement.  Defendants dispute the reliability of the Event Study with their own expert reports by Dr. Denis and Dr. Jiang, but this evidence by Defendants raises questions of law and fact within the zone where experts might disagree.  Therefore, the DeRosa Event Study satisfies the loss causation requirement to demonstrate by a preponderance of evidence that a fact finder could conclude damages exist on a common basis.

### 3.2.2.1 The Questions of Law and Fact Regarding Economic Loss Apply to Both Merger Arbitrageurs and Traditional Shareholders

Defendants also argue that merger arbitrageurs are present in the putative class, could not have been damaged according to Plaintiffs' theories due to the nature of an arbitrage investment strategy, and were not represented in the Keath/DeRosa Report.  Defs.' Opp. 18–19 (D.I. 144).  According to Defendants, merger arbitrageurs are investors who profit from mergers by simultaneously buying shares in the target company and shorting shares of the acquiring company upon announcement of the merger, then closing both positions upon close of the merger.  *Id.*  Such investors profit from the differential valuation between the two positions, reflecting the value of the risk that the merger may not close.  *Id.*

If Defendants' arguments were true, they would defeat the commonality of the question of economic loss for merger arbitrageurs.  However, Plaintiffs have challenged with arguments that Defendants' expert analysis regarding merger arbitrageurs was flawed and with evidence that merger arbitrageurs were in fact harmed.  Pls.' Reply 9, Ex. 63 5–10 (D.I. 162).  Plaintiffs opine on several potential theories of damages for merger arbitrageurs in their rebuttal, including that arbitrageurs were affected by paying out dividends on their short positions due to the delayed close of the merger, receiving a lower return on investment due to the delayed close of the merger, and receiving reduced cash consideration upon closing of the merger.  *Id.*

However, these three theories are not the same as those alleged for the putative class.  The three theories of damages that flow from Plaintiffs' Second Amended Complaint and are articulated in Plaintiffs' Motion for Class Certification are those of (1) Trading Damages for class members who sold Hudson City shares between the release of the Joint Proxy Statement and the close of the merger, (2) Dividend Damages for class members who received reduced dividends during the pendency of the merger, and (3) Closing Damages for class members who held shares through the close of the merger and received less value for their Hudson City shares than would have been estimated at the time of the release of the Joint Proxy Statement based on the content of the Joint Proxy Statement.  Pls.' Second Am. Compl. ¶¶ 118–121 (D.I. 72); Pls.' Mot. 10 (D.I. 136).  None of these three theories of damages encompasses obligations by Defendants to merger arbitrageurs to pay out dividends on their short positions in M&T Bank or suffer lower returns on investment due to lost opportunity costs in the period of delay before closing.  The Keath/DeRosa Report also does not analyze or estimate these types of damages.  Upon close of the merger shareholders were able to elect whether to receive cash or M&T shares as consideration for their M&T shares, and the amount of cash consideration per Hudson City share was based on the M&T share price at the time of the close of the merger.  *See* Pls.' Mot., Ex. 1 (Joint Proxy Statement) A-3, Art. II § 2.1(b) (Merger Agreement) (D.I. 136).  This means that merger arbitrageurs would have received reduced cash consideration, just as typical shareholders who elected cash consideration would have, and at an equivalent reduced value to shareholders who elected to receive M&T shares instead of cash.  To the extent the  DeRosa Event Study substantiates this reduced value, there is at least some evidence that merger arbitrageurs are represented in Plaintiffs' damages model, and thus some evidence that merger arbitrageurs were injured-in-fact.

Defendants' expert report by Dr. Jiang argues that merger arbitrageurs could not have been damaged under Plaintiffs' theories of damages.  Defs.' Opp., Ex. 2 25–32 (D.I. 147).

The preponderance of this evidence demonstrates that there is a dispute between experts regarding whether economic loss exists in common class-wide, including for merger arbitrageurs. That Defendants disagree with Plaintiffs' alleged theories of damages, and the question of whether merger arbitrageurs were injured-in-fact, merely reinforces a conclusion that there are indeed questions of law and fact regarding economic loss to merger arbitrageurs.  The conflicting positions of the experts can be resolved at a later stage.  In addition, Defendants have raised no questions of law or fact surrounding injury or damages that merger arbitrageurs, or any other individual class members, would want to raise in separate claims.  Therefore, a preponderance of evidence supports the conclusion that common questions of economic loss predominate over individual ones.

### 3.2.3 Element 3: Transaction Causation

In *Mills*, the Supreme Court established the transaction causation element of a 14(a) claim to address the question of whether shareholders must prove that they relied on deficient proxy materials during a shareholder vote.  *See generally* 396 U.S. 375, 380–81 (1970).  The Court held that plaintiffs asserting 14(a) claims need not prove reliance—i.e., that the materially misleading or omissive proxy statement would have caused a different outcome in a shareholder vote—when they prove that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in accomplishment of the transaction."  *Id.* at 385.  The Third Circuit has added the requirement that the "transaction [must be] the direct cause of the pecuniary injury for which recovery is sought" for the transaction causation element to be satisfied in 14(a) claims.  *Gen. Elec.*, 980 F.2d at 933.

Here the Parties do not dispute that there was a shareholder vote that relied on the Joint Proxy Statement, that the shareholder vote was required for the merger and resulted in approval of the merger between M&T and Hudson City, and that the merger actually closed (i.e., that the proxy solicitation was an essential link in the accomplishment of the merger).  What the Parties do dispute is: first, whether the shareholder vote itself *can be* the operative transaction referred to in *Mills*, and second, whether instead the *close* of the merger *must be* the operative transaction.  If the close of the merger must be the operative transaction, then shareholders that sold shares prior to the merger's closing would be excluded from the putative class because their damages could not have been caused by an operative transaction that occurred *after* they sold their shares.

Plaintiffs argue that the shareholder vote provided approval for the merger and should be the operative transaction.  Pls.' Post-Arg. Reply 18–21 (D.I. 203).  Plaintiffs alternatively argue that if the shareholder vote is not the operative transaction, then the operative transaction should be the entire Merger Agreement, which bound the Hudson City and M&T through the terms of this contractual agreement.  *Id.* at 21.  Defendants argue that the close of the merger must be the operative transaction, consistent with the recent decision in *In re Pattern Energy Group, Inc.*, No. 20-275 (MN) (JLH), 2023 WL 2655537, at *4 (D. Del. Mar. 27, 2023).  Defs.' Sur-Reply at 2–4 (D.I. 207).

The Court first addresses the two disputed issues above as to transaction causation before analyzing whether Plaintiffs have met their burden to show at class certification viable questions of law and fact that the transaction was the "direct cause of the pecuniary injury for which recovery is sought."  *Gen. Elec.*, 980 F.2d at 933.

### 3.2.3.1 The Shareholder Vote Cannot Be the Operative Transaction Under Mills

Regarding the first issue, the Court reads the Supreme Court's decision in *Mills* as precluding the shareholder vote from serving as the operative transaction. Although *Mills* does not expressly define the term "transaction," its meaning can be inferred from language in the opinion. Specifically, the:

> . . . requirement that the defect have a significant propensity to affect the voting process is found in the express terms of Rule 14a-9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to *the transaction for which approval is sought*, that correction of the defect or imposition of liability would not further the interests protected by 14(a).

*Mills*, 396 U.S. at 384 (emphasis added). The Court concludes from the emphasized phrase above that the *Mills* Court considered the "transaction" as separate from the "approval" the shareholder vote provides for such a transaction. In addition, Plaintiffs' own brief contains a similar differentiation between "Hudson Stockholders['] vote[]" and the "Merger Agreement" that the vote ratified. *See* Pls.' Post-Arg. Reply 21 (D.I. 203). Therefore, *Mills* counsels that the shareholder vote itself cannot be the operative transaction; instead the operative transaction must be the transaction that such a shareholder vote authorizes.

### 3.2.3.2 The Operative Transaction—the Merger—Can Include Events Prior to Its Closing

As for the second issue, although the shareholder vote cannot be the operative transaction, it does not follow that the operative transaction *must* be the close of the merger. As discussed below, policy reasons support a fact-specific determination regarding the scope of the transaction under *Mills*. The factual circumstances in the instant case support a conclusion at class certification that there are viable questions of law and fact about whether Plaintiffs' events in the DeRosa Event Study were directly caused by the full scope of the merger.

Plaintiffs argue a contract-based theory of transaction causation—that the merger is the operative transaction with a scope defined by the Merger Agreement, and shareholder approval of

47

the merger bound the companies and caused Hudson City shareholders injury when M&T experienced adverse events during the pendency of the merger.  *See* Pls.' Post-Arg. Reply 23 (D.I. 203) ("Here, the 'contract' arose when the Hudson stockholders voted to ratify the Merger Agreement, and thus bound themselves and the Company to the Merger described therein"). Under their theory, damages to shareholders who sold their shares prior to the completion of the merger through its closing are not ineligible under 14(a) under the circumstances of this case, because the merger would still be the cause of damages incurred through performance of the Merger Agreement prior to the close of the merger.  *See Id.* at 21 (D.I. 203).  Plaintiffs point out that there are circumstances under securities causes of action where courts have found transaction causation for purposes of damages when the transaction in question had not yet been consummated.  *Id.* at 20–21 (discussing the "aborted purchaser-seller doctrine").

Defendants argue that the close of the merger must be the operative transaction, consistent with the recent decision in *In re Pattern Energy Group, Inc.*, No. 20-275 (MN) (JLH), 2023 WL 2655537, at *4 (D. Del. Mar. 27, 2023).  Defs.' Sur-Reply at 2–4 (D.I. 209).  Defendants further take issue with Plaintiffs' assertion of the aborted purchaser-seller doctrine, arguing that it is a doctrine only applicable to statutory standing under 14(e) claims involving fraudulent tender offers.  *Id.* at 6.

Although there is no authority before the Court to support application of the aborted purchaser-seller doctrine to a 14(a) claim, Plaintiffs only asserted the doctrine as an example of courts considering damages under the Exchange Act where there is a contract for a transaction, but the transaction was never completed.  *See* Pls' Post-Arg. Reply at 20 (D.I. 203).

