IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID JAROSLAWICZ, Individually and on behalf of all others similarly situated,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>M&T BANK CORPORATION, HUDSON CITY BANCORP INC., ROBERT G. WILMERS, RENE F. JONES, MARK J. CZARNECKI, BRENT D. BAIRD, ANGELA C. BONTEMPO, ROBERT T. BRADY, T. JEFFERSON CUNNINGHAM III, GARY N. GEISEL, JOHN D. HAWKE, JR., PATRICK W.E. HODGSON, RICHARD G. KING, JORGE G. PEREIRA, MELINDA R. RICH, ROBERT E. SADLER, JR., HERBERT L. WASHINGTON, DENIS J. SALAMONE, MICHAEL W. AZZARA, VICTORIA H. BRUNI, DONALD O. QUEST, JOSEPH G. SPONHOLZ, CORNELIUS E. GOLDING, WILLIAM G. BARDEL, and SCOTT A. BELAIR,<br><br>　　　　*Defendants*. | C.A. No. 15-00897-EJW |

**MEMORANDUM OPINION and ORDER**

Francis J. Murphy, Jr., Jonathan L. Parshall, Murphy, Spadaro & Landon, Wilmington, DE; Steven M. Coren, Benjamin M. Mather, Matthew R. Williams, Kauffman, Coren & Ress, P.C, Philadelphia, PA.

*Counsel for Plaintiffs.*

Brian M. Rostocki, Anne M. Steadman, Justin M. Forcier, Reed Smith LLP, Wilmington, DE; Jonathan K. Youngwood, Janet A. Gochman, Tyler A. Anger, Katherine A. Hardiman, Simpson, Thacher & Bartlett, New York, NY.

*Counsel for Defendants, M&T Bank Corporation, Brent D. Baird, Angela C. Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Mark J. Czarnecki, Gary N. Geisel, John D. Hawke, Jr., Patrick W.E. Hodgson, Rene F. Jones, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler Jr., Herbert L. Washington, and Robert G. Wilmers.*

Kevin R. Shannon, Daniel Rusk, Potter Anderson & Corroon LLP, Wilmington, DE; Tracy Richelle High, Scott A. Foltz, Sullivan & Cromwell LLP, New York, NY.

*Counsel for Defendants, Hudson City Bancorp Inc., Michael W. Azzara, William G. Bardel, Scott A. Belair, Victoria H. Bruni, Cornelius E. Golding, Donald O. Quest, Denis J. Salamone, and Joseph G. Sponholz.*

February 7, 2024
Wilmington, Delaware

**WALLACH, U.S. Senior Circuit Judge, sitting by designation:**

## CONTENTS

I.    Introduction ................................................................................................................ 4

II.   Background ................................................................................................................. 5

III.  Procedural History ................................................................................................... 10

IV.  The Motion to Exclude the Keath/DeRosa Report ................................................ 13

   1.   Legal Standard ..................................................................................................... 13

      1.1   The *Daubert* Standard ................................................................................. 15

   2.   Plaintiffs Have Met Their Burden to Demonstrate that the Keath/DeRosa Report Is Admissible Under FRE 702 and *Daubert* ................................................................ 17

     2.1 Mr. Keath and Dr. DeRosa are Qualified ...................................................... 17

     2.2 The Keath/DeRosa Report Fits Plaintiffs' Claim .......................................... 18

     2.3 Plaintiffs Need Only Demonstrate the Reliability of the DeRosa Event Study Within the Keath/DeRosa Report ..................................................................................... 20

     2.4 The DeRosa Event Study is Sufficiently Reliable ......................................... 23

   3.   The Keath/DeRosa Report is Admissible for Purposes of Class Certification ................. 25

V.   The Motion for Class Certification ........................................................................ 26

   1.   Legal Standard ..................................................................................................... 26

   2.   Commonality and Predominance ........................................................................ 27

     2.1 Legal Standard ............................................................................................... 28

     2.2 Plaintiffs Have Not Satisfied the Requirements of Commonality and Predominance. .. 32

       2.2.1 Element 1: Materiality ............................................................................. 33

       2.2.2 Element 2: Loss Causation ....................................................................... 35

       2.2.3 Element 3: Transaction Causation ........................................................... 53

     2.3 Conclusion ..................................................................................................... 65

   3.   Numerosity, Superiority, Typicality, Adequacy, and Ascertainability ............................. 66

     3.1 Whether Mr. Elan's Conduct was Unethical ................................................. 66

VI.  Conclusion .............................................................................................................. 72

# I.      INTRODUCTION

On August 28, 2023, the Court issued a Memorandum Opinion and Order resolving Plaintiffs' Motion for Class Certification ("Plaintiffs' Motion" or "Motion for Class Certification") and Defendants' Motion to Exclude ("Defendants' Motion" or "Motion to Exclude") the Expert Report and Opinions of M. Travis Keath and David DeRosa ("Keath/DeRosa Report" or "Report").  *Jaroslawicz v. M&T Bank Corp.*, C.A. No. 15-00897-EJW, 2023 WL 5528723 (Aug. 28, 2023).  On November 1, 2023, the Court issued an Order finding that it clearly erred in applying the Third Circuit's legal standard for commonality and predominance in its August 28, 2023 Opinion, and ordering that it would review and amend the August 28, 2023 Opinion consistent with the Third Circuit's legal standard.  *Jaroslawicz v. M&T Bank Corp.*, C.A. No. 15-00897-EJW, 2023 WL 7182117 (Nov. 1, 2023).  The Court's August 28, 2023 Memorandum Opinion and Order is hereby VACATED, and the present Memorandum Opinion and Order shall substitute as the entire Order addressing Defendants' Motion to Exclude and Plaintiffs' Motion for Class Certification.

These Motions come before the Court following from Plaintiffs' Second Amended Complaint as former shareholders of Hudson City Bancorp ("Hudson City" or "HCBK") alleging, inter alia, violations of provisions of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)" or "14(a)") by Defendants M&T Bank Corporation ("M&T") and Hudson City. Section 14(a) protects the public against injuries caused by the issuance of negligently misleading or omissive proxy statements.

Plaintiffs submitted the Keath/DeRosa Report in support of their Motion for Class Certification to provide evidence of damages experienced by the putative class.  Pls.' Mot., Ex. 35 (D.I. 136).  Defendants filed their Motion to Exclude the Report concurrently with their Opposition

to Class Certification, based on concerns about the methodologies used by both Mr. Keath and Dr. DeRosa.  *See* Defs.' Opp. (D.I. 144); Defs.' Mot. (D.I. 145, 146).  Given that the Keath/DeRosa Report is the only evidence put forward by Plaintiffs to support their alleged theories of damages, the Court must decide Defendants' Motion to Exclude prior to addressing Plaintiffs' Motion for Class Certification.  For the reasons that follow, Defendants' Motion to Exclude is DENIED, and Plaintiffs' Motion for Class Certification is also DENIED.

## II.   BACKGROUND

Plaintiffs' sole remaining claims are their two 14(a) claims against M&T and Hudson City, respectively.  The following summarizes Plaintiffs' alleged facts regarding these surviving claims.

On August 27, 2012, Hudson City and M&T entered into a Merger Agreement ("Merger Agreement"), whereby M&T would absorb Hudson City and Hudson City shareholders would receive a mixture of 40% cash and 60% M&T stock in exchange for their Hudson City stock. Second Am. Compl. ¶¶ 6, 58 (D. I. 72).  Hudson City was required to obtain shareholder approval before executing the Merger Agreement, and federal securities law requires each party to the merger to file proxy statements prior to any shareholder vote.  *Id.* ¶ 10.  Section 14(a) requires that proxy statements must not be materially misleading or omissive.  *Id.* ¶¶ 10, 75.  M&T and Hudson City opted to file a Joint Proxy Statement in support of their merger ("Joint Proxy Statement"), which was declared effective February 22, 2013, and announced a special meeting of Hudson City shareholders on April 18, 2013, to vote on the merger.  *Id.* ¶ 11.  The special meeting occurred on April 18, 2013, where Hudson City shareholders approved the merger.  *Id.* ¶¶ 6, 14–15.

The merger was originally expected to close in August of 2013.  *Id.* ¶¶ 4, 6.  However, the merger did not close until more than two years later, on November 1, 2015, with a total period of pendency of the merger of two-and-a-half years.  *Id.*  As detailed below, Plaintiffs allege that the

delay was caused by regulatory scrutiny over M&T's violations of Bank Secrecy Act/Anti Money Laundering ("BSA/AML") laws, that the regulatory risks were known at the time of the issuance of the Hudson City-M&T Joint Proxy Statement and were omitted, and that these omissions were material.

Federal law requires the Federal Reserve Board ("Federal Reserve") to approve bank mergers, and one criterion for such approval is the banks' effectiveness in combatting money laundering. *Id.* ¶ 68. Plaintiffs note that bank regulators had increased scrutiny industry-wide throughout 2012 regarding compliance with BSA/AML laws, which should have put M&T and Hudson City on notice of regulatory risks to merger approval. *Id.* ¶¶ 69–74. Prior to the Hudson City shareholder vote on April 18, 2013, in late 2012 or early 2013 the Federal Reserve reviewed M&T's BSA/AML compliance procedures, expressed concern about them, required remedial efforts, and advised the merger could not be approved as scheduled. *Id.* ¶¶ 86, 92. The Federal Reserve's concerns involved M&T bank accounts which were advertised as "free" to customers, but for which M&T subsequently charged customers fees without their consent. *Id.* ¶¶ 8, 77. On October 9, 2014, the Consumer Financial Protection Bureau ("CFPB") announced that it was also taking regulatory action against M&T for these same practices. *Id.* ¶ 110. The agencies eventually required M&T to remediate approximately 3.5 million of its consumer accounts. *Id.* ¶ 113. The Federal Reserve withheld approval of the merger until September 30, 2015, citing the BSA/AML and consumer protection violations as the reasons for the delay. *Id.* ¶ 9.

Between April 12, 2013, and September 30, 2015, both M&T and regulators made multiple public disclosures about increased regulatory scrutiny of M&T's BSA/AML and consumer protection violations and their effect on the merger. *Id.* ¶¶ 11–12, 15–20. Plaintiffs allege that Hudson City shareholders suffered injury when the value of M&T and Hudson City shares

declined in response to these public disclosures because they caused merger delays and decreased share prices. *Id.* ¶ 121. These impacts allegedly deprived Hudson City shareholders of the benefit of the bargain they would have otherwise received from the Merger Agreement, including damages from reduced prices for Hudson City shares sold prior to the merger close, reduced cash consideration and value of M&T shares received at the merger close, and reduced Hudson City dividends during the entire pendency of the merger. *Id.* ¶¶ 62, 120–21.

The putative class representatives, Mr. and Mrs. Belina ("Belina Family") and Mr. Krublit, represent putative class members with different postures and exposures to these alleged damages. Mr. Krublit held his Hudson City shares through the close of the merger, while the Belina Family sold their Hudson City shares on or about May 7, 2015, prior to the close of the merger, and thus were only exposed to the alleged damages that would have accrued as of the date of sale of their shares. Second Am. Compl. ¶ 26 (D.I. 72).

Plaintiffs allege that the Joint Proxy Statement was materially misleading and omissive in its representations about M&T's compliance with federal laws, including BSA/AML laws. *Id.* ¶¶ 79–83. These deficiencies included affirmative statements about M&T's compliance with the USA Patriot Act and omissions regarding known regulatory risks to M&T and to approval of the merger by regulators. *Id.*

Plaintiffs also allege that the regulatory risks to M&T were known or knowable by both M&T and Hudson City officers, that the above misleading Joint Proxy Statement was the proximate cause of the damages shareholders experienced, and that M&T and Hudson City therefore published a negligently materially misleading and omissive Joint Proxy Statement and should be liable to Plaintiffs for these damages under Section 14(a). *Id.* ¶¶ 3, 75–79, 92, 98, 118–21.

Plaintiffs' theory of injury and liability is that shareholders did not receive "the benefit for which they bargained when voting in favor of the Merger" when they "received tainted M&T shares" as a result of share price reductions when news of M&T's regulatory problems became publicly known and restrictions imposed by regulators to comply with federal law and as penalties for non-compliance.  Pls.' Mot. 10, 26–27 (D.I. 136).

Plaintiffs assert a combination of "Trading Damages," "Dividend Damages," and "Closing Damages" associated with this injury, based on their expert report by Mr. M. Travis Keath and Dr. David F. DeRosa (the "Keath/DeRosa Report" or "Report").  Pls.' Mot., Ex. 35 (D.I. 136).  Defendants' Motion to Exclude seeks to prevent admission of the Keath/DeRosa Report for class certification purposes.  *See generally* Defs.' Mot. (D.I. 146).  The Report is divided into two sections, a trading model written by Mr. Keath ("Keath Trading Model" or "Trading Model"), *see generally* Pls.' Mot., Ex. 35 12–23 (D.I. 136), and an event study written by Dr. DeRosa ("DeRosa Event Study" or "Event Study"), *see generally id.* at 24–35.  The Keath Trading Model is based on the application of a methodology attributed by Mr. Keath to an article published by Dr. Marcia Kramer Mayer in 2000 ("Mayer Study"), *id.* at ¶¶ 41–42, and purports to estimate the total number of Hudson City shares impacted by Plaintiffs' alleged damages on each day from the close of trading on February 20, 2013 (which Mr. Keath incorrectly states is the date of record of the special meeting of shareholders to approve the merger)[1] to October 30, 2015 (the last day of trading of Hudson City shares prior to the close of the merger), *see id.* at ¶¶ 35–36, 70, Appx. G–I.  The DeRosa Event Study uses what Dr. DeRosa asserts is a standard methodology that is a "workhorse of financial analysis" to "analyze the impact that M&T's serial disclosures had on [M&T] stock

---

[1]     The special shareholder meeting was held on April 18, 2013, while the Joint Proxy Statement was declared effective on February 22, 2013.  Pls.' Mot. at 2–3 (D.I. 136).

during the Measurement Period" and "demonstrates four instances[, i.e., 'events,'] where [M&T's] stock price declined significantly after M&T's negative disclosures and the drop can be explained by the market's incorporation of bad news specific to M&T." *Id.* at ¶¶ 72–81. The Event Study then estimates the per-share damages associated with each event based these stock price declines, presented as "trading damages" for those shareholders who sold their Hudson City shares prior to the close of the merger ("Trading Damages), *see id.* at 36–38, and "Closing Damages" for those shareholders who held their shares through the merger's close ("Closing Damages"), *see id.* at 40–42. The Event Study additionally estimates a separate type of damages unrelated to share price impacts from these four adverse events, that of "dividend damages." The Event Study estimates the dividend damages by comparing Hudson City's quarterly dividends distributed to shareholders from April 12, 2013 to August 10, 2015 with the typical quarterly dividend of $0.08 per share prior to this period ("Dividend Damages"). *See id.* at 38–40.

Defendants have rebutted the Keath/DeRosa Report with two expert reports by Dr. David J. Denis and Dr. Wei Jiang, and a Declaration by Dr. Marcia Kramer Mayer. Dr. Denis's report argues that the Event Study's Dividend Damages methodology is flawed and lacks a causal relationship between reduced dividends and the merger delay. *See* Defs.' Opp., Ex. 1, 20–21 (D.I. 147). Dr. Denis also criticizes the Event Study's methodology for choosing the dates of the events used to estimate Trading and Closing Damages. *See id.* at 24–30 (D.I. 147). Dr. Jiang's report critiques the Keath/DeRosa Report for failing to account for the presence of merger arbitrageurs in the putative class. Dr. Jiang provides one definition of merger arbitrageurs in stock-for-stock deals as purchasing shares (i.e., a long position) in the target company and simultaneously shorting a number of shares of the acquiror's stock according to the exchange ratio of stock in the merger consideration. Defs.' Opp., Ex. 2 ¶ 33 (D.I. 147). However, Dr. Jiang also notes that this definition

"is just one approach" that merger arbitrageurs might take, and provides examples of alternative strategies that merger arbitrageurs might employ to hedge the long position in the target company, such as taking "a long position in put options on target stock or on a stock market index." *Id.* at ¶ 33 n.37. Dr. Jiang asserts that merger arbitrageurs are fundamentally different from non-arbitrage investors and that merger arbitrageurs could not have been harmed under Plaintiffs' theories of damages. *See id.* at 22–35. Dr. Jiang further utilizes a methodology to estimate that merger arbitrageurs might make up as much as 15–30% of Hudson City shares on the record date. *See id.* at ¶¶ 66–79. Dr. Mayer's Declaration provides a variety of critiques of the Keath Trading Model and concludes that the Mayer Study's methodology has major limitations regarding its accuracy and reliability for the purposes of the Keath Trading Model, and that the Keath Trading Model made major implementation errors in applying the Mayer Study's methodology that further entirely undermine its reliability for Mr. Keath's purposes. *See generally* Defs.' Post-Arg. Resp., Ex. 25 (D.I. 200).

