IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID JAROSLAWICZ, Individually and on behalf of all others similarly situated,<br><br>      *Plaintiffs*,<br><br>v.<br><br>M&T BANK CORPORATION, HUDSON CITY BANCORP INC., ROBERT G. WILMERS, RENE F. JONES, MARK J. CZARNECKI, BRENT D. BAIRD, ANGELA C. BONTEMPO, ROBERT T. BRADY, T. JEFFERSON CUNNINGHAM III, GARY N. GEISEL, JOHN D. HAWKE, JR., PATRICK W.E. HODGSON, RICHARD G. KING, JORGE G. PEREIRA, MELINDA R. RICH, ROBERT E. SADLER, JR., HERBERT L. WASHINGTON, DENIS J. SALAMONE, MICHAEL W. AZZARA, VICTORIA H. BRUNI, DONALD O. QUEST, JOSEPH G. SPONHOLZ, CORNELIUS E. GOLDING, WILLIAM G. BARDEL, and SCOTT A. BELAIR,<br><br>      *Defendants*. | C.A. No. 15-00897-EJW |

**MEMORANDUM OPINION and ORDER**

    Francis J. Murphy, Jr., Jonathan L. Parshall, MURPHY, SPADARO & LANDON, Wilmington, DE; Steven M. Coren, Benjamin M. Mather, Matthew R. Williams, KAUFFMAN, COREN & RESS, P.C, Philadelphia, PA.

*Counsel for Plaintiffs*.

    Brian M. Rostocki, Anne M. Steadman, Justin M. Forcier, REED SMITH LLP, Wilmington, DE; Jonathan K. Youngwood, Janet A. Gochman, Tyler A. Anger, V. Noah Gimbel, Katherine A. Hardiman, SIMPSON, THACHER & BARTLETT, New York, NY.

*Counsel for Defendants, M&T Bank Corporation, Brent D. Baird, Angela C. Bontempo, Robert T. Brady, T. Jefferson Cunningham III, Mark J. Czarnecki, Gary N. Geisel, John D.*

*Hawke, Jr., Patrick W.E. Hodgson, Rene F. Jones, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler Jr., Herbert L. Washington, and Robert G. Wilmers.*

Kevin R. Shannon, Daniel Rusk, Potter Anderson & Corroon LLP, Wilmington, DE; Tracy Richelle High, Scott A. Foltz, Sullivan & Cromwell LLP, New York, NY.

*Counsel for Defendants, Hudson City Bancorp Inc., Michael W. Azzara, William G. Bardel, Scott A. Belair, Victoria H. Bruni, Cornelius E. Golding, Donald O. Quest, Denis J. Salamone, and Joseph G. Sponholz.*

June 13, 2024
Wilmington, Delaware

**WALLACH, U.S. Senior Circuit Judge, sitting by designation:**

## I.      INTRODUCTION

On February 7, 2024, the Court issued a Memorandum Opinion and Order vacating the Court's earlier August 28, 2023 Opinion ("*Jaroslawicz I*") and denying Plaintiffs' Motion for Class Certification ("Original Motion" or "Original Motion for Class Certification") and Defendants' Motion to Exclude ("Motion to Exclude") the Expert Report and Opinions of M. Travis Keath and David DeRosa ("Keath/DeRosa Report" or "Report"). *Jaroslawicz v. M&T Bank Corp.*, No. 15-00897, 2024 WL 474846 (D. Del. Feb. 7, 2024) (*Jaroslawicz II* or February 7, 2024 Opinion).

Presently before the Court are Plaintiffs' Motion for Reconsideration of the February 7, 2024 Order, D.I. 224, and Plaintiffs' Renewed Motion for Consideration, D.I. 227.  These Motions are fully briefed and ripe for decision.  The Court's February 7, 2024 Opinion provides an extensive summary of the procedural history, factual background, and dispositive arguments by the Parties relevant to resolving Plaintiffs' Original Motion for Class Certification and Defendants' Motion to Exclude the Keath/DeRosa Report, and this background discussion need not be repeated here.  The Court hereby reincorporates that discussion of background and procedural history. *Jaroslawicz II*, 2024 WL 474846, at *2–5.

The following discussion first addresses the Motion for Reconsideration before turning to the Renewed Motion for Class Certification.  For the reasoning that follows, both Motions are DENIED.

## II.      MOTION FOR RECONSIDERATION

Plaintiffs argue in their Motion for Reconsideration that the Court committed clear error in *Jaroslawicz II* in making merits predictions of Plaintiffs' potential to satisfy their burden of proof

at the merits stage.  Pls.' Mot. for Rec. at 1–5 (D.I. 225).  Plaintiffs further argue that several of the specific predictions in *Jaroslawicz II* were clearly erroneous.  *Id.* at 6–10.  Defendants argue that the Court's predictions in *Jaroslawicz II* were entirely appropriate under Third Circuit and Supreme Court precedent, and that the individual predictions were not clearly erroneous.  *See generally* Defs.' Opp. to Rec. (D.I. 234).

## A.  Legal Standard for a Motion for Reconsideration

A motion for reconsideration "should be granted only where the moving party shows . . . '(1) an intervening change in the controlling law; (2) the availability of new evidence . . . or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.'"  *In re Marinari*, 838 F. App'x 709, 712 (3d Cir. 2021) (quoting *In re Energy Future Holdings Corp.*, 904 F.3d 298, 311–12 (3d Cir. 2018)).  Both Plaintiffs and Defendants concede that reconsideration is appropriate "to correct a clear error of law or fact or to prevent manifest injustice.  Pls.' Mot. for Rec. at 1 n.2 (quoting *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)); *See* Defs.' Opp. to Rec. at 2 (quoting *Butamax Advanced Biofuels LLC v. Gevo Inc.*, Nos. 12-1036, 12-1200, 12-1300, 2015 WL 4919975, at *1 (D. Del. Aug. 18, 2015).

## B.  Plaintiffs' asserted errors of law and fact are unavailing.

Plaintiffs argue that the Court's February 7, 2024 Opinion clearly erred in interpreting and applying the legal standard for predominance under Rule 23.  Pls.' Mot. for Rec. at 1–5 (D.I. 225). The Court purportedly erred by making predictions about the ability of Plaintiffs to prove the elements of their claim on the merits because these predictions are contrary to the legal standard for predominance at class certification.  *Id.*  Plaintiffs contend the predominance standard requires that courts only delve into the merits where strictly necessary to determine whether the elements of Rule 23 are met, and that predictions about how the later merits stages will resolve are inappropriate under this standard.  *Id.*

Plaintiffs further argue that the predictions themselves contained clear errors, and that the evidence Plaintiffs have provided amply meets the legal standard for predominance under Rule 23. *Id.* at 6–10.

The legal standard for predominance under Rule 23(b)(3) requires the Court to make findings that resolve the Parties' factual and legal disputes regarding the essential elements of the claim to the extent they are relevant to whether common issues predominate.

Plaintiffs argue that the Court improperly engaged in predictions of "[P]laintiffs' potential to satisfy their burden of proof at the merits stage," based on "a mistaken view that the direction in *Hydrogen Peroxide* and other cases to engage in a 'rigorous analysis' at the class certification stage" requires such predictions. Pls.' Mot. for Rec. at 2 & n.4 (D.I. 225) (referencing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)). The Court did make predictions regarding the ability of Plaintiffs to succeed on the merits of their claim based on the common evidence submitted in support of their Motion for Class Certification. As for the propriety of doing so under binding precedent, the Court now once again explains its understanding of the class certification legal standard. Any further dispute about this understanding will need to be addressed on appeal.

At the class certification stage,

[T]he District Court must conduct a 'rigorous analysis' of the evidence and arguments presented. . . . That involves three key aspects. First, the court must find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence. . . . Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits. . . . Third, the court must consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it. . . . If after all that, the Court is convinced by a preponderance of the evidence that the plaintiffs' claims are capable of common proof at trial, then the predominance requirement is satisfied.

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (cleaned up).

"When doing so, the court cannot be bashful. . . . Rule 23 gives no license to shy away from making

factual findings that are necessary to determine whether the Rule's requirements have been met."

*Marcus v. BMW of N. Am.*, 687 F.3d 583, 591 (3d Cir. 2012).   "Although the trial court has

discretion to grant or deny class certification, the court should not suppress 'doubt' as to whether

a Rule 23 requirement is met—no matter the area of substantive law." *Hydrogen Peroxide*, 552

F.3d at 321.

> We recognize the Supreme Court has observed that '[p]redominance is a test readily
> met in certain cases alleging consumer or securities fraud or violations of the
> antitrust laws.' . . . But it does not follow that a court should relax its certification
> analysis, or presume a requirement for certification is met, merely because a
> plaintiff's claims fall within one of those substantive categories.

*Id.* at 321–22 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

Class certification requires common evidence for the class that satisfies more than a

"threshold showing" of plausibility.   *See Hydrogen Peroxide*, 552 F.3d at 307.   Rather, the

common evidence before the court must be *actually* sufficient for Plaintiffs to prevail at trial for

each of the elements of their claim, and the court's analysis will often resemble a merits analysis.[1]

---

[1]   *See Marcus*, 687 F.3d at 591 ("The requirements set out in Rule 23 are not mere pleading
rules." (quoting *Hydrogen Peroxide*, 552 F.3d at 316)); *Hydrogen Peroxide*, 552 F.3d at 321 ("A
'threshold showing' could signify, incorrectly, that the burden on the party seeking certification is
a lenient one (such as a prima facie showing or a burden of production) or that the party seeking
certification receives deference r a presumption in its favor.   So defined, 'threshold showing' is an
inadequate and improper standard.   '[T]he requirements of Rule 23 must be met, not just supported
by some evidence.'" (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006)
(*IPO*)); *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 304–05 (3d Cir. 2016) ("[A] district
court is called to formulate some *prediction* as to how specific issues will play out . . . in a given
case . . . .   The court cannot rely on a mere threshold showing that a proposed class-wide method
of proof is plausible in theory. . . .   Rather, the court's Rule 23(b)(3) finding *necessarily entails
some analysis of whether the proposed class-wide evidence will actually be sufficient for the class
to prevail on the predominant issues in the case.*   If class-wide evidence is lacking, the court cannot

That said, "if the court decides that the central, predominant issues in the case are common, then Rule 23(b)(3) is met despite the possibility that some subsidiary issues will require individualized evidence." *Harnish*, 833 F.3d at 305 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)).

Plaintiffs argue that the Court erred in unnecessarily undertaking merits "predictions," Pls.' Mot. to Rec. at 2 n.4, but there was no clear error of law given the above legal standards for class certification decisions. Plaintiffs note each of the predictions made by the Court in its analysis of the competing evidence and arguments by the Parties, and that these predictions were stated with regard to whether "Plaintiffs have the potential to satisfy their burden of proof at the merits stages" based on this evidence. *Id.* (quoting *Jaroslawicz II*, 2024 WL 474846, at *14). Plaintiffs contend that any consideration of the merits at class certification must be "for the sole purpose of ensuring that the alleged claims can be properly resolved on a class-wide basis." *Id.* at 3 (citing *Hydrogen Peroxide*, 552 F.3d at 317 n.17). The Court does not disagree with Plaintiffs on this point.