### 3.2.3.3 Pattern Energy Applied to Different Circumstances

Plaintiffs invite the Court to deviate from its fellow District of Delaware court in *Pattern Energy*, arguing that under the "atypical" circumstances presented here the merger could have directly caused the asserted injuries to shareholders who sold their shares prior to the close of the merger. *Id.* at 19–21. Plaintiffs are correct that their circumstances are distinguishable from those in *Pattern Energy* and that a bright-line rule against 14(a) damages caused prior to the close of a merger authorized through a misleading or omissive proxy statement violates Congressional intent.

Defendants argue that the reasoning and conclusion of the *Pattern Energy* court should apply here and that Plaintiffs' argument that this is an "atypical" case that should receive case-specific treatment on the question of transaction causation is incorrect. *See* Defs.' Post-Arg. Sur-Reply at 1–6 (D.I. 209). Defendants argue the conclusion from *Pattern Energy* that, for 14(a) claims involving mergers, alleged damages prior to the close of the merger fail to satisfy the transaction causation element and are unrecoverable because their damages "would not be the result of the [m]erger itself, which had yet to take place when the shares were sold." *Id.* at 2 (quoting *Pattern Energy*, 2023 WL 2655537, at *4). Plaintiffs argue that *Pattern Energy* is neither controlling nor persuasive because the facts of the instant case are distinguishable. *See* Pls.' Post-Arg. Reply 18–20 (D.I. 203). Plaintiffs argue that *Pattern Energy* is distinguishable because the merger in *Pattern Energy* closed within six days of the shareholder vote, as opposed to the two and a half years between Hudson City's shareholder vote and its merger with M&T, and there were no alleged events in the six-day pendency in *Pattern Energy* to cause any diminution of value for its shareholders, compared with the multiple events alleged by Plaintiffs here. *Id.* at 18–19. Plaintiffs suggest that if the *Pattern Energy* court had been presented with the facts in this case, it might have decided differently. *Id.* at 19.

As Defendants note, the *Pattern Energy* court found that one of the reasons the case failed the predominance analysis was that proving injury to shareholders who sold both before and after the close of the merger would have required different evidence for shareholders who sold before the close of the merger and those who held shares until close.   Defs.' Sur-Reply 2 (D.I. 209). Although such common evidence was not available in *Pattern Energy*, in the instant case Plaintiffs have produced evidence of damages common to shareholders who sold both before and after the close of the merger through the DeRosa Event Study.   While the *Pattern Energy* court independently found that shareholders who sold prior to the close of the merger could not have been injured as a matter of law, the commonality of evidence in the instant case is notable and gives weight to Plaintiffs' suggestion that the *Pattern Energy* court might have decided differently under the facts presented here.   Had the lack of common evidence not been dispositive and had a merger delay been a direct cause of the plaintiffs' injury, the *Pattern Energy* court would have had to analyze these circumstances, which may have altered its legal analysis.

Further, the *Pattern Energy* court grounded its legal analysis and conclusion in the requirement that the "transaction [be] the direct cause of the pecuniary injury for which recovery is sought."  *Pattern Energy*, 2023 WL 2655537, at *3–4 (quoting *Gen. Elec.*, 980 F.2d at 933). However, the *General Electric* court did not create did not create this rule to parse distinctions under 14(a) between the close of a merger and the overall merger process, but rather in light of the assertion of liability for damages caused by board mismanagement.  *General Electric*, 980 F.2d at 933 ("Yet the mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss.").   That the *Pattern Energy* court was not presented with any authority where a court had supported merger damages under 14(a) incurred prior to the close of

a merger, *see Pattern Energy*, 2023 WL 2655537, at *4, does not imply that there are no circumstances under which such damages would be viable.

The plaintiffs in *Pattern Energy* alleged damages under 14(a) related to proxy statement assertions that the merger "represented the best value and highest price reasonably available to shareholders," when the defendants had been aware of an offer from another bidder that offered a higher price and the other bidder "remained willing to engage on more favorable terms." *In re Pattern Energy Group Inc. Sec. Litig.*, 2022 WL 957761, *7 (March 20, 2022) (internal quotation marks omitted). Under such circumstances, it would be impossible to accrue damages prior to the close of the merger, as the difference in merger consideration between the proposed merger and the alternate offer would have been the source of damages. Further, the *Pattern Energy* plaintiffs did not allege damages from events during the pendency of their merger, and the merger closed within six days of the shareholder vote authorizing it. *See generally In re Pattern Energy Grp. Inc. Sec. Litig.*, 2022 WL 957761, at *4-6 (D. Del. March 30, 2022); Pls.' Post-Arg. Reply 18 (D.I. 203) (noting the shareholder vote on March 10, 2020 and the close of the merger on March 16, 2020).

In the instant case, however, Plaintiffs allege damages from reductions in share prices due to public disclosures about regulatory actions impacting M&T and creating greater risks that the merger might not close. These damages are asserted under a benefit-of-the-bargain theory, rather than one like that of *Pattern Energy* where damages were based in allegedly insufficient terms for the merger in question. Plaintiffs' damages each occurred from events prior to the close of the merger and over the course of a two-and-a-half year pendency of the merger, whether applied to shareholders who held through the close of the merger or to those who sold prior to the merger. The theories of liability and damages between the claims in *Pattern Energy* and the instant case

are therefore divergent.  In addition, it would be unfair and illogical to permit damages in the instant case from events for shareholders who held shares through the close of the merger, but to disallow the *same damages* from the *same events* as those who sold their shares after the disclosures but before the merger's close.

### 3.2.3.4 Policy Considerations Support Broad Availability of Damages Under 14(a)

Plaintiffs further argue that the policy implications of adopting a bright-line rule in accordance with *Pattern Energy*, disallowing all damages during the pendency of mergers, could significantly undermine the enforceability of Section 14(a) in situations where "a misleading proxy [] eviscerate[s] stockholder value, but . . . the merger never close[s] due to the merger partner's wrongdoing."  Pls' Post-Arg. Reply 19 (D.I. 203).  The Court is persuaded by this argument.  The Supreme Court has underscored that Congress could not have intended to "insulate from private redress an entire category of proxy violations" under Section 14(a).  *Mills*, 396 U.S. at 382.  Indeed, Congress intended Section 14(a) to enforce "fair corporate suffrage [as] an important right that should attach to every equity security bought on a public exchange," and "[t]he provision was intended to promote the 'free exercise of the voting rights of stockholders . . . .'"  *Id.* at 381 (quoting H.R. Rep. No. 73-1383, at 12–13 (1934), and citing *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964)).  In light of this policy consideration, the Court is not persuaded to adopt a bright-line rule that all damages prior to a merger's closing in 14(a) claims are precluded as a matter of law regardless of the circumstances.

### 3.2.3.5 The Factual Circumstances Surrounding the Meaning of "Transaction" for Purposes of Transaction Causation Support Class Certification

The Parties have not argued, and the Court cannot identify, binding authority defining the term "transaction" under the transaction causation element of 14(a) as a matter of law in *Mills*,

*General Electric*, or otherwise.  As such, defining the nature and scope of the transaction in a 14(a) case becomes a factual inquiry.  As the court in *Pattern Energy* discussed, the facts associated with Plaintiffs' alleged damages must be applied to the Third Circuit's requirement that the operative transaction must be the "direct cause of the pecuniary injury for which recovery is sought."  *Gen. Elec.*, 980 F.2d at 933; *see also Pattern Energy*, 2023 WL 2655537, at *3.

In this case, the Hudson City-M&T Joint Proxy Statement itself provides helpful factual guidance.  The Joint Proxy Statement provides a description of the transactions that encompassed the merger between M&T and Hudson City:

> Over the course of the weekend of August 25–26, M&T and its legal advisor and Hudson City and its legal and financial advisors engaged in negotiations of *the terms of the proposed transaction, including the form and mix of consideration, representation and warranties, covenants and closing conditions, among others*.

Pls.' Mot., Ex. 1 (Joint Proxy Statement) 80 (D.I. 136) (emphasis added).  This emphasized language suggests the merger "transaction" encompassed more than merely the close of the merger, but the entirety of the terms of the Merger Agreement.  *See Id.* at 158–220 (Merger Agreement) (D.I. 136).  On the other hand, the Joint Proxy Statement continues:

> . . . Hudson City's board of directors unanimously adopted and approved the merger agreement and the *transactions* contemplated thereby, and declared the *merger and other transactions* contemplated by the merger agreement to be advisable. The Hudson City board of directors then directed Messrs. Hermance and Salamone and Hudson City's advisors to finalize and execute a definitive merger agreement *on the terms reviewed at the board meeting*.

Pls.' Mot., Ex. 1 (Joint Proxy Statement) 80 (D.I. 136) (emphasis added).  The first emphasized language of "merger and other transactions" could be interpreted to distinguish the close of the merger from the other terms of the Merger Agreement that contemplate "other transactions" than the close of the merger, which would argue in favor of Defendants' interpretation of the close of the merger as the operative transaction.  However, the phrase could also be interpreted as referring

to the "merger" as the umbrella transaction, including sub-transactions encompassed in the four corners of the Merger Agreement, while "other transactions contemplated by the merger agreement" could refer to those transactions implied or required by law in furtherance of full performance of the Merger Agreement.  Under such an "umbrella transaction" interpretation, the sub-transactions could include, inter alia, execution of the Merger Agreement, issuance of the Joint Proxy Statement, the shareholder votes by Hudson City and M&T, and the merger's closing. Further, the board then directed execution of the full "merger agreement *on the terms reviewed at the board meeting*."  When reviewed using the initial references to the "proposed transaction" argument as encompassing all of the terms of the Merger Agreement, this final authorization of the entire Merger Agreement supports Plaintiffs' argument that the "merger" as transaction included the entire Merger Agreement, and not merely the close of the merger.   The Court will not determine the facts on the merits at the class certification stage, but this evidence is sufficient to conclude that a legitimate question of fact exists whether the "proposed transaction" encompassed merely the close of the merger or the entire terms of the Merger Agreement for purposes of transaction causation.

### 3.2.3.6 Whether the Merger Directly Caused Plaintiffs' Pecuniary Injury Is a Viable Question of Fact and Law Amenable to Common Proof

Plaintiffs must still satisfy the rule from *General Electric* that the merger directly caused the alleged damages for those who held shares through the close of the merger.  Plaintiffs have advanced three theories of damages for their putative class members: Trading Damages, Dividend Damages, and Closing Damages.  Pls.' Mot. 10, Ex. 35 (D.I. 136).