## III.   <u>PROCEDURAL HISTORY</u>

Plaintiffs' Motion for Class Certification and Defendants' Motion to Exclude the Keath/DeRosa Report reach the Court after an extended procedural history. Plaintiffs' initial Complaint was filed on October 7, 2015, D.I. 1, and was amended on February 19, 2016, D.I. 19. The Amended Complaint included four counts, one count against M&T and its directors and one count against Hudson City and its directors, each alleging violation of Section 14(a), one count against Defendants collectively alleging violation of Section 20(a) of the Securities Exchange Act, and one count against Hudson City's directors alleging breach of fiduciary duty. *Id.* at 47–51. Defendants filed a Motion to Dismiss the Amended Complaint on April 19, 2016, D.I. 61, and the Court granted the Motion on March 30, 2017, D.I. 70, with leave to amend the Section 14(a)

claims.  Plaintiffs filed a Second Amended Complaint on April 20, 2017, D.I. 72, and Defendants moved to dismiss the Second Amended Complaint on May 26, 2017, D.I. 75.  The Court granted the Motion to Dismiss the Second Amended Complaint on October 27, 2017, with leave to amend. D.I. 85.  Plaintiffs then provided notice of intent to stand upon their Second Amended Complaint and requested entry of judgment.  D.I. 86.  The Court dismissed the Complaint with prejudice on November 21, 2017.  D.I. 87.  Plaintiffs then appealed the Court's dismissal to the Third Circuit. D.I. 88.

The Third Circuit initially affirmed the Court's dismissal on December 26, 2018.  *See generally Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96 (3d Cir. 2018) [hereinafter *Jaroslawicz I*]. Plaintiffs then petitioned for re-hearing, and the Third Circuit granted the rehearing and vacated its initial opinion.  *See Jaroslawicz v. M&T Bank Corp.*, 925 F.3d 605, 606 (3d Cir. 2019).  Upon rehearing, the Third Circuit issued its final opinion on Plaintiffs' appeal on June 18, 2020, vacating the Court's dismissal as to Plaintiffs' Section 14(a) claims and remanding for further proceedings. *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 705, 717 (3d Cir. 2020) [hereinafter *Jaroslawicz II*].

Defendants answered the First and Second Amended Complaints on September 18, 2020. D.I. 102, 103.  After the initiation of discovery, but before its conclusion, Plaintiffs filed their Motion for Class Certification on April 13, 2022.  D.I. 136.  Defendants filed their Memorandum in Opposition to the Motion for Class Certification on June 8, 2022, along with Defendants' Motion to Exclude.  D.I. 144, 145, 146.  As of July 25, 2022, the Motion for Class Certification and Motion to Exclude were fully briefed.

On December 15, 2022, the Court held oral argument regarding the Motion for Class Certification and the Motion to Exclude.  During oral argument, the Court ordered supplemental

briefing by the parties on ethical issues identified in the briefing and at oral argument as well as on legal authority addressing questions involving the Motion to Exclude.  On January 17, 2023, Plaintiffs filed their Post-Argument Memorandum, D.I. 189, and after a status conference on January 19, 2023, Defendants filed their Memorandum in Opposition to Plaintiffs' Post-Argument Memorandum, D.I. 200, on April 3, 2023.  On April 17, 2023, Plaintiffs filed their Reply to Defendants' Memorandum in Opposition.  D.I. 203.  On June 1, 2023, the Court held oral argument regarding the Parties' supplemental briefing.  On June 28, 2023, Plaintiffs submitted their Motion for Leave to File Supplemental Declarations and Memorandum in Support of the Appointment of Lead Class Counsel and Delaware Counsel under F.R.C.P. 23(g).  D.I. 215.  On July 5, 2023, the Court held a telephonic conference and subsequently granted Plaintiffs' Motion for Leave to File on July 7, 2023.  D.I. 217.

On August 28, 2023, the Court issued a Memorandum Opinion and Order denying Defendants' Motion to Exclude and granting-in-part, denying-in-part Plaintiffs' Motion for Class Certification.  D.I. 218; *Jaroslawicz v. M&T Bank Corp.*, C.A. No. 15-00897-EJW, 2023 WL 5528723 (Aug. 28, 2023).  On September 12, 2023, Plaintiffs notified the Court by email that Defendants filed a Petition with the United States Court of Appeals for the Third Circuit seeking permission to appeal the Court's August 28, 2023 Opinion pursuant to Rule 23(f) of the Federal Rules of Civil Procedure and Rule 5 of the Federal Rules of Appellate Procedure.  On October 27, 2023, Plaintiffs filed a Letter notifying the Court that the Third Circuit denied Defendants' Petition.  D.I. 220; Order, *Jaroslawicz v. M&T Bank Corp.*, No. 23-8038 (3d Cir. Oct. 27, 2023), D.I. 15.  On November 1, 2023, having reviewed the Parties' briefs before the Third Circuit regarding Defendants' Petition, the Court issued an Order concluding that its August 28, 2023 Order had clearly erred in applying the Third Circuit's Rule 23 legal standard for commonality

and predominance as set forth in *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 318–320 (3d Cir. 2008), and ordering that it would review and amend its August 28, 2023 Opinion consistent with Third Circuit precedent.  D.I. 221; *Jaroslawicz v. M&T Bank Corp.*, C.A. No. 15-00897-EJW, 2023 WL 7182117 (Nov. 1, 2023).

## IV.   THE MOTION TO EXCLUDE THE KEATH/DEROSA REPORT

Defendants have moved to exclude the Keath/DeRosa Report.  The Report is Plaintiffs' asserted proof for both the fact of injury according to their theories of damages and a viable methodology for determining the amounts of damages class-wide.  Defendants seek to exclude the Report pursuant to Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), based on asserted methodological problems with the development of the Keath Trading Model and the DeRosa Event Study.  *See* Defs.' Mot. 1–3 (D.I. 146).

The Court denies the Motion because Plaintiffs have shown by a preponderance of evidence that the Keath/DeRosa Report satisfies the *Daubert* standard for admissibility for purposes of class certification.

### 1.  Legal Standard

The *Daubert* standard applies to expert testimony submitted at class certification when it is "critical to class certification."  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).  Class certification requires that Plaintiffs establish by a preponderance of evidence that the requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") have been met.  *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020).  This includes demonstrating that the predominance prong of Rule 23(b)(3) is satisfied, which requires that questions of law and fact common to the class predominate over issues impacting only individual class members.  To assess the predominance of questions of law and fact, courts must broach the

merits of the case, but only to the extent necessary to determine whether common questions predominate, not to resolve the merits of the questions. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Proof of a plaintiff's injury is one of the three elements of the Section 14(a) claim at issue in this case. *See Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992). Defendants assert that the Report is Plaintiffs' sole means of proving a class-wide methodology for measuring damages. Defs.' Mot. 5 (D.I. 146). Plaintiffs do not contest this assertion. *See generally* Pls.' Opp. (D.I. 158).

When injury is an element of the claim in question, "'the putative class must first demonstrate economic loss'—that is, the fact of damage—'on a common basis'" in order to survive the predominance inquiry. *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 306 (3d Cir. 2016) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 189 (3d Cir. 2001). Thus, in order for the Court to certify their class, Plaintiffs must show via a preponderance of evidence that the question of injury-in-fact exists on a class-wide basis, even though they are not yet required to prove the amounts of damages. As this court has noted before, "plaintiffs . . . need only show that a 'viable method' is available to prove damages on a class-wide basis." *In re Heckmann Corp. Sec. Litig.*, C.A. No. 10-378-LPS-MPT, 2013 WL 2456104, at *10 (D. Del. June 6, 2013) (citing *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at *9 (D.N.J. Jan. 25, 2011) (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002))).[2]

---

[2]     This recommendation by a magistrate judge was never adopted because the parties settled before it could be adopted. *See In re Heckmann*, Case No. 10-378 (D. Del. Mar. 24, 2014) (D.I. 293). The Parties each cite to this magistrate's recommendation, which while non-binding is persuasive.

The Keath/DeRosa Report is Plaintiffs' sole evidence for a viable class-wide method to determine the amount of damages, so absent the Report there would be no evidence to support a finding of class-wide injury-in-fact.  Therefore, the Report is critical to the class certification analysis and it must satisfy the *Daubert* standard before being cognizable by the Court in support of class certification.

Decisions about whether to exclude expert evidence by trial courts are discretionary.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).  Courts need not exclude the entirety of an expert's testimony or evidence simply because a portion fails to satisfy *Daubert*.  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) ("But when the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad.") (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 (11th Cir. 1998)).  Therefore, if a portion of the Keath/DeRosa Report is reliable under *Daubert*, it should not be excluded.

### 1.1 The *Daubert* Standard

Under *Daubert*, FRE 702 creates "a gatekeeping role for the [trial] judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The proponent of evidence from an expert bears the burden of demonstrating its admissibility by a preponderance of evidence.  *United States v. Schiff*, 538 F. Supp. 2d 818, 834 (D. N.J. 2008); *see Daubert*, 509 U.S. at 592 n.10.

Expert evidence is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)–(d).  Rule 702(a) requires that expert evidence "help[s] the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  As such, Rule 702 "embodies a trilogy of restrictions on

expert testimony: qualification, reliability and fit." *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).

To be qualified under *Daubert*, an expert must "possess specialized expertise." *Schneider*, 320 F.3d at 404. The Third Circuit construes this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *In re Paoli*, 35 F.3d at 741 (citation omitted).

For the evidence to "fit" the case under *Daubert*, the expert's evidence "must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404.

An expert's evidence is "reliable under Rule 702 if it is based on 'good grounds,' i.e., if it is based on the methods and procedures of science." *In re Paoli*, 35 F.3d at 744. The grounds must not be mere "subjective belief or speculation." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). However, the grounds also need not be "the best methodology or unassailable research. Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *Id.* at 665 (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Plaintiffs "do not have to demonstrate . . . that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re TMI Litig.*, 193 F.3d at 665 (quoting *In re Paoli*, 35 F.3d at 744). "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *In re Paoli*, 35 F.3d at 744–45. "Hearing the expert's testimony and assessing its flaws [can be] an important part of assessing what conclusion was correct and [a

16

judge] may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *Id.* at 745.

The Third Circuit requires courts to evaluate the reliability of expert testimony by considering eight factors, based on the Supreme Court's four *Daubert* factors and four additional factors the Third Circuit emphasized in *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985). *See In re Paoli*, 35 F.3d at 742.  These eight factors are:

> . . . (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8.  Ultimately the decision of whether to exclude expert evidence is at a court's discretion. *Id.* at 749.

**2. Plaintiffs Have Met Their Burden to Demonstrate that the Keath/DeRosa Report Is Admissible Under FRE 702 and *Daubert***

**2.1 Mr. Keath and Dr. DeRosa are Qualified**

Defendants do not dispute that Mr. Keath and Dr. DeRosa are qualified.  *See generally* Defs.' Mot. (D.I. 146).  Plaintiffs cite to the summaries of the qualifications of Mr. Keath and Dr. DeRosa found in their report.  Pls.' Opp. 4–5 (D.I. 158) (citing the Keath/DeRosa Report); Pls' Mot., Ex. 35, ¶¶ 19–22, ¶¶ 23–32 (D.I. 136).  The Court finds these summaries of qualifications sufficient to establish that Mr. Keath and Dr. DeRosa possess sufficient specialized expertise in the disciplines of trading models and event studies, respectively, to be qualified as experts under *Daubert*.

## 2.2 The Keath/DeRosa Report Fits Plaintiffs' Claim

Defendants argue Plaintiffs' damages model does not fit their 14(a) claim because out-of-pocket damages are the only viable theory of damages available under a 14(a) claim in the Third Circuit, but none of Plaintiffs' three asserted types of damages are grounded in this theory.  Defs.' Mot. 12–13 (D.I. 146); Defs.' Reply 8 (D.I. 169); *see also* Defs.' Opp. 12–14 (D.I. 144). Defendants make no argument that the Keath/DeRosa Report is not relevant to the theories of damages Plaintiffs' *have* asserted.

Defendants' arguments addressing a lack of alignment between Plaintiffs' asserted damages and those legally available to them in the Third Circuit are directed at issues in the pleadings or in the merits, and such issues must be raised and adjudged through different procedural mechanisms than through their Motion to Exclude.  Defendants' assertion that there is only one cognizable theory of damages in a 14(a) claim in the Third Circuit is further addressed below in deciding Plaintiffs' Motion for Class Certification, specifically in the context of commonality of the loss causation element of 14(a).

Plaintiffs argue that the Keath/DeRosa Report is relevant to their theories of injury and damages because the Report contains testimony about the methodology and computation of Plaintiffs' damages and demonstrates that damages are calculable on a class-wide basis. Pls.' Opp. 6–7 (D.I. 158).  Plaintiffs have asserted damages theories that require calculating how much Hudson City share prices declined after each of a series of discrete public disclosures (i.e., events) that eventually revealed the full extent of M&T's regulatory hazard.  *See* Pls.' Mot., Ex. 35 (Keath/DeRosa Report), ¶ 80 (D.I. 136).  The DeRosa Event Study portion of the Report purports to calculate the impact of these events while also accounting for market-wide movement in bank stock generally.  *Id*.

"An event study . . . 'is a statistical regression analysis that examines the effect of an event on a depend[e]nt variable, such as a corporation's stock price.'" *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010) (quoting *In re Apollo Group Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D. Ariz. 2007)).  Event studies are considered "almost obligatory" in circumstances where an expert must "isolate[e] stock declines associated with market-wide and industry-wide downturns from those specific to the company itself" by "consider[ing] firm-specific events that might have caused those declines." *In re DVI, Inc. Sec. Litig.*, Civ. A. No. 2:03-cv-05336, 2010 WL 3522090, at *13 (S.D.N.Y. Sept. 3, 2010) (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009); *see also In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d. 1005, 1014–15 (C.D. Cal. 2003) ("[A] number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.") (collecting cases).  Further, the Court notes that event studies are also a common and accepted methodology specifically in 14(a) securities cases for distinguishing the impact of firm-specific events from broader market events and trends.  *See In re Heckman Corp. Sec. Litig.*, 2013 WL 2456104, at *8; *Goldkrantz v. Griffin*, No. 97 CIV. 9075(DLC), 1999 WL 191540, at *4–5 (S.D.N.Y. Apr. 6, 1999); *In re Willis Towers Watson PLC Proxy Litig.*, No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582, at *2–3 (E.D. Va. Sept. 4, 2020) (finding the event-study sufficed to raise adequate class-wide questions for purposes of class certification, despite disputes over its merits).  Therefore, an event study is a reasonable choice of methodology under Plaintiffs' alleged theories of damages because it purports to examine the effect of the public disclosure events on Hudson City share prices while also accounting for market-wide downturns in bank stocks.

In weighing the above relevance of the Keath/DeRosa Report to the questions of law and fact at issue in this case, the Report is clearly relevant and "fits" the case. The Court's review of the Report confirms that it contains detailed descriptions of its methodologies and its results. It puts forward trading model and event study methodologies that seek to both demonstrate the fact of damages and compute estimates of damages for each of the three theories of damages alleged by Plaintiffs. These methodologies can be helpful to the trier of fact in making determinations about Plaintiffs' alleged damages, including answering questions about the weight the fact-finder will give to them in light of Defendants' concerns about how Mr. Keath and Dr. DeRosa implemented them. Therefore, the Keath/DeRosa Report satisfies the fitness requirement under *Daubert* because the methodologies are relevant to the case and will be helpful to the trier of fact.

### 2.3 Plaintiffs Need Only Demonstrate the Reliability of the DeRosa Event Study Within the Keath/DeRosa Report

Defendants argue against the admissibility of the Trading Model developed by Mr. Keath because it: 1) is based on a methodology published by Marcia Kramer Mayer in 2000 (the "Mayer Study") that Defendants consider antiquated, 2) does not properly follow the Mayer Study's recommendation to use company-specific data, and 3) does not incorporate merger arbitrageurs as a class of traders or compensate for their presence among shareholders of Hudson City. Defs.' Mot. 2, 8–11 (D.I. 146). In supplemental briefing, Defendants also rebutted the reliability of the Keath Trading Model with a Declaration by Marcia Kramer Mayer critically analyzing Mr. Keath's application of her original Multi-Sector Multi-Trader ("MSMT") model methodology. Defs.' Post-Arg. Resp. 40–42, Ex. 25 (D.I. 200).