Plaintiffs next argue the Court misread *Hydrogen Peroxide* and *Lamictal* to allow predictions on each of the elements of the cause of action, and instead these cases only "permit a narrow determination as to whether the [specific issues pertinent to their antitrust claims] were too individualized for class treatment." *Id.* at 3 n.5. In so arguing, Plaintiffs selectively quote the multi-step process for "rigorous analysis" laid out by the *Lamictal* court, and emphasize only its conclusion that predominance is satisfied where "the plaintiffs' claims are *capable of common proof at trial . . . .*" *Id.* at 4 n.5 (emphasis by Plaintiffs) (quoting *Lamictal*, 957 F.3d at 190–91).

---

be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication. *This analysis will often resemble a merits determination, in that it relates to plaintiffs' ability to prove the elements of their claims.*") (emphasis added) (discussing and elaborating on *Hydrogen Peroxide*) (cleaned up).

However, Plaintiffs' quotation strangely omits the instruction by the *Lamictal* court that to determine whether the claims are capable of common proof, a court's rigorous analysis must first "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits" and "consider 'all relevant evidence and arguments,' including 'expert testimony, whether offered by a party seeking class certification or by a party opposing it.'" *Lamictal*, 957 F.3d at 190–91 (quoting *Hydrogen Peroxide*, 552 F.3d at 307); *see also Hydrogen Peroxide*, 552 F.3d at 324 ("[A] district court . . . may not decline to resolve a genuine legal or factual dispute because of concern for an overlap with the merits.").

Plaintiffs assert that a "merits inquiry is not permissible when the merits issue is unrelated to a Rule 23 requirement." Pls.' Mot. for Rec. at 4 (quoting *In re Community Bank of N. Va.*, 622 F.3d 275, 294–95 (3d Cir. 2010) (quotation omitted)); *see also Id.* at n.6 (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision . . . .").  However, Plaintiffs do not identify how the issues the Court analyzed are unrelated to the predominance requirement of Rule 23.

The Court acknowledges that the principles of "rigorous analysis" at class certification as described by binding authority in the Third Circuit are in tension.  Courts must simultaneously rigorously review all the evidence and arguments, make findings resolving disputes even if they entail the merits of the claim, and even predict (after resolving these disputes and making these findings) whether the common evidence is sufficient for plaintiffs to prevail on the merits at trial.  Yet, despite the rigor of this review, courts must also avoid evaluating the probable outcome of the case on the merits.  In closely contested cases such as the present one, threading this needle can be difficult.

The only way to reconcile this tension is to acknowledge that a court's class certification review is not a complete picture of the case, but only of the *common* evidence advanced by plaintiffs at this stage. Any merits-like analysis underlying a prediction at the class certification stage is thus necessarily incomplete, as it excludes any individualized evidence that might be brought to bear by plaintiffs at the later merits stages. This is the reason the Third Circuit has been careful to note that a court's findings at class certification are not properly construed as merits findings, as the court is always free to make contrary findings at later merits stages of the proceeding. *Hydrogen Peroxide*, 552 F.3d at 318 ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.").

In this context, the Court's predictions in its February 7, 2024 Order did not delve unnecessarily into the merits. The "central, predominant issues in the case," *Harnish*, 833 F.3d at 305, are the elements of Plaintiffs' Section 14(a) claim that the Parties dispute at class certification, namely the transaction causation and loss causation elements. If Plaintiffs fail to prove either of these disputed elements on the merits, then their Section 14(a) action likewise fails. Questions about Plaintiffs' common evidence to prove these elements are therefore not "subsidiary," *id.*, and a failure to prove either element with common evidence means Plaintiffs must meet their burden at trial with individualized evidence instead, and individual issues would then predominate. *See Lamictal*, 957 F.3d at 190 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." (quoting *Hydrogen Peroxide*, 552 F.3d at 311)).

This is precisely what the Court concluded in its February 7, 2024 Opinion. After weighing all the evidence and arguments, the Court concluded that the preponderance of *common* evidence

could not prove either the transaction causation or loss causation elements of Plaintiffs' Section 14(a) claim on the merits.  *See Jaroslawicz II*, 2024 WL 474846 at *16–29.  In other words, the balance of common evidence before the Court at class certification is not "sufficient for the class to prevail on the predominant issues of the case," *Harnish*, 833 F.3d at 305, and "[P]laintiffs' claims are [not] capable of *common proof* at trial," *Lamictal*, 957 F.3d at 191 (emphasis added). It is true that the Court couched its findings in terms of "predictions" of likely success on the merits, but this was only in service of determining whether the common evidence would be sufficient, or if individualized evidence would be required.[2]  It was not a "free-ranging merits inquir[y]," Pls.' Mot. for Rec. at 5 (quoting *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013)), but rather one limited to the essential elements of Plaintiffs' cause of action, and one that predictably "resemble[d] a merits examination" given the extent of the disputed evidence and elements, *Harnish*, 833 F.3d at 305; *see also Hydrogen Peroxide*, 552 F.3d at 324 (quoting *IPO*, 471 F.3d at 42 ("rejecting the view that 'a district judge may not weigh conflicting evidence and determine the existence of a Rule 23 requirement just because that requirement is *identical* to an issue on the merits.'")) (emphasis added).  If this was unclear in the Court's February 7, 2024 Opinion, it should be clear now.

**C.  The Court's findings and predictions did not contain clear errors.**

Plaintiffs make five arguments that the Court clearly erred in its analysis and predictions; that it erred by:

---

[2]     *See Lamictal*, 957 F.3d at 190 ("Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, *a district court must formulate some prediction* as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case. . . . *If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.*" (quoting *Hydrogen Peroxide*, 552 F.3d at 311)) (emphasis added).

A. Considering at all whether the common evidence was sufficient to prevail on the loss causation element of their Section 14(a) claim.  Pls.' Mot. for Rec. at 5 & n.7 (D.I. 225).

B. Requiring that the common evidence address intervening events or market forces subsequent to the event dates on which Plaintiffs seek to establish injury and damages with their expert report.  *Id.* at 6–10, Sec. (a) & n.8, (d), (f) & n.12, (h) & n.13.

C. Finding that Plaintiffs' approval of the merger despite the first notice of M&T's regulatory problems severed the causal link to injury from this first of the four events put forward to establish injury and damages.  *Id.* at 7, Sec. (c) & n.9.

D. Finding a multi-day event window was insufficiently supported.  *Id.* at 6–7, 9–10, Sec. (b), (g).

E. Concluding as a matter of law that Plaintiffs' Dividend Damages could not have been directly caused by the merger because this is an impermissible ruling on loss causation at class certification.  *Id.* at 8, Sec. (e) & n.11.

The Court now addresses each of these arguments in turn.

**1)   The holding of *Halliburton I* does not govern Section 14(a) cases.**

First, Plaintiffs argue that the Court's entire inquiry was an improper review of loss causation at the class certification stage.  Pls.' Mot. for Rec. at 5.  In support of this proposition, Plaintiffs point to a range of securities fraud cases under Section 10(b) of the Securities Act of 1934.  *Id.* at 5–6 & n.7, 9 n.12, 10.[3]  The foundation of the dispositive analysis in each of these

---

[3]      Citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807, 809 813 (2011) (*Halliburton I*); *City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.*, No.

cases is *Halliburton I*, where the Supreme Court did hold that loss causation need not be proved at the class certification stage.  563 U.S. at 813–15.  However, *Halliburton I* specifically held that proof of loss causation was not a prerequisite to trigger the presumption of reliance in Section 10(b) cases under the Supreme Court's prior precedent in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  The *Basic* presumption is specific to Section 10(b) cases, addressing the reliance (i.e., transaction causation) element of Section 10(b) claims.  Section 14(a) has a distinct transaction causation legal standard, which does not involve the question of reliance by shareholders.  *See Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992).  Instead of reliance, Section 14(a)'s transaction causation element requires proof that the alleged injuries were directly caused by the transaction shareholders authorized.  *Id.* ("Thus, the appellees' re-election as directors did not create any cognizable harm because the shareholders' votes did not authorize the transaction that caused the losses.").

As the Supreme Court stated in *Halliburton I*, loss causation and transaction causation (i.e., reliance in the Section 10(b) context) are distinct concepts and elements under Section 10(b).  *See* 563 U.S. at 812 ("Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock.").  However, the court of appeals in *Halliburton I* had held that proof of loss causation was required in order to trigger the *Basic* presumption of reliance under a fraud-on-the-market theory, and it was this connection between loss causation and reliance that the Supreme Court corrected in *Halliburton I*.

---

12-5275, 2015 WL 5097883, at *5 (D.N.J. Aug. 31, 2015); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 600, 611 (7th Cir. 2020); *Hall v. Johnson & Johnson*, No. 18-1833, 2023 WL 9017023, at *8 (D.N.J. Dec. 29, 2023); *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 468 (E.D. Pa. 2021); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222-23 (3d Cir. 2006); *In re Conduent Inc. Sec. Litig.*, No. 19-8237, 2022 WL 17406565, at *5 (D. N.J. Feb. 28, 2022); *Malriat v. QuantumScape Corp.*, No. 21-cv-00058, 2022 WL 17974629, at *15 (N.D. Cal. Dec. 19, 2022).

*Id.* at 813.  The reliance element, and the Court's clarification, was dispositive in the case because "[w]hether common questions of law or fact predominate *in a securities fraud action* often turns on the element of reliance."  *Id.* at 810 (emphasis added).  The loss causation element of the Section 10(b) action was not in dispute.  *Id.* at 813 ("Halliburton concedes that securities fraud plaintiffs should not be required to prove loss causation in order to . . . achieve class certification.").

Plaintiffs' claim is not a securities fraud action, but rather an action alleging injury from misrepresentations and omissions in a proxy statement under Section 14(a).  Further, there is no reliance element in a Section 14(a) claim.  Actions under Section 14(a) very well may turn on the element of loss causation, given that the nature of injury is not limited solely to the buying or selling of securities in Section 14(a) claims.  Indeed, Plaintiffs Closing Damages theory does not depend on the purchase or sale of Hudson City or M&T shares by putative class members.  Therefore, questions about if, when, and how the injury actually occurred, and how to calculate damages, are essential questions of fact underpinning Plaintiffs' cause of action.  Further, Defendants in this case have not conceded the loss causation element, but thoroughly dispute these factual questions, unlike the defendants in *Halliburton I*.  The Court must be satisfied that these questions within the loss causation element of Plaintiffs' Section 14(a) claim are susceptible to proof at trial based on common evidence before certifying the class.  *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015) ("[P]redominance and commonality are satisfied if *each element* of the alleged . . . violation involves common questions of law and fact capable of proof by evidence common to the class.").

In sum, *Halliburton I* does not hold that loss causation need not be proven at class certification for all securities causes of action, but rather the holding is limited to securities fraud actions under Section 10(b).  Plaintiffs have not provided, and the Court cannot identify, any other

authority demonstrating that loss causation need not be considered for Section 14(a) actions.  Each of Plaintiffs' asserted authorities on this point are Section 10(b) cases determining whether the reliance element of a Section 10(b) action is satisfied at the class action stage, and are based on the *Halliburton I* holding.  These authorities simply do not speak to the disputed issues in this case.  Given the disputed facts underpinning Plaintiffs' damages theories, and that the Court must resolve such disputes at the class certification stage before determining if the predominance element of Rule 23(b)(3) is satisfied, the Court's analysis and "predictions" did not unnecessarily delve into the merits of loss causation.