Addressing Dividend Damages, Defendants argue that Hudson City was under no obligation to issue dividends nor would their shareholders have expected any dividends after

August 2013, i.e., the original estimated closing date for the merger.  Defs.' Opp. 16 (D.I. 144);

Defs. Opp., Ex. 1 ¶ 40 (D.I. 147).

Courts have consistently found in Section 14(a) cases that injuries from future management decisions by board members were not directly caused by the shareholder votes and proxies that elected them. *Gen. Elec.*, 980 F.2d at 933 (where a director's subsequent mismanagement was the direct cause of the losses rather than the shareholder vote electing the director); *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 797 (11th Cir. 2010) (where a director's failure to follow company policies was the cause of injury rather than the director's election by shareholders); *In re Zagg Sec. Litig.*, No. 2:12-CV-852, 2014 WL 505152, at *7 (D. Utah Feb. 7, 2014) (where a director's investment decisions were the cause of the losses rather than the election of the director which was the object of the proxy at issue); *In re Danaher Corp. S'holder Derivative Litig.*, 549 F. Supp. 3d 59, 73 (D.D.C. 2021) (where the directors' failure to nominate diverse candidates for future board seats was not caused by the election of these directors).  In a 14(a) merger context, at least one district court has found that mismanagement by company directors and officers prior to issuance of the merger proxy solicitations was too attenuated to satisfy the direct causation requirement of *General Electric*.  *Gannon v. Cont'l Ins. Co.*, 920 F. Supp. 566, 573, 584 (D.N.J. 1996) (where the merger agreement's consideration for the merger and the proxy statement reflected the nature of the mismanagement).

Consistent with these decisions, the Court is persuaded that Dividend Damages could not have been directly caused by the merger so as to satisfy the rule in *General Electric*.  As asserted by Defendants, decisions about whether to issue dividends are typically discretionary and authorized by a company's board.  Plaintiffs have offered no evidence that continued issuance of dividends was part of the Merger Agreement, despite efforts to produce board minutes showing

how the Merger Agreement impacted board decision-making regarding dividends.  *See* Defs.'
Opp., Ex. 1 (Denis Report), ¶ 42, Ex. 28 (DeRosa Tr.) 134:23–144:13, 154:15–154:5 (D.I. 147);
*see also* Defs.' Mot. 18–19 (D.I. 146) (noting that Dr. DeRosa has been unable "identify the
particular minutes supporting a connection between the merger delay and Hudson City's dividend
cuts").  In fact, the very effort to produce such minutes actually supports an inference that the
issuance of Hudson City dividends was indeed a matter of board discretion, and thus could not
satisfy the direct causation requirement of *General Electric*.  Therefore, Dividend Damages as
alleged by Plaintiffs are too attenuated to satisfy the Third Circuit's rule in *General Electric* and
likely do not present a question of law common to the class.  However, the Court does not conclude
this as a matter of law on the merits at this stage, because class certification decisions must only
consider the merits to the extent necessary to address class certification questions.  *See Amgen*,
568 U.S. at 466.  If Dividend Damages were the only alleged damages, this could have been
grounds to deny class certification for a lack of viable question of fact and law regarding
transaction causation for Plaintiffs' damages theory.

Regarding Trading and Closing Damages, Plaintiffs' theories do present questions
common to the class.  Under Plaintiffs' theory of transaction causation, it was the shareholder
approval of the merger transaction in the form of the Merger Agreement that created a legal
expectation to the "benefit of the bargain," and Trading and Closing Damages when they did not
receive the full benefit due to the deficiencies in the Joint Proxy Statement.  Pls.' Opp. 6 (D.I.
158).

Plaintiffs have supported their theories of Trading and Closing Damages with evidence
from the DeRosa Event Study that shareholder approval of the merger caused shares of M&T and
Hudson City to trade in lock-step, and that events that diminished the value of M&T shares also

diminished the value of Hudson City shares. Pls.' Mot. 26–27, Ex. 35 (Keath/DeRosa Report) ¶¶ 126–37, 146 (D.I. 136). This evidence is common evidence for any putative class members who held shares during the events, and not just those who held shares through the close of the merger. Defendants have rebutted this evidence with the expert reports from Dr. Denis and Dr. Jiang, disputing that Plaintiffs' asserted damages were caused by the merger, that the events chosen by Dr. DeRosa were appropriate, and that merger arbitrageurs present in the putative class would have been injured. *See generally* Defs.' Opp., Ex. 1 (Denis Report) 20–33, Ex. 2 (Jiang Report) 22–32.

Regarding evidence of directness, attenuation, or intervening causes, the DeRosa Event Study is evidence that the value of Hudson City and M&T shares were linked once the merger was authorized by shareholders, and that subsequent public release of the omitted proxy information caused downdrafts in both M&T and Hudson City shares. Even though Defendants dispute this evidence with their own expert reports, this dispute presents questions of law and fact as to whether the shares were linked, whether the downdrafts in share price identified by Plaintiffs on the dates their Event Study identifies were attributable to the merger, and whether the connection to the merger was direct or indirect.

In sum, Plaintiffs have shown by a preponderance of evidence that the merger as umbrella transaction could have could have directly caused their alleged Trading and Closing Damages. Further, the Court does not discern, based on the pleadings at this stage, a basis for precluding these damages as a matter of law for failing to satisfy the transaction causation element for shareholders who sold their Hudson City shares prior to the close of the merger. Therefore, Plaintiffs' have satisfied the requirements of commonality and predominance under Rule 23 as to transaction causation based on their alleged Trading and Closing Damages, and the Court need not

find at this stage that Dividend Damages are unavailable to the putative class due to attenuation of causation.

At the class certification stage, the Court is persuaded that the preponderance of the Parties' competing evidence regarding Trading and Closing Damages presents a legitimate factual dispute regarding causation that is sufficient to demonstrate viable questions of law and fact regarding whether the merger was "the direct cause of the pecuniary injury for which recovery is sought" by shareholders who sold prior to the close of the merger.

### 3.3 Commonality and Predominance Conclusion

Upon review, the Court finds that Plaintiffs have demonstrated by a preponderance of evidence that viable questions of law and fact exist in common among Plaintiffs' putative class regarding each of the three elements of Plaintiffs' 14(a) claims, and that these questions predominate over questions affecting putative class members individually.

None of the foregoing analysis or conclusions should be interpreted as determinations on the merits as to questions of law or fact.  Merits determinations are not appropriate at the class certification stage.  *See Amgen*, 568 U.S. at 466–67.  The Court has discussed the merits only to the extent necessary to determine the scope of a certifiable class under the commonality and predominance requirements of Rule 23, which require determining for each element of the claim whether questions of law and fact are common to the class and predominate over questions impacting putative class members individually.  Questions of law can be decided on the merits at the summary judgment stage, and questions of law and fact can be decided at trial if the case reaches that stage.

## 4.  Typicality

Plaintiffs seek appointment of lead plaintiffs, the Belina Family and Mr. Krublit, as class representatives for the putative class.  Pls.' Mot. 12 (D.I. 136).  The Belina Family and Mr.

Krublit each held Hudson City shares as of the publication of the Joint Proxy Statement, and the Belina Family sold their shares during the pendency of the merger on May 7, 2015, while Mr. Krublit held his shares through the close of the merger.  Second Am. Compl. 11–12 (D.I. 72).

### 4.1 Legal Standard

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  According to the Third Circuit, assessing typicality includes three distinct, though related, concerns:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough Corp ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).  This is in the interest of ensuring "class members will be fairly and adequately protected in their absence."  *Id.* at 597 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997)).

Class representatives must be "sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation – so that certifying those individuals to represent the class will be fair to the rest of the proposed class."  *Id.*  This includes inquiring into not just the similarity of the legal theory and legal claims at issue, but the "similarity of the individual circumstances on which those theories and claims are based."  *Id.*  "Ensuring that absent class members will be fairly protected requires the claims and defenses of the representative to be sufficiently similar not just in terms of their legal form, but also in terms of their factual basis and support."  *Id.*  "Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of other class members will be fairly and adequately protected in their absence."  *Id.* at 598.

**4.2 Plaintiffs' Representatives' Claims Are Typical of Traditional Shareholders, But Not Typical of Merger Arbitrageurs**

Defendants argue that merger arbitrageurs are part of the putative class in potentially significant numbers (15–30%) and that their interests are divergent from traditional investors like the proposed class representatives.  Defs.' Opp. 28 (D.I. 144).  Defendants describe merger arbitrageurs as those investors who, after a merger is announced, "will take a long position in the target's stock and a short position in the acquirer's stock at a ratio equivalent to the share consideration offered in the underlying transaction," the target in this case being Hudson City and the acquirer M&T.  *Id.* at 18 (D.I. 144) (citing Ex. 2 (Jiang Report) ¶ 33 (D.I. 144)).[6]  Based on this definition, Defendants argue that "merger arbitrageurs could not be harmed by any purported omissions in the Joint Proxy because the potential profit from their investment strategy was depending on the merger-arbitrage spread and deal closure, rather than Hudson City's or M&T's stock performance."  *Id.*  Plaintiffs reply that Defendants "provide no actual evidence that arbitrageurs were unharmed or that Plaintiffs are atypical from them," and that arbitrageurs are routinely included in securities class actions.  Pls.' Reply 9 (D.I. 157) (citing *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 63 (D.N.H. 2019)).

The Court must consider whether merger arbitrageurs should be treated differently than traditional shareholders in securities class actions, as their investment activities objectives may not be typical of the broader class of traditional shareholders and may cause them to experience injury

---

[6]     Defendants' expert report by Dr. Jiang notes that Defendants' asserted definition of a combination of long positions in the target and short positions in the acquirer accounts for "just one approach that merger arbitrageurs use to mitigate market risk exposure resulting from the long position in the target stock."  Defs.' Opp., Ex. 2 (Jiang Report) ¶ 33 n.37.  Dr. Jiang elaborates that "[a]s an alternative strategy, merger arbitrageurs could try to hedge market risk by taking a long position in target stock along with a long position in put options on target stock or put options on a stock market index."  *Id.*

under 14(a) differently.  Plaintiffs cite *Levy* as collecting cases in support of their proposition that arbitrageurs are routinely included in class actions, but *Levy* and the cases it cites discuss whether arbitrageurs can be subject to the same presumption of reliance on market prices under a fraud-on-the-market theory of reliance in the context of a 10(b) claim.  *See Levy*, 448 F. Supp. 3d at 63; *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 676–77 (E.D. Pa. 2004).  However, liability in 14(a) claims does not require establishing fraud, and reliance on the proxy statements is established for 14(a) claims through the transaction causation element.  As such, Plaintiffs' assertion of *Levy* is inapposite.