Plaintiffs present five arguments in response. First, they argue that while the Keath Trading Model is based on a particular study, multi-trader models like the one used by Mr. Keath are commonly used to determine damages in securities class actions and have evolved through a

process of refinement, as evidenced by comparative studies.  Pls.' Reply, Ex. 63, 1–3 (D.I. 157).

Second, Plaintiffs argue that Mr. Keath used all the company-specific data that was publicly

available, and that he performed a sensitivity analysis to determine the Trading Model was not

sensitive to changes in model parameters reflecting data that was not company-specific.  Pls.' Opp.

9–10, 13 (D.I. 158) (citing Pls.' Mot., Ex. 35, ¶¶ 37, 43, 51–52, 61, 64–65 (D.I. 136); Pls.' Reply,

Ex. 63, ¶¶ 7–10, 12 (D.I. 157)).  Third, Plaintiffs assert that the Trading Model is not sensitive to

the presence of merger arbitrageurs, that an underestimation of the number of merger arbitrageurs

would actually result in an underestimation of Trading Damages rather than an overestimation,

and that Defendants' initial expert report is flawed in its definitions of merger arbitrageurs and its

methodology for estimating the proportion of Hudson City shareholders who were merger

arbitrageurs.  Pls.' Reply, Ex. 63 ¶¶ 12–14, 19–20 (D.I. 162).  Fourth, Plaintiffs argue that

Defendants' supplemental Declaration by Dr. Mayer is not properly before the Court because Dr.

Mayer was not noticed to Plaintiffs as a potential witness before the close of expert discovery

months prior to filing the supplemental Mayer Declaration.  Pls.' Post-Arg. Reply 11–14 (D.I.

203).  Finally, Plaintiffs argue that even if the Keath Trading Model fails to satisfy *Daubert*, this

is no reason to exclude the entire report because the DeRosa Event Study portion of the report is

sufficient to address their theories of damages on its own.

The Court finds the Keath Trading Model is unreliable for purposes of class certification.

Dr. Mayer's supplemental Declaration is properly before the Court despite Defendants' lack of

disclosure of her as a witness before the close of discovery, because the Declaration was offered

in rebuttal to Plaintiffs' own rebuttal report by Mr. Keath.  Further, Dr. Mayer's Declaration is

devastating to the credibility of Mr. Keath's application of Dr. Mayer's MSMT methodology to

traders of Hudson City shares.[3]  In light of the rebuttal Declaration by Dr. Mayer, the Court cannot find Mr. Keath's trading model reliable under *Daubert* for purposes of class certification.

However, the Court is persuaded by Plaintiffs' argument that the DeRosa Event Study portion of the Keath/DeRosa Report is sufficient on its own to satisfy *Daubert*, and that a determination that the Keath Trading Model is unreliable under *Daubert* does not require exclusion of the entire Report.

The Keath Trading Model portion of the Report only serves to provide estimates as to the number of shares impacted by various events during the pendency of the merger.  These estimates are only useful in the Report when combined with the Event Study's estimates of per-share damages to produce an aggregate estimate of the total combined damages to all putative class members for each of Plaintiffs' three damages theories.  However, Rule 23 does not require such an aggregate estimate.  The Third Circuit was clear in *Neale* that "individual damages calculations do not preclude class certification under Rule 23(b)(3) . . . ." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 42 (2013) (Ginsberg, J. & Breyer, J., dissenting) (citing William B. Rubenstein, 2 *Newberg on Class Actions*

---

[3]     Plaintiffs represent Mr. Keath's multi-trader model ("MTM") as an implementation of an MTM designed by Dr. Marcia Kramer Mayer in a report she published in 2000 that Plaintiffs assert is widely recognized by courts and reliable as a trading model.  Pls.' Mot., Ex. 35, ¶¶ 41–42 (D.I. 136); Pls.' Reply, Ex. 63, ¶ 1 (Keath/DeRosa Rebuttal Report), Ex. 66 (Mayer (2000) Article) (D.I. 157); Pls.' Opp., 8–9, 12 (D.I. 158).  Dr. Mayer's opinion of Mr. Keath's implementation of her MSMT methodology is therefore highly probative as to its credibility.  Dr. Mayer's analysis provides extensive evidence that Mr. Keath's implementation of the MSMT methodology was flawed in, inter alia, its assumptions of institutional trading, Defs.' Post-Arg. Resp., Ex. 25, 4–6 (D.I. 200), its application of pool parameters from the original Mayer (2000) article to the Hudson City/M&T circumstances, *id.* at 6–8, and in errors it commits in implementing the MSMT for unidentified investors, *id.* at 8–10.  Dr. Mayer also provides evidence that Mr. Keath incorrectly performed sensitivity analysis in varying parameters of the model for unidentified investors.  *Id.* at ¶¶ 29–30.  The Court finds these critiques of Mr. Keath's implementation of the Mayer MSMT methodology credible and persuasive.

§ 4:54 (5th ed. 2012))).  Also, "it is 'a misreading of *Comcast*' to interpret it as 'precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement.'"  *Id.* (quoting *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014)).

The DeRosa Event Study section is the exclusive source of the Report's methodology to estimate the *per-share* impacts from Plaintiffs' asserted Trading, Dividend, and Closing Damages, and these impacts are stated either in the body of the Report or in Appendix K.  *See* Pls.' Mot., Ex. 35 (Keath/DeRosa Report) ¶¶ 137, 146, Fig. 7–8, Appx. K (D.I. 136).  The charts in Appendix K can be used to calculate the asserted damages on an individualized per-share basis, based on the specific date when each individual share of HCBK was sold.  *Id.* at Appx. K.  Further, Dr. Mayer notes that "[s]ettlement plans of allocation in securities cases typically include a claims process, whereby investors submit documentation of actual holdings, purchases, and sales.  Settlements are not allocated based on the MSMT."  Defs.' Post-Arg. Opp., Ex. 25 ¶ 28 (D.I. 200).  Plaintiffs suggest the award of damages after trial would be distributed by a similar claims process.  *See* Pls.' Post-Arg. Reply 10 (D.I. 203).  As a result, the Keath Trading Model estimates are not necessary to calculate damages on an individualized basis across the class for any of Plaintiffs' three damages theories.  The DeRosa Event Study portion of the Keath/DeRosa Report is sufficient to satisfy Rule 23(b)(3)'s predominance inquiry as to damages, because it is sufficient on its own, without the Keath Trading Model estimates, to provide a basis for individualized calculation of damages on a class-wide basis.

### 2.4 The DeRosa Event Study is Sufficiently Reliable

Defendants argue against the admissibility of the DeRosa Event Study because it: 1) studies changes in M&T stock prices rather than Hudson City stock prices; 2) uses event dates that i) were cherry-picked based on the timing of significant "downdrafts" in the price of M&T stocks, ii)

occurred before the shareholder vote (April 13, 2013), iii) do not disaggregate merger news from other news or developments such as publication of earnings reports on the same dates (October 14, 2014 and April 5, 2015), and iv) occurred on the day after the relevant merger news release (October 1, 2015); and 3) does not factually support a causal connection between merger delays and the report's purported dividend damages. *See* Defs.' Mot. 13–20 (D.I. 146).

Plaintiffs counter each of these arguments. First, they argue that the Event Study provides sound reasons for studying M&T rather than Hudson City shares, including that M&T stock was easier to model because it had a bigger market with more shares and that Hudson City's share prices were highly correlated with M&T share prices after the merger was announced. Pls.' Opp. 15 (D.I. 158). Second, Plaintiffs state that the choice of event dates was based on first identifying statistically significant "downdrafts" in the stock price using an econometric regression analysis and only later cross-referencing those event dates with dates alleged in the Complaint. *Id.* at 16. Further, Plaintiffs argue that the issues Defendants raise regarding the selection of event dates are not appropriate at this stage of litigation, as they speak to the merits rather than the reliability of the Event Study methodology. *Id.* at 17–18. Finally, Plaintiffs argue that causation is a legal issue that Plaintiffs are not required to prove at the class certification stage. *Id.* at 19. They further argue that Defendants have attempted to establish a lack of causation with an expert report, and that it is inappropriate for such a report to assert legal conclusions. *Id.* at 19.

In evaluating the above arguments, the Court finds Dr. DeRosa has provided "good grounds" for his choice to evaluate M&T share prices instead of Hudson City share prices in the Event Study. Dr. DeRosa's justifications are credible and reasonable that the M&T shares provided a more robust market for the study of valuation trends and their share prices were strongly coupled to Hudson City share prices during the period in question. Dr. DeRosa also provided

"good grounds" for his choices of event dates in the Event Study. He stated he used an econometric regression analysis to identify event dates where "downdrafts" occurred in M&T stock throughout the pendency of the merger, while also compensating for market-wide trends in bank stocks. As discussed above regarding whether the Event Study fits the case, event studies of this type are "almost obligatory" in securities cases dealing with damages calculated based on share price reductions, so Dr. DeRosa's choice of conducting an event study involved the application of a reliable scientific method to the facts of this case. In addition, Dr. DeRosa has provided reasonable justifications for his particular applications of that general methodology. Consequently, Dr. DeRosa's choices were the product of reliable reasoning within the zone where experts might disagree, and questions about these choices can be resolved on the merits.

Again, the Court's role in a *Daubert* review is to determine whether the testimony is based on sufficient facts and data and on sound principles and methods, not to resolve whether its conclusions are correct. Fed. R. Evid. 702(b)–(d). Even if the conclusions are incorrect, "[a judge] may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *In re Paoli*, 35 F.3d at 745.

In sum, event studies are a generally accepted methodology for computing the value of stock price declines associated with adverse events, and Dr. DeRosa had "good grounds" for his choices in implementing his Event Study—the merits of which can be debated at a later stage. Therefore, the Court finds the DeRosa Event Study is reliable under *Daubert*.

## 3.  The Keath/DeRosa Report is Admissible for Purposes of Class Certification

As set forth above, Plaintiffs have shown by a preponderance of evidence that the Keath/DeRosa Report satisfies the *Daubert* standard for admissibility because Mr. Keath and Dr. DeRosa are qualified and the Event Study portion of the Report both fits the case and is reliable.

Therefore, the Court denies Defendants' Motion to Exclude the Keath/DeRosa Report for purposes of class certification.

## V.       THE MOTION FOR CLASS CERTIFICATION

Plaintiffs have filed their Motion for Class Certification under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  As the following analysis explains, the Court finds that Plaintiffs have not met their burden regarding the Rule 23 elements of commonality and predominance.  Accordingly, the Court declines to certify the class.

### 1.  Legal Standard

Rule 23 governs the requirements for class certification and requires plaintiffs to show that the class satisfies six elements: 1) numerosity, 2) commonality, 3) typicality, and 4) adequacy of representation, Fed. R. Civ. P. 23(a), 5) predominance of questions of law or fact common to class members over any questions affecting only individual members, and 6) superiority of a class action over other available methods for fairly and efficiently adjudicating the controversy, Fed. R. Civ. P. 23(b)(3).  In the Third Circuit, the class members must also be "currently and readily ascertainable based on objective criteria" and a court should not need to resort to "mini trials" in order to identify whether an individual is included in the class.  *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129, 138 (3d Cir. 2023) (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020)).

Plaintiffs bear the burden of proof for each of the elements of Rule 23 by a preponderance of the evidence.  *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020).  "[T]he requirements set out in Rule 23 are not mere pleading rules."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008).  The court must perform a "rigorous analysis" to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."  *Marcus v. BMW of N.*

26

*Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (quoting *In re Hydrogen Peroxide*, 552 F.3d at 307);

*see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) ("A party seeking class

certification . . . must be prepared to prove that there are *in fact* sufficiently numerous parties,

common questions of law or fact, etc. . . .  Frequently that 'rigorous analysis' will entail some

overlap with the merits of the plaintiff's underlying claim. That cannot be helped."); *see generally*

*In re Lamictal*, 957 F.3d at 191–95 (finding abuse of discretion by the district court for failure to

rigorously analyze the plaintiffs' and defendants' competing expert reports in its injury and

damages findings as part of its predominance analysis).

### 2.  Commonality and Predominance

As the following discussion reveals, when limiting the Court's inquiry to this standard,

Plaintiffs have not met their burden of proof regarding commonality and predominance.

Defendants raise a number of concerns aimed at the commonality and predominance

requirements of Rule 23.  First, Defendants argue that Plaintiffs have not offered a methodology

for computing class-wide damages.  *See* Defs.' Opp. 12–14 (D.I. 144).  Second, they argue that

the methodology Plaintiffs have offered for determining damages does not match their 14(a) claim,

because it relies on a theory of injury that is not available to 14(a) claims.  *See Id.* at 14–17.  Third,

they argue Plaintiffs' damages methodology cannot be reliably applied on a class-wide basis.  *See*

*Id.* at 17–19.  Fourth, aside from their Motion to Exclude Plaintiffs' damages model, Defendants

also argue that Plaintiffs' Motion fails to satisfy commonality because the Keath/DeRosa Report

does not represent merger arbitrageurs who are members of the putative class.  *See Id.* at 19–23.

For purposes of this Motion, the Court disagrees with each of Defendants' arguments, but

nevertheless concludes that Plaintiffs fail to satisfy the commonality and predominance

requirements of Rule 23 according to the preponderance of evidence.

**2.1 Legal Standard**

The commonality element of Rule 23(a) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted)). "A court's focus must be on whether the *defendant's conduct* is common as to all of the class members." *Id.* at 486 (cleaned up) (emphasis added).

The predominance requirement of Rule 23(b)(3) builds on the commonality question by requiring that questions of law or fact common to class members predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). As with commonality, the predominance analysis does not ask "whether each plaintiff has a 'colorable' claim," but focuses on "whether the defendant's conduct [was] common as to all of the class members." *Reyes*, 802 F.3d at 486, 489 (quoting *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 298–99 (3d Cir. 2011)). Predominance does not require "the elimination of all individual circumstances." *Id.* at 489. Instead, "predominance is satisfied if common issues predominate." *Id.* For example, in the context of fraud claims under Section 10(b) of the Securities Act, even individualized reliance by class members on fraudulent misrepresentation need not defeat predominance when the Securities Act and the misrepresentation by defendants apply uniformly to the entire class. *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003).

Commonality is often analyzed in tandem with predominance, in that commonality is "subsumed" in the predominance analysis as the first step of such analysis. *Reyes*, 802 F.3d at 486. However, commonality and predominance are still distinct concepts. *Id.* at 489.

28

Multiple recent United States Supreme Court cases have clarified the legal standard for commonality and predominance for certification of class actions.  First, analyzing commonality and predominance frequently requires substantial engagement with the merits of the claims presented, especially because these requirements concern questions of law or fact common to the class.  *Comcast*, 569 U.S. at 33–34.  Second, "[m]erits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 466.  Third, when considering predominance, "the pivotal inquiry is whether proof of [the element of the claim] is needed to ensure that the *questions* of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses."  *Id.* at 467 (quoting Fed. R. Civ. P. 23(b)(3)).

However, in the Third Circuit, a district court must ultimately "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."  *Marcus*, 687 F.3d at 600 (quoting *In re Hydrogen Peroxide*, 552 F.3d at 311).  The Third Circuit does not consider these class certification findings to be final merits determinations, as they can be overturned or modified based on subsequent argument at the merits stages of litigation.  *In re Hydrogen Peroxide*, 552 F.3d at 318 ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.").

The Third Circuit has clarified that "predominance and commonality are satisfied if *each element* of the alleged [] violation involves common questions of law and fact capable of proof by evidence common to the class."  *Reyes*, 802 F.3d at 489.  The elements of a 14(a) claim are: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation

materials, was 'an essential link in the accomplishment of the transaction.'" *Gen. Elec.*, 980 F.2d at 932 (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970)).

The second element, which requires injury-in-fact, is often referred to as "loss causation." *See* 15 U.S.C. §78u-4(b)(4); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008); *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 235 (4th Cir. 2023); *In re Resolute Energy Corp. Sec. Litig,*, Civ. No. 19-77-RGA, 2021 WL 327385, at *2 (D. Del. Feb. 1, 2021). The third element, requiring the proxy solicitation to be an essential link in the accomplishment of the transaction, is often referred to as "transaction causation." *See Gen. Elec.*, 980 F.2d at 932–33; *Karp*, 69 F.4th at 235.