> **2)  The fact of injury is an essential issue as part of the essential element of loss causation, and the Court did not err in requiring proof of at least some class-wide injury-in-fact by a preponderance of the evidence.**

Second, Plaintiffs argue the Court erred in requiring common evidence to substantiate injury on dates other than the four event dates presented by Plaintiffs' expert report, given the potential for intervening events or market forces that could affect the amount of damages on those dates.  Pls.' Mot. for Rec. at 6–10, Sec. (a) & n.8, (d), (f) & n.12, (h) & n.13.  Plaintiffs refer to their damages model as a "constant dollar" approach, and that such a constant dollar approach has been supported by other courts at class certification.

Plaintiffs' expert report includes evidence common to the class in support of the fact of injury on four separate dates.  Pls.' Ex. 35 (Keath/DeRosa Report) at ¶¶ 98–125.  However, the Court noted in its February 7, 2024 Opinion that Plaintiffs had not supported the proposition that the losses incurred on those specific dates were internalized in an unaltered state henceforth from those dates for indefinite periods of time, and determined that there was not common evidence to prove injury for individual class members who sold their shares on various dates all the way through to the close of the merger.  *Jaroslawicz II*, 2024 WL 474846, at *17–18.

14

Plaintiffs argue that given Plaintiffs' expert evidence of some price impact of the disclosures on Hudson City share prices during the four events in their event study, Defendants bear the burden of proof of a lack of price impact. Pls.' Mot. for Rec. at 6 (quoting *Hall*, 2023 WL 9017023, at \*15 (citing *Goldman Sachs Grp., Inc. v. Ark Teacher Ret. Sys.*, 141 S. Ct. 1951, 1962–63 (2021))), n.8 (citing *In re Allstate Corp. Sec. Litig.*, No. 16 C 10510, 2020 WL 7490280, at \*3 (N.D. Ill. Dec. 21, 2020). However, this burden-shifting to defendants as described in *Hall*, *Allstate*, and *Goldman Sachs* was established in *Basic* and reaffirmed by the Supreme Court in *Halliburton II* as the burden of defendants in order to successfully rebut the presumption of reliance for Section 10(b) claims, once that presumption is established. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278–79, 283–84 (2014) (*Halliburton II*); *see also Allstate*, 966 F.3d at 608 ("[A] district court must be willing to consider evidence offered by the defense to show that the alleged misrepresentations did not actually affect the price of the securities. *Halliburton II* requires that."). For the reasons articulated above, precedent regarding the reliance element of Section 10(b) cases is irrelevant to the loss causation issues under Section 14(a) disputed in the Plaintiffs' class certification motions.

Plaintiffs alternately argue that the Court inappropriately required Plaintiffs' expert to "calculate damages with precision, and account for intervening factors." Pls.' Mot. for Rec. at 7 (citing *Utesch v. Lannett Co.*, 2021 WL 3560949, at \*16 n.14 (E.D. Pa. Aug. 12, 2021) ("[A] plaintiffs' 'damages model does not need to be exact' at class certification." (quoting *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 261 (3d Cir. 2016)))). Plaintiffs note that the *Utesch* court did not require the expert's damages model to specify precisely how the plaintiffs would measure the price impact of various misrepresentations and corrective disclosures, nor how the price impact would be distinguished from various intervening factors to be uncovered in discovery. *Id. Utesch*

is not persuasive.  The expert in that case was using a well-established out-of-pocket damages methodology for Section 10(b) cases, measuring the difference between the artificial inflation in price upon each individual plaintiff's purchase of shares and the actual share price upon their sale, as opposed to Plaintiffs' proposed constant-dollar benefit-of-the-bargain methodology in the instant case.  *See Utesch*, 2021 WL 3560949, at *16.  Further, the plaintiffs in *Utesch* were not proposing a constant dollar approach to damages, but had proposed "multiple frequently-used methods and techniques to calculate artificial inflation and distinguish 'confounding' sources of increases or decreases in a stock price from the impact of an alleged fraud."  *Id.* at *16 n.14.  The plaintiffs in that case did not need to specify the precise combination of methods they would utilize to address these "confounding sources," but they had at least proposed viable methods for doing so, *see id.*, unlike Plaintiffs' expert in the present matter, *Jaroslawicz II*, 2024 WL 474846, at *17–18.

In addition, Plaintiffs' assertion relies on a quote by the *Utesch* court of the Third Circuit's consideration in *Modafinil*, of the Supreme Court's holding in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  However, after noting that a "damages model does not need to be exact" at class certification, the *Modafinil* court goes on to state that:

> [A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).

837 F.3d at 261 (quoting *Comcast*, 569 U.S. at 35) (alteration in *Modafinil*).  Here, Plaintiffs' expert model does not even attempt to address intervening impacts on share prices on dates other than the four events analyzed, unlike the expert report in *Utesch*, which are only a small fraction of the dates on which class members would have sold shares and potentially incurred injuries.  Such a methodology cannot be said to "measure only those damages attributable to [Plaintiffs']

theory." *Id.* Plaintiffs' reliance on *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017), is similarly problematic. *Waggoner* also involved a *Comcast* challenge, but the Second Circuit concluded that the district court had not abused its discretion because the damages model in that case fit the plaintiffs' theory of liability, unlike Plaintiffs' model in the instant case.

Plaintiffs assert that individualized damages calculations on their own do not defeat the Rule 23(b)(3) predominance requirement. Pls.' Mot. for Rec. at 9 (citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 373–75 (3d Cir. 2015)). The Court agrees that "individual damages calculations do not preclude class certification under Rule 23(b)(3) . . . ." *Neale*, 794 F.3d at 374–75 (quoting *Comcast*, 569 U.S. at 42 (Ginsburg, J. & Breyer, J., dissenting) (citing 2 William B. Rubenstein, *Newberg on Class Actions* § 4:54 (5th Ed. 2012)). However, the problem with Plaintiffs' proposed methodology is not that individualized calculations would be required, but that Plaintiffs have not proposed any mechanism for incorporating intervening or "confounding" factors into their proposed damages calculations. Neither is this a situation where Plaintiffs are being required to prove "class members' damages are . . . susceptible to a formula for classwide measurement." *Neale*, 794 F.3d at 375 (quoting *In re Deepwater Horizon*, 739 F.3d 790, 815 & n.104 (5th Cir. 2014)). Plaintiffs' methodology need not be reducible to a formula, but they must at least provide *some* reliable method for addressing intervening price impacts on dates other than those addressed by the Event Study. Even if individualized calculations are allowable at class certification, and a formula is likewise unnecessary at this stage, Plaintiffs must show at least *some* methodology to determine the fact of injury and amount of damages with evidence common to the class, and Plaintiffs have the burden of proof of this determination by a preponderance of the evidence. *Neale* does not contradict this requirement; it instead supports it, as the court in *Neale*

remanded to the district court for the district court to rigorously analyze predominance in the first instance.  *See Neale*, 794 F.3d at 375.

Plaintiffs' most persuasive argument that intervening causes need not be considered at this stage comes from their citation to *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *12 (D. Nev. Mar. 1, 2023), and *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *8–12 (N.D. Ga. Aug. 25, 2020).  Both of these cases are Section 10(b) cases, as with nearly every other case Plaintiffs cite in support of their positions, and thus have limited relevance regarding this case. However, both opinions do analyze the substance of their respective plaintiffs' asserted methodologies and both courts grant class certification despite a lack of clear methodology for addressing intervening causes and potentially variable damages throughout the class period.

The details of each court's analysis, however, do not ultimately weigh in Plaintiffs' favor. Despite these courts acknowledging that proof of loss causation is not necessary at class certification for the Section 10(b) claims at issue, the courts do analyze and discuss the arguments and evidence regarding the sufficiency of the plaintiffs' expert models for ultimately addressing loss causation.  In *Ferris*, the court weighed the defendants' argument that the plaintiffs' expert should "take into consideration other confounding events that may explain some or all of the back-end price drop," noting that "[the plaintiffs' expert] states in his report attached to plaintiffs' reply that . . . confounding information can be addressed by his methodology when that [loss causation] analysis is performed" later at the merits stages.  2023 WL 2337364 at *12.  In *Acuity Brands*, the plaintiffs' expert asserted "an array of widely-accepted economic tools and techniques that may be used to appropriately adjust observed market reaction to new information . . . depending on facts and circumstances . . . [and] a factual record that is complete," in response to the defendants' arguments that their methodology could not "account for differences in the level of inflation over

the Class Period." 2020 WL 5088092 at *9. The *Acuity Brands* court then determined that it would not be appropriate to expect the plaintiffs' expert to commit to a particular method to measure the inflation without having the full the record available. *Id.* at 10. However, this was based on the plaintiffs' expert's assertion of various methodological options. In the instant case, Plaintiffs' expert has not presented *any* methodology or argument for addressing price impact throughout the class period at the present class certification stage, or later at the merits stages. In their Motion for Reconsideration, Plaintiffs assert this is a "constant dollar" approach, Pls.' Mot. for Rec. at 9, but nowhere in the Event Study does Dr. DeRosa state that this is his approach or justify why a "constant dollar" methodology would be appropriate in this instance, *see generally* Pls.' Ex. 35 at ¶¶ 72–165. Without such common evidence in the Event Study, Plaintiffs' present assertion of a "constant dollar" methodology is unsubstantiated.

Plaintiffs have not shown a clear error of fact or law regarding the Court's determination that Plaintiffs have not supported the injury-in-fact component of Section 14(a)'s loss causation element because they have not presented any binding or persuasive authority outside of a Section 10(b) context that loss causation cannot be considered at the class certification stage. Plaintiffs also have not demonstrated through any binding or persuasive authority that an expert report need not comment in *any* way or provide *any* methodological options to address intervening or confounding factors regarding price impact or the potential for price impact to vary throughout the class period. In each of Plaintiffs' asserted cases where these issues were at play, experts provided courts at least some indication that there were methods to address them and that they were prepared to do so at the appropriate merits stage. There is no such evidence in the record before this Court, and the Court requires at least a bare minimum of evidence in this regard to satisfy Rule 23's requirement that Plaintiffs' common evidence be sufficient to prevail on the merits.