There are other bases on which the interests of class representatives may be atypical from putative class members.  In considering typicality, courts must consider the factual circumstances of the case in addition to the specific legal claims or defenses.  *In re Schering*, 589 F.3d at 597. Here, the disparate factual circumstances of merger arbitrageurs compared with traditional shareholders are dispositive.

A number of courts have held that "arbitrageurs 'do not stand in the position of the public, unprofessional investor and, accordingly, the distinction between them and the public shareholder is rational, justified, and fair.'"  *Greenfield v. Flying Diamond Oil Corp.*, No. 78 Civ. 3723, 1981 WL 1621, at *6 (S.D.N.Y. Mar. 30, 1981) (quoting *Kaufman v. Lawrence*, No. 74 Civ. 5081 (RLC), 1977 U.S. Dist. LEXIS 13206, at *3–4 (S.D.N.Y. Oct. 31, 1977)) (citing *Zeidman v. J. Ray McDermott & Co.*, Civ. A. No. 77-2650 Section G, 1978 U.S. Dist. LEXIS 16920 (E.D. La. June 28, 1978); *Oscar Gruss & Son v. Geon Indus., Inc.*, 75 F.R.D. 531 (S.D.N.Y. 1977)).  The *Zeidman* court excluded the arbitrage community from the class because "[arbitrageurs'] sophistication, access to information and resources place them in an entirely different category than the named plaintiffs in this action."  *Zeidman*, 1978 U.S. Dist. LEXIS 16920, at *21.  In *Greenfield*, the court

certified a class including merger arbitrageurs because the defendants had not provided evidence that arbitrageurs in fact exist or that the alleged omissions would have been immaterial to arbitrageurs or affected them in a manner not common to the named plaintiff. *Greenfield*, 1981 WL 1621, at *7. In *Kaufman*, the court excluded merger arbitrageurs from a class settlement because the facts showed they had opposed the plaintiff's attempts to enjoin the merger, clearly showing the misrepresentations would not have deterred their investments. *Kaufman*, 1977 U.S. Dist. LEXIS 13206, at *13. In *Oscar Gruss*, a merger arbitrageur was the class representative, and during class certification the court narrowed the scope of the class to only those similarly situated to the arbitrageur with respect to third-party reliance and causation questions given the atypical nature of the arbitrageur's positionality with respect to the claimed securities violation. *Oscar Gruss*, 75 F.R.D. at 535.

In the instant case, Defendants have provided evidence in their expert report by Dr. Jiang that merger arbitrageurs could represent a significant fraction of the total putative class. Defs.' Opp., Ex. 2 (Jiang Report), 35–44 (D.I. 147). Dr. Jiang's report also provides significant evidence why merger arbitrageurs are positioned differently than traditional investors with respect to the materiality of the Joint Proxy Statement omissions and the nature of the damages they could have experienced from merger delays and share price fluctuations (i.e., losses from an increased arbitrage spread between Hudson City and M&T share prices). *Id.* at 14–30. This contradicts Plaintiffs' assertion that Defendants have provided no actual evidence that arbitrageurs were unharmed or that Plaintiffs are atypical from them. Pls.' Reply 9 (D.I. 157). In addition, Plaintiffs' own expert rebuttal by Mr. Keath describes two additional new theories of harm merger arbitrageurs could have experienced beyond those of traditional investors: arbitrageurs had to pay dividends on their short positions in M&T, and the merger delays lowered the return on an

arbitrageur's investment.  Pls.' Reply, Ex. 63 (Keath Rebuttal Report) 8–9 (D.I. 162).  Defendants have provided more evidence for the presence of merger arbitrageurs in the putative class than the *Greenfield* court had at its disposal when it allowed merger arbitrageurs to be included in the certified class due to a lack of evidence of their presence.  However, Defendants have produced less evidence of different interests between merger arbitrageurs and traditional shareholders than that presented in *Kaufman* or *Oscar Gruss* to support excluding merger arbitrageurs from the certified class.

Nevertheless, the circumstances in the instant case raise concerns about the level of similarity between the proposed class representatives and merger arbitrageurs.  With no binding precedent to clearly direct our analysis and varying district court analyses that fail to provide clear persuasive support, the Court must resort to first principles to resolve the question of whether typicality is satisfied.  Weighing the above evidence, the Court is concerned about the representatives' ability to fairly and adequately represent the interests of merger arbitrageurs in their absence.  The fact that on rebuttal Plaintiffs' own expert has suggested additional theories of harm for merger arbitrageurs that Plaintiffs have not asserted as theories of damages in this case suggests that the interests of merger arbitrageurs may not be adequately protected by the class representatives.  As the *Schering* court explained, complete factual similarity is not required, but there must be enough factual similarity to protect the interests of all those included in the putative class, in this case including some number of merger arbitrageurs.  *See* 589 F.3d at 597.  The factual differences between the class representatives and merger arbitrageurs already seem to have impacted the interests of merger arbitrageurs in the putative class through the lack of their representation in Plaintiffs' damages theories and damages model.  As a result, the Court finds the Belina Family and Mr. Krublit, as traditional shareholders, are not typical of merger arbitrageurs.

## 5.   Adequacy of Representation

### 5.1 Legal Standard

The adequacy requirement of Rule 23(a) requires that "the representative parties [in a class action] will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement has two components: (1) the experience and performance of class counsel, and (2) the interests and incentives of the representative plaintiffs.  *See Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citing *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005)).  "[A]dequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experience, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."  *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).

### 5.2 Adequacy of the Class Representatives

The concerns raised above regarding typicality of the proposed class representatives' claims and factual circumstances flow into the Court's concerns about adequacy of the proposed class representatives as well.  Briefly introducing Defendants concerns, they argue that (1) the Belina Family and Mr. Krublit all lack adequate knowledge of the case, Defs.' Opp. 25–28 (D.I. 144), (2) Mr. Krublit is inadequate as a class representative for his failure to preserve documents and inability to comply with discovery requests, *id.* at 24, and (3) Mr. Krublit is inadequate due to ethical concerns surrounding his recruitment to be a lead plaintiff in this matter by Mr. Kenneth A. Elan, *id.* at 23–24, (4) the proposed class representatives are unable to represent the interests of merger arbitrageurs as part of the putative class, *id.* at 28.  Plaintiffs argue that even if Mr. Elan did violate ethical rules, his conduct should not be imputed to either Mr. Krublit or Plaintiffs' current counsel.

First, regarding Plaintiffs' knowledge of the case, Defendants argue that Mr. Krublit had not read draft complaints or filings until recently before his deposition, was not aware of which aspects of the action were pending, had only spent approximately ten hours on the case between 2016 and 2021, and displayed flawed understanding at his deposition of the theory of damages for the case. *See* Defs.' Opp. 25–28 (D.I. 144); Defs.' Post-Arg. Resp. 35–36 (D.I. 199); Oral Arg., June 1, 2023, at 1:04:55–05:30. However, as Defendants admit, the knowledge threshold is low and the Court would be within its discretion on these facts to find that Mr. Krublit has adequate knowledge of the case to satisfy Rule 23(a). Oral Arg., June 1, 2023, at 1:05:30–40. Defendants also argue Mr. Krublit has failed to vigorously participate in the case, given he was at times difficult to reach by Mr. Elan. Defs.' Post-Arg. Resp. 36 (D.I. 199); Oral Arg., June 1, 2023, at 1:07:27–08:15.

Regarding knowledge, "[f]or a class representative to be adequate, it must have '[a] minimal degree of knowledge' about the case, . . . and have no conflict of interest with class counsel . . . [or] members of the class." *In re Suboxone (Buprenorphine Hydrochlorine and Naloxon) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (internal citations omitted). "The inquiry that a court should make regarding the adequacy of representation requisite of Rule 23(a)(4) is to determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) [hereinafter *In re Community Bank*], *as amended* (Oct. 20, 2010) (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988). "[C]lass members with divergent or conflicting interests [from the lead plaintiffs and class counsel] cannot be adequately represented

. . . ." *Id.* at 291–92 (quoting *In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 395 (3d Cir. 2004)).

Plaintiffs' class representatives have shown sufficient familiarity with the case. Delaware courts have held plaintiffs to a low standard in accordance with the "very minimal" standard of knowledge required by the Third Circuit. *See In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003); *In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Ret. Accts.) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 560 (D. Del. 1994) (citing *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982) (where class representation was adequate even when he "displayed a complete ignorance of the facts concerning the transaction he was challenging") (abrogated on other grounds in *Garber v. Lego*, 11 F.3d 1197, 1206–07 (3d Cir. 1993)), *cert. denied*, 459 U.S. 880 (1982)). Given the "complete ignorance" of the class representative in *Lewis*, the dispositive issues for adequacy are whether the class representatives' interests are aligned with the rest of the putative class and whether class counsel is qualified, experienced, and generally capable to conduct the proposed litigation, not whether the class representatives are sufficiently knowledgeable about the case. Therefore, Defendants' arguments regarding Plaintiffs' knowledge of the case are unavailing.

Regarding Defendant's concerns about Mr. Krublit being difficult to reach at times, the Court is unaware of Plaintiffs seeking extensions for filings or missing deadlines resulting from any communication difficulties with Mr. Krublit. Additionally, Mr. Krublit has sat for depositions in this matter, complied with discovery requests, and been generally active in the case since Plaintiffs' successful appeal to the Third Circuit. On these facts, the Court is not prepared to find Mr. Krublit inadequate due to difficulty contacting him in years past.