Loss causation requires proving both economic loss and proximate causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (holding in the Section 10(b) securities fraud context). Even though the Supreme Court has not separately held that loss causation must be proved under Section 14(a) as well as Section 10(b), there is growing consensus among circuit courts that the loss causation requirement of 15 U.S.C. §78u-4(b)(4) applies equally to Section 14(a) and 10(b) claims. *See Karp*, 69 F.4th at 235; *Kuebler v. Vectren Corp.*, 13 F.4th 631, 638 n.1, 646 (7th Cir. 2021); *N.Y.C. Emp.'s Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010) (overruled in part on other grounds by *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc)); *Grace v. Rosenstock*, 228 F.3d 40, 46–47 (2d Cir. 2000). In the context of Section 10(b) fraud claims, the Third Circuit has stated that loss causation is to be analyzed according to a substantial factor test entailing examination of the causal nexus through "general principles of causation, such as materiality, directness, foreseeability, and intervening causes." *Pure Earth, Inc. v. Call*, 618 F. App'x. 119, 123 (3d Cir. 2015) (citing *Dura Pharms., Inc.*, 544 U.S. at 341–42; *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 424 (3d Cir. 2007)). Accordingly, Plaintiffs in

this 14(a) action must prove both economic loss and proximate causation under a substantial factor

test for causal nexus involving analysis of materiality, directness, foreseeability, and intervening

causes in order to satisfy the loss causation element of 14(a).

Plaintiffs argue that "[a]t the class certification stage, materiality and loss causation need

not be considered."  Pls.' Mot. 24 (D.I. 136) (quoting *City of Sterling Heights Gen. Emp.'s Ret.

Sys. v. Prudential Fin. Inc.*, Civ. A. No. 12-5275, 2015 WL 5097883, at *5 (D.N.J. Aug. 31, 2015)).

With respect to our sister court in New Jersey, the Court does not construe *Sterling Heights* as

stating that the elements of materiality and loss causation are irrelevant at the class certification

stage and need not be considered at all.  The *Sterling Heights* court cited to the United States

Supreme Court's *Amgen* and *Halliberton I* cases in support for its statement that materiality and

loss causation need not be considered at the class certification stage.  However, neither case

obviated the need to *consider* whether materiality and loss causation are amenable to class-wide

proof by common evidence under Rule 23; rather, the cases concluded that materiality (*Amgen*)

and loss causation (*Halliburton I*) need not be *proved* at the class certification stage.  *See Amgen*,

568 U.S. at 473–75 ("Because a failure of *proof* on the issue of materiality, unlike the issues of

market efficiency and publicity, does not give rise to any prospect of individual questions

overwhelming common ones, materiality need not be *proved* prior to Rule 23(b)(3) class

certification" (emphasis added)); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811–

15 (2011) ("we conclude the Court of Appeals erred by requiring EPJ Fund to *prove* loss causation

at the certification stage" (emphasis added)).  Therefore, while Plaintiffs need not *prove* materiality

or loss causation on the merits at this stage, they must at least demonstrate that these elements

present live questions of law or fact and are amenable to proof on a common basis, as with all

elements of 14(a).  *See Reyes*, 802 F.3d at 489.

In sum, Plaintiffs must provide sufficient evidence to support a finding by the preponderance of the evidence that the questions of law and fact for their 14(a) claims exist in common among all members of the putative class and that these common questions predominate over questions impacting putative class members on an individual basis.  Further, Plaintiffs' evidence must be sufficient for the Court to *predict* that Plaintiffs have the potential to satisfy their burden of proof at the merits stages for each element of their 14(a) claims.

The elements of their claims are: 1) whether the proxy solicitation was materially misleading or omissive, 2) loss causation—whether injury-in-fact (i.e., economic loss) exists class-wide and the proxy statement proximately caused these injuries, and 3) transaction causation—whether the proxy solicitation was an essential link in the accomplishment of the transaction shareholders were asked to authorize (i.e., the merger) and directly caused Plaintiffs' damages.  However, as discussed above regarding Defendants' Motion to Exclude, under *Neale*, 794 F.3d at 374–75, Plaintiffs need not provide an aggregate damages model in order to support the loss causation element—evidence of individualized damages is sufficient for class certification.

### 2.2 Plaintiffs Have Not Satisfied the Requirements of Commonality and Predominance.

While the Court does not yet reach the merits of Plaintiffs' claims, the Court does not predict that Plaintiffs will succeed on the merits in proving their asserted damages by a preponderance of the evidence, based on the evidence provided in support of their Motion for Class Certification.  Evidence for each of Plaintiffs' Dividend Damages, Trading Damages, and Closing Damages is insufficient to demonstrate a likelihood they can prove both the loss causation and transaction causation elements of their 14(a) claims.

### 2.2.1 Element 1: Materiality

The Third Circuit has already extensively reviewed the issue of the materiality of the allegedly misleading and omissive portions of the Joint Proxy Statement in its review of this Court's earlier dismissal of the case, so the Court will only briefly analyze the materiality question as to the allegedly misleading or omissive statements before turning to the more contested questions of transaction causation and loss causation.

The test for materiality of omitted proxy information is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (quoting *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003)); *see also Jaroslawicz II*, 962 F.3d at 710. Determining materiality "involves an assessment of whether 'the disclosure of the omitted fact or misrepresentation would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Jaroslawicz II*, 962 F.3d at 710 (quoting *EP Medsystems, Inc., v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)). Materiality of the statement or omission is to be assessed "at the time and in the light of the circumstances under which it is made." *Id.* (quoting *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006)).

Upon its rehearing of Defendants' Motion to Dismiss, the Third Circuit in *Jaroslawicz II* determined Plaintiffs had plausibly alleged a materially omissive Joint Proxy Statement. Based on the plain language of the requirements SEC regulations and guidance documents for proxy statements to disclose "risk factors," the court found that "M&T's generic statement about money laundering compliance is not far from the risk statement offered in SEC guidance as *inadequate*." *Id.* at 715. "M&T should have 'specifically link[ed]' its general statements to 'each risk to [its] industry, company, or investment' using details that connected the pending merger review to its existing and anticipated business lines." *Id.* (quoting SEC Legal Bulletin No. 7, "Plain English

Disclosure," Release No. SLB-7, 1999 WL 34984247, *6 (June 7, 1999)) (alteration in original). Because the Joint Proxy Statement failed to provide "such concise and plain discussions of the *significance of regulatory review*, framed in the context of M&T's *particular business and industry*" regarding its BSA/AML compliance problems, the Third Circuit held that Plaintiffs have plausibly alleged facts where "there is a substantial likelihood that a reasonable shareholder would [have] consider[ed] it important in deciding how to vote." *Id.* (quoting *Seinfeld*, 461 F.3d at 369) (alteration in original). The Third Circuit also held that Plaintiffs had met their pleading burden in asking this Court to infer that M&T's consumer compliance practices cast enough doubt on M&T's controls and compliance systems and posed enough of an independent regulatory risk that a reasonable shareholder would consider it important in deciding how to vote. *Id.*

Defendants offer no new evidence in their Opposition to Plaintiffs' Motion for Class Certification to contest the alleged omissions and misleading statements in their Joint Proxy Statement or the materiality these alleged omissions and misleading statements. *See generally* Defs.' Opp. (D.I. 144). They continue to assert that Defendants filed supplemental proxy disclosures on April 12, 2013, informing shareholders that the merger would be substantially delayed, that the Federal Reserve Board had identified concerns with M&T's BSA/AML compliance program, and that the merger's termination date was being extended to January 31, 2014. Defs.' Opp. 1, 5–6 (D.I. 144). Defendants state that shareholders were knowledgeable of these deficiencies when they voted to approve the merger on April 18, 2013, and argue that shareholders who sold their Hudson City shares prior to January 31, 2014 should be excluded from the class because they were on notice of the delay. *Id.* at 19–22. Plaintiffs' rebuttal is that the supplemental disclosures failed to fully disclose the seriousness of the BSA/AML violations and

made no mention at all of the consumer violations, so were therefore not curative of the omissions in the original Joint Proxy Statement.  Pls.' Reply, 5 (D.I. 157).

The Third Circuit extensively analyzed the materiality issue in its opinion and held Plaintiffs had satisfied the pleading requirements for their 14(a) claims.  *Jaroslawicz II*, 962 F.3d at 715.  The above disagreements between the Parties regarding the effect of the supplemental disclosures only serve to further demonstrate that the questions of whether the Joint Proxy Statement contained misleading or omissive content, and the materiality of this content, are live questions for consideration on the merits.  The preponderance of the evidence suggests that Plaintiffs have a likelihood of demonstrating a substantial likelihood that a reasonable shareholder would consider the alleged omissions important in deciding how to vote.  Further, all members of the putative class held Hudson City shares with voting rights on the issuance of the Joint Proxy Statement.  Pls.' Mot. 4 n.4 (D.I. 136).  Therefore, the issue of the materiality of omissions in the Joint Proxy Statement is common among all putative class members and predominates over individual questions.

### 2.2.2 Element 2: Loss Causation

As discussed above, at the merits stages Plaintiffs must prove loss causation by a preponderance of evidence establishing both economic loss and proximate causation.  At the class certification stage, Plaintiffs must demonstrate sufficient evidence for the Court to predict that they may succeed at the merits stage.

Plaintiffs allege that they suffered economic losses from the misstatements and omissions in the proxy statement that, once publicly revealed, injured them through "deductions [to their Hudson City share prices] along the way" to the merger, and "diminished value at the end" at the closing of the merger.  Pls.' Mot. 26 (D.I. 136).  This resulted in class members receiving "less than what was coming to them."  *Id.*  Plaintiffs further argue putative class members' economic

losses were proximately caused by the misstatements and omissions in the proxy statement because they were within the ability of Defendants to know and were a foreseeable consequence within the zone of risk of Defendants' conduct.  Pls.' Second Am. Compl. ¶ 118 (D.I. 72); Pls.' Mot. 26–27 (D.I. 136).  Plaintiffs have advanced three theories of damages for their putative class members ("Trading Damages," "Dividend Damages," and "Closing Damages") and have submitted an expert report with a methodology for calculating damages on a class-wide basis.  Pls.' Mot. 10, Ex. 35 (D.I. 136).  While Plaintiffs have argued that this methodology allows for damages calculations on a "formulaic basis and [does] not require individualized inquiries of Class members," *id.* at 9, Plaintiffs have also argued that a methodology of individualized damages calculations is sufficient for class certification, Pls.' Post-Arg. Reply 10 (D.I. 203) (citing *Neale*, 764. F.3d at 375).

### 2.2.2.1 *The Legal Standard for Benefit-of-the-Bargain Damages for 14(a) Claims*

At the outset, Defendants argue against Plaintiffs' entire benefit-of-the-bargain theory of injury.  Plaintiffs assert their damages under a theory of injury that they were entitled to the benefit of the bargain to which they agreed.  Defendants argue that benefit-of-the-bargain damages are unavailable under 14(a) claims, and Defendants' damages are limited only to out-of-pocket damages.  Defendants support this argument with their interpretation of the Delaware District Court's opinion in *In re Resolute Energy Corp. Sec. Litig,*, Civ. No. 19-77-RGA, 2021 WL 327385, at *2 (D. Del. Feb. 1, 2021), *aff'd*, No. 21-1412, 2022 WL 260059 (3d Cir. Jan. 27, 2022) [hereinafter *Resolute*].  Defs.' Opp. 11–14 (D.I. 144).  Defendants further argue that Plaintiffs have not offered a methodology for computing class-wide damages consistent with their theory of legal liability.  *See* Defs.' Opp. 14–19 (D.I. 144).  Defendants ground this argument in their interpretation of the Supreme Court's opinion in *Comcast* and the Third Circuit's precedent in

*Neale*.  Defs.' Opp. 15 (D.I. 144) (discussing *Comcast*, 569 U.S. at 33–34, and *Neale*, 794 F.3d at 374 n.10).

The Third Circuit has stated that *Comcast* does not stand for a general proposition that class certification requires a method of calculating class-wide damages.  *See Neale*, 794 F.3d at 374–75 ("[I]t is a misreading of *Comcast* to interpret it as precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." (cleaned up)).  The court also expressly stated that methodologies which provide only "individual[ized] damages calculations do not preclude class certification under Rule 23(b)(3)," consistent with several other circuit courts.  *Id.* at 375.  Consequently, Plaintiffs are not required to offer a methodology for computing aggregate class-wide damages at class certification.  As described in the legal standard discussion above, for the loss causation analysis at class certification Plaintiffs need to demonstrate by a preponderance of evidence that questions of law or fact regarding economic loss and proximate causation exist class-wide and predominate over individual questions.  Plaintiffs must also convince the Court that there is a fair likelihood they may succeed on the merits at later stages.

As for the range of potentially viable theories of damages in 14(a) claims, the Court disagrees with Defendants' interpretation of *Resolute*.  First, an opinion from another court in the District of Delaware is not binding precedent on this Court.  Second, the Court does not read either of the opinions of the district court or the Third Circuit in *Resolute* to conclude that out-of-pocket damages are the only available damages for 14(a) claims.[4]  Instead, as Plaintiffs argue, the Third

---

[4]   First, *Resolute* decided a motion to dismiss, whereas the instant case has already survived a motion to dismiss.

Circuit has made clear that "recovery [in 14(a) actions] is not limited to out of pocket loss . . . but may include loss of a possible profit or *benefit* . . . unless the loss is wholly speculative." *Gould v. American-Hawaiian S. S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976) (emphasis added); *see* Pls.' Mot. 11 n.3 (D.I. 136); *see also In re Heckmann*, 2013 WL 2456104, at *14. Further, the Third Circuit has already implicitly supported the viability of Plaintiffs' alleged Dividend and Closing Damages by not overturning this Court's earlier finding that the First Amended Complaint plausibly pled these damages, irrespective of the Third Circuit's non-precedential affirmance in

---

Second, the discussion in *Resolute* to which Defendants point does not analyze the actual content of the complaint in that case, so amounts to dicta. The *Resolute* court found that the complaint "failed to plead, among other things, loss causation . . . [and] the original complaint failed to offer any notice of what the relevant economic loss might have been." *Resolute*, 2021 WL 327385, at *2 (internal quotation marks omitted). The court then took the liberty of opining that "there were two possible economic loss theories Lead Plaintiff *could have* argued, but both were insufficient." *Id.* (emphasis added). This all amounts to dicta that, in an unpublished non-binding opinion that was reviewed by the Third Circuit, but that the Third Circuit affirmed in a non-precedential opinion that did not discuss the relevant dicta at all, offers minimal persuasive value.

Third, the circumstances in *Resolute* are distinguishable from those alleged by Plaintiffs. The *Resolute* court's discussion of damages theories does not address the theories alleged by Plaintiffs in the instant case, and thus is not persuasive authority regarding the legal or logical impossibility of Plaintiffs' theories. The district court in *Resolute* determined the amended complaint at issue was alleging a theory of a merger premium that undervalued the target company—that the board had failed to secure a better deal and not that a misleading or omissive proxy statement caused the damages as required by a 14(a) claim. *Id.* at *3–4. However, in the instant case Plaintiffs allege they did not receive the full benefit of their bargain, a very different theory of injury. While the plaintiffs in *Resolute* wanted a better deal, Plaintiffs in the instant case want the deal they say they agreed to, not the deal they received. Because the benefit-of-the-bargain theory of injury was not at issue by the *Resolute* court, it would not have been briefed, and there is no language in *Resolute* analyzing the possibility or impossibility of 14(a) damages under a benefit-of-the-bargain theory. This is not a sound foundation to read into the *Resolute* opinion that it conclusively states benefit-of-the-bargain damages are unavailable as a matter of law for 14(a) claims.