**3) The Court's finding that injury from share price downdrafts due to the April 12, 2013 disclosure event were included in the "benefit-of-the-bargain" was not clearly erroneous.**

Third, Plaintiffs argue that the Court erred in finding that they had not demonstrated injury-in-fact regarding the share price downdrafts on April 12, 2013.  Mot. for Rec. at 7, Sec. (c) & n.9. The Court found that Plaintiffs' evidence demonstrated a rapid market and share price response to the disclosure of M&T's regulatory issues on April 12, 2013, and that there was evidence that each of the lead Plaintiffs was aware of the disclosure and able to incorporate this news into their votes at the shareholder vote to approve the merger on April 18, 2013.  *Jaroslawicz II*, 2024 WL 474846, at *18–19.  As a result, the share price downdraft from that disclosure was "priced-in" as of the shareholder vote, and was part of the benefit-of-the-bargain by Plaintiffs.  *Id.* at *19.  These findings all pertained to the Court's loss causation analysis.  *Id.*

Plaintiffs assert that these findings are improper because "[proof] that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction" is the only causation requirement of their claim.  Pls.' Mot. for Rec. at 7 (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970)).  However, the *Mills* opinion and rule addressed the transaction causation element of Section 14(a), and the Court's findings were part of its loss causation analysis, not transaction causation.  Therefore, the instruction that "neither approval of the Merger nor a showing that the merger was 'fair' . . . can sever that causal link," Pls.' Mot. for Rec. at 7 n.9 (citing *Mills*, 396 U.S. at 384–85 & n.5), is inapposite as this limitation pertains to the wrong element of the cause of action.  The rule in *Mills* was designed to address the otherwise thorny question of reliance by shareholders on the misleading or omissive proxy statements, and in effect held that Plaintiffs need not prove actual shareholder reliance on the statements if they can show that the "particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *See Mills*, 396 U.S. at

384–85.  *Mills* did *not* address the separate questions of injury-in-fact and proximate causation that are central to the separate loss causation element of a Section 14(a) claim.

The Court's analysis was grounded entirely in the injury-in-fact and proximate causation prongs of loss causation.  In this context, the Court reviewed Plaintiffs' asserted theory of injury, that of not receiving the benefit-of-the-bargain struck by shareholders upon approving the merger with their vote.  Under this theory, any purported injuries that were not part of that bargain would logically fall outside the scope of injuries available to Plaintiffs.  So, the April 12, 2013 downdraft could not lead to foreseeable injury and damages, because these purported damages were in-fact already-seen by shareholders and factored into their decision of whether or not to move forward with the merger.  There is therefore no conflict between the Court's findings and *Mills*, and no error in this reasoning based on the arguments presently before the Court.

### 4)  Plaintiffs have not demonstrated that the Court clearly erred in finding a lack of sufficient evidence to support injury-in-fact from the disclosure on October 1, 2015, but even if it had, this is harmless error.

Fourth, Plaintiffs contend that the Court's finding that Plaintiffs had not adequately supported their multi-day window for damages regarding the September 30, 2015 public disclosure violates binding precedent in *In re DVI, Inc. Securities Litigation*, 639 F.3d 623, 635 (3d Cir. 2011) ("[W]e do not require that public information be absorbed 'instantaneously.' . . . That some information took two days to affect the price does not undermine a finding of efficiency.") (*abrogated on other grounds by Amgen*, 568 U.S. 455 (2013)).  As an initial matter, the quoted statement of law in *DVI* involved the question of market efficiency for invoking the *Basic* presumption of reliance for a Section 10(b) claim, and not the loss causation element of Section 14(a) that the Court's findings entailed.  In addition, even if the quoted portion of *DVI* were on-point, the Court's finding did not turn on a conclusion that a multi-day trading window was unavailable to Plaintiffs as a matter of law.  *Jaroslawicz II*, 2024 WL 474846, at *21–22.  The

Court's finding was factual in nature, based on a rigorous review and weighing of the competing evidence, and reflected the preponderance of that evidence. *Id.* If Plaintiffs had effectively addressed the concerns raised by Defendants' expert regarding this event in either the Event Study or Plaintiffs' rebuttal report to Defendants' expert report, they may have persuaded the Court to a different finding that the multi-day window was supported by the preponderance of the common evidence at class certification. However, Plaintiffs' rebuttal report did not discuss the critiques raised by Defendants' expert regarding this event. The rebuttal report offered only the conclusory assertion that Defendants' expert had erred in his analysis, providing no explanation for how he had erred, and leaving the Court to weigh Defendants' critiques against the Event Study on its own. *Id.* at *22. The Event Study does not address the reasonable, thoroughly explained, and persuasive critiques by Defendants' expert, so the Court made its factual findings accordingly, and Plaintiffs have not demonstrated any clear error of law or fact in doing so.

### 5) Plaintiffs' Dividend Damages arguments are unavailing.

Fifth, and finally, Plaintiffs argue that the Court's finding that Dividend Damages could not have been directly caused by the transaction at issue was "made without the benefit of record evidence sufficient to establish [the requisite] causal connection" and that "Plaintiffs will prove the causal connection on a class-wide basis at the merits stage of the case." Pls.' Mot. for Rec. at 8. Class certification requires more than a "threshold showing" and "[i]t is incorrect to state that a plaintiff need only demonstrate an 'intention' to try the case in a manner that satisfies the predominance requirement." *Hydrogen Peroxide*, 552 F.3d at 321.

However, Plaintiffs have supplemented the record regarding Dividend Damages in their Renewed Motion for Class Certification, and whether the preponderance of evidence in the combined records of their Original and Renewed Motions for Class Certification satisfies Rule 23's requirements is addressed in the consideration of their Renewed Motion below.

Plaintiffs also argue that the Court clearly erred in determining that Dividend Damages were unavailable to Plaintiffs as a matter of law.  Plaintiffs assert that the evidence clearly shows dividends were promised to shareholders and expected, and thus were part of the benefit-of-the-bargain, and that lost dividends are generally available in cases of corporate wrongdoing.  Pls.' Mot. for Rec. at 8 n.11 (citing *MacGregor Yacht Corp. v. State Comp. Ins. Fund*, 74 Cal. Rptr. 2d 473 (Cal. Ct. App. 1998); *Patton v. Nicholas*, 279 S.W.2d 848, 854, 857 (Tex. 1955); *Lehman v. Eldridge*, 2013 WL 12059613, at *3 (S.D. Fla. Dec. 11, 2013)).

None of the elements of the claims at issue in the cases cited by Plaintiffs resemble the transaction causation requirement that was dispositive in the Court's February 7, 2024 Opinion. *MacGregor Yacht Corporation* and *Lehman* both involved breach of contract claims under state law, where the courts determined that lost dividends could be cognizable for damages.  In *Lehman*, the court declined to reconsider its prior summary judgment, which found dividend damages were available for a breach of contract claim, where damages is a necessary element of a breach of contract claim.  2013 WL 12059613, at *2–3.  In *MacGregor Yacht Corporation*, the court's determination turned on extensive actuarial evidence of the chain of causation between the defendant's improper practices and the eventual loss of dividends, which is a proof of damages issue (addressed under Section 14(a)'s loss causation element), and not grounded in transaction causation.  74 Cal. Rptr. 2d at 480.  *Patton* was an appeal from a trial verdict of a claim of mismanagement by the president of a corporation for the purpose of suppression of dividends, not tied to any transaction, *see* 279 S.W.2d at 852–53, where there was ample evidence at trial of extensive growth in the company's cash reserves over a period of six years and of the president's express commitment not to pay dividends out of personal animosity toward the plaintiffs as

minority shareholders, *see id.* at 850–52.  These are all analogous to loss causation issues under the Section 14(a) framework, not the transaction causation requirement.

Also of note, the suit in *Lehman* was brought against an individual defendant based on that individual's actions and included counts for accounting and breach of fiduciary duty, *see* 2013 WL 12059613 at *1, and the suit in *Patton* was brought against the president and majority shareholder of the company for mismanagement, where the company's board was dominated by the defendant, *see* 279 S.W.2d at 849, 852.  Plaintiffs' Section 14(a) claim is brought against M&T and Hudson City corporations, with its count against individual directors for breach of fiduciary duty having already been dismissed.  *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *7–8 (D. Del. Mar. 30, 2017); D.I. 70.  The transaction causation rule as set forth in *General Electric*[4] does not govern an essential element of that state law claim of breach of fiduciary duty, and Plaintiffs' assertions of *Lehman* and *Patton* would have more persuasive value under that count than under their Section 14(a) claim.  Meanwhile, *MacGregor Yacht Corporation* involved a suit by a company wholly owned by a married couple against its insurer for excessively high premiums, where these higher expenses reduced the ability for the company to pay out dividends to the married couple, which the plaintiffs proved at trial.  *See* 74 Cal. Rptr. 2d at 480.  These are not analogous to the circumstances of Hudson City shareholders.  The Court infers that the married couple who wholly owned MacGregor Yacht Corporation likely used dividends from the company as one of the primary means of distributing its profits, rather than through their salaries or bonus

---

[4]    980 F.2d at 933 ("Rather, damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction, *such as a corporate merger*, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought.") (emphasis added).

payments to themselves as employees, and they had no recourse to public markets for reaping the rewards of any increase in the company's valuation. Hudson City, on the other hand, made dividend policy and quarterly dividend decisions through a professionalized board and based on a variety of economic conditions and factors, and it was publicly traded, so dividends were not the sole means for shareholders to reap value from Hudson City.

Accordingly, Plaintiffs have shown no clear error in the Court's prior determination that Dividend Damages are unavailable under Plaintiffs' Section 14(a) claim because the Hudson City Board's dividend decisions were discretionary and not dictated by the Joint Proxy or Merger Agreement, and thus "the shareholders' votes did not authorize the transactions that caused the losses." *Gen. Elec.*, 980 F.2d at 933.

## D. Conclusion

As described above, Plaintiffs' arguments that the Court clearly erred in its application of the legal standard for predominance, and that its specific predictions and findings included clear errors of law or fact, are unavailing.[5] To be clear, the Court does not conclude that it would have been impossible for Plaintiffs to support the elements of their claim with common evidence, under their benefit-of-the-bargain theory of liability. However, Plaintiffs did not support

---

[5] In addition, Plaintiffs do not argue against the Court's separate finding that the Hudson City Board's approvals of amended Merger Agreements subsequent to the shareholder vote defeat transaction causation for the latter three event dates beyond the initial date. Therefore, even if the Court were to agree with Plaintiffs' loss causation arguments above, this transaction causation finding would be independently dispositive to deny class certification because each of the events on which Plaintiffs rely independently fail to satisfy the transaction causation element of Section 14(a), irrespective of any consideration of loss causation.

their original Motion for Class Certification with common evidence that would be sufficient for the putative class to prevail at trial.[6]  *See Harnish*, 833 F.3d at 304–05.

Accordingly, Plaintiffs' Motion for Reconsideration is DENIED.

### III.    RENEWED MOTION FOR CLASS CERTIFICATION

In concert with their Motion for Reconsideration, Plaintiffs filed a Renewed Motion for Class Certification ("Renewed Motion") on February 26, 2024.  D.I. 227.  In their Renewed Motion, Plaintiffs incorporate by reference arguments and evidence asserted in their Motion for Reconsideration and in their original Motion for Class Certification.  Renewed Mot. at 5 & n.6 (D.I. 228).  The Court granted Plaintiffs leave to incorporate these arguments and this evidence into their Renewed Motion.  D.I. 233.  Plaintiffs also assert new evidence and arguments as to their asserted Dividend Damages, Renewed Mot. at 2–3, 6–11, provide a new Class Definition attempting to carve out merger arbitrageurs from the putative class, *id.* at 11–12, and request appointment of class representatives and class counsel, *id.* at 12–13.  Defendants argue that the Renewed Motion improperly relitigates issues already decided in the February 7, 2014 Order under law of the case doctrine, that the Renewed Motion and additional evidence by Plaintiffs do not address the inability to demonstrate transaction causation for Plaintiffs' purported Dividend Damages, and that Plaintiffs new proposed class definition is overbroad and not ascertainable because it does not fully excise merger arbitrageurs, and even if it did, would not be susceptible to a reliable and administratively feasible mechanism of identifying class members.  *See generally* Defs.' Opp. to Renewed Mot. at 9–20 (D.I. 240).