Second, regarding Defendants' argument that Mr. Krublit's failure to preserve emails should disqualify him from representing the class, Defendants assert that during discovery he was only able to produce requested account statements, and not emails, because he "[doesn't] really save them" and likely deleted emails between himself and his lawyers that contained "back and forth" communications concerning this case.  *See* Defs.' Opp. 24–25 (D.I. 144), Ex. 9 (Krublit Dep.) 18:10–13, 104–06 (D.I. 147); Defs.' Post-Arg. Resp. 35 (D.I. 199); Oral Arg., June 1, 2023, at 1:05:40–58.  Defendants say they know that there are missing records given that they have source records from Mr. Feinstein and Mr. Elan that touch on email records Mr. Krublit would have had, that these records from Mr. Feinstein and Mr. Elan do not match, and that Mr. Krublit's missing records would be necessary for a full picture.  Oral Arg., June 1, 2023, at 1:05:55–1:06:37.  Further, Defendants assert the gaps in the record could be critical to knowing "what [Mr. Krublit] was saying to whom, what he understood, whether he was solicited, whether there was a recommendation from [Mr.] Feinstein . . . has somewhat hampered our efforts to find the truth."  Oral Arg., June 1, 2023, at 1:06:37–52.  Missing communications records of Mr. Krublit could also shed light on other times Mr. Krublit was difficult to reach by Plaintiffs' counsel in this matter.  *See* Oral Arg., June 1, 2023, at 1:07:27–08:15.

As for Defendants' concerns about the preservation and production of records, the Court acknowledges the importance of preserving and producing records.  However, the Court finds Mr. Krublit's statements in his deposition generally credible regarding the issues of solicitation and recommendation (as discussed below where the Court addresses Defendants' arguments that ethical concerns are imputed to Mr. Krublit), and additional email records of Mr. Krublit would likely not implicate him directly in Mr. Elan's questionable ethical conduct.  The Court is also unpersuaded that the records Defendants would seek from Mr. Krublit have a material bearing on

the elements of Plaintiffs' 14(a) claims, being materiality, transaction causation, and loss causation. His account statements should suffice as proof of transaction and loss causation, and his records are irrelevant to the question of materiality of the omissive or misleading proxy statement information. There is no indication from the record currently before the Court that Mr. Krublit himself has a conflict of interest with the class. Therefore, the failure to preserve these records does not render Mr. Krublit unfit to represent the class when he has no conflict of interest with the class and has retained adequate counsel to represent the class's interests.

Third, regarding Defendants' ethical concerns surrounding Mr. Krublit's recruitment as a class representative, the ethical concerns stem from a $300 donation made by Mr. Kenneth A. Elan, the personal attorney of co-lead Plaintiff Mr. Krublit, to a community organization at the request of Mr. Krublit's investment broker. Defs.' Opp. 24 (D.I. 144). The donation was requested by the broker in exchange for the broker introducing Mr. Elan to Mr. Krublit at the complaint stage in this case and prior to Mr. Krublit securing Mr. Elan as his attorney. *Id.* Defendants initially did not point to any particular ethical provisions that this donation might have violated or rationale for why it would disqualify Mr. Krublit from serving as class representative, nor any implications for Mr. Elan. *See id.* They simply stated in a conclusory fashion after asserting the above facts that "[a]ccordingly, Mr. Krublit cannot serve as a class representative." *Id.*

At the request of the Court, the Parties undertook extensive additional discovery and supplemental briefing regarding these circumstances to address Mr. Elan's conduct in recruiting Mr. Krublit, whether this conduct violated the New York Rules of Professional Conduct that govern Mr. Elan as an attorney licensed in New York, and how the conduct impacts the adequacy of both Mr. Krublit as class representative and the proposed class counsel.

In this supplemental briefing, Defendants have presented evidence from their discovery process and analysis about the possibility of Mr. Elan's conduct violating Rules 7.2 and 7.3 of the New York Code of Professional Responsibility, without taking a position as to whether Mr. Elan's conduct did violate these rules.  *See* Defs.' Post-Arg. Resp. 2, 5–34 (D.I. 199).

The imputation of ethical concerns about improper solicitation of a class representative is a serious concern.  As a threshold question, the Court must first consider whether Mr. Elan's conduct was unethical.  Only after finding the ethical concern credible does the Court consider whether the ethical breach was imputed to Mr. Krublit.

### 5.2.1 Whether Mr. Elan's Conduct Was Unethical

Whether Mr. Elan's conduct violated professional rules is only a relevant issue before the Court insofar as it impacts the adequacy of class counsel and lead plaintiffs.

Mr. Krublit was recruited as a lead plaintiff in this matter by Mr. Elan in October 2015.  Through two affidavits and his deposition by Defendants, Mr. Elan detailed the events surrounding his recruitment of Mr. Krublit as a co-lead Plaintiff.  *Id.* at Ex. 1 (Elan Tr.), Ex. 9 (Elan Aff. I); Elan Aff. II (D.I. 212).  At the time, Mr. Elan was an attorney working with attorneys, Mr. Roy Jacobs and Ms. Deborah Gross, to recruit potential new lead plaintiffs for this case.  Defs.' Post-Arg. Opp. 9, Ex. 1 (Elan Tr.) 36:14–17 (D.I. 199).  Mr. Elan was introduced to Mr. Krublit through Mr. Krublit's financial advisor and broker, Mr. Geoff Feinstein of the Jeffrey Matthews Financial Group.  Defs.' Post-Arg. Opp. 8 (D.I. 199).  Mr. Elan came into contact with Mr. Feinstein after reaching out to his longtime contact, Mr. Gene Stice, who had previously introduced Mr. Elan to other financial brokers who then referred their clients to Mr. Elan for potential legal representation.  *Id.*  At the time, Mr. Stice worked as a compliance officer at Jeffrey Matthews Financial Group, and was a colleague of Mr. Feinstein.  *Id.*

Mr. Elan donated $300 to a charity of Mr. Feinstein's amidst Mr. Elan's efforts to secure

Mr. Krublit as a lead plaintiff through Mr. Feinstein, and the payment appears to have been a quid

pro quo in exchange for referring or recommending Mr. Elan to Mr. Krublit.[7]  Further, Mr. Elan's

---

[7]      Mr. Elan sent Mr. Feinstein an initial email on October 8, 2015, after Mr. Feinstein's colleague, Mr. Stice, had suggested Mr. Elan contact Mr. Feinstein about his clients with Hudson City stock. Defs.' Post-Arg. Resp. 9 (D.I. 199).  Mr. Feinstein did not respond to this email, and Mr. Elan sent a follow-up on October 9, 2015.  *Id.* at 10.  Mr. Feinstein then responded about 45 minutes later that he had spoken to his clients and that neither were interested in being lead plaintiffs.  *Id.*  Mr. Elan replied 15 minutes later with information about how strong the case was and how beneficial it would be for his clients to be "steering the ship instead of being below deck." *Id.* at 11.

Five days later, on October 14, 2015, Mr. Elan emailed Mr. Feinstein and Mr. Stice to offer a "presentation" about the strength of the case to Mr. Feinstein's clients.  *Id.* at 11–12.  Mr. Stice and Mr. Elan spoke on the phone shortly thereafter, and Mr. Elan offered to take Mr. Feinstein "out for a drink." *Id.* at 12.  Mr. Stice responded to Mr. Elan's earlier email about 25 minutes later that Mr. Feinstein "is very active with the JCC and in lieu of a 'drink' he would be happy to take a donation." *Id.* at Ex. 15, JM-108.  Mr. Elan emailed Mr. Stice a few minutes later, at 5:17 PM, and wrote, "You tell Geoff, all I need is a name and I will mail him a check." *Id.* at Ex. 15, JM-108.  Only after this donation offer by Mr. Elan did Mr. Feinstein then email Mr. Krublit for a second conversation about the Hudson City litigation, just a few minutes later at 5:30 PM.

After some further correspondence the following morning, on October 15, 2015, about the potential amount of damages, Mr. Feinstein emailed at 10:54 AM to provide Mr. Krublit's name and phone number to Mr. Elan and to tell him that Mr. Krublit would be available by phone until noon. *Id.* at Ex. 15, JM-113–15.  Mr. Elan then called Mr. Krublit, and sometime later that day after the phone conversation, Mr. Krublit agreed to retain Mr. Elan. *Id.* at Ex. 17 (Elan Aff.) ¶ 26. At 12:05 PM, just after providing Mr. Elan the contact information of Mr. Krublit, and only five minutes after Mr. Krublit was no longer available for a call, Mr. Feinstein emailed Mr. Elan a solicitation for a fundraiser at the Bridgewater JCC. *Id.* at Ex. 15, JM-118.

At 9:41 AM on October 16, 2015, Mr. Feinstein emailed Mr. Elan the financial statements of Mr. Krublit at Mr. Elan's request, and signed the email with "Let's make some $$$$$." *Id.* at Ex. 5, JM-117.  Mr. Feinstein doesn't remember what this referred to, but said it could have been the case against Hudson City or it "[c]ould be a fundraiser as well." *Id.* at Ex. 13 (Feinstein Tr.) 62:8–16.  At 11:39 AM later that morning, Mr. Elan emailed Mr. Feinstein to say "a check is in the mail to you at the office." *Id.* at Ex. 15, JM-118.

The sequence and timing of these communications demonstrate a series of transactional events between Mr. Elan and Mr. Feinstein, which strongly suggest a quid pro quo.  Mr. Feinstein first communicated a lack of interest by his clients.  Mr. Elan followed up days later with encouragement to reconsider, and offered Mr. Feinstein a drink.  Mr. Feinstein, through Mr. Stice, solicited the prospect of a donation.  Only after a positive response from Mr. Elan and request for "a name" did Mr. Feinstein provide Mr. Krublit's contact information.  Immediately after doing

attempts to explain away this appearance are not entirely credible.[8]  Even if the donation did not

represent a quid pro quo for recommending Mr. Elan, Mr. Elan and Plaintiffs have admitted it was

a "thank you," Defs. Post-Arg. Resp., Ex. 1 (Elan Tr.), 33:20–21, 34:5–7, 35:1–2, Ex. 9

---

so, Mr. Feinstein sent the formal solicitation of the donation to the Bridgewater JCC fundraiser. Finally, Mr. Elan sent the donation check a day later, only after securing Mr. Krublit as a client and receiving Mr. Krublit's financial statements confirming his ownership of Hudson City shares. This course of events was neither haphazard nor inconsequential.

[8]      Mr. Elan has denied that he waited until Mr. Krublit was going to be a class member before he sent his donation to Mr. Feinstein, and described his action of sending the check a day later as reasonably prompt and consistent with paying other expenses for the week on the last day of the week.  *See* Defs.' Post-Arg. Resp., Ex. 1 (Elan Tr.) 113:24–114:8.  He also has stated that he gives to a number of Jewish-affiliated charities because, "[m]y mother, rest in peace, was very involved for her entire adult life with Jewish organizations . . . this is my mom's memory and everything else." *Id.* at 115:8–15.