*Resolute*.[5]  Other circuits have also consistently agreed that benefit-of-the-bargain damages are

available for 14(a) actions.[6]  Further, the Second Circuit's "reasonable certainty" standard for

_____

[5]      This case already survived a Motion to Dismiss as to loss causation when the Third Circuit vacated and remanded this Court's dismissal in a precedential opinion, where Defendants "waived the argument that the . . . Second Amended Complaint failed to plausibly allege loss causation" and where the Court found Plaintiffs' Dividend Damages and Closing Damages were pled sufficiently in its order granting the Motion to Dismiss.  *See Jaroslawicz II*, 962 F.3d at 708 n.7 (affirming D.I. 70 as to loss causation regarding Plaintiffs' 14(a) claim); Mem. Order 12 (D.I. 70) (finding that the Dividend Damages and Closing Damages pled in the First Amended Complaint (D.I. 54) were sufficient to survive Defendants' Motion to Dismiss).  While the Third Circuit's ultimate opinion did not analyze loss causation, given that Defendants waived that argument on en banc rehearing, the Third Circuit's original (now vacated) *Jaroslawizc I* opinion did analyze the issue and found the pleading standard satisfied based on a theory of "lost opportunity."  *See Jaroslawicz I*, 912 F.3d at 115; *see generally Jaroslawicz II*, 962 F.3d 701.  Therefore, the Court already explicitly, and the Third Circuit implicitly, determined that theories of damages other than the single out-of-pocket theory asserted by Defendants are plausible.

         It should be noted that Plaintiffs' first assertion of their Trading Damages theory occurred in the Second Amended Complaint. Pls' Second Am. Compl. ¶ 121 (D.I. 72) (*compare with* Pls.' First Am. Compl. ¶ 117 (D.I. 54)).  In addition, the Court's Order dismissing the Second Amended Complaint did not address the sufficiency of the loss causation pleadings, and thus did not analyze the viability of the new Trading Damages theory.  *See generally* Mem. Order (D.I. 84).  While the Third Circuit's *Jaroslawicz I* opinion did analyze loss causation, the court incorrectly stated that the loss causation pleadings in the First and Second Amended Complaints were identical, *Jaroslawicz I*, 912 F.3d at 115 (vacated on other grounds), when in fact Plaintiffs made a small addition to paragraph 121 in the Second Amended Complaint to reflect their Trading Damages theory, *compare*  Pls.' Second Am. Compl ¶ 121 (D.I. 72), *with* Pls.' First Am. Compl. ¶ 117 (D.I. 54).  Therefore, the Court does not interpret the Third Circuit to have made any implicit determination regarding the viability of Plaintiffs' Trading Damages theory in *Jaroslawicz II*.  However, Plaintiffs' Dividend Damages and Closing Damages *were* identically pled between the First and Second Amended Complaints, so the Third Circuits reasoning in *Jaroslawicz I* is pertinent to these damages theories.

         In sum, this Court and the Third Circuit have already found that there can be plausible loss causation theories for 14(a) claims beyond the out-of-pocket loss theory espoused by Defendants.

[6]      In *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir. 1981), the Second Circuit analyzed Section 28(a) of the Securities Act, as did the Third Circuit in *Gould*, which authorizes damages for causes of action under the Act, to determine if benefit-of-the-bargain theories of damages are viable under its provisions.  The Second Circuit reasoned that Section 28(a) used broad language that did not limit damages to only out-of-pocket measures, and held that they were available where the damages "can be established with reasonable certainty," based upon a similar standard for application of the theory in common law fraud actions.  *Id.* at 114.  The court noted that "this result

damages under this theory is consistent with the comment in *Gould* that "wholly speculative" damages are unavailable for securities claims. *See Gould*, 535 F.2d at 781. Therefore, the Court concludes that benefit-of-the-bargain damages are available for 14(a) claims, provided that they are grounded in the transaction at issue and are not wholly speculative.

### 2.2.2.2 Rigorous Analysis of Plaintiffs' Evidence Supports a Prediction That Their Trading and Closing Damages Are Wholly Speculative and They Cannot Prove Either Economic Loss or Proximate Causation

Plaintiffs support their Trading and Closing Damages theories with the Event Study by Dr. DeRosa, which studies and quantifies downdrafts in M&T stock prices attributable to negative news releases about the merger on four dates: April 12, 2013, October 17, 2014, April 6, 2015, and September 30, 2015. The Court found the Event Study generally reliable for class certification purposes, so the relevant question is whether the preponderance of evidence supports a prediction that Plaintiffs may succeed in proving their damages theories on the merits with the Event Study's assertions in light of Defendant's responsive expert reports and arguments. The Court first addresses Defendants' concerns about the Event Study as a whole before analyzing the evidence

---

furthers the purpose of sections 14(a) and 14(e) of the 1934 Act deterrence of misrepresentations in connection with mergers and tender offers and encourages private enforcement of the Act." *Id.*

The Second Circuit elaborated about constraints to the application of benefit-of-the-bargain damages for Securities Act causes of action in *Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 59–60 (2d Cir. 1984), where the "proposed claim is based on the value the stock purportedly would have had if [the Defendant's] true financial condition had been publicly known at the time of the transaction, clearly a speculative proposition." Instead, "[a] claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different." *Id.* at 60.

The Second Circuit has continued to support viability of benefit-of-the-bargain damages under its *Osofsky* standard for Securities Act actions, including 14(a) claims. *See Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924 (2d Cir. 1992); *Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608 (2d Cir. 1994); *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044 (2d Cir. 1995). The Ninth Circuit has also supported the *Osofsky* analysis, applying benefit-of-the-bargain damages in a Section 14(e) action. *Plaine v. McCabe*, 797 F.2d 713, 722 (9th Cir. 1986).

for damages based on each individual date asserted.  The Court concludes with its own critique of the limits of the Event Study in justifying its ultimate damages calculations for Trading and Closing Damages.

### General Critiques of the Event Study

Defendants criticize the Event Study generally for its choice to study M&T shares rather than Hudson City shares, then use the merger ratio to calculate Hudson City losses.  Defs.' Opp., Ex. 1 (Denis Report) at ¶ 50 (D.I. 147).  Defendants argue the Event Study doesn't justify this choice.  *Id.*

Dr. DeRosa provided some justification in his deposition, stating he chose to study M&T shares because M&T had the "bigger market, more shares, [was] easier to model and because . . . [t]he poison was coming from MTB, not from Hudson."  Defs.' Opp., Ex 28 (DeRosa Dep.) at 130:6–13.

The choice to study M&T rather than Hudson City shares seems reasonable on the surface, based on Dr. DeRosa's explanation.  Further, the Merger Agreement has Hudson City shares converting to M&T shares upon close of the merger, so impacts on M&T's shares might better reflect the actual outcomes for shareholders, at least for Closing Damages (i.e., those shareholders who held to close).  This is a dispute within the zone in which experts might disagree, and could be further explored at trial.  The preponderance of this evidence does not support a prediction that Plaintiffs will be unable to prove the adequacy of M&T shares as a basis for damages instead of Hudson City shares.

### Trading Damages and Closing Damages as Computed by the Event Study Are Wholly Speculative

First, Dr. DeRosa describes the Event Study's methodology as grounded in a historical study that was the first to statistically distinguish whether share price reactions were based on

individual events specific to the relevant company's shares or were the product of broad market-wide changes.   Pls.' Mot., Ex. 35 (Keath/DeRosa Report) at ¶¶ 72–79 (D.I. 136).   The Event Study then explains how it demonstrates that four dates on which M&T's share prices declined significantly are explained "by the market's incorporation of bad news specific to M&T" rather than by "changes in bank stocks generally."   *Id.* at ¶¶ 80–97.

The Event Study computes the total damages to any given shareholder by adding the cumulative damages as calculated by this methodology, i.e., as measured on the date of the share price downdrafts.   *Id.* at ¶¶ 135, 146.   These damages are attributed to shareholders no matter when the shareholders sold their shares between the start of the measurement period and the close of the merger, or whether they retained them through the merger's close.   The Event Study offers no discussion or rationale for how share price declines on a single day carry forward through time or are sustained within the share price on a later date on which the shares were sold or transferred through the merger's close.   *See generally id.* at ¶¶ 72–165.   Neither does Dr. DeRosa's rebuttal analysis provide any evidence or explanation for this proposition.   *See generally* Pls.' Reply, Ex. 63 (Keath/DeRosa Rebuttal Report) at ¶¶ 29–41 (D.I. 157).

The Court is unwilling to infer without having been provided sufficient evidence or argument that share price declines on individual days are sustained and internalized without alteration over long periods of time, given the complexity of markets and market forces acting on share prices on a continuous basis.   Indeed, such concerns have animated other courts considering share-price damages for securities claims.   *See e.g. Dura Pharmaceuticals*, 544 U.S. at 342–43 ("When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but *changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken*

*separately or together account for some or all of that lower price. . . .* Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss." (emphasis added)).  The Court is especially concerned, as with the Supreme Court in *Dura Pharmaceuticals*, about the impact of the passage of time in diminishing the impact of negative merger-related news on M&T and Hudson City share prices. Here, the Event Study puts forward damages incurred on four separate dates, two of which are more than a year before the close of the merger.  The Event Study may present a reliable methodology for determining the impact of negative M&T-related news on M&T's share price relative to share prices in the broader banking sector *on that day*.  However, the Event Study offers *no* evidence describing what happens to those share price impacts after the day in question.

Accordingly, the Court interprets the Event Study as inviting the Court to infer that the share price downdrafts it identifies were retained and internalized in the share price in perpetuity and without alteration until such time as a shareholder sold their shares or the merger closed. Absent any evidence in support, the Court finds such an inference to be "wholly speculative," and thus Plaintiffs' asserted Trading and Closing Damages as described by the Event Study fail to satisfy the Third Circuit's standard in *Gould*.  *See* 535 F.2d at 781.

### **Trading Damages and Closing Damages Are Also Unsupported By the Preponderance of the Evidence**

Even if Plaintiffs' Trading and Closing Damages were not wholly speculative, the preponderance of evidence between Plaintiffs' and Defendants' expert reports and associated exhibits do not support proof of either economic loss or proximate causation, or both, for each of Plaintiffs' asserted dates on which shares experienced downdrafts in value.

#### ***April 12, 2013***

The Event Study first quantifies the stock price impact of the initial public disclosure of M&T's BSA/AML issues.  *Id.* at ¶¶ 98–108.  The Study finds that M&T stock declined $3.64 more than would be predicted by the SPSIBK bank index decline on that date, which equates to a $0.31 per share drop in Hudson City share price based on the merger ratio in the Merger Agreement.  *Id.* at ¶¶ 101–03.  The Study also cites contemporaneous stock analyst reports that attribute the stock decline to the BSA/AML disclosure, *id.* at ¶¶ 106–08, and concludes that the "negative disclosure reasonably explained the unexplained decline in [M&T shares] on April 12, 2013, and in my opinion, the drop was caused by the disclosure," *id.* at ¶ 105.

Dr. Denis's responsive expert report counters that the April 12, 2013 disclosure was before the April 18, 2013 shareholder vote to approve the merger, and that there is no basis for attributing damages for share price declines that occurred before shareholders voted to approve the merger.  Defs.' Opp., Ex. 1 at ¶54 (D.I. 147).  Defendants further argue in their brief in opposition to Plaintiffs' class certification motion that on April 12, 2013, M&T and Hudson City also announced their intention to extend the merger's termination date to January 31, 2014, and as a result there would be no causal connection between losses incurred prior to this new termination date and the alleged misrepresentation in the Joint Proxy Statement.  *See* Defs.' Opp. at 20.  Defendants note that Hudson City shareholders had the power to change their proxy votes at any time prior to the April 18, 2013 shareholder vote and were informed of how to do so in the April 12, 2013 proxy supplemental disclosure.  *Id.* at 21; Defs.' Opp., Ex. 3 (Joint Proxy) at 47; Ex. 28 (DeRosa Dep.) 98:24–99:9.  Further, the Belinas voted on April 18, 2013, at the shareholder vote meeting itself, six days after the April 12, 2013 disclosure.  Defs.' Ex. 23 (Belinas' Interrogatory Response).  While Mr. Krublit may have voted by mail shortly after the release of the Joint Proxy Statement

in February 2013, he has stated that he was aware of the merger delay shortly after the April 12, 2013 disclosure, and probably by April 13, 2013.  Defs.' Ex. 9 (Krublit Dep.) at 74:3–9.

Plaintiffs' expert rebuttal report provides only a barebones justification for including the April 12, 2013 share decline in its damages calculations.  Its sole argument is a reassertion that the disclosures included information about the BSA/AML issues and the likelihood of delay to the merger, combined with the conclusory assertion that this is "always a bad thing for the company to be acquired."  Pls.' Reply, Ex. 63 at ¶ 36 (D.I. 157).

Plaintiffs present arguments in their Reply to Defendants' arguments that the supplemental disclosures did not disclose the full scope of risk known at the time regarding the BSA/AML regulatory scrutiny, including the likelihood it would extend past January 31, 2014, and that the disclosures also did not mention the consumer violations at all, which presented separate regulatory scrutiny and risk.  Pls.' Reply at 5 (D.I. 157).

The preponderance of this evidence supports a prediction that damages calculated from the April 12, 2013 share price decline do not satisfy the element of loss causation for a 14(a) claim.  Shareholders were provided ample notice of that price decline before voting on April 18, 2013, and had ample opportunity to amend their vote beforehand as well.  That price decline was "priced-in" to shareholder expectations at the time of the merger vote six days later, and thus would have been included in the "benefit of the bargain" expected by shareholders.  The DeRosa Event Study does not provide any evidence to the contrary, and in fact supports such a conclusion based on its analysis that the share price rapidly incorporated the April 12, 2013 disclosures in the first hours of trading that day.  Pls.' Mot., Ex. 35 at ¶ 99–100 (D.I. 136).

As such, Defendants' argument that shareholders who sold their Hudson City shares prior to January 31, 2014, could not have been harmed is moot.  The next date on which damages are

alleged is October 17, 2014, well after January 31, 2014.  If damages from the April 12, 2013 disclosures are not viable, then there are no other alleged Trading or Closing Damages available to shareholders who sold prior to October 17, 2014, much less January 31, 2014.

### *October 17, 2014*

The Event Study identifies a drop of $3.30 per share in M&T shares on October 17, 2014, compared with an estimated increase in M&T share price of $0.37 if M&T shares had followed the industry average increase that day of the SPSIBK index, for a net decline of $3.67 compared with the SPSIBK index.  Pls.' Mot., Ex. 35 at ¶¶ 111–12.  This translated to a relative loss of $0.31 per Hudson City share, based on the merger ratio.  *Id.* at ¶ 112.  The Event Study attributes this relative loss to the disclosure on October 17, 2014, that the scope of M&T's regulatory compliance review had been expanded to include *all its customers*, not just high-risk ones.  *Id.* at ¶ 109 n.51; Second Am. Cmplt. at ¶ 18 (D.I. 72).

Defendants' rebuttal expert report notes that the Event Study's methodology did not attempt to compensate for or disaggregate the effects of confounding non-merger-related M&T news on the same date—to whit, the negative merger disclosure was made as part of M&T's quarterly operating and financial performance report, i.e. it's quarterly earnings call.  Defs.' Opp., Ex. 1 (Denis Report) at ¶ 56 (D.I. 147); Ex. 28 (DeRosa Dep.) at 98:11–20, 102:18–103:2, 106:8–108:2 (discussing that the Event Study's regression method is incapable of disaggregating merger-related impacts when there are multiple types of negative M&T news on the same date, and that Dr. DeRosa did not attempt to do so, and was not aware of confounding negative financial disclosures on October 17, 2014, in addition to the merger-related news).  Defendants' expert report also notes that the arbitrage spread between Hudson City and M&T actually narrowed on October 17, 2014, which would be indicative of a reduced perception of risk surrounding the

merger in the marketplace, not an increased risk, and is inconsistent with the Event Study's conclusion.  Defs.' Opp., Ex. 1 at ¶ 58.

Plaintiffs' rebuttal expert report notes that the negative financial results reported by M&T on October 17, 2014, are partly attributable to the increased operating costs associated with its regulatory compliance efforts.  Pls.' Reply, Ex. 63 at ¶¶ 37–38.  Plaintiffs' rebuttal report does not, however, discuss or explain the impact of weak M&T revenues reported on October 17, 2014.

The preponderance of this evidence suggests that the actual amount of damages attributable to the merger delays specifically, rather than non-merger-related weak M&T revenues, cannot be discerned by Plaintiffs' evidence.  Some of Plaintiffs' asserted $0.37 decline in Hudson City share value could plausibly be related to the earnings call disclosures on October 17, 2014, but it is impossible to say how much because Plaintiffs have not put forward any evidence to aid in estimating the proportion attributable to the merger itself.  Third Circuit and Second Circuit precedent both instruct against finding these damages were established for purposes of loss causation, and arguably so does the Supreme Court's precedent.  *Gould v. American-Hawaiian S. S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976) (holding 14(a) claims support "loss of a possible profit or benefit . . . unless the loss is wholly speculative"); *Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir. 1981) (holding benefit-of-the-bargain damages for securities claims must be "established with reasonable certainty"); *see also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005) ("Given the tangle of factors affecting price, . . . that the misrepresentation . . . 'touches upon' a later economic loss . . . is insufficient.  To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires.").