---

[6]    Nor have Plaintiffs put forward any additional common evidence to address the Court's concerns regarding their Trading Damages or Closing Damages theories in their Renewed Motion for Class Certification.

**A. Law of the case doctrine does not limit the Court's discretion to consider only the issues and evidence newly argued in Plaintiffs' Renewed Motion.**

Defendants argue that the law of the case doctrine dictates that the Court limit its inquiry to the novel evidence and the new class definition submitted by Plaintiffs in their Renewed Motion. Defs.' Opp. to Renewed Mot. at 2, 8.  Law of the case doctrine counsels "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pepper v. United States*, 562 U.S. 476, 506 (2011) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  However, "[t]wo values animate law-of-the-case doctrine: judicial economy and unfair prejudice." *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 273 (3d Cir. 2017) (holding the district court did not violate law of the case doctrine where the party "failed to show any prejudice from the District Court's change in position").  "Law of the case may counsel against, but does not prevent, a district court from reconsidering its prior rulings." *Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 836 (3d Cir. 2022) (citing *Arizona*, 460 U.S. at 618); *see also United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) ("Interlocutory orders remain open to trial court reconsideration, and do not constitute law of the case." (quoting *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) (cleaned up)).  "[A]pplication of the [law of the case] rule is a discretionary, not absolute, process and if . . . a party advances a basis for a court to reach a different result than it did previously the court will not be bound by its earlier decision." *Bridges v. Comm'r Soc. Sec.*, 672 F. App'x 162, 167 (3d Cir. 2016) (holding law of the case did not bar the court from granting a renewed motion to dismiss based on a ground that was newly asserted on the renewed motion, when the court had denied the original motion to dismiss on a different asserted ground). The doctrine "directs a court's discretion, [but] it does not limit the tribunal's power." *Pepper*, 562 U.S. at 506 (quoting *Arizona*, 460 U.S. at 618).  "Accordingly, the doctrine 'does not apply if

the court is "convinced that [its prior decision] is clearly erroneous and would work a manifest injustice."'" *Id.* (quoting *Agostini v. Felton*, 521 U.S. 203, 236 (1997) (quoting *Arizona*, 460 U.S. at 618 n.8)) (alteration in original).

The issues of law and fact presently before the Court pertain to the same stage of litigation, being brought in the Renewed Motion for Class Certification filed immediately after the Court adjudicated the first Motion for Class Certification. It is questionable whether law of the case doctrine even applies between these same-stage Motions given the minimal likelihood of prejudice to the Parties—neither of the Parties have relied on the Court's February 7, 2024 decision in any subsequent stage of this case. Even if the doctrine does apply here, law of the case is discretionary and does not limit the Court's consideration to only those issues newly asserted in the Renewed Motion, especially given the Court must examine whether its prior analysis included clear error or created manifest injustice.

That said, the clear error and manifest injustice standard for a permissible change in position by a court under law of the case doctrine is the same standard as that for Plaintiffs' Motion for Reconsideration. Plaintiffs' Motion for Reconsideration did not assert any change in controlling law or any new evidence previously unavailable to the Court, so this leaves the third ground for reconsideration: "the need to correct a clear error of law or fact or to prevent manifest injustice." *See Marinari*, 838 F. App'x at 712 (quoting *Energy Future Holdings*, 904 F.3d at 311–12). Having already reviewed Plaintiffs' arguments from their Motion for Reconsideration above for clear error and manifest injustice, the Court reaffirms its analysis, findings, and conclusions from that review and applies them here regarding Plaintiffs' Renewed Motion for Class Certification. This leaves Plaintiffs' new arguments and additional evidence in their Renewed Motion, to which the Court now turns.

**B. Plaintiffs' arguments repeated in their Renewed Motion from their Motion for Reconsideration remain unpersuasive.**

In their briefing in support of this Renewed Motion for Class Certification, Plaintiffs repeat several arguments they made in support of their Motion for Reconsideration above. As a preliminary matter, the Court briefly addresses these arguments first for the sake of thoroughness.

Plaintiffs argue that the Court should not engage in predictions about which party will prevail on particular issues at the class certification stage, citing *Amgen*, *Reyes*, *Hydrogen Peroxide*, and *Community Bank*. Renewed Mot. at 14–15. The Court already fully evaluated this argument and these cases above, finding that Plaintiffs' argument omits important instruction under the Third Circuit's precedent that a court's "rigorous review" at class certification *must* review all evidence and arguments by the parties and make findings that resolve these arguments, even if such findings overlap with the merits entirely, as long as such arguments and findings are relevant to Rule 23's requirements. The Court hereby reaffirms its above analysis of the legal standard at class certification from its discussion of Plaintiffs' Motion for Reconsideration. Plaintiffs bear the burden to show more than plausibility that they might succeed on the merits— rather, that they have produced sufficient class-wide common evidence for Plaintiffs to potentially prevail at trial without having to resort to individualized evidence. If Plaintiffs have not shouldered their burden successfully for *each element* of their cause of action, then individualized issues may predominate and defeat class certification.

Plaintiffs reassert that loss causation need not be proved at the class certification stage under Rule 23's predominance requirement. *See* Renewed Mot. at 15–16, 18 & n.21. This argument was thoroughly discussed above regarding Plaintiffs' Motion for Reconsideration, and the Renewed Motion adds nothing substantively new to Plaintiffs' argument. The Court has no reason to alter its legal analysis and findings from that above. Plaintiffs' argument relies solely on

29

legal authority that loss causation is not to be considered at class certification regarding the presumption of reliance for Section 10(b) securities fraud claims, and this authority is inapposite to the second element (loss causation) of a Section 14(a) claim at issue in this case.  Plaintiffs' argument is therefore unavailing, and Plaintiffs at class certification must support the second element of their 14(a) claim (i.e., loss causation) by a preponderance of common evidence, as with each of the elements of their claim.  *See Reyes*, 802 F.3d at 489.

Plaintiffs once again challenge the Court's prior determination that the share price downdraft caused by the April 2013 disclosure was included in the benefit of the bargain based on the named Plaintiffs' awareness of the disclosure and that the disclosure and share price downdraft would have informed their merger vote six days later.  *See* Renewed Mot. at 19–20.  Plaintiffs argue that the disclosure prior to the shareholder vote did not "sever the causal link."  *Id.* at 19.  Plaintiffs assert the holding of the Third Circuit in the earlier pleading stage of this matter in support of this proposition.  *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 715 n.14 (3d Cir. 2020) ("But the supplemental [April 12, 2013] disclosures plausibly failed to cure the defect that had already occurred given the omitted risks . . . [so] the effect of the supplemental disclosures raises an issue of fact, which precludes dismissal for now.").  The Third Circuit's holding in this matter is not binding on the Court, as it was at the pleading stage, while the class certification standard is more "rigorous."  *See Hydrogen Peroxide*, 552 F.3d at 321.  Further, the Third Circuit's holding was limited to the element of materiality, and not the issues of loss causation and transaction causation that were the focus of the Court's February 7, 2024 Opinion.  *Compare Jaroslawicz*, 962 F.3d at 715 n.14, *with Jaroslawicz II*, 2024 WL 474846, at *29.

In addition, Plaintiffs' characterization regarding the April 2013 disclosure misconstrues the Court's previous finding.  The problem is not that the disclosure didn't cause the downdraft,

or that the downdraft wasn't sufficiently merger-related to create a causal nexus for purposes of loss causation. The Court did not, and does not now, make any findings regarding either of these propositions. The Court finds that damages due to this disclosure prior to the shareholder vote itself are not cognizable under Plaintiffs' theory of liability—any such damages would have been *included* in the bargain that Hudson City shareholders made with M&T upon voting to approve the Merger Agreement, so could not amount to a lost benefit of that bargain. Damages theories and models must fit Plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35 (holding that a "model purporting to serve as evidence of damages . . . must measure only those damages attributable to [a plaintiff's] theory" of "[liability] accepted for class-action treatment by the District Court").

Finally, Plaintiffs repeat their argument that their proposed event window of September 30 to October 1, 2015 is not impermissible, even if it deviates from the single-day windows of their other event dates. Renewed Mot. at 20 (citing *DVI*, 639 F.3d at 635). This argument again misconstrues the Court's reasoning and findings as to this event,[7] but even if Plaintiffs had not, the argument is unavailing because the Trading Damages and Closing Damages from this date still fail to satisfy the loss causation element as wholly speculative and both the loss causation and transaction causation elements as governed by board discretion (i.e., the four extensions to the Merger Agreement by the Hudson City Board). See the above discussion regarding the Motion

---

[7] Plaintiffs' expert has not addressed the factual critique by Defendants' expert of the choice to use this two-day window, showing a large volume of trading during the afternoon of September 30, 2015, immediately after the adverse disclosure at issue, and a low volume of trading on October 1, 2015. *See Jaroslawicz II*, 2024 WL 474846, at *21–22. This evidence undermines any justification for the two-day window, and remains unrebutted. The Court is required to make findings at class certification based on the preponderance of the evidence. That the Third Circuit "[does] not require that public information be absorbed 'instantaneously,' . . . [when] some information took two days to affect the price," *DVI*, 639 F.3d at 635, is inapposite under circumstances where the preponderance of the evidence demonstrates that the disclosures were absorbed on the same day, as Defendants have shown and Plaintiffs have failed to rebut.

for Reconsideration, the below "Trading Damages and Closing Damages" Section, and *Jaroslawicz II*, 2024 WL 474846, at *22–23, 28–29, for further explanation of these points.

**C. Courts do not straightforwardly and routinely grant class certification for Section 14(a) claims, and doing so would fail to accomplish the "rigorous analysis" required by *Hydrogen Peroxide* and its progeny.**

Plaintiffs argue that "[a]ctions under Section 14(a) tend to be straightforward and are routinely certified for class treatment in this Circuit and elsewhere."  Renewed Mot. at 16 (citing *Erickson v. Jernigan Capital, Inc.*, No. 20-cv-09575, 2023 WL 5966785 (S.D.N.Y. Sept. 14, 2023); *In re EQT Corp. Sec. Litig.*, 19-cv-00754, 2022 WL 3293518 (W.D. Pa. Aug. 11, 2022); *In re Heckman Corp. Sec. Litig.*, No. 10-378, 2013 WL 2456104 (D. Del. June 6, 2013); *In re Willis Towers Watson PLC Proxy Litig.*, No. 17-cv-1338, 2020 WL 5361582 (E.D. Va. Sept. 4, 2020); *Hurwitz v. LRR Energy L.P.*, No. 15-711, 2018 WL 6804481 (D. Del. Jan. 2, 2018)).  For various reasons, none of these cases support Plaintiffs' contention.