However, Mr. Elan's donation of $300 to the Bridgewater JCC also significantly exceeds the typical size of his charitable donations.  *See* Elan Aff. II (D.I. 212) (where his donations to other charities ranged from $100 to $200).  Three days after Mr. Elan sent the check, Mr. Feinstein emailed him to say "Thanks for the donation!!!!!! Greatly appreciated!!!" Defs.' Post-Arg. Resp., Ex. 3 (Elan Prod.) at 30.  This exclamatory response is a change in tone from Mr. Feinstein's brief responses to Mr. Elan's outreach prior to his promise of a donation and retention of Mr. Krublit, and appears highly consistent with how a recipient of an unexpectedly large donation would respond.  It appears that this was Mr. Elan's intended effect, and consistent with a desire to build a relationship with someone who could be a valuable source of referrals moving forward.  Mr. Elan's donation was in the context of an email from Mr. Feinstein that said, "Let's make some $$$$$," and where Mr. Feinstein does not recall the specific meaning of that statement, but has suggested that it "[c]ould be a fundraiser as well." *Id.* at Ex. 13 (Feinstein Tr.) 62:8–16.  Mr. Elan further continued to reach out to Mr. Feinstein about future litigation, and after one such outreach offered an encouraging, "you are still my 'go to guy.' Thanks for checking." *Id.* at Ex. 3 (Elan Prod.) 5.

This all suggests, if not a quid pro quo, a pattern intended to elicit reciprocity in referral of clients on an ongoing basis.  It is not the Court's place to adjudge the question, but this seems more than enough to raise the question of propriety under Rule 7.2 of the New York Rules of Professional Conduct.

(McDonough Aff.) ¶ 22, Ex. 17 (Elan Aff.) ¶ 3 (D.I. 200), which is prohibited under Rule 7.2 of the New York Rules of Professional Conduct.[9]

Mr. Elan retained counsel, Mr. Chris McDonough, to serve as an ethics expert on his behalf, who also filed an Affidavit and was deposed. Defs.' Post-Arg. Resp., Ex. 5 (McDonough Tr.), Ex. 9 (McDonough Aff.) (D.I. 200). Mr. McDonough stated his opinion that the evidence of Mr. Elan's donation and interactions with Mr. Feinstein in recruiting Mr. Krublit did not violate Rule 7.2 of New York or Delaware Rules of Professional Conduct, because they did not demonstrate a greater than nominal amount provided with intent to induce or reward a recommendation and undertaken in contemplation of that recommendation. *See* Defs. Post-Arg. Resp., Ex. 9 11 (D.I. 200). The Court does not find Mr. McDonough's expert testimony credible.[10]

---

[9]   "A lawyer shall not compensate *or give anything of value* to a person or organization to recommend or obtain employment by a client, *or as a reward* for having made a recommendation resulting in employment by a client . . . ." 22 NYCRR 1200.0, R. 7.2(a) (emphasis added). Here, that Mr. Elan donated to Mr. Feinstein's favorite charity instead of directly paying him would seem to be no defense, because the donation was something of value given to an organization of which Mr. Feinstein was a part as a member of the board of the JCC. Defs.' Post-Arg. Resp., Ex. 15 JM-118. Further, the Court construes this "thank you" gift as a "reward."

[10]   Mr. McDonough stated in his Affidavit that "I also base my opinion upon the facts as set forth in Mr. Elan's affidavit." Defs.' Post-Arg. Resp., Ex. 9 ¶ 5 (D.I. 200). In Mr. McDonough's deposition he testified that he could not recall if he had ever seen Mr. Elan's Affidavit when posed questions about Mr. Elan's experience as referenced in Mr. Elan's Affidavit. *Id.* at Ex. 5(McDonough Tr.) 65:14–20 ("Q: . . . Have you ever seen his affidavit before? A: I honestly don't recall. Q: So you may have written your affidavit on the 14th without having reviewed Mr. Elan's affidavit? A: I don't recall."). Mr. McDonough also stated he executed his own Affidavit two days prior to the execution of Elan's first Affidavit. *Id.* at Ex. 5 (McDonough Tr.) 66:12–21 ("Q: . . . Mr. Elan actually doesn't sign this until the 16th of January. . . . Which is two days after you signed your affidavit. A: Correct. Q: So you could not have seen the final when you signed your affidavit, right? A: Yes, correct."). Ultimately, Mr. McDonough could not confirm he had based his opinion on Mr. Elan's Affidavit, as he had sworn in his own Affidavit. *Id.* at Ex. 5 (McDonough Tr.) 67:5–11 ("Q: No. Let me ask you directly. Did you base your opinion on a draft of Mr. Elan's affidavit? A: I don't know whether my information came from Mr. Elan verbally or through his affidavit or through a writing. I just don't recall.").

Based on the above evidence, the Court finds that a reasonable person would find Mr. Elan's $300 donation as more than nominal under these circumstances, and that Mr. Elan himself thought of it as more than nominal as well, given his typical range of donations to charities. The Court also finds Mr. Elan intended to reward Mr. Feinstein for putting Mr. Elan in touch with Mr. Krublit and that the donation was undertaken in contemplation of that outreach, based on Mr. Elan's admission in his own affidavit, the email exchanges between Mr. Elan and Mr. Feinstein, and Mr. McDonough's statement that it was a thank you in his Affidavit. The Court would need more evidence before it to make a finding that Mr. Feinstein "recommended" Mr. Elan, and the legal distinctions between recommending, referring, or merely putting in contact have not been briefed before the Court. However, there are sufficient facts to raise the question of whether there

---

Mr. McDonough also failed to review whether Rule 7.3 was violated, despite his having access to the transcript of the Oral Argument held on December 15, 2022, where the Court stated its express wish that the Parties address Rule 7.3. *See id.* at Ex. 5 (McDonough Tr.) 62:20–63:15 ("Q: The Court says, 'And what's more sensitive to me is violations of the Rule of Professional Conduct, including Model Rule 7.2 and 7.3.' Do you see that? A: Yes. Q: But you, sir, did not cite 7.3 in your affidavit, correct? A: No, I didn't feel it was relevant. . . . Q: But you had access to this entire transcript, correct? A: Correct."). Mr. McDonough provided no substantive explanation why he did not address Rule 7.3 other than the conclusory statement he "didn't feel it was relevant" based on the scope of the inquiry "[a]s it has been explained to me" through some combination of speaking with Mr. Elan and Plaintiffs' lead counsel. *Id.* at 62:20–63:3 ("Q: So you disagree with the Court that it's relevant, sir? A: I'm not disagreeing with the Court. . . . Secondly, if you look at paragraph 5, I set out in the paragraph exactly what I was tasked to opine upon. And that's what I did."); *id.* at 79:22–80:12 ("Q: Let's go to paragraph 5 again. You've made it very clear to me that this is the paragraph that tells me what work -- what you thought the scope of your assignment was, correct? A: Correct. Q: And you say, 'As it has been explained to me.' Who explained it to you? A: I spoke to counsel, one of the attorneys, and I spoke to Mr. Elan as well as reviewing the transcripts. Q: And did the attorneys, Mr. Williams or Mr. Coren, approve this paragraph? . . . A: I don't believe so. I don't think I asked for their approval."). However, at Oral Argument on June 2, 2023, Plaintiffs' counsel stated he communicated the scope of the Court's concerns with Mr. McDonough and avoided further guidance of Mr. McDonough because Mr. Elan, and not Plaintiffs' counsel, had retained Mr. McDonough. Oral Arg., June 1, 2023, at 11:30–14:05. Based on this sequence, the Court doubts the credibility of Mr. McDonough's specific testimony in this case, and rejects his qualification as an ethics expert.

was an impermissible "recommendation" by Mr. Feinstein under the New York Rules of Professional Conduct.  Therefore, there is a live question of an ethical violation by Mr. Elan that could color the adequacy of Mr. Krublit, and the Court now turns to that inquiry.

### 5.2.2 Mr. Krublit's Adequacy As Class Representative Is Not Compromised By The Circumstances Of His Recruitment

The Court is unaware of any binding precedent in the Third Circuit regarding a standard for Rule 23(a)(4) adequacy of class representatives who were improperly solicited.  However, courts have nearly universally found class representatives adequate at class certification when the class representatives themselves played no part in the misconduct.  *See, e.g., Korn v. Franchard Corp.*, 456 F.2d 1206, 1211–12 (2d Cir. 1972) (finding putative class representative adequate because she had not engaged in unethical behavior and counsel who had committed misconduct had been removed from the case); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17cv2335, 2018 WL 6300479, at *7 (S.D. Cal. Nov. 29, 2018) ("In a case where the plaintiff's counsel solicits professional employment for the purposes of filing a class action and violates the Rules of Professional Conduct, such violations do not make the plaintiff an inadequate class representative."); *Du Pont Glore Forgan, Inc. v. Am. Tel. & Tel. Co.*, 69 F.R.D. 481, 483–84 (S.D.N.Y. 1975) (finding plaintiffs were adequate to represent the class despite improper solicitation because they did not participate in any "improper conduct").

No one has introduced evidence that Mr. Krublit was aware of Mr. Elan's donation to his broker's community organization prior to being presented with emails at his deposition.  *See* Defs.' Opp., Ex. 9, 23–46 (D.I. 147).  Even if he had known about the donation, the adequacy question involves whether this compromises his "ability and [] incentive to vigorously represent the claims of the class," *In re Community Bank*, 795 F.3d at 393, or creates a "conflict of interest with . . . members of the class," *In re Suboxone*, 967 F.3d at 272.  During his deposition, Defendants

inquired as to what changed Mr. Krublit's mind to become interested in serving as lead plaintiff in the case around the time he was first contacted with Mr. Elan and whether he was offered anything in exchange for participating in the suit or serving as lead plaintiff.  Defs.' Opp., Ex. 9, 34 (D.I. 147).  Mr. Krublit responded that he was never offered anything of value.  *Id.*  He also described how he felt what Hudson City and M&T did was wrong and that they should be held responsible for it.  *Id.* at 29–30.  His broker also never tried to encourage him to join the lawsuit.  *Id.* at 44.