In sum, there are strong legal and factual grounds for predicting that the preponderance of evidence does not support Plaintiffs' asserted Trading or Closing Damages associated with the October 17, 2014 merger disclosure.

### *April 6, 2015*

The Event Study notes that M&T disclosed that the Federal Reserve would further delay acting on the merger application on April 6, 2015. Pls.' Mot., Ex. 35 at ¶ 114. This would require further delaying the close of the merger beyond the then-existing termination date of April 30, 2015, upon which Hudson City and M&T boards agreed to a fourth amendment to the Merger Agreement, extending the termination date to October 31, 2015. Defs.' Opp., Ex. 1 (Denis Report) at ¶ 60 n.90, Ex. 16 (M&T 8-K Filing) at 2. The Event Study states M&T shares dropped $3.45 on April 6, 2015, a net of $3.09 lower than the SPSIBK index dropped that day, equating to a drop of $0.31 per Hudson City share, and attributes this drop to the disclosure about the merger delay. Pls.' Mot., Ex. 35 at ¶¶ 115–18.

Defendants' expert report argues only that this delay was not foreseeable prior to the shareholder vote on April 18, 2013, and that such delays are common in mergers and a previously-known risk for this merger. Defs.' Opp., Ex. 1 (Denis Report) at ¶ 60. However, Dr. Denis cites to the M&T Form 8-K disclosure on April 17, 2015, which not only discloses that Hudson City and M&T entered into an amendment on April 16, 2015, to extend the termination date for the Merger Agreement, but also that they had done so on three prior occasions, on April 13, 2013, December 16, 2013, and December 8, 2014. Defs.' Opp., Ex. 1 (Denis Report) at ¶ 60 n.90, Ex. 16 (M&T Form 8-K) at 2.

Plaintiffs rebuttal expert report counters that the April 6, 2015 downdraft was caused by previously undisclosed BSA/AML problems that were revealed over time.  Pls.' Reply, Ex. 63 at ¶ 39.

The preponderance of evidence here suggests that the April 6, 2015 downdraft in M&T share price was attributable to the negative news about further merger delay.

However, the preponderance of evidence does not support a prediction that this evidence satisfies the transaction causation or loss causation elements of Plaintiffs' claim.  Plaintiffs' benefit-of-the-bargain theory of injury is predicated on the assumption Plaintiffs were bound by the Merger Agreement once shareholders voted to approve it.  The evidence of three Hudson City board votes to extend the merger's termination date prior to the April 6, 2015 downdraft presents evidence of intervening causes in the chain of causation leading back to the shareholder vote and Joint Proxy Statement.  Hudson City shareholders were not bound to the Merger Agreement's terms after the termination date of the original Merger Agreement that they approved, absent action by the Hudson City board to amend that Merger Agreement.  The Hudson City board could have opted to terminate the Merger Agreement instead of extending the termination date on any of those three occasions if they had determined in their discretion that the merger was no longer in the best interests of shareholders.  These were discretionary actions by the Hudson City board that represent intervening causes that likely undermine proximate causation for purposes of loss causation.  Accordingly, the Court predicts that Plaintiffs' Trading and Closing Damages for all events subsequent to the Hudson City board's extension of the Merger Agreement termination date on December 16, 2013 (the downdrafts on each of the dates of October 17, 2014, April 6, 2015, and September 30, 2015) fail to satisfy the loss causation element.

As discussed below in the Transaction Causation sections, the intervening cause of discretionary board action also likely defeats transaction causation for these asserted downdrafts.

### *September 30, 2015*

The Event Study states that M&T shares dropped $4.80 from the close of trading on September 30, 2015, to the close of trading on October 1, 2015, and that M&T's disclosure that the Federal Reserve had approved the merger with Hudson City but placed new restrictions on M&T's growth was the only negative disclosure on either of those two days. Pls.' Mot., Ex. 35 at ¶¶ 119–22, n.53. Further, the SPSIBK banking index gained value on October 1. *Id.* at ¶ 122. Based on this M&T decline, the Event Study calculated the impact on Hudson City shareholders to be $1.28 per Hudson City share. *Id.* at ¶ 125.

Defendants' expert states that the Event Study does not explain the choice to study the price decline from the close of trading on September 30, when the Federal Reserve announced its merger approval and growth restriction at 12:30 PM EDT on September 30, not at the close of trading. Defs.' Opp., Ex. 1 (Denis Report) at ¶ 62. Dr. Denis also provides evidence that M&T's stock price reacted immediately to the news on September 30, increasing from $120.76 at 12:29 PM to $122.86 at 12:30 PM on September 30, with the trading volume increasing from 1,135 shares per minute in the ten minutes prior to 12:30 PM to an average of 45,020 shares per minute in the ten minutes after 12:30 PM. *Id.* at ¶ 63. By 1:00 PM, when M&T made its public announcement about the Federal Reserve's decision, M&T shares had returned to $120.18 per share, but increased again to $121.95 per share by the close of trading on September 30. *Id.* Finally, the total trading volume from 12:30 PM to the close of trading on September 30 was 4.2 million shares, while the trading volume for the entire day of October 1 was only 3.2 million shares. *Id.* Dr. Denis notes that the Event Study provides no justification for ignoring the trading

action on September 30 in the wake of the Federal Reserve's announcement, and that the Event Study's calculation of Trading Damages on the day after the announcement is inconsistent with its calculation of Trading Damages for the previous three event dates, where damages are based on impacts on the same day of trading.  *Id.* at 64.  Dr. Denis further argues that the large changes in price and trading volumes on September 30 suggest the market fully reacted to the news of approval on September 30.  *Id.*

Plaintiffs' rebuttal report only offers brief and conclusory assertions in response to this substantial critique by Dr. Denis.  *See* Pls.' Reply, Ex. 63 at ¶¶ 40–41.

The preponderance of this evidence demonstrates that the Event Study's choice to calculate Trading and Closing Damages based solely on October 1, 2015, and not on September 30, 2015, is not well-supported.  There was substantial market reaction to the Federal Reserve's decision that is not incorporated in the Event Study's analysis.  Further, the choice of October 1, 2015, instead of September 30, 2015, has the effect of substantially increasing the total damages asserted by the Event Study.  The Event Study calculates damages based on the $4.80 share price drop from the close of September 30 ($121.95) to the close of October 1 ($117.15).  However, M&T shares traded at $120.76 just prior to the Federal Reserve's announcement on September 30, a difference of $3.61 instead of the $4.80 asserted by the Event Study.  Thus, even if the share price drop on October 1 is attributable to continued market incorporation of the negative news, the Event Study overstates damages from this date by approximately 33%.  Further, Dr. Denis raises persuasive questions about the validity of using October 1 trading action to calculate damages, when trading volumes were substantially less than those that occurred throughout the afternoon of September 30, immediately after the Federal Reserve and M&T announcements, and when none of the other dates studied use multi-day trading windows as the basis for damages.  Plaintiffs have therefore

thus far failed to support their asserted damages from October 1, 2015 by a preponderance of the evidence, and based on this evidence the Court predicts that they will likewise fail to support their asserted damages at later stages of this proceeding.

**The Court Concludes Plaintiffs Have Not Met Their Burden Regarding Loss Causation**

The above evidence relates primarily to the question of economic loss—whether Plaintiffs were in fact injured—but the intervening nature of the Hudson City board's extensions of the Merger Agreement touches on proximate causation.

Regarding the fact of injury, Plaintiffs put forward no evidence to support the proposition that downdrafts in share price months or years prior to the close of the merger are retained and internalized in the share price, without change, upon the sale of shares or close of the merger months or years later.  The Court can not assume that this is the case.  Without evidence supporting such a proposition, the Court predicts that Plaintiffs' method to quantify economic loss for both Closing Damages and Trading Damages is wholly speculative given that markets are generally forward-looking and that there are a multitude of other market forces impacting share prices over time.

Further, even if Plaintiffs had supported this proposition, the preponderance of evidence in support of their Motion for Class Certification supports a prediction that Plaintiffs will have difficulty proving injury from the disclosures on April 12, 2013, October 17, 2014, and September 30, 2015.

Regarding proximate causation, the decisions by the Hudson City and M&T boards to extend the termination date of the Merger Agreement multiple times subsequent to the shareholder vote on April 18, 2013, represent intervening causes that attenuate the chain of causation.  These

Merger Agreement amendments affected the availability of losses due to the asserted downdrafts on October 17, 2014, April 5, 2015, and October 1, 2015.  The Court consequently can not discern proximate causation between the deficient proxy statement and these asserted damages, given that either board could have allowed the Merger Agreement to terminate rather than extending the merger deadline once the regulatory challenges were discovered.

Therefore, the Court predicts that Plaintiffs likely will not satisfy the element of loss causation on the merits for their asserted Trading and Closing Damages, based on the evidence presently before the Court, and the Court concludes that Plaintiffs have not satisfied Rule 23's commonality and predominance elements for the loss causation element of their 14(a) claims.

### 2.2.3 Element 3: Transaction Causation

In *Mills*, the Supreme Court established the transaction causation element of a 14(a) claim to address the question of whether shareholders must prove that they relied on deficient proxy materials during a shareholder vote.  *See generally* 396 U.S. 375, 380–81 (1970).  The Court held that plaintiffs asserting 14(a) claims need not prove reliance—i.e., that the materially misleading or omissive proxy statement would have caused a different outcome in a shareholder vote—when they prove that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in accomplishment of the transaction."  *Id.* at 385.  The Third Circuit has added the requirement that the "transaction [must be] the direct cause of the pecuniary injury for which recovery is sought" for the transaction causation element to be satisfied in 14(a) claims.  *Gen. Elec.*, 980 F.2d at 933.

Here the Parties do not dispute that there was a shareholder vote that relied on the Joint Proxy Statement, that the shareholder vote was required for the merger and resulted in approval of the merger between M&T and Hudson City, and that the merger actually closed (i.e., that the proxy solicitation was an essential link in the accomplishment of the merger).  What the Parties do dispute

is: first, whether the shareholder vote itself *can be* the operative transaction referred to in *Mills*, and second, whether instead the *close* of the merger *must be* the operative transaction.  If the close of the merger must be the operative transaction, then shareholders that sold shares prior to the merger's closing would be excluded from the putative class because their damages could not have been caused by an operative transaction that occurred *after* they sold their shares.

Plaintiffs argue that the shareholder vote provided approval for the merger and should be the operative transaction.  Pls.' Post-Arg. Reply 18–21 (D.I. 203).  Plaintiffs alternatively argue that if the shareholder vote is not the operative transaction, then the operative transaction should be the entire Merger Agreement, which bound the Hudson City and M&T through the terms of this contractual agreement.  *Id.* at 21.  Defendants argue that the close of the merger must be the operative transaction, consistent with the recent decision in *In re Pattern Energy Group, Inc.*, No. 20-275 (MN) (JLH), 2023 WL 2655537, at *4 (D. Del. Mar. 27, 2023).  Defs.' Sur-Reply at 2–4 (D.I. 207).

The Court first addresses the two disputed issues above regarding transaction causation before analyzing whether Plaintiffs have met their burden to show at class certification viable questions of law and fact that the transaction was the "direct cause of the pecuniary injury for which recovery is sought."  *Gen. Elec.*, 980 F.2d at 933.

### 2.2.3.1 The Shareholder Vote Cannot Be the Operative Transaction Under *Mills*

Regarding the first issue, the Court reads the Supreme Court's decision in *Mills* as precluding the shareholder vote from serving as the operative transaction.  Although *Mills* does not expressly define the term "transaction," its meaning can be inferred from language in the opinion.  Specifically, the:

> . . . requirement that the defect have a significant propensity to affect the voting process is found in the express terms of Rule 14a-9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to *the transaction for which approval is sought*, that correction of the defect or imposition of liability would not further the interests protected by 14(a).

*Mills*, 396 U.S. at 384 (emphasis added).  From the emphasized phrase above, it is clear the *Mills* Court considered the "transaction" as separate from the "approval" the shareholder vote provides for such a transaction.  In addition, Plaintiffs' own brief contains a similar differentiation between "Hudson Stockholders['] vote[]" and the "Merger Agreement" that the vote ratified.  *See* Pls.' Post-Arg. Reply 21 (D.I. 203).  Therefore, *Mills* teaches that the shareholder vote itself cannot be the operative transaction; instead the operative transaction must be the transaction that such a shareholder vote authorizes.

### 2.2.3.2 The Operative Transaction—the Merger—Can Include Events Prior to Its Closing

As for the second issue, although the shareholder vote cannot be the operative transaction, it does not follow that the operative transaction *must* be the close of the merger.  As discussed below, policy reasons support a fact-specific determination regarding the scope of the transaction under *Mills*.  The factual circumstances in the instant case support a conclusion at class certification that there are viable questions of law and fact about whether Plaintiffs' events in the DeRosa Event Study were directly caused by the full scope of the merger.

Plaintiffs argue a contract-based theory of transaction causation—that the merger is the operative transaction with a scope defined by the Merger Agreement, and shareholder approval of the merger bound the companies and caused Hudson City shareholders injury when M&T experienced adverse events during the pendency of the merger.  *See* Pls.' Post-Arg. Reply 23 (D.I. 203) ("Here, the 'contract' arose when the Hudson stockholders voted to ratify the Merger Agreement, and thus bound themselves and the Company to the Merger described therein").

Under their theory, damages to shareholders who sold their shares prior to the completion of the merger through its closing are not ineligible under 14(a) under the circumstances of this case, because the merger would still be the cause of damages incurred through performance of the Merger Agreement prior to the close of the merger.  *See Id.* at 21 (D.I. 203).  Plaintiffs point out that there are circumstances under securities causes of action where courts have found transaction causation for purposes of damages when the transaction in question had not yet been consummated.  *Id*. at 20–21 (discussing the "aborted purchaser-seller doctrine").

Defendants argue that the close of the merger must be the operative transaction, consistent with the recent decision in *In re Pattern Energy Group, Inc.*, No. 20-275 (MN) (JLH), 2023 WL 2655537, at *4 (D. Del. Mar. 27, 2023).  Defs.' Sur-Reply at 2–4 (D.I. 209).  Defendants further take issue with Plaintiffs' assertion of the aborted purchaser-seller doctrine, arguing that it is a doctrine only applicable to statutory standing under 14(e) claims involving fraudulent tender offers.  *Id.* at 6.

Although there is no authority before the Court to support application of the aborted purchaser-seller doctrine to a 14(a) claim, Plaintiffs only asserted the doctrine as an example of courts considering damages under the Exchange Act where there is a contract for a transaction, but the transaction was never completed.  *See* Pls' Post-Arg. Reply at 20 (D.I. 203).

### 2.2.3.3 Pattern Energy Applied to Different Circumstances

Plaintiffs invite the Court to deviate from its fellow District of Delaware court in *Pattern Energy*, arguing that under the "atypical" circumstances presented here the merger could have directly caused the asserted injuries to shareholders who sold their shares prior to the close of the merger.  *Id.* at 19–21.  Plaintiffs are correct that their circumstances are distinguishable from those

in *Pattern Energy* and that a bright-line rule against 14(a) damages caused prior to the close of a merger authorized through a misleading or omissive proxy statement violates Congressional intent.

Defendants argue that the reasoning and conclusion of the *Pattern Energy* court should apply here and that Plaintiffs' argument that this is an "atypical" case that should receive case-specific treatment on the question of transaction causation is incorrect. *See* Defs.' Post-Arg. Sur-Reply at 1–6 (D.I. 209). Defendants argue the conclusion from *Pattern Energy* that, for 14(a) claims involving mergers, alleged damages prior to the close of the merger fail to satisfy the transaction causation element and are unrecoverable because their damages "would not be the result of the [m]erger itself, which had yet to take place when the shares were sold." *Id.* at 2 (quoting *Pattern Energy*, 2023 WL 2655537, at *4). Plaintiffs argue that *Pattern Energy* is neither controlling nor persuasive because the facts of the instant case are distinguishable. *See* Pls.' Post-Arg. Reply 18–20 (D.I. 203). Plaintiffs argue that *Pattern Energy* is distinguishable because the merger in *Pattern Energy* closed within six days of the shareholder vote, as opposed to the two-and-a-half years between Hudson City's shareholder vote and its merger with M&T, and there were no alleged events in the six-day pendency in *Pattern Energy* to cause any diminution of value for its shareholders, compared with the multiple events alleged by Plaintiffs here. *Id.* at 18–19. Plaintiffs suggest that if the *Pattern Energy* court had been presented with the facts in this case, it might have decided differently. *Id.* at 19.