First, even if the Court credits at face value Plaintiffs' assertion that actions under Section 14(a) *tend* to be straightforward, the extensive history of litigation in the present matter demonstrates that Plaintiffs' particular case is certainly *not* straightforward.  Further, none of Plaintiffs' asserted authority shows that a court should relax its required "rigorous analysis" under *Hydrogen Peroxide* and its progeny for Section 14(a) cases.  Indeed, Plaintiffs' asserted cases collectively show there is nothing routine about class certification analysis—aside from one outlier that deferred this analysis to a later stage, each of these courts evaluated the evidence and arguments against the core questions of class certification, and each turns on the particular circumstances of that case.

In *Erickson*, while the court decided to grant certification, it did so after carefully scrutinizing arguments by the defendants that the plaintiffs' damages model was inconsistent with their theory of liability and that benefit-of-the-bargain damages are available as an alternative to

out-of-pocket-damages.  *See Erickson*, 2023 WL 5966785, at *3–5.  In particular, the plaintiffs'

damages theory was based on the difference between the fair value of the company and the actual

merger consideration negotiated and received upon close of the merger, and the court found the

plaintiffs offered "different methods of quantifying Jernigan's fair value . . . ."  *Id.* at *4.  There

was nothing routine or straightforward about this analysis, and the plaintiffs were held to the

rigorous review of their required burden of proof at class certification.

In *EQT*, the plaintiffs alleged they purchased EQT stock at inflated values and then

"experienced a precipitous drop in value following disclosure of [the d]efendants' purported

material misrepresentations and omissions," similar to that of Defendants in the instant case.  2022

WL 3293518, at *5.  *EQT* even included a Section 14(a) proxy claim in addition to a Section 10(b)

fraud claim.  *Id.* at *6.  However, while the *EQT* court declined to assess the validity of the

plaintiffs' damages model in light of the defendants' arguments based on Third Circuit precedent

in *Neale*, 794 F.3d at 374–75, it did so because "common issues predominate all other issues of

law and fact in this case."  *See EQT*, 2022 WL 3293518, at *27–28.  The dispositive issue in *EQT*

was the defendants' argument that the plaintiffs' event study failed to prove price impact from

certain corrective disclosures, and thus could not trigger the *Basic* presumption of reliance for

purposes of the Section 10(b) claim under the predominance requirement of Rule 23.  *See id.* at

*25–26.  In the instant case, Defendants have challenged, and the Court remains concerned by,

several other issues under its predominance analysis of Plaintiffs Section 14(a) claim, so any

similar "straightforward and routine" treatment of issues with Plaintiffs' damages model are not

dispositive.

In *Heckman*, the Section 14(a) issue at class certification was the defendants' argument

against the viability of the plaintiffs' theory of damages, based on *Comcast*.  The court granted

certification because, as this Court has also recognized in its February 7, 2024 Order, a theory of injury based on "diminution in the value of stock . . . is not limited to out-of-pocket loss." *Heckman*, 2013 WL 2456104 at \*14 (citing *Mills*, 396 U.S. at 389; *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976)).  However, the *Heckman* court did not face or resolve issues related to loss causation or transaction causation under a Section 14(a) claim, *see generally id.* at \*12–14, which are dispositive as to Plaintiffs' Trading Damages and Closing Damages in the instant case.

The *Willis Towers* court found predominance was satisfied in a Section 14(a) claim despite arguments challenging the plaintiffs' theory of damages, citing to the Supreme Court's holdings in *Halliburton I*, *Halliburton II*, and *Amgen* for the proposition that evidence of loss causation is not necessary at class certification, and merits analysis at the class certification stage should be avoided unless necessary.  2020 WL 5361582, at \*10–11.  However, the *Willis Towers* court, decided within the Fourth Circuit, did not have the benefit of the Third Circuit's legal standard in *Hydrogen Peroxide* and its progeny requiring that all arguments and evidence must be reviewed and resolved at class certification, even if this rigorous analysis resembles a merits inquiry, as discussed above regarding Plaintiffs' Motion for Reconsideration.

Finally, in *Hurwitz* the court "preliminarily certif[ied]" the action, despite a predominance challenge that the plaintiff had not yet provided a damages model, noting that the model would be needed at trial and the certification decision could be revisited at later stages of litigation if the plaintiff failed to provide one.  2018 WL 6804481, at \*3 & n.3.  The opinion was short and included limited discussion of evidence and arguments by the parties, but the court's language of "preliminarily certifying" the class telegraphs that the court likely would have revisited class certification in later proceedings.  The parties reached a settlement shortly thereafter, so there was

34

no challenge to resolve any question of whether this limited discussion satisfied the rigorous analysis required by *Hydrogen Peroxide* and its progeny.

In sum, aside from *Hurwitz*, there appears nothing routine or preordained about the analysis or conclusions reached by any these courts, and each of their circumstances are readily distinguishable from the instant case. Courts in the Third Circuit are called to undertake a rigorous examination of the evidence and arguments at class certification, and even the courts cited by Plaintiffs that grant class certification have done so upon such a rigorous review.

**D. Both loss causation and transaction causation requirements apply at class certification to Plaintiffs' Dividend Damages under Rule 23's predominance requirement.**

Plaintiffs argue that the Court has misidentified the transaction causation element of their cause of action, and that what the Court has analyzed in the past instead is properly construed as loss causation, which as discussed above Plaintiffs argue should not be considered at class certification. Renewed Mot. at 17–18. Plaintiffs further argue that even if loss causation were to be considered at class certification, reduced dividends (and thus their Dividend Damages) were nevertheless a foreseeable consequence of the foreseeable regulatory delay to the merger. Renewed Mot. at 7–8. Plaintiffs' arguments are unpersuasive.

Once again, a Section 14(a) cause of action has three elements: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Jaroslawicz II*, 2024 WL 474846, at *13 (quoting *Gen. Elec.*, 980 F.2d at 932) (cleaned up). The Court has labeled each of these elements as materiality, loss causation, and transaction causation as a form of shorthand. Accordingly, what the Court refers to as transaction causation, the third element of the cause of action, is a distinct element from loss causation, the second element. To satisfy Rule 23, Plaintiffs

must satisfy the Court that there is sufficient common evidence for them to prevail at trial on *both* transaction causation and loss causation elements.  *See Reyes*, 802 F.3d at 489 ("[P]redominance and commonality are satisfied if *each element* of the alleged . . . violation involves common questions of law and fact capable of proof by evidence common to the class.").  Further, these distinct elements have distinct legal standards, which the Court discussed at length in *Jaroslawicz II*.  *See* 2024 WL 474846, at *13 & 16 (loss causation), 24–26 & 28 (transaction causation).

Loss causation (the second element) must be demonstrated through proof of both injury-in-fact and proximate causation.  *Id.* at *13 (citing *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (requiring in the Section 10(b) context that proof of both economic loss (i.e., injury-in-fact) and proximate causation are necessary to prove loss causation); *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 235 (4th Cir. 2023) (equating loss causation principles between Section 10(b) and Section 14(a) securities claims);[8] *Pure Earth, Inc. v. Call*, 618 F. App'x. 119, 123 (3d Cir. 2015) (holding proximate causation requires examination of causal nexus through "general principles of causation, such as materiality, directness, foreseeability, and intervening causes")).

Plaintiffs argue that the common evidence they have put forward is sufficient at class certification to satisfy the loss causation element (apparently grounded in Plaintiffs' interpretation that the Court's concerns are properly construed under loss causation rather than transaction causation) for their proposed Dividend Damages.  Renewed Mot. at 18–19.  These arguments include that the evidence shows "M&T's concealment of its serious regulatory problems, the delay

---

[8]     *See also Kuebler v. Vectren Corp.*, 13 F.4th 631, 638 n.1, 646 (7th Cir. 2021); *N.Y.C. Emp.'s Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010) (overruled in part on other grounds by *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc)); *Grace v. Rosenstock*, 228 F.3d 40, 46–47 (2d Cir. 2000).

that caused, and the economic consequences to Hudson, including the need to conserve cash by slashing dividends," and that these consequences were all foreseeable. *Id.* Plaintiffs further argue that any question about whether or not they were foreseeable or there were intervening causes breaking the chain of causation is a common question on the merits and does not defeat predominance. *See id.* at 19. Even if the Court were to be persuaded by these loss causation arguments regarding Plaintiffs' Dividend Damages, they do not address the independent requirement of transaction causation as set forth in *General Electric*.[9] This issue is distinct from Plaintiffs' other loss causation arguments, and is dispositive at class certification as to their Dividend Damages.

For transaction causation, the Third Circuit requires that the "transaction was the direct cause of the pecuniary injury for which recovery is sought." *Gen. Elec.*, 980 F.2d at 933. Plaintiffs contend that this requirement is more appropriately considered as part of the loss causation analysis, but the Court disagrees.[10]

---

[9]      Plaintiffs' argument that their Dividend Damages are based on a common and acceptable method of measuring damages, sometimes known as "yardstick" or "benchmark," Renewed Mot. at 20 n.24, is inapposite to the transaction causation issue here. That their proposed method of measuring damages may be reliable and appropriate to use to calculate their proposed Dividend Damages has no bearing on whether they have shown by a preponderance of common evidence that they can prove at trial their purported dividend injury was directly caused by the Joint Proxy or Merger Agreement, as the third element of the Section 14(a) cause of action requires.

[10]      The Court's previous class certification Opinion propounded the legal standard for transaction causation in circumstances where a board's discretionary decisions are at issue. *Jaroslawicz II*, 2024 WL 474846, at *28. In addition to the discussion in the present Opinion, the Court hereby adopts the analysis and its legal conclusion from this previous February 7, 2024 Opinion that injuries from discretionary board management decisions cannot be considered "directly" caused by the transaction at issue in a Section 14(a) claim. *See Gen. Elec.*, 980 F.2d at 933 ("Yet the mere fact that omissions in proxy materials . . . *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss. . . . under Section 14(a) . . . .").

In one sense, whether the Court reviews the *General Electric* requirement under the second or third element of Section 14(a) is of no moment.[11]  Even so, the Court reads the *General Electric* requirement regarding transaction causation as clarifying the third element of Section 14(a), that the "proxy solicitation itself . . . was an essential link in the accomplishment of the transaction."[12] *Mills*, 396 U.S. at 385.  Where the offending "proxy materials" only "*indirectly* lead to financial loss through mismanagement," *General Electric*, 980 F.2d at 933, the proxy statement cannot be said to be an *essential* link in the accomplishment of the transaction.  Therefore, the rule in *General Electric* is a useful clarification of the third element of a Section 14(a) claim as set forth in *Mills*, otherwise known as transaction causation.  *See Karp*, 69 F.4th at 235–36.

In the instant case, decisions by the Hudson City Board about whether or not to issue dividends, and in what amounts, are discretionary board decisions, which are only indirectly related to any transaction shareholders authorized, and no proxy statement or shareholder vote was required to authorize them.  Thus, the Joint Proxy at issue in this case was not an "*essential* link in the accomplishment" of these dividends, as "the shareholders' votes did not authorize the

---

[11]    Whether the holding of *General Electric* regarding transaction causation is properly applied under loss causation, as Plaintiffs argue, or the third element, as the Court applied it in *Jaroslawicz II* based on its reading of both *General Electric* and *Karp*, is immaterial.  The requirement must be applied under one of the elements, and failing to satisfy Rule 23's predominance requirement for either element for any of Plaintiffs' theories of injury and damages is dispositive as to that theory.