The Court finds the above statements by Mr. Krublit at his deposition credible.  Given this evidence, the Court has no basis to conclude that Mr. Krublit has divergent or conflicting interests with the putative class, or that he lacks sufficient resolve to vigorously litigate the case on behalf of the class.  Further, he did not participate in, have awareness of, or endorse Mr. Elan's $300 donation.  Because Mr. Krublit did not play any part in Mr. Elan's conduct, such conduct cannot be imputed to him for class certification purposes, and Mr. Krublit is not inadequate to serve as class representative.

### 5.3 Plaintiffs Are Inadequate to Represent Merger Arbitrageurs

Defendants' final argument is that the Belina Family and Mr. Krublit are inadequate to represent merger arbitrageurs because they are traditional shareholders and their interests are not aligned with those of merger arbitrageurs.  *See* Defs.' Opp. 28 (D.I. 144).  Defendants argue that merger arbitrageurs are sophisticated investors with very different investment strategies and would have been impacted differently than traditional shareholders by the factual circumstances of the case.  *See id.* at 18–19, 28; *see also supra* Section V.4.2 (for Defendants' definition of merger arbitrageurs).

The Court agrees with Defendants that there are serious adequacy concerns regarding the ability of the class representatives to represent the interests of merger arbitrageurs.  Plaintiffs have asserted theories of damages that are tailored to the factual circumstances of traditional investors

like themselves, but which fail to represent some of the key types or theories of damages a merger

arbitrageur would raise.  *See* Pls.' Reply, Ex. 63 8–9 (D.I. 162) (i.e., that arbitrageurs had to pay

dividends on their short positions in M&T, and that the merger delays lowered the return on an

arbitrageur's investment).  While Plaintiffs' Trading Damages model does represent losses from

arbitrage spread to a degree,[11] Dr. DeRosa admitted that merger arbitrageurs were not discussed

in the Keath/DeRosa Report.  Defs.' Opp., Ex. 28 68:11 (D.I. 147).  Plaintiffs' counsel also failed

to explore these relevant theories of merger arbitrageur damages with their experts and commission

an expert report that articulated a damages model capable of measuring the variety of damages

applicable to merger arbitrageurs.[12]

After evaluating the totality of these facts, not only is there a preponderance of evidence

that the class representatives might not adequately represent the interests of merger arbitrageurs as

the case proceeds, but they also have not done so thus far in the litigation of their claims.  Such

evidence is highly suggestive that the factual circumstances surrounding merger arbitrageurs are

so different from those of the class representatives as to render their interests in litigating the claims

substantially different.  The court in *Oscar Gruss* determined the factual circumstances of the

merger arbitrageurs in that case differed substantially enough from those of traditional investors

---

[11]     According to Defendants' expert, Dr. Jiang, arbitrage spread is the core mechanism for
damages for merger arbitrageurs.  *See* Defs.' Mot., Ex. 2 ¶¶ 53–57 (D.I. 147).  Dr. DeRosa
supported this analysis in his deposition, and noted that arbitrage spread is represented in his
calculation of Trading Damages.  Defs. Opp., Ex. 28 128–29 (D.I. 147); *see Keath/DeRosa Report*,
Pls.' Mot., Ex. 35 ¶¶ 132–33, 135–36 (D.I. 136) (stating trading damages are the sum of loss of
Hudson City share valuation and the arbitrage spread between Hudson City and M&T share
prices).

[12]     The Second Amended Complaint does not articulate these theories of damages, and
according to Dr. DeRosa in his deposition, he developed the structure and concepts of the damages
model in the Keath/DeRosa Report based on his reading of the Second Amended Complaint.  *See*
Defs.' Opp., Ex. 28 31, 44–45 (D.I. 147).

as to undermine their typicality and adequacy to litigate the case on behalf of a putative class of diverse investor types.  *Oscar Gruss*, 75 F.R.D. at 535.  Just as with *Oscar Gruss*, the Court here has serious concerns that the interests of the class representatives and merger arbitrageurs are too disparate based on their factual circumstances, and that the class representatives' representation of merger arbitrageurs has been inadequate thus far.  On this basis, the Court does not find the proposed class representatives are adequate to represent merger arbitrageurs, as Defendants have described them, within the putative class.

### 5.4 Adequacy of Class Counsel

Per Rule 23(c)(1)(B), an order granting class certification "must appoint class counsel under Rule 23(g)," not under Rule 23(a).  Fed. R. Civ. P. 23(c)(1)(B); *see also Sheinberg v. Sorenson*, 606 F.3d 130, 132 (3d Cir. 2010).  Plaintiffs' Motion for Class Certification makes no express request for appointment of class counsel, nor makes arguments that Plaintiffs' counsel satisfy the criteria of Rule 23(g).  However, Plaintiffs do argue in their Motion that class counsel is adequate under Rule 23(a) and provide evidence in support.  *See* Pls.' Mot. 20 (D.I. 136).

Plaintiffs' counsel stated at Oral Argument on June 1, 2023, that they had already been appointed as class counsel by the Court under a prior judge.  Oral Arg., June 1, 2023, at 30:40–31:10.  However, Judge Andrews had appointed Plaintiffs' counsel on January 8, 2016, pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B).  Satisfying Rule 23(g) is a separate requirement from that of appointment of lead counsel under the provisions of the PSLRA.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 265 (3d Cir. 2001).

Prior to a telephonic conference on July 5, 2023, to discuss the Rule 23(g) issue, Plaintiffs filed a Motion for Leave to File Supplemental Declarations and Memorandum in Support of the Appointment of Lead Counsel and Delaware Counsel Under Federal Rule of Civil Procedure

23(g).  Pls.' Mot. (D.I. 215).  The Court granted this Motion subsequent to the July 5, 2023, telephonic conference, having heard no objection from Defendants.  (D.I. 217).

Plaintiffs propose Steven M. Coren ("Coren") and Coren & Ress, P.C. ("CorenRess") as Lead Counsel for the Class, and Francis J. Murphy ("Murphy") and Murphy & Landon, P.A. ("MurphyLandon") as Delaware Counsel for the Class, (collectively, "Proposed Class Counsel"), pursuant to Federal Rule of Civil Procedure 23(g).  Pls.' Supp. Mem. 1 (D.I. 215).

Rule 23(g) requires courts to consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).  However, courts "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  Courts also have significant discretion in determining adequacy of class counsel, as "no clearly defined standard exists to determine whether class counsel is qualified to represent the putative class."  *Walter v. Palisades Collection, LLC*, Civ. A. No. 06-378, 2010 WL 308978, at *9 (E.D. Pa. Jan. 26, 2010).

Plaintiffs have supported their Proposed Class Counsel with evidence of the work they have undertaken thus far in litigating this case, Pls.' Supp. Mem. 3–4 (D.I. 215), their experience in complex litigation, *id.* at 5–6, their knowledge of the applicable securities and class action law, *id.* at 7, and their ability to commit the necessary resources to represent the class, *id.* at 7–8.

Defendants do not dispute these assertions by Plaintiffs.  However, Defendants argue that Proposed Class Counsel may have been "infected" by the ethical concerns surrounding Mr. Elan's recruitment of Mr. Krublit as class representative, as Mr. Elan was working with former counsel

for Plaintiffs to recruit additional plaintiffs to this case at the time and remains in communication with Proposed Class Counsel and the case to this day.  Defs.' Post-Arg. Resp. 25 n.15 (D.I. 199).

Regarding the impact of the ethical concerns surrounding Mr. Krublit's recruitment and the imputation of any misconduct to current Plaintiffs' counsel, the Court looks to other jurisdictions for persuasive guidance given the lack of binding precedent.  The Seventh Circuit applies a standard where counsel is deemed inadequate if their misconduct creates a conflict of interest that "creates a serious doubt that counsel will represent the class loyally."  *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 495 (7th Cir. 2013) (citing *Creative Montessori Learning Ctrs. v. Ashford Gear LLC* , 662 F.3d 913, 918–19 (7th Cir. 2011) [hereinafter *Ashford II*).  Adding to its prior "serious doubt" standard, the *Reliable* court noted that "even 'serious' or 'major' ethical violations—not prejudicial to the class—can require denial of class certification," but "'slight' or 'harmless' breach[es] of ethics will not impugn the adequacy of class counsel." *Reliable*, 704 F.3d at 499 (citing *Ashford II*, 662 F.3d at 919).  This is to avoid the risk that opposing parties could use ethics rules as "procedural weapons."  *Id.*

Reviewing the Seventh Circuit's standard in light of Rule 23(g)'s criteria, the dispositive questions for adequacy of counsel for class certification are whether the concerns raise 1) questions around counsel's knowledge, experience, general ability to conduct the litigation, and efforts expended thus far in the litigation; 2) "serious doubts" as to the alignment of interests between class counsel and Plaintiffs; or 3) concerns that counsel committed a "serious ethical violation." *See* Fed. R. Civ. P. 23(g)(1)(A); *Reliable*, 704 F.3d at 495; *see also Wetzel*, 508 F.2d at 247 (describing the pre-23(g) criteria as "counsel's qualifications, experience, or general ability to conduct the litigation," which are very similar to the 23(g) criteria).  Ethics concerns about conduct of counsel that do not speak to these criteria are better addressed through state bar disciplinary

proceedings than through denial of class certification. *See Reliable*, 704 F.3d at 502. Further, counsel that have not committed misconduct may be permitted to proceed in the case even where associated counsel has committed an ethical breach, particularly where the associated counsel had only a "peripheral" role in the litigation. *See Akerly v. Red Barn Sys., Inc.*, 551 F.2d 539, 543–44 (3d Cir. 1977) ("This Court is urged to adopt a per se rule that if one co-counsel is disqualified for ethical reasons, all co-counsel must be barred from representation. We decline to follow such a path [and instead employ] a careful sifting of all of the facts and circumstances."); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238–39 (9th Cir. 1998) ("[T]he addition of new and impartial counsel can cure a conflict of interest even where previous counsel continues to be involved in the case.").