As Defendants note, the *Pattern Energy* court found that one of the reasons the case failed the predominance analysis was that proving injury to shareholders who sold both before and after the close of the merger would have required different evidence for shareholders who sold before the close of the merger and those who held shares until close. Defs.' Sur-Reply 2 (D.I. 209). Although such common evidence was not available in *Pattern Energy*, in the instant case Plaintiffs

have produced evidence of damages common to shareholders who sold both before and after the close of the merger through the DeRosa Event Study.   While the *Pattern Energy* court independently found that shareholders who sold prior to the close of the merger could not have been injured as a matter of law, the commonality of evidence in the instant case is notable and gives weight to Plaintiffs' suggestion that the *Pattern Energy* court might have decided differently under the facts presented here.  Had the lack of common evidence not been dispositive and had a merger delay been a direct cause of the plaintiffs' injury, the *Pattern Energy* court would have had to analyze these circumstances, which may have altered its legal analysis.

Further, the *Pattern Energy* court grounded its legal analysis and conclusion in the requirement that the "transaction [be] the direct cause of the pecuniary injury for which recovery is sought."  *Pattern Energy*, 2023 WL 2655537, at *3–4 (quoting *Gen. Elec.*, 980 F.2d at 933). However, the *General Electric* court did not create this rule to parse distinctions under 14(a) between the close of a merger and the overall merger process, but rather in light of the assertion of liability for damages caused by board mismanagement.  *General Electric*, 980 F.2d at 933 ("Yet the mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss.").  That the *Pattern Energy* court was not presented with any authority where a court had supported merger damages under 14(a) incurred prior to the close of a merger, *see Pattern Energy*, 2023 WL 2655537, at *4, does not imply that there are no circumstances under which such damages would be viable.

The plaintiffs in *Pattern Energy* alleged damages under 14(a) related to proxy statement assertions that the merger "represented the best value and highest price reasonably available to shareholders," when the defendants had been aware of an offer from another bidder that offered a

higher price and the other bidder "remained willing to engage on more favorable terms." *In re Pattern Energy Group Inc. Sec. Litig.*, C.A. No. 20-275 (MN) (JLH), 2022 WL 957761, at *7 (D. Del. Mar. 30, 2022) (internal quotation marks omitted). Under such circumstances, it would be impossible to accrue damages prior to the close of the merger, as the difference in merger consideration between the proposed merger and the alternate offer would have been the source of damages. Further, the *Pattern Energy* plaintiffs did not allege damages from events during the pendency of their merger, and the merger closed within six days of the shareholder vote authorizing it. *See generally Id.* at *4-6; Pls.' Post-Arg. Reply 18 (D.I. 203) (noting the shareholder vote on March 10, 2020 and the close of the merger on March 16, 2020).

In the instant case, however, Plaintiffs allege damages from reductions in share prices due to public disclosures about regulatory actions impacting M&T and creating greater risks that the merger might not close. These damages are asserted under a benefit-of-the-bargain theory, rather than one like that of *Pattern Energy* where damages were based in allegedly insufficient terms for the merger in question. Plaintiffs' damages each occurred from events prior to the close of the merger and over the course of a two-and-a-half year pendency of the merger, whether applied to shareholders who held through the close of the merger or to those who sold prior to the merger. The theories of liability and damages between the claims in *Pattern Energy* and the instant case are divergent. It would be unfair and illogical to permit damages in the instant case from events for shareholders who held shares through the close of the merger, but to disallow the *same damages* from the *same events* as those who sold their shares after the disclosures but before the merger's close.

### 2.2.3.4 Policy Considerations Support Broad Availability of Damages Under 14(a)

Plaintiffs further argue that the policy implications of adopting a bright-line rule in accordance with *Pattern Energy*, disallowing all damages during the pendency of mergers, could significantly undermine the enforceability of Section 14(a) in situations where "a misleading proxy [] eviscerate[s] stockholder value, but . . . the merger never close[s] due to the merger partner's wrongdoing."  Pls' Post-Arg. Reply 19 (D.I. 203).  The Court is persuaded by this argument.  The Supreme Court has underscored that Congress could not have intended to "insulate from private redress an entire category of proxy violations" under Section 14(a).  *Mills*, 396 U.S. at 382.  Indeed, Congress intended Section 14(a) to enforce "fair corporate suffrage [as] an important right that should attach to every equity security bought on a public exchange," and "[t]he provision was intended to promote the 'free exercise of the voting rights of stockholders . . . .'"  *Id.* at 381 (quoting H.R. Rep. No. 73-1383, at 12–13 (1934), and citing *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964)).  In light of this policy consideration, the Court is not persuaded to adopt a bright-line rule that all damages prior to a merger's closing in 14(a) claims are precluded as a matter of law regardless of the circumstances.

### 2.2.3.5  The Factual Circumstances Surrounding the Meaning of "Transaction" for Purposes of Transaction Causation Support Class Certification

The Parties have not argued, and the Court does not discern, binding authority defining the term "transaction" under the transaction causation element of 14(a) as a matter of law in *Mills*, *General Electric*, or otherwise.  Accordingly, defining the nature and scope of the transaction in a 14(a) case becomes a factual inquiry.  As the court in *Pattern Energy* discussed, the facts associated with Plaintiffs' alleged damages must be applied to the Third Circuit's requirement that the operative transaction must be the "direct cause of the pecuniary injury for which recovery is sought."  *See Pattern Energy*, 2023 WL 2655537, at *3; *Gen. Elec.*, 980 F.2d at 933.

In this case, the Hudson City-M&T Joint Proxy Statement itself provides helpful factual guidance.  The Joint Proxy Statement provides a description of the transactions that encompassed the merger between M&T and Hudson City:

> Over the course of the weekend of August 25–26, M&T and its legal advisor and Hudson City and its legal and financial advisors engaged in negotiations of *the terms of the proposed transaction, including the form and mix of consideration, representation and warranties, covenants and closing conditions, among others*.

Pls.' Mot., Ex. 1 (Joint Proxy Statement) 80 (D.I. 136) (emphasis added).  This emphasized language suggests the merger "transaction" encompassed more than merely the close of the merger, but the entirety of the terms of the Merger Agreement.  *See Id.* at 158–220 (Merger Agreement) (D.I. 136).  On the other hand, the Joint Proxy Statement continues:

> . . . Hudson City's board of directors unanimously adopted and approved the merger agreement and the *transactions* contemplated thereby, and declared the *merger and other transactions* contemplated by the merger agreement to be advisable. The Hudson City board of directors then directed Messrs. Hermance and Salamone and Hudson City's advisors to finalize and execute a definitive merger agreement *on the terms reviewed at the board meeting*.

Pls.' Mot., Ex. 1 (Joint Proxy Statement) 80 (D.I. 136) (emphasis added).  The first emphasized language of "merger and other transactions" could be interpreted to distinguish the close of the merger from the other terms of the Merger Agreement that contemplate "other transactions" than the close of the merger, which would argue in favor of Defendants' interpretation of the close of the merger as the operative transaction.  However, the phrase could also be interpreted as referring to the "merger" as the umbrella transaction, including sub-transactions encompassed in the four corners of the Merger Agreement, while "other transactions contemplated by the merger agreement" could refer to those transactions implied or required by law in furtherance of full performance of the Merger Agreement.  Under such an "umbrella transaction" interpretation, the sub-transactions could include, inter alia, execution of the Merger Agreement, issuance of the Joint

Proxy Statement, the shareholder votes by Hudson City and M&T, and the merger's closing. Further, the board then directed execution of the full "merger agreement *on the terms reviewed at the board meeting*."  When reviewed using the initial references to the "proposed transaction" argument as encompassing all of the terms of the Merger Agreement, this final authorization of the entire Merger Agreement supports Plaintiffs' argument that the "merger" as transaction included the entire Merger Agreement, and not merely the close of the merger.   The Court will not determine the facts on the merits at the class certification stage, but the preponderance of this evidence is sufficient to predict that Plaintiffs could succeed on the question of fact of whether the "proposed transaction" encompassed merely the close of the merger or the entire terms of the Merger Agreement for purposes of transaction causation.

### 2.2.3.6 The Merger Agreement Hudson City Shareholders Approved Could Not Be the Direct Cause of Plaintiffs' Asserted Damages

Even if Plaintiffs are able to establish loss causation, they still must establish transaction causation by satisfying the rule from *General Electric* that the merger directly caused their alleged damages.   Plaintiffs' three theories of damages, Trading Damages, Dividend Damages, and Closing Damages, have been described above.  Pls.' Mot. 10, Ex. 35 (D.I. 136).

First addressing Dividend Damages, Defendants argue that Hudson City was under no obligation to issue dividends nor would their shareholders have expected any dividends after August 2013, i.e., the original estimated closing date for the merger.  Defs.' Opp. 16 (D.I. 144); Defs. Opp., Ex. 1 ¶ 40 (D.I. 147).

Courts have consistently found in Section 14(a) cases that injuries from future management decisions by board members were not directly caused by the shareholder votes and proxies that elected them.  *Gen. Elec.*, 980 F.2d at 933 (where a director's subsequent mismanagement was the direct cause of the losses rather than the shareholder vote electing the director); *Edward J.*

*Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 797 (11th Cir. 2010) (where a director's failure to follow company policies was the cause of injury rather than the director's election by shareholders); *In re Zagg Sec. Litig.*, No. 2:12-CV-852, 2014 WL 505152, at *7 (D. Utah Feb. 7, 2014) (where a director's investment decisions were the cause of the losses rather than the election of the director which was the object of the proxy at issue); *In re Danaher Corp. S'holder Derivative Litig.*, 549 F. Supp. 3d 59, 73 (D.D.C. 2021) (where the directors' failure to nominate diverse candidates for future board seats was not caused by the election of these directors).   In a 14(a) merger context, at least one district court has found that mismanagement by company directors and officers prior to issuance of the merger proxy solicitations was too attenuated to satisfy the direct causation requirement of *General Electric*.  *Gannon v. Cont'l Ins. Co.*, 920 F. Supp. 566, 573, 584 (D.N.J. 1996) (where the merger agreement's consideration for the merger and the proxy statement reflected the nature of the mismanagement).

Consistent with these decisions, the Court is persuaded that Dividend Damages could not have been directly caused by the merger so as to satisfy the rule in *General Electric*.  As asserted by Defendants, decisions about whether to issue dividends are typically discretionary and authorized by a company's board.  Plaintiffs have offered no evidence that continued issuance of dividends was part of the Merger Agreement, despite efforts to produce board minutes showing how the Merger Agreement impacted board decision-making regarding dividends.  *See* Defs.' Opp., Ex. 1 (Denis Report), ¶ 42, Ex. 28 (DeRosa Tr.) 134:23–144:13, 154:15–154:5 (D.I. 147); *see also* Defs.' Mot. 18–19 (D.I. 146) (noting that Dr. DeRosa has been unable "identify the particular minutes supporting a connection between the merger delay and Hudson City's dividend cuts").  In fact, the very need to produce such minutes as evidence of causation actually supports an inference that the issuance of Hudson City dividends was indeed a matter of board discretion,

and thus could not satisfy the direct causation requirement of *General Electric*.  Therefore, Dividend Damages as alleged by Plaintiffs are too attenuated to satisfy the Third Circuit's rule in *General Electric* and the Court predicts they do not present a question of law common to the class.

Second, regarding Trading Damages and Closing Damages, the same intervening causes that undermined proximate causation under the element of loss causation, as discussed above, also attenuate the directness of causation for transaction causation.  Shareholders were already on notice of the April 12, 2013 disclosure, including the share price downdraft associated with that disclosure, when they voted for the merger on April 18, 2013.  Therefore, shareholders caused any injury from that disclosure themselves when they voted to approve the merger with that information in hand—the Merger Agreement could not have been the direct cause of shareholder economic loss for that disclosure, the loss having been incurred well before the shareholder vote authorizing the Merger Agreement.  As for the remaining asserted share price downdrafts on October 17, 2014, April 6, 2015, and October 1, 2015, the repeated board amendments to the Merger Agreement shareholders voted to approve were intervening causes, attenuating the relationship between the transaction shareholders approved (the original Merger Agreement) and the final transaction that was eventually performed to closing (the third amended Merger Agreement).  Therefore, the original Merger Agreement shareholders approved on April 18, 2013, could not have been the direct cause of any losses they may have incurred from these later downdrafts, but rather an indirect cause, where the subsequent amended Merger Agreements approved later by Hudson City and M&T boards would have been the direct causes of these losses. The Court therefore predicts that Plaintiffs will not be able to prove transaction causation on the merits for any of their asserted share price downdrafts under their asserted Trading Damages or Closing Damages theories.

**2.3 Conclusion**

Upon rigorous review of all the evidence and arguments of the Parties, the Court concludes Plaintiffs have not satisfied the commonality and predominance elements of Rule 23 by a preponderance of the evidence presently before the Court.  The evidence put forward at this stage supports the conclusion that Plaintiffs' Dividend Damages were not directly caused by the transaction at issue because they were the product of independent discretionary board decisions, not directly tied to the merger itself.  As for Trading and Closing Damages, the evidence presently before the Court supports conclusions that the preservation of diminished value from share price downdrafts on individual dates through to future dates in the distant future is unsubstantiated and likely wholly speculative, and thus unavailable for 14(a) claims in the Third Circuit.  However, even if these damages as asserted and supported were not wholly speculative, Plaintiffs have failed to demonstrate economic loss for three of their four asserted dates of share price declines, and have failed to demonstrate proximate causation for the remaining date along with two of the others.  Thus, Plaintiffs have failed to demonstrate loss causation for each of their four asserted damages dates.  Plaintiffs have also failed to demonstrate transaction causation for all four of their asserted damages dates.

None of the foregoing analysis or conclusions should be interpreted as determinations on the merits as to questions of law or fact.  Merits determinations are not appropriate at the class certification stage.  *See Amgen*, 568 U.S. at 466–67.  The Court has discussed the merits only to the extent necessary to determine the scope of a certifiable class under the commonality and predominance requirements of Rule 23.  In the Third Circuit this requires determining for each element of the claim whether questions of law and fact are common to the class and predominate over questions impacting putative class members individually.  *Reyes*, 802 F.3d at 489.  It also requires predictions as to the likelihood that Plaintiffs will be able to prove the elements of their

claims on the merits. *In re Lamictal*, 957 F.3d at 190 (citing *In re Hydrogen Peroxide*, 552 F.3d at 311). While Plaintiffs have failed to demonstrate a likelihood of success based on the evidence and arguments presently before the Court, the Court may always amend this Order if new evidence is available at later merits stages of this proceeding to address the deficiencies identified herein. *See In re Energy Future Holdings Corp*., 904 F.3d 298, 311 (3d Cir. 2018).

### 3.  Numerosity, Superiority, Typicality, Adequacy, and Ascertainability

In its earlier Memorandum Opinion and Order disposing of Plaintiffs' Motion for Class Certification, the Court conducted extensive analysis and discussion regarding the remaining Rule 23 elements of numerosity, superiority, typicality, adequacy, and ascertainability. *See generally Jaroslawicz*, C.A. No. 15-00897-EJW, 2023 WL 5528723, at *12, 27–39. While nothing in the Parties briefs to the Third Circuit or the Court's rigorous analysis of the evidence and arguments by the Parties leads the Court to alter its analysis on these issues from that original discussion, the Court need not reach this analysis or its prior conclusions due to Plaintiffs failure to satisfy the commonality and predominance elements of Rule 23.

However, while the issue of ethical misconduct by Mr. Kenneth Elan as part of the Court's prior adequacy analysis is no longer relevant to a determination of Plaintiffs' Motion for Class Certification, as an ethical matter before the Court, it still needs to be addressed. The Court hereby repeats its analysis from its earlier Memorandum Opinion and Order of the ethical propriety associated with Mr. Elan's $300 contribution to the investment broker of one of the named Plaintiffs. *See id.* at *31–33, n.7–10.