[12]    *See*, *e.g.*, *Karp*, 69 F.4th at 235–36 ("Today, *Mills* and *Virginia Bankshares* are best understood as defining the test for transaction causation, not loss causation. . . . Transaction causation, often called reliance, is generally easier to establish than loss causation—it requires only a showing that the proxy statement was an essential link in the transaction. . . . But loss causation requires that a plaintiff prove that the challenged misrepresentations or omissions caused her economic loss. . . . And post-PSLRA, the Supreme Court has repeatedly emphasized that the two elements are distinct." (quotation marks and citations omitted)).

transactions that caused the losses." *Gen. Elec.*, 980 F.2d at 933.  Put another way, future dividends were not part of the "transaction" shareholders authorized.  Unless there is some dimension of the Joint Proxy or Merger Agreement that shareholders approved that bound the discretion of the Hudson City Board regarding its dividend decisions,[13] these dividend decisions were discretionary, only indirectly related to the Joint Proxy or Merger Agreement shareholders approved, and thus the Joint Proxy and Merger Agreement were not *essential* to the dividend decisions by the Board. This is true even if the pendency of the merger and the terms of the Merger Agreement may have created powerful financial conditions to consider in making that decision.  If Plaintiffs wish to satisfy the predominance requirement of Rule 23 for their Dividend Damages, under their benefit-of-the-bargain theory of liability they must show sufficient common evidence to prevail at trial that future dividends were promised as one of the benefits of that bargain, i.e., promised in the Merger Agreement, or at the very least in the Joint Proxy.[14]

---

[13]    The Court previously construed that the "transaction" for purposes of transaction causation and the third element of Section 14(a) in this case was the Merger Agreement that shareholders authorized the board of Hudson City to enter into with M&T on April 18, 2013.  *Jaroslawicz II*, 2024 WL 474846, at *27.  The Court hereby reaffirms and readopts this analysis and finding from its February 7, 2024 Opinion.

[14]    The Court does find sufficient common evidence that Plaintiffs could potentially prevail at trial for the proposition that the merger delay foreseeably and actually caused financial conditions that in turn caused dividend reductions.  In other words, Plaintiffs can potentially prove loss causation (as defined in *Jaroslawicz II*) at trial based on the common evidence presently before the Court.  However, Plaintiffs also bear the burden of demonstrating transaction causation under *General Electric* and *Mills*, showing that the dividends were promised in the Joint Proxy as part of the Merger Agreement shareholders approved.

**E. Plaintiffs' cumulatively asserted common evidence of Dividend Damages does not demonstrate a promise of future dividends in the Joint Proxy or Merger Agreement approved by Hudson City shareholders.**

Plaintiffs have purported to demonstrate that dividends were included in the bargain shareholders struck with additional evidence and arguments in the present Renewed Motion, or arguments that were repeated but not previously analyzed by the Court in its February 7, 2024 Opinion. Plaintiffs have not done so by a preponderance of the evidence.

Much of the evidence cited by Plaintiffs is asserted to support the "causal connection between: (1) the concealed facts that led to the Merger delay; and (2) the reduced dividends to Hudson Shareholders prior to the Merger's close." Renewed Mot. at 5; *see also id.* at 6–11. This type of proposition addresses issues of proximate causation and injury-in-fact (i.e., loss causation), but does nothing to demonstrate that the dividends were part of the expected benefit of the bargain for shareholders.[15]

Plaintiffs cite to a comparison of Hudson City's dividend cuts during the period from 2013–2015 and "nine companies comparable to Hudson listed in the Joint Proxy" that did not cut dividends. *Id.* at 3 (citing Pls.' Ex. 35 (Keath/DeRosa Report), ¶¶ 139–40 & Appx. L thereto). The reduced dividends by Hudson City relative to its peer banks is suggestive that the impacts on Hudson City from a combination of its then-current business model and the merger delay impacted

---

[15]    Plaintiffs' assertion that Dividend Damages "represent[] harm in the form of a 'materialization of the risk' created by the false Proxy and the issues it concealed," Renewed Mot. at 5 n.7 (citing *Howard v. Arconic Inc.*, 2:17-cv-1057, 2021 WL 2561895, at *17 n.14 (W.D. Pa. June 23, 2021)), is likewise relevant only to the question of loss causation—whether the Joint Proxy actually and proximately caused the damages. *See Howard*, 2021 WL 2561895, at *17 ("Plaintiffs' other *loss causation theory* fares better. Under the materialization of the risk theory, Plaintiffs can prove *loss causation* by showing an event that reveals that an earlier statement was false, or in other words, by showing the materialization of a risk that was misrepresented by the Company.") (emphasis added). The assertion is inapposite to whether the dividends were promised in the Joint Proxy as part of the bargain, as transaction causation dictates.

the Hudson City Board's comfort level with continuing to issue dividends at the same level as previously.  This evidence does not, however, show that dividends were promised as part of the merger's bargain.

The Keath/DeRosa Report supports the causal relationship between the merger delay and dividend cuts with references to an array of Hudson City Board and Audit Committee minutes.[16] Plaintiffs also cite to these minutes and others extensively in their recitation of impacts from the merger delay that purportedly caused the claimed reduction in dividends.  *See* Renewed Mot. at 6–7.  These Board and Audit Committee minutes reference various business expectations for the merger, merger related expenses and accumulations of cash to pay for them, investments in a new strategic plan once the merger was delayed, and other financial and management impacts from the merger delays throughout the period of 2013–2016.  None of these minutes reference any loss of discretion by the Board in issuing dividends, although they do discuss numerous financial and managerial impacts from the merger delays.  Instead, the references to dividend discussions suggest Hudson City management and its Board retained and utilized this discretion regarding dividend decisions.[17]  While this evidence does show a chain of causation between the merger

---

[16]     Pls.' Ex. 35 (Keath/DeRosa Report) at ¶ 138 & n.58 (citing Board minutes from September 18, 2012 (Pls.' Ex. 26 & 55); October 23, 2012 (Pls.' Ex. 27); December 11, 2012 (Pls.' Ex. 28); April 30, 2013 (Pls.' Ex. 29); June 18, 2013 (Pls.' Ex. 30); September 10, 2013 (Pls.' Ex. 31); March 25, 2014 (Pls.' Ex. 24); December 8, 2014 (Pls.' Ex. 32); April 28, 2015 (Pls.' Ex. 33); September 29, 2015 (Pls.' Ex. 25)) (also citing Hudson City Audit Committee Minutes from July 28, 2015 (Pls.' Ex. 34)).

[17]     *See*, *e.g.*, Pls.' Ex. 15 at 2 ("Mr. Salamone then updated the Board on the request for a $0.04 dividend."); *see also* Pls.' Ex. 23 at 1 ("The Company also reported today that the Board of Directors declared a quarterly cash dividend of $0.04 per share . . . ."); *see also* Pls.' Ex. 25 at 2 ("Mr. Salamone discussed the Company's dividend.  He stated that management has decided not to seek approval for the payment of a dividend to shareholders for the third quarter as a result of the expected earnings for the quarter."); *see also* Pls.' Ex. 67 at 125–26 ("Q: Why was it reduced

delays and the dividend cuts, it also clearly shows Hudson City management and Board deliberations about the extent of impacts from the merger delay and management and Board decision-making about dividends flowing from these impacts.  This may be enough to satisfy the standard at class certification as to the loss causation element of Plaintiffs' Section 14(a) claim regarding Dividend Damages, but the evidence does nothing to show dividends were promised as part of the bargain, so they do not address the transaction causation element.

Yet, some of Plaintiffs' evidence can be read as an attempt to support this latter proposition. Plaintiffs say the Joint Proxy contains evidence that J.P. Morgan projected Hudson City's ability and likelihood to continue paying quarterly dividends at a rate of eight cents per share throughout the period of 2012–2016.  Pls.' Mot. for Class Cert. at 10 (D.I. 136); Renewed Mot. at 2, 6.  A review of the referenced portion of the Joint Proxy shows that J.P. Morgan had conducted an economic valuation of Hudson City to determine whether the merger consideration in the Merger Agreement was fair.  Pls.' Ex. 1 (Joint Proxy) at 84.  However, the portion of the Joint Proxy referenced by Plaintiffs states that the eight cents per share of quarterly dividends was an input assumption in that valuation analysis, and nowhere does it state that J.P. Morgan had assessed the viability of Hudson City doing so into the future.  *Id.* at 86–88.[18]  Further, the reference to 2012–

---

from eight cents to four cents?  A: I was waiting for that question.  It was not because of the delay in the merger, it's because of the business model could not support eight cents because we were anticipating if the merger was not going to happen, we'd have to take another big balance sheet restructuring . . . .  *We concluded that we were a safer and sounder institution by distributing less capital* because of our business model and the losses we were going to ensure that four cents was safer than eight cents.  If we were going to merge, days or weeks after this, eight cents was fine. *We had enough capital, but looking forward to the future, we had a safety and soundness issue in front of us and four cents was much more prudent.*") (emphasis added).

[18]     "These forecasts were based on numerous variables and assumptions that are inherently uncertain and may be beyond the control of management, including, without limitation, factors

42

2016 is with respect to input asset growth assumptions, with no evidence that this has any relation to dividends, and is mentioned completely separately from the assumption made of $0.32 per year of dividends. *Id.* at 87–88. J.P. Morgan's updated presentation to the Hudson City Board on August 26, 2012, likewise lists the $0.32 per share per year as an input assumption into its dividend discount model, and does not describe how that specific number was produced. Pls.' Ex. 76 at 10.[19] A review of the entire J.P. Morgan opinion and Appendix B of the Joint Proxy, which sets out J.P. Morgan's methodology, shows there is no mention at all as to why J.P. Morgan specifically chose this $0.32 per year dividend assumption. *See generally* Pls.' Ex. 1 (Joint Proxy) at 84–89, 221–23. In sum, Plaintiffs' references to J.P. Morgan's dividend estimates do not substantiate that the "Joint Proxy projects Hudson's stand-alone ability to pay dividends of 32 cents a year (8 cents a quarter) from 2013–2016" as Plaintiffs contend. Renewed Mot. at 2, 6.

Plaintiffs assert that "Hudson was portrayed as a company with such strong earnings prospects that, even if it stood alone, dividends would remain steady," but do not cite to any evidence for this proposition. *Id.* at 2. Plaintiffs do cite to a comparative dividends chart and references to risks of "stressed conditions" that could impact "dividend policy." *Id.* However, the reference to "stressed conditions" appears in the Joint Proxy several pages after the reference to

---

related to general economic and competitive conditions and prevailing interest rates." Pls.' Ex. 1 (Joint Proxy) at 86. "J.P. Morgan calculated a range of implied values for Hudson City common stock by discounting to present values *estimates of Hudson City's future dividend stream* and terminal value. In performing its analysis, J.P. Morgan utilized *the following assumptions* . . . dividends per share of $0.32 annually . . . ." *Id.* at 87–88 (emphasis added).