Mr. Elan is not listed as counsel before the Court in this lawsuit. Defendants argue that despite not being admitted as counsel in the action, Mr. Elan has been actively involved in the action in a way that compromises the proceedings, including being on the signature block of the original Complaint, appearing to represent Mr. Krublit at Mr. Krublit's deposition, and being included on an extensive number of communications related to the case throughout 2021 and 2022. Oral Arg., June 1, 2023, at 48:05–55:20. However, Plaintiffs counter that Mr. Elan was only on the signature block of Complaints in the case because every attorney involved in identifying clients and developing the Complaints were also listed. *Id.* at 55:26–56:50. Plaintiffs' counsel have explained that Mr. Elan has not been involved in the action since these early activities, nor since Mr. Coren has been involved in the case, *id.*, and that Mr. Elan has been included on communications throughout since 2021 only to the extent necessary as Mr. Krublit's personal counsel to keep Mr. Elan informed and included in activities like depositions and mediations, and to organize responses by Mr. Elan to the Court's requests for supplemental briefing. *Id.* at 56:56–

1:00:36.  The Court is persuaded by Plaintiffs' explanations on this front, and Mr. Elan's conduct is therefore not imputed to Plaintiffs' counsel given his peripheral ongoing participation in the case.

There is no evidence in the record that Mr. Coren or Mr. Murphy, or other currently named counsel for Plaintiffs, were implicated in Mr. Elan's pay-for-referral conduct, nor that Mr. Elan is playing a role in the litigation of the case.  Absent such evidence, the Court has no concerns that proposed class counsel committed any ethical breach nor any "serious doubt" as to a conflict of interest between class counsel and members of the class.

Regarding the remaining criteria of Rule 23(g), Plaintiffs' counsel and their firms are qualified and capable of conducting the litigation.  They have dutifully represented Plaintiffs in this action since 2015, including multiple motions to dismiss and appeals to the Third Circuit, and continuing with extensive discovery, motions, and briefings for their Motion for Class Certification.  Pls.' Supp. Mem. 3–4 (D.I. 215).  By their own account, they have expended well over 2,900 hours in all of these activities, in addition to incurring expenses for expert reports and declarations.  *See* Pls.' Mot. 20 (D.I. 136).  Proposed Class Counsel are generally experienced in complex litigation and securities and class action law.  *Id.* at 5–7.  In all of their conduct before the Court, they have submitted briefs and supporting evidence with competent arguments and presentation of the law and have acted with highly ethical and lawyerly dedication to professionalism.  Accordingly, the Court finds Proposed Class Counsel adequate under the criteria of Section 23(g) and appoints them as Lead Counsel and Delaware Counsel for the Class, respectively.

**6.   Ascertainability, Class Definition, and "Fail-Safe" Language**

The Third Circuit requires that, "in a class action under Rule 23(b)(3), 'class members must be currently and readily ascertainable based on objective criteria.'"  *In re Niaspan*, 67 F.4th 118,

130 (3d Cir. 2023) (quoting *Hargrove*, 974 F.3d at 477).  To satisfy this requirement, "[p]laintiffs must show that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Id.*  "Fail safe" language in a class definition (i.e., language that requires findings of fact to ascertain class membership) is reviewed skeptically by the Third Circuit, is outright rejected by the Seventh and Sixth Circuits, and the Fifth and Ninth Circuits have declined to reject the approach outright.  *Byrd*, 784 F.3d at 167 (3d Cir. 2015) (discussing fail-safe language negatively); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012) (rejecting fail-safe language); *Doe v. Trinity Logistics, Inc.*, No. CV 17-53-RGA-MPT, 2018 WL 1610514, at *10–11 (D. Del. Apr. 3, 2018), *report and recommendation adopted,* No. CV 17-053-RGA, 2018 WL 2684109 (D. Del. June 5, 2018).  The Third Circuit has also commented that "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593 (3d Cir. 2012), *see also Byrd*, 784 F.3d at 163–65 (3d Cir. 2015) (discussing *Marcus*).

Plaintiffs seek to certify a class with the following definition:

> [A]ll persons or entities who were Hudson City shareholders and were entitled to vote on the Merger pursuant to the Joint Proxy dated February 22, 2013, *and who suffered damages as a result* ("Class").

> Excluded from the Class are: (i) the defendants; (ii) members of the family of any defendant; (iii) any firm, trust corporation, officer, or other entity in which any defendant has a controlling interest; and (iv) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

Pls. Mot. at 12–13 (D.I. 136) (emphasis added).

Plaintiffs assert that "identities of members of the Class (*i.e.*, Hudson shareholders entitled to vote) can feasibly be ascertained by way of historical trading records."  Pls.' Mot. at 13 (D.I. 136).  Stock and brokerage account records are objective criteria and are readily available to easily

show whether or not an individual held Hudson City shares as of the close of the market on February 20, 2013.  However, whether an individual "suffered damages as a result" of the Joint Proxy Statement is "fail-safe" language that would require a finding on the merits in order to ascertain the membership of the class.  This fail-safe language would require individualized fact-finding which the Third Circuit has disallowed in *Marcus* and *Byrd* as part of class definitions.  *See Marcus*, 687 F.3d at 593.  Therefore, the putative class is unascertainable as defined by Plaintiffs.

The Court hereby acts on its discretionary authority to sua sponte tailor the class definition to meet the required legal standard, and will only certify the class after excising the above fail-safe clause (see italicized clause above).  However, simply deleting the fail-safe clause in the class definition leads to additional questions of overbreadth regarding merger arbitrageurs.  Defs.' Opp. at 30 (D.I. 144).  If the fail-safe clause were permissible, Defendants' arguments that merger arbitrageurs were not injured under Plaintiffs' damages theories would moot Defendants' arguments that the proposed class representatives are inadequate to represent merger arbitrageurs. Because the fail-safe clause is impermissible and must be excluded, the resulting amended definition with the phrase excluded will include merger arbitrageurs, and thus trigger the Court's concerns about the atypicality and inadequacy of the proposed class representatives regarding merger arbitrageurs, as discussed above.  Therefore, the Court must also exercise its discretion to tailor the class definition to exclude merger arbitrageurs.

Even though the Court is convinced that *some* merger arbitrageurs must be excluded from the class, this poses the challenge of crafting a precise definition of merger arbitrageurs to use in the class definition to exclude merger arbitrageurs from the class.  Plaintiffs have not proposed class definition language to exclude merger arbitrageurs because they have argued that merger

arbitrageurs should not be excluded from the class. At the same time, Defendants have offered conflicting statements about how to define merger arbitrageurs, and the Court recognizes that there may be a variety of merger arbitrage investment strategies. *See supra* n.6; Defs.' Opp., Ex. 2 (Jiang Report) ¶ 33 n.37 ("Taking a short position in the acquiror's stock is just one approach that merger arbitrageurs use to mitigate market risk exposure resulting from the long position in the target stock. . . . [Alternatively], merger arbitrateurs could try to hedge market risk by taking a long position in target stock along with a long position in put options on target stock or put options on a stock market index.").

While the Court has discretion to redefine the class at any point prior to final judgment, Fed. R. Civ. P. 23(C), an order certifying the class must also define the class, Fed. R. Civ. P. 23(c)(1)(B). The Parties have not briefed proposed definitions of merger arbitrageurs to use within the class definition for excluding merger arbitrageurs from the class. The Court is not willing to sua sponte tailor the class definition to exclude merger arbitrageurs absent briefing on this issue, and instead will first hear from the Parties about a suitable proposed class definition that does so. Therefore, the Court declines to certify the class at this time, and will do so after a determination as to a class definition that excludes merger arbitrageurs as Defendants have argued and that meets the requirement that the class be "defined with reference to objective criteria" and that class members be identifiable through "a reliable and administratively feasible mechanism." *In re Niaspan*, 67 F.4th at 130.

## VI.    <u>CONCLUSION</u>

As the above analysis has explained, the Court finds that for purposes of class certification theDeRosa Event Study portion of the Keath/DeRosa Report satisfies the *Daubert* standard. The Court further finds that Plaintiffs have met their burden in their Motion for Class Certification

regarding the elements of Rule 23(a) and (b)(3) for the putative class and proposed class representatives and class counsel, except that the class representatives are atypical of and inadequate to represent merger arbitrageurs, and merger arbitrageurs must therefore be excluded from the class.  Therefore, Defendants' Motion to Exclude is DENIED, and Plaintiffs' Motion for Class Certification is GRANTED IN PART as to satisfaction of the requirements of Rule 23(a) and (b)(3) for traditional shareholders of Hudson City, but Plaintiffs' Motion is DENIED IN PART with prejudice as to the inclusion of merger arbitrageurs in the class, as described by Defendants, and DENIED IN PART without prejudice as to Plaintiffs' proposed class definition and as to certification of the class.  The Court will approve a class definition and certify the class subsequent to a determination regarding an appropriate class definition that excludes merger arbitrageurs and satisfies the requirement of ascertainability of the class based on objective criteria and a reliable and administratively feasible mechanism.

Accordingly, pursuant to Rule 23 the Court hereby Orders that Mr. and Mrs. Belina, and Mr. Krublit, be and hereby are appointed as class representatives; that Mr. Coren and Coren & Ress, P.C. be and hereby are appointed as Lead Counsel for the Class; and that Mr. Murphy and Murphy & Landon, P.A. be and hereby are appointed as Delaware Counsel for the Class.

It is further Ordered that the following class definition,

All persons or entities who were Hudson City shareholders and were entitled to vote on the Merger pursuant to the Joint Proxy dated February 22, 2013 ("Class").

Excluded from the Class are: (i) the defendants; (ii) members of the family of any defendant; (iii) any firm, trust corporation, officer, or other entity in which any defendant has a controlling interest; (iv) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

will be further tailored prior to its approval and to certification of the class, subsequent to a determination as to language to effectively exclude merger arbitrageurs from the Class and satisfy the ascertainability requirement.

It is further Ordered that the Parties shall meet and confer and notify the Court within fifteen days of the issuance of this Opinion of an appropriate definition of merger arbitrageurs to use in the class definition to exclude merger arbitrageurs from the Class.  If the Parties cannot agree to such a definition, the Parties shall notify the Court and the Court will hold a telephonic conference to reach a determination as to the definition.

The Court reserves its discretion to further tailor the class definition and certify the Class after making the above determination, consistent with the analysis and reasoning herein regarding the requirements of Rule 23.

This Memorandum Opinion and Order resolves the Motion in docket entry 145 (Motion to Exclude), but not the Motion in docket entry 136 (Motion for Class Certification).


SO ORDERED