### 3.1 Whether Mr. Elan's Conduct was Unethical

Mr. Elan's conduct was raised before the Court regarding Plaintiffs' Motion for Class Certification as relevant to the adequacy of class counsel and lead plaintiffs. Ethical concerns having been raised before the Court, the Court has a duty to explore and address them. At the

request of the Court, the Parties undertook extensive additional discovery and supplemental briefing regarding these circumstances to address Mr. Elan's conduct in recruiting Mr. Krublit as a named Plaintiff in this matter, whether this conduct violated the New York Rules of Professional Conduct that govern Mr. Elan as an attorney licensed in New York, and how the conduct impacts the adequacy of both Mr. Krublit as class representative and the proposed class counsel.  The Court need not reach the question of Mr. Krublit's adequacy to decide Plaintiffs' Motion for Class Certification, but now addresses the ethical concerns underlying that question.

Mr. Krublit was recruited as a lead plaintiff in this matter by Mr. Elan in October 2015. Through two affidavits and his deposition by Defendants, Mr. Elan detailed the events surrounding his recruitment of Mr. Krublit as a co-lead Plaintiff.  *Id.* at Ex. 1 (Elan Tr.), Ex. 9 (Elan Aff. I); Elan Aff. II (D.I. 212).  At the time, Mr. Elan was an attorney working with attorneys, Mr. Roy Jacobs and Ms. Deborah Gross, to recruit potential new lead plaintiffs for this case.  Defs.' Post-Arg. Opp. 9, Ex. 1 (Elan Tr.) 36:14–17 (D.I. 199).  Mr. Elan was introduced to Mr. Krublit through Mr. Krublit's financial advisor and broker, Mr. Geoff Feinstein of the Jeffrey Matthews Financial Group.  Defs.' Post-Arg. Opp. 8 (D.I. 199).  Mr. Elan came into contact with Mr. Feinstein after reaching out to his longtime contact, Mr. Gene Stice, who had previously introduced Mr. Elan to other financial brokers who then referred their clients to Mr. Elan for potential legal representation. *Id.*  At the time, Mr. Stice worked as a compliance officer at Jeffrey Matthews Financial Group, and was a colleague of Mr. Feinstein.  *Id.*

Mr. Elan donated $300 to a charity of Mr. Feinstein's amidst Mr. Elan's efforts to secure Mr. Krublit as a lead plaintiff through Mr. Feinstein, and the payment appears to have been a quid

pro quo in exchange for referring or recommending Mr. Elan to Mr. Krublit.[7]  Further, Mr. Elan's

attempts to explain away this appearance are not entirely credible.[8]  Even if the donation did not

---

[7]    Mr. Elan sent Mr. Feinstein an initial email on October 8, 2015, after Mr. Feinstein's colleague, Mr. Stice, had suggested Mr. Elan contact Mr. Feinstein about his clients with Hudson City stock.  Defs.' Post-Arg. Resp. 9 (D.I. 199).  Mr. Feinstein did not respond to this email, and Mr. Elan sent a follow-up on October 9, 2015.  *Id.* at 10.  Mr. Feinstein then responded about 45 minutes later that he had spoken to his clients and that neither were interested in being lead plaintiffs.  *Id.*  Mr. Elan replied 15 minutes later with information about how strong the case was and how beneficial it would be for his clients to be "steering the ship instead of being below deck." *Id.* at 11.

Five days later, on October 14, 2015, Mr. Elan emailed Mr. Feinstein and Mr. Stice to offer a "presentation" about the strength of the case to Mr. Feinstein's clients.  *Id.* at 11–12.  Mr. Stice and Mr. Elan spoke on the phone shortly thereafter, and Mr. Elan offered to take Mr. Feinstein "out for a drink."  *Id.* at 12.  Mr. Stice responded to Mr. Elan's earlier email about 25 minutes later that Mr. Feinstein "is very active with the JCC and in lieu of a 'drink' he would be happy to take a donation."  *Id.* at Ex. 15, JM-108.  Mr. Elan emailed Mr. Stice a few minutes later, at 5:17 PM, and wrote, "You tell Geoff, all I need is a name and I will mail him a check."  *Id.* at Ex. 15, JM-108.  Only after this donation offer by Mr. Elan did Mr. Feinstein then email Mr. Krublit for a second conversation about the Hudson City litigation, just a few minutes later at 5:30 PM.

After some further correspondence the following morning, on October 15, 2015, about the potential amount of damages, Mr. Feinstein emailed at 10:54 AM to provide Mr. Krublit's name and phone number to Mr. Elan and to tell him that Mr. Krublit would be available by phone until noon.  *Id.* at Ex. 15, JM-113–15.  Mr. Elan then called Mr. Krublit, and sometime later that day after the phone conversation, Mr. Krublit agreed to retain Mr. Elan.  *Id.* at Ex. 17 (Elan Aff.) ¶ 26. At 12:05 PM, just after providing Mr. Elan the contact information of Mr. Krublit, and only five minutes after Mr. Krublit was no longer available for a call, Mr. Feinstein emailed Mr. Elan a solicitation for a fundraiser at the Bridgewater JCC.  *Id.* at Ex. 15, JM-118.

At 9:41 AM on October 16, 2015, Mr. Feinstein emailed Mr. Elan the financial statements of Mr. Krublit at Mr. Elan's request, and signed the email with "Let's make some $$$$$."  *Id.* at Ex. 5, JM-117.  Mr. Feinstein does not remember what this referred to, but said it could have been the case against Hudson City or it "[c]ould be a fundraiser as well."  *Id.* at Ex. 13 (Feinstein Tr.) 62:8–16.  At 11:39 AM later that morning, Mr. Elan emailed Mr. Feinstein to say "a check is in the mail to you at the office."  *Id.* at Ex. 15, JM-118.

The sequence and timing of these communications demonstrate a series of transactional events between Mr. Elan and Mr. Feinstein, which strongly suggest a quid pro quo.  Mr. Feinstein first communicated a lack of interest by his clients.  Mr. Elan followed up days later with encouragement to reconsider, and offered Mr. Feinstein a drink.  Mr. Feinstein, through Mr. Stice, solicited the prospect of a donation.  Only after a positive response from Mr. Elan and request for "a name" did Mr. Feinstein provide Mr. Krublit's contact information.  Immediately after doing so, Mr. Feinstein sent the formal solicitation of the donation to the Bridgewater JCC fundraiser. Finally, Mr. Elan sent the donation check a day later, only after securing Mr. Krublit as a client

represent a quid pro quo for recommending Mr. Elan, Mr. Elan and Plaintiffs have admitted it was a "thank you," Defs. Post-Arg. Resp., Ex. 1 (Elan Tr.), 33:20–21, 34:5–7, 35:1–2, Ex. 9 (McDonough Aff.) ¶ 22, Ex. 17 (Elan Aff.) ¶ 3 (D.I. 200), which is prohibited under Rule 7.2 of the New York Rules of Professional Conduct.[9]

---

and receiving Mr. Krublit's financial statements confirming his ownership of Hudson City shares. This course of events was neither haphazard nor inconsequential.

[8]    Mr. Elan has denied that he waited until Mr. Krublit was going to be a class member before he sent his donation to Mr. Feinstein, and described his action of sending the check a day later as reasonably prompt and consistent with paying other expenses for the week on the last day of the week.  *See* Defs.' Post-Arg. Resp., Ex. 1 (Elan Tr.) 113:24–114:8.  He also has stated that he gives to a number of Jewish-affiliated charities because, "[m]y mother, rest in peace, was very involved for her entire adult life with Jewish organizations . . . this is my mom's memory and everything else."  *Id.* at 115:8–15.

However, Mr. Elan's donation of $300 to the Bridgewater JCC also significantly exceeds the typical size of his charitable donations.  *See* Elan Aff. II (D.I. 212) (where his donations to other charities ranged from $100 to $200).  Three days after Mr. Elan sent the check, Mr. Feinstein emailed him to say "Thanks for the donation!!!!!! Greatly appreciated!!!"  Defs.' Post-Arg. Resp., Ex. 3 (Elan Prod.) at 30.  This exclamatory response is a change in tone from Mr. Feinstein's brief responses to Mr. Elan's outreach prior to his promise of a donation and retention of Mr. Krublit, and appears highly consistent with how a recipient of an unexpectedly large donation would respond.  It appears that this was Mr. Elan's intended effect, and consistent with a desire to build a relationship with someone who could be a valuable source of referrals moving forward.  Mr. Elan's donation was in the context of an email from Mr. Feinstein that said, "Let's make some $$$$$," and where Mr. Feinstein does not recall the specific meaning of that statement, but has suggested that it "[c]ould be a fundraiser as well."  *Id.* at Ex. 13 (Feinstein Tr.) 62:8–16.  Mr. Elan further continued to reach out to Mr. Feinstein about future litigation, and after one such outreach offered an encouraging, "you are still my 'go to guy.' Thanks for checking."  *Id.* at Ex. 3 (Elan Prod.) 5.

This all suggests, if not a quid pro quo, a pattern intended to elicit reciprocity in referral of clients on an ongoing basis.  It is not the Court's place to adjudge the question, but this seems more than enough to raise the question of propriety under Rule 7.2 of the New York Rules of Professional Conduct.

[9]    "A lawyer shall not compensate *or give anything of value* to a person or organization to recommend or obtain employment by a client, *or as a reward* for having made a recommendation resulting in employment by a client . . . ."  22 NYCRR 1200.0, R. 7.2(a) (emphasis added).  Here, that Mr. Elan donated to Mr. Feinstein's favorite charity instead of directly paying him would seem to be no defense, because the donation was something of value given to an organization of which

Mr. Elan retained counsel, Mr. Chris McDonough, to serve as an ethics expert on his behalf, who also filed an Affidavit and was deposed. Defs.' Post-Arg. Resp., Ex. 5 (McDonough Tr.), Ex. 9 (McDonough Aff.) (D.I. 200).  Mr. McDonough stated his opinion that the evidence of Mr. Elan's donation and interactions with Mr. Feinstein in recruiting Mr. Krublit did not violate Rule 7.2 of New York or Delaware Rules of Professional Conduct, because they did not demonstrate a greater than nominal amount provided with intent to induce or reward a recommendation and undertaken in contemplation of that recommendation.  *See* Defs. Post-Arg. Resp., Ex. 9 11 (D.I. 200).  The Court does not find Mr. McDonough's expert testimony credible.[10]

---

Mr. Feinstein was a part as a member of the board of the JCC.  Defs.' Post-Arg. Resp., Ex. 15 JM-118.  Further, the Court construes this "thank you" gift as a "reward."

[10]     Mr. McDonough stated in his Affidavit that "I also base my opinion upon the facts as set forth in Mr. Elan's affidavit."  Defs.' Post-Arg. Resp., Ex. 9 ¶ 5 (D.I. 200).  In Mr. McDonough's deposition he testified that he could not recall if he had ever seen Mr. Elan's Affidavit when posed questions about Mr. Elan's experience as referenced in Mr. Elan's Affidavit.  *Id.* at Ex. 5(McDonough Tr.) 65:14–20 ("Q: . . . Have you ever seen his affidavit before?  A: I honestly don't recall.  Q: So you may have written your affidavit on the 14th without having reviewed Mr. Elan's affidavit?  A: I don't recall.").  Mr. McDonough also stated he executed his own Affidavit two days prior to the execution of Elan's first Affidavit.  *Id.* at Ex. 5 (McDonough Tr.) 66:12–21 ("Q: . . . Mr. Elan actually doesn't sign this until the 16th of January. . . .  Which is two days after you signed your affidavit.  A: Correct.  Q: So you could not have seen the final when you signed your affidavit, right?  A: Yes, correct.").  Ultimately, Mr. McDonough could not confirm he had based his opinion on Mr. Elan's Affidavit, as he had sworn in his own Affidavit.  *Id.* at Ex. 5 (McDonough Tr.) 67:5–11 ("Q: No.  Let me ask you directly.  Did you base your opinion on a draft of Mr. Elan's affidavit?  A: I don't know whether my information came from Mr. Elan verbally or through his affidavit or through a writing.  I just don't recall.").

        Mr. McDonough also failed to review whether Rule 7.3 was violated, despite his having access to the transcript of the Oral Argument held on December 15, 2022, where the Court stated its express wish that the Parties address Rule 7.3.  *See id.* at Ex. 5 (McDonough Tr.) 62:20–63:15 ("Q: The Court says, 'And what's more sensitive to me is violations of the Rule of Professional Conduct, including Model Rule 7.2 and 7.3.'  Do you see that?  A: Yes.  Q: But you, sir, did not cite 7.3 in your affidavit, correct?  A: No, I didn't feel it was relevant. . . . Q: But you had access to this entire transcript, correct?  A: Correct.").  Mr. McDonough provided no substantive explanation why he did not address Rule 7.3 other than the conclusory statement he "didn't feel it was relevant" based on the scope of the inquiry "[a]s it has been explained to me" through some

Based on the above evidence, the Court finds that a reasonable person would find Mr. Elan's $300 donation as more than nominal under these circumstances, and that Mr. Elan himself thought of it as more than nominal as well, given his typical range of donations to charities.  The Court also finds Mr. Elan intended to reward Mr. Feinstein for putting Mr. Elan in touch with Mr. Krublit and that the donation was undertaken in contemplation of that outreach, based on Mr. Elan's admission in his own affidavit, the email exchanges between Mr. Elan and Mr. Feinstein, and Mr. McDonough's statement that it was a thank you in his Affidavit.  The Court would need more evidence before it to make a finding that Mr. Feinstein "recommended" Mr. Elan, and the legal distinctions between recommending, referring, or merely putting in contact have not been briefed before the Court.  However, there are sufficient facts to raise the question of whether there was an impermissible "recommendation" by Mr. Feinstein under the New York Rules of Professional Conduct.  Therefore, the Court finds sufficient evidence to question whether Mr. Elan's conduct violated the ethical rules to which he was bound.

The Court currently takes no action on its finding regarding Mr. Elan's conduct, as it is not dispositive of the Motions presently before the Court.  However, the Court reserves its

---

combination of speaking with Mr. Elan and Plaintiffs' lead counsel.  *Id.* at 62:20–63:3 ("Q: So you disagree with the Court that it's relevant, sir?  A: I'm not disagreeing with the Court. . . . Secondly, if you look at paragraph 5, I set out in the paragraph exactly what I was tasked to opine upon.  And that's what I did."); *id.* at 79:22–80:12 ("Q: Let's go to paragraph 5 again.  You've made it very clear to me that this is the paragraph that tells me what work -- what you thought the scope of your assignment was, correct?  A: Correct.  Q: And you say, 'As it has been explained to me.'  Who explained it to you?  A: I spoke to counsel, one of the attorneys, and I spoke to Mr. Elan as well as reviewing the transcripts.  Q: And did the attorneys, Mr. Williams or Mr. Coren, approve this paragraph? . . . A: I don't believe so.  I don't think I asked for their approval.").  However, at Oral Argument on June 2, 2023, Plaintiffs' counsel stated he communicated the scope of the Court's concerns with Mr. McDonough and avoided further guidance of Mr. McDonough because Mr. Elan, and not Plaintiffs' counsel, had retained Mr. McDonough.  Oral Arg., June 1, 2023, at 11:30–14:05.  Based on this sequence, the Court doubts the credibility of Mr. McDonough's specific testimony in this case, and rejects his qualification as an ethics expert.

discretion to consider these findings in later stages of this matter, insofar as the findings become relevant at those stages.

## VI.    <u>CONCLUSION</u>

As the above analysis has explained, the Court concludes that for purposes of class certification the DeRosa Event Study portion of the Keath/DeRosa Report satisfies the *Daubert* standard.  The Court further concludes that Plaintiffs have failed to satisfy their burden in their Motion for Class Certification regarding the commonality and predominance elements of Rule 23. Accordingly, the present Memorandum Opinion and Order shall substitute as the entire Order addressing Defendants' Motion to Exclude and Plaintiffs' Motion for Class Certification, and Court's August 28, 2023 Memorandum Opinion and Order, D.I. 218; *Jaroslawicz v. M&T Bank Corp.*, C.A. No. 15-00897-EJW, 2023 WL 5528723 (Aug. 28, 2023), is hereby VACATED.  In accordance with the reasoning herein, Defendants' Motion to Exclude, D.I. 145, is hereby DENIED, and Plaintiffs' Motion for Class Certification, D.I. 136, is hereby DENIED.

The Court reserves its discretion to amend this Memorandum Opinion and Order if new evidence available in the later merits stages of this proceeding alters its analysis regarding the commonality and predominance requirements of Rule 23.

SO ORDERED