[19] The slide listing J.P. Morgan's dividend discount model assumptions lists as sources, "Company Filings; SNL Financial; FactSet; [and] Management projections . . . as of June 30, 2012," without specifying which individual assumptions were supported by which combination of sources, nor how J.P. Morgan produced their assumptions from these sources. Pls.' Ex. 76 at 10.

"dividend policy" and does not appear to be linked in any way.  *Compare* Pls.' Ex. 1 at 46, *with id.* at 50.  Further, the disclosure of such risks in this risk section of the Joint Proxy tends to support the proposition that dividends were not promised as deal consideration or otherwise, and that they were subject to a wide array of risks and managerial considerations.

Plaintiffs cite to a statement in the Joint Proxy that the merger would "increase potential returns" through complementary characteristics between the two companies, Renewed Mot. at 2 (citing Pls.' Ex. 1 (Joint Proxy) at 81), but this statement does not mention dividends at all and cannot be read to promise any particular amount of dividends as a benefit of the bargain.

Plaintiffs also assert evidence from the deposition of Defendant Salamone purporting to support the proposition that the dividend reductions approved by the Hudson City Board were directly attributable to the merger delays.  Renewed Mot. at 8 (quoting Pls.' Ex. 67 (Salamone Dep.) at 129).  The deposition excerpt does show that the merger delay caused the Hudson City Board to reconsider its financial condition and ability to pay dividends in light of the need to continue as an independent entity for a longer period of time.  *Id.*  However, this is not evidence that dividends were promised to shareholders as part of the merger.

Plaintiffs further support their contention the reduced dividends were a "forced economic necessity," rather than discretionary, with a range of evidence of steps taken by the Hudson City Board in response to the "difficult position" in which they found themselves flowing from the merger delay.  *See* Renewed Mot. at 8–11.  This evidence shows impacts from the merger delay such as the Board's need to engage in balance sheet restructuring[20] and invest in development and

---

[20]     Pls.' Ex. 57 at 2; Pls.' Ex. 69 at 3, 5.

implementation of a new strategic plan,[21] delays in implementation of this strategic plan,[22] additional costs of ensuring employee retention during the extended pendency of the merger,[23] erosion of customers who moved their money elsewhere due to loss of confidence in Hudson City,[24] limitations imposed by the pending merger on investing in certain revenue opportunities that led to large cash balances for Hudson City and created opportunity costs and lost revenue and earnings,[25] and a final delay to the merger in 2015 and the choice by M&T to advance the record date of its own dividends to a date before the close of the merger that collectively deprived Hudson City shareholders entirely of two quarters of dividends.[26]

None of this evidence demonstrates that the dividends in question were part of the bargain for which shareholders voted in April 2013. That bargain entailed a closing of the merger prior to August 27, 2013. *See* Pls.' Ex. 1 (Joint Proxy) at 41 & 213, Sec. 8.1(b)(ii).[27] The Board in its own

---

[21]     Pls.' Ex. 29 at 4; Pls.' Ex. 32; Pls.' Ex. 57 at 2–3.

[22]     Pls.' Ex. 71 at 2.

[23]     Pls.' Ex. 29 at 5; Pls.' Ex. 57 at 5–6; Pls.' Ex. 69 at 3–5.

[24]     Pls.' Ex. 57 at 6–7.

[25]     *See* Pls.' Ex. 57 at 8; Pls.' Ex. 70 at 1, 4; Pls.' Ex. 31 at 2.

[26]     Renewed Mot. at 10–11 (citing Pls.' Ex. 33 at 1–2; Pls.' Ex. 72–74; Pls.' Ex. 67 (Salamone Dep.) at 225–26).

[27]     The Merger Agreement sets the original termination date of the Merger Agreement as "the first anniversary of the date hereof (such date, the 'Outside Date')." Pls.' Ex. 1 (Joint Proxy (Merger Agreement)) at 213, Sec. 8.1(b)(ii) (emphasis in original). The Merger Agreement does not otherwise define or reference the "Outside Date" in any other section. Hudson City and M&T both signed and entered into the Merger Agreement on August 27, 2012, Pls.' Ex. 1 (Joint Proxy) at 3–4, making August 27, 2012 the "date hereof," and the first anniversary of that date as August 27, 2013. Additionally, the Joint Proxy refers to August 27, 2013, as the deadline for the merger, after which either bank may choose not to proceed with the merger. *Id.* at 41. Accordingly, the Court construes the original termination date of the Merger Agreement to be August 27, 2013.

discretion extended that deadline four times before the final close of the merger in 2015, *Jaroslawicz II*, 2024 WL 474846 at *20; Defs.' Ex. 1 (Denis Report) at ¶ 60 n.90; Defs.' Ex. 16 (M&T Form 8-K) at 2, despite the difficult position that they faced by needing to retain employees, restructure their balance sheet, invest in a new strategic plan, forego new revenue opportunities, and develop a large cash position in preparation for the merger.  If these circumstances had truly backed them into a corner, the Board could have declined to amend the Merger Agreement on any one of those four occasions.  Plaintiffs' evidence that the Hudson City Board needed to reconsider its dividend policy due to the merger delay and its various associated operational and managerial impacts does not go so far as to show a "forced economic necessity" that deprived the Board of its discretion.  Renewed Mot. at 8.

In light of these discretionary extensions of the Merger Agreement by the Board, the only quarterly dividend reductions that could plausibly be directly caused by the combination of shareholder approval of the Merger Agreement and the merger delay would be those that would have occurred prior to August 27, 2013, being the April and July quarterly dividends of 2013. However, the preponderance of the evidence does not show that Plaintiffs' evidence of board minutes and the Salamone Deposition are sufficient for them to prevail in demonstrating the Merger Agreement approved by shareholders *directly* forced the hands of the Hudson City Board, as required under *General Electric*.

First, portions of the Salamone Deposition show that as of 2012 Hudson City's business model was failing due to a combination of low interest rate lending conditions and high interest rate debt on their balance sheet that they could not restructure on their own (hence the motivation to merge with M&T to achieve this necessary restructuring).  *See* Pls.' Ex. 67 (Salamone Dep.) at 126, 129; Defs.' Ex. 39 (Salamone Dep.) at 60–61.  Further, Hudson City had previously reduced

its dividends from fifteen cents per quarter to eight cents in 2011, Defs.' Ex. 1 (Denis Report) at ¶ 46, Denis Ex. 4 (Hudson City Dividends chart), which is consistent with and suggestive of a long-term trend for Hudson City in declining financial position and ability to pay out dividends.  Finally, Mr. Salamone stated in his deposition that "from the time [Hudson City] signed the merger agreement, every dividend had to be approved by both regulators on [Hudson City's] side" and the regulators approved every dividend recommendation by the Board "because [Hudson City was] very prudent with how [they] distributed capital."  Pls.' Ex. 67 (Salamone Dep.) at 128.  This statement tends to support that Hudson City retained substantial Board and managerial discretion about its distributions of capital, with distributions to shareholders in the form of dividends as only one of these options.  *See also id.* at 126.

Accordingly, the cumulative evidence and arguments put forward by Plaintiffs in support of their Dividend Damages in their original and Renewed Motions for Class Certification fail to satisfy the predominance requirement of Rule 23 by a preponderance of the evidence.  The preponderance of this evidence fails to demonstrate that the Hudson City Board lacked discretion under the Merger Agreement, but instead shows continued discretion by the Board to set dividend policy, subject to regulatory approval, and even allow the Merger Agreement to lapse if financial conditions of the merger delay became unacceptable.  Discretionary board decisions not authorized directly by the transaction approved by shareholders do not satisfy the rule from *General Electric*, and Plaintiffs have not shown sufficient common evidence that they could prevail at trial in proving a direct connection between lost dividends and the Joint Proxy or Merger Agreement, outside the application of the Hudson City Board's discretion in setting dividend policy.

**F. Trading Damages and Closing Damages remain insufficiently supported under the predominance requirement of Rule 23.**

Plaintiffs do not support their purported Trading Damages and Closing Damages with any additional evidence or argument in their Renewed Motion, instead resting for these damages on their incorporation by reference of the evidence and arguments in their Motion for Reconsideration for these damages. *See* Renewed Mot. at 4–5 & n.5. The Court adopts its prior analysis and findings from its February 7, 2024 Opinion and from the above Opinion regarding Plaintiffs' Motion for Reconsideration regarding these two types of proposed damages. Plaintiffs' arguments remain unpersuasive, and Plaintiffs have not supported these damages with sufficient common evidence for a fact-finder to conclude they were not wholly speculative (for all events in the Event Study), that they were included in the benefit of the bargain (for the April 12, 2013 event), or that the Hudson City Board's discretionary actions to extend the Merger Agreement did not break the chain of causation (for the October 17, 2014; April 6, 2015; and September 30/October 1, 2015 events) regarding loss causation and transaction causation. Plaintiffs therefore have failed to satisfy the predominance requirement of Rule 23 as to the loss causation element of Section 14(a) for all four of their asserted events in their model for Trading Damages and Closing Damages, and as to transaction causation for the October 17, 2014; April 6, 2015; and September 30/October 1, 2015 events.

**G. The Court need not decide Plaintiffs' remaining arguments.**

Plaintiffs also propose a new class definition with their Renewed Motion to satisfy the ascertainability requirement of Rule 23, and request that the Court appoint Mr. and Mrs. Belina and Mr. Krublit as class representatives, Mr. Coren and Coren & Ress, P.C. as lead class counsel, and Mr. Murphy and Murphy & Landon, P.A. as Delaware class counsel. Renewed Mot. at 11–13. Plaintiffs' proposed class definition attempts to respond to the Court's findings in its first class

certification Opinion on August 28, 2023, that the presence of merger arbitrageurs in the class render the class unascertainable.  Defendants challenge Plaintiffs' proposed class definition as inadequate to accomplish the goal of excising merger arbitrageurs from the putative class, consistent with the Court's August 28, 2023 Opinion.  However, that Opinion was vacated and replaced with the Court's February 7, 2024 Opinion, which did not reach the ascertainability requirement given the failure of Plaintiffs to satisfy the predominance requirement of Rule 23. Plaintiffs having failed to satisfy the predominance requirement again in their Renewed Motion, the Court once again declines to reach the question of the ascertainability requirement, and also need not reach the issues of appointment of class representatives and class counsel.

## IV.   CONCLUSION

As the foregoing discussion describes, Plaintiffs have failed to show in their Motion for Reconsideration a clear error or manifest injustice in the Court's February 7, 2024 Opinion regarding their original Motion for Class Certification.  Plaintiffs have additionally failed to show that the preponderance of the cumulative common evidence provided in their Renewed Motion for Class Certification and reincorporated past filings demonstrates that Plaintiffs are capable of prevailing at trial on the issue of transaction causation for their alleged Dividend Damages, and the issues of loss causation and transaction causation for their Trading and Closing Damages.

In accordance with the reasoning herein, Plaintiffs Motion for Reconsideration, D.I. 224, and Plaintiffs' Renewed Motion for Class Certification, D.I. 227, are both hereby DENIED.

The Court reserves its discretion to amend this Memorandum Opinion and Order if new evidence available in the later merits stages of this proceeding alters its analysis regarding the commonality and predominance requirements of Rule 23.

SO ORDERED