# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DAVID JAROSLAWICZ, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.  1:15-cv-00897-EJW |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| M&T BANK CORPORATION; Michael W. Azzara; Brent D. Baird; William G. Bardel; Scott A. Belair; Angela C. Bontempo; Robert T. Brady; Victoria H. Bruni; T. Jefferson Cunningham, III; Mark J. Czarnecki; Gary N. Geisel; Cornelius E. Golding; John D. Hawke, Jr.; Patrick W.E. Hodgson; Hudson City Bancorp Inc.; Rene F. Jones; Richard G. King; Jorge G. Pereira; Donald O. Quest; Melinda R. Rich; Robert E. Sadler, Jr.; Denis J. Salamone; Joseph G. Sponholz; Herbert L. Washington; and Robert G. Wilmers. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) | |

Presently before this Court is Defendants' (collectively, "M&T" or "Defendants") Motion for Summary Judgment (D.I. 249), and supporting Brief (D.I. 250 (hereinafter, "MSJ" or "Defendants' Brief")).  Defendants move for judgment on all the claims of David Jaroslawicz, individually and on behalf of all others similarly situated (collectively, "Plaintiffs" or "Plaintiff–shareholders"), in the Second Amended Complaint (D.I. 72), comprising: Count I (Violations of Federal Proxy Laws against M&T, the M&T Directors, and Jones) and Count II (Violations of Federal Proxy Law against Hudson City and the Hudson City Directors).  Plaintiffs responded in opposition to the summary judgment motion (D.I. 256).  Defendants replied (D.I. 301).  This Court held oral argument on this Motion on March 13, 2026.  D.I. 313.  This Court **GRANTS** Defendants' motion as to both Counts in Plaintiffs' Complaint.

## I.    Introduction

M&T argues that Plaintiffs cannot establish that M&T violated Section 14(a) of the Securities and Exchange Act of 1934 as a matter of law.  This case arises out of a merger agreement between M&T and Hudson City Bancorp (Hudson City) in which M&T was to acquire Hudson City.  Prior to executing the merger, Hudson City was required to obtain shareholder approval.  To do so, M&T and Hudson City filed a Joint Proxy Statement (Joint Proxy) as required by the Securities and Exchange Commission (SEC) to inform shareholders of the merger.  Plaintiff–shareholders allege that this statement contained material misrepresentations or omissions about the merger and the regulatory challenges the merger faced, causing it to close significantly later than expected.  Plaintiffs also seek "benefit-of-the-bargain" damages.  Plaintiffs bring their claims under Section 14(a) of the Securities and Exchange Act.  15 U.S.C. § 78n(a).

## II.    Background

Hudson City, facing difficulties in the wake of the 2008 financial crisis, began assessing future options for its survival.  In May 2012, Hudson City engaged in discussions regarding a potential acquisition by M&T.  MSJ at 10.  On August 27, 2012, the two banks entered into a Merger Agreement where M&T would absorb Hudson City and Hudson City Shareholders would receive a mix of 40% cash and 60% M&T stock in exchange for their Hudson City stock.  *Jaroslawicz v. M&T Bank Corp.*, No. CV 15-00897-EJW, 2024 WL 474846, at *2 (D. Del. Feb. 7, 2024) (hereinafter, "*Feb. 7 Decision*").  Prior to executing the merger, Hudson City was required to obtain shareholder approval and file proxy statements before any shareholder vote.  *Id.*  M&T and Hudson City filed a Joint Proxy, declared effective on February 22, 2013, to inform shareholders of the terms of the merger and announced a Hudson City shareholder

meeting for April 18, 2013, to conduct a vote on the merger. *Id.*; D.I. 271 at 17 (Plaintiffs'

Exhibit 50 at 7).[1]  The meeting was held, and Hudson City shareholders voted for the merger on

April 18, 2013. *Feb. 7 Decision*, 2024 WL 474846 at *2.  The merger was originally expected to

close in August of 2013; however, it did not close until November 1, 2015. *Id.*; D.I. 256 at 2

(hereinafter "Opposition to MSJ" or "Plaintiffs' Brief").  Plaintiffs allege in their Complaint and

Brief that regulatory scrutiny over M&T's compliance with Bank Secrecy Act/Anti Money

Laundering ("BSA/AML") laws, along with Consumer Violations regarding mislabeled "free"

checking accounts, significantly delayed the close of the merger causing Plaintiffs financial

harm. *See* Opposition to MSJ at 3; *Feb. 7 Decision*, 2024 WL 474846 at *2.

M&T had been subject to regulatory scrutiny in the months and years leading up to the

merger.   [date]   , the Federal Reserve Board (FRB) conducted an examination of M&T's

BSA/AML program, during which the FRB identified certain deficiencies,   . . .

M&T. *See* MSJ at 13.  Throughout 2012, M&T Directors listed

BSA/AML as one of their "Key Compliance Risks." *See, e.g.*, Plaintiffs' Exhibit 48 at

MTB00299480 (D.I. 270 at 66).

The FRB also identified concerns with   [other matters]

Plaintiffs' Ex. 131 at 10–11.  M&T became aware of the regulatory risks

surrounding its "free" checking practice prior to the merger's announcement, in 2012.  MSJ at

25–26.  M&T terminated the "free" checking practice on September 25, 2012. *Id.* at 26.  In late

2014, the Consumer Financial Protection Bureau ("CFPB") issued an enforcement action against

M&T for these "free checking" consumer violations.  Plaintiffs' Ex. 131 at 10.  On October 9,

---

[1] References to "Plaintiffs' Exhibit" and "Defendants' Exhibits" refer to the exhibits that were
filed in support of the summary judgment briefs.

2014, the CFPB announced it was taking regulatory action against M&T for this "free" checking account practice and ultimately issued a Consent Order. Plaintiffs' Ex. 131 at 10 n.27; *see* Plaintiffs' Ex. 111 (the "Consent Order"). As part of the settlement, M&T agreed to pay $3.1 million, an amount which constituted less than 0.1% of the merger's value. MSJ at 26.

Plaintiffs allege that the proxy materials were materially misleading and omissive for failing to disclose the extent of the regulatory risks posed to the merger from the BSA/AML deficiencies and the consumer violations. *See, e.g.*, Plaintiffs' Brief at 34, 37. Plaintiffs allege injury under a "benefit-of-the-bargain" theory, contending that they did not receive the benefit for which they had bargained when they voted for approval of the merger. *Feb. 7 Decision*, 2024 WL 474846 at *3. Plaintiffs allege three types of damages resulting from the misrepresentations and omissions: trading, closing, and dividend damages. Opposition to MSJ at 21. Trading damages arose from Hudson's "share price being depressed by undisclosed regulatory problems during the pendency of the Merger." *Id.* Closing damages arose from receiving "tainted M&T shares" at the eventual close of the merger. *Id.* Plaintiffs calculated both trading and closing damages using the DeRosa Event Study, which determined damages as of four dates. *Id.* at 22. Plaintiffs also allege dividend damages, which allegedly arose from an implicitly promised rate of annual dividends of $0.32 that was later cut significantly. *Id.* at 22–27.

## III.     Procedural History

Plaintiffs filed their initial Complaint on October 7, 2015, D.I. 1, and filed an Amended Complaint on February 19, 2016. D.I. 54. The Amended Complaint alleged violations of Section 14(a), Section 20(a), and breach of fiduciary duty. D.I. 54; *see Feb. 7 Decision*, 2024 WL 474846 at *4. Defendants filed a Motion to Dismiss the Amended Complaint on April 19, 2016, D.I. 61, which this Court granted without prejudice on March 30, 2017, with leave for

Plaintiffs to amend the Section 14(a) claims. *Jaroslawicz v. M&T Bank Corp.*, No. CV 15-897-RGA, 2017 WL 1197716, at *8 (D. Del. Mar. 30, 2017). Plaintiffs filed a Second Amended Complaint on April 20, 2017, D.I. 72, which Defendants moved to dismiss on May 26, 2017. D.I. 75. The Court granted without prejudice the Motion to Dismiss the Second Amended Complaint on October 27, 2017, with leave to amend. *Jaroslawicz v. M&T Bank Corp.*, 296 F. Supp. 3d 670, 673 (D. Del. 2017). Plaintiffs filed notice of intent to stand upon their Second Amended Complaint and requested entry of judgment on November 17, 2017. D.I. 86 (Notice of Intent). The Court dismissed the Complaint with prejudice on November 21, 2017. D.I. 87 (Dismissal of Third Amended Complaint). Plaintiffs appealed to the U.S. Court of Appeals for the Third Circuit on December 12, 2017. D.I. 88 (Notice of Appeal).

The Third Circuit affirmed in part and vacated in part this Court's dismissal of Plaintiffs' Complaint on December 26, 2018. *Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 100–01 (3d Cir. 2018). Plaintiffs petitioned for rehearing, which was granted on June 4, 2019, and the Third Circuit vacated the December 26 opinion and judgment. *Jaroslawicz v. M&T Bank Corp.*, 925 F.3d 605, 606 (3d Cir. 2019). On June 18, 2020, the Third Circuit issued its final opinion, holding that Plaintiffs had plausibly alleged a claim against Defendants for making false or misleading proxy solicitations, but affirming the dismissal of the other claims. *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 705 (3d Cir. 2020).

Plaintiffs then filed a motion in the District Court for Class Certification on April 13, 2022, D.I. 136, and Defendants filed their Memorandum in Opposition to the Motion for Class Certification on June 8, 2022, along with their Motion to Exclude the Keath/DeRosa Expert Report. D.I. 144; D.I. 145. On August 28, 2023, this Court issued a Memorandum Opinion and Order denying Defendants' Motion to Exclude and granting-in-part, denying-in-part Plaintiffs'

Motion for Class Certification. *Jaroslawicz v. M&T Bank Corp.*, No. 15-cv-00897-EJW, 2023 WL 5528723, at *1 (D. Del. Aug. 28, 2023). Defendants filed a Petition for Interlocutory Review with the Third Circuit seeking permission to appeal, but it was denied. *See* D.I. 220. On November 1, 2023, this Court issued an Order concluding that its August 28 Order had clearly erred in applying the Third Circuit's Rule 23 legal standard for class certification and ordered that it would review and amend its August 28 Opinion consistent with Third Circuit precedent. *Jaroslawicz v. M&T Bank Corp.*, No. CV 15-00897-EJW, 2023 WL 7182117, at *1–2 (D. Del. Nov. 1, 2023). On February 7, 2024, this Court vacated the August 28 Opinion and Order and denied Defendants' Motion to Exclude and also denied Plaintiffs' Motion for Class Certification. *Feb. 7 Decision*, 2024 WL 474846, at *1. Plaintiffs filed a Motion for Reconsideration of the February 7, 2024 Order and a Renewed Motion for Class Certification. D.I. 224; D.I. 225. On June 13, 2024, this Court denied both motions. *Jaroslawicz v. M&T Bank Corp.*, No. CV 15-00897-EJW, 2024 WL 2975766, at *1 (D. Del. June 13, 2024) (hereinafter, "*June 13 Decision*").

## IV.     Legal Standard

### A.     Summary Judgment

A party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment has the burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party may meet this burden by demonstrating that the non-moving party fails to make a showing sufficient to establish the existence of an element essential to their case. *Id.* To meet its burden under Rule 56(c) and defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The moving party must show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law when the facts are viewed in the light most favorable to the nonmoving party." *Citizens for Health v. Leavitt*, 428 F.3d 167, 175 (3d Cir. 2005) (providing standard "[t]o affirm the grant of summary judgment").[2] While "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" in determining whether a genuine factual question exists, "summary judgment should not be denied unless there is sufficient evidence for a jury to reasonably find for the nonmovant." *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986)).

### B.      Securities and Exchange Act Section 14(a)

Plaintiffs allege claims under Section 14(a) of the Securities Exchange Act of 1934, as codified in 15 U.S.C. § 78n(a), under SEC regulation 17 C.F.R. § 240.14a–9. Under 15 U.S.C. § 78n(a) it is unlawful to solicit a proxy "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n. Under 17 C.F.R. § 240.14a–9, solicitations through proxy statements may not be "false or misleading with respect to any material fact" or omit "to state

---

[2] The Third Circuit has explained:

> The non-movant's allegations are to be taken as true, and when they "conflict with those of the movant, the former must receive the benefit of the doubt." *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir.1995) (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976)).
>
> The Supreme Court has held that in response to a motion for summary judgment, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

*Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002).

any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. The Supreme Court held in *J. I. Case v. Borak* that private parties have a right to bring suit for violation of Section 14(a), ensuring a private right of action is available to parties harmed by misleading or omissive proxy materials. *J. I. Case Co. v. Borak*, 377 U.S. 426, 430–31 (1964).

Third Circuit precedent has identified three elements of a Section 14(a) claim to determine liability for false or misleading proxy statements under Section 14(a). *See Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 710 (3d Cir. 2020) ("Third Circuit Decision") (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)). First, the proxy statement must contain a material misrepresentation or omission. *Tracinda*, 502 F.3d at 228. Second, the plaintiff must have suffered an injury as a result of this misrepresentation or omission. *Id.* Third, the proxy solicitation itself, rather than the particular defect in the solicitation materials, must have been an essential link in the accomplishment of the transaction. *See Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970).

## V. Discussion

### A. The Plaintiffs fail to raise a genuine dispute of material fact to support their allegation that M&T made material misrepresentations or omissions in the proxy materials.

#### 1. Legal standard for material misrepresentations or omissions.

The Third Circuit has identified a two-part test for determining whether a proxy statement contained a material misrepresentation or omission. First, this Court must determine

whether "there is a substantial likelihood that a reasonable shareholder would consider [the omission or misrepresentation] important in deciding how to vote." *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 710 (quoting *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003)). "That involves an assessment of whether 'the disclosure of the omitted fact or misrepresentation would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Jaroslawicz*, 962 F.3d at 710 (quoting *EP Medsystems, Inc., v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)). Second, the materiality of the statement should be assessed "at the time and in the light of the circumstances under which it is made." *Jaroslawicz*, 962 F.3d at 710 (quoting *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006)). Materiality of statements must be assessed in the context of which they were made: "to be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Here, to show that there is a genuine dispute of material fact about materiality, Plaintiffs must show 1) that a genuine dispute of material fact exists about whether a reasonable shareholder would consider the alleged omission or misrepresentation material in deciding how to vote and 2) that a genuine dispute of material fact exists about whether the Defendants knew and could have provided different or further information to shareholders at the time when the disclosures were made.

Here, Defendants' required disclosures were governed by Item 105 of Regulation S-K, which asks for "the most significant factors that make an investment in the registrant or offering speculative or risky." *Jaroslawicz*, 962 F.3d at 705–06 (quoting 17 C.F.R § 229.105). "Each 'risk factor' requires an individual topic heading supported by information that is both 'concise

and organized logically.'" *Id.* As the Third Circuit explained, Item 105 requires disclosures of "the most significant factors known to make an investment speculative or risky." *Id.* at 711.

### 2. Defendants contend that there is no genuine dispute of material fact as to materiality.

Defendants contend there is no genuine dispute of material fact as to materiality as Plaintiffs cannot prove any material omission or misrepresentation in the proxy statements because 1) Defendants disclosed everything they were required to disclose based on what they knew at the time, 2) a reasonable shareholder would not have changed their vote based on further disclosure of regulatory deficiencies, 3) the Supplemental Disclosures cured any alleged defect in the Joint Proxy, and 4) the bank examination privilege limited further disclosures.

### a) Defendants contend that the proxy materials fully disclosed everything required by Item 105 of Regulation S-K.

Item 105 requires "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Defendants contend that the Joint Proxy fully disclosed the risks to the merger as they were known to Defendants at the time of issuance, which is all that is required under Item 105, and therefore sufficient for Section 14(a). *See* MSJ at 30. Defendants contend that there were no material omissions or misrepresentations because they disclosed everything that they were required to disclose under Item 105 based on their knowledge at the time and were not required to make any "speculative" disclosures. *See* MSJ at 35. They contend that their disclosures were sufficient based on what they knew at the time: that M&T expected to face "increased regulation," that FRB approval was required for the Merger to close, and they could make "no assurances" that "regulatory approvals . . . will be received on a timely basis." *Id.* at 34–35; Defendants' Ex. 1 (Joint Proxy)

at 34–35, 100–01.  Defendants assert that these disclosures satisfied the requirement of "known" risks that would make the Merger "speculative or risky."  MSJ at 35 (citing *Jaroslawicz*, 962 F.3d at 711).

> **b)    Defendants further contend that any additional information would not have been material to shareholders because it would not have affected the way they voted.**

Furthermore, Defendants contend that even if Defendants *had* known more information to disclose, any additional information would not have been material to shareholders.  MSJ at 36.  Defendants contend that the only additional information M&T had in February 2013 (the time of the Joint Proxy's issuance) was ████████ [certain matters] ████████

████████████  *Id.*  The disclosure of this information, in tandem with the disclosures already made about increased regulatory scrutiny, would not have significantly altered the total mix of information, Defendants argue.  *Id.*  Defendants point to several Plaintiffs' depositions to show that further disclosures of what was known at the time would not have altered the reasonable shareholders' vote: Mr. Belina testified that he would have still voted for the merger after reading the Supplemental Disclosures and both Mr. Belina and Mr. Krublit testified that they believed the merger remained in Hudson City's best interest well after its approval.  *Id.* at 36–37.

> **c)    Defendants contend that any defects in the Joint Proxy were sufficiently cured by the Supplemental Disclosures.**

Defendants next contend that even if the Joint Proxy was deficient, the Supplemental Disclosures, issued on April 12, 2013, before the shareholder vote on April 18, 2013, sufficiently cured any defect.  *See* MSJ at 37.  Defendants point to language in the Supplemental Disclosures

11 of 56

that states that M&T and Hudson City "expect additional time will be required to obtain a regulatory determination on the applications necessary to complete their proposed merger" and that M&T "has learned that the Federal Reserve has identified certain regulatory concerns . . . relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program." Defendants' Ex. 2 at 6. Even after the Supplemental Disclosures disclosed the delay of the merger, shareholders overwhelmingly voted to approve the merger. *See* MSJ at 38; Defendants' Ex. 37 at 2.

> ### d) Defendants contend that their disclosures were limited by the bank examination privilege and confidential supervisory information ("CSI").

Finally, Defendants contend that disclosures of the FRB or other agency recommendations or opinions are barred by the bank examination privilege, and the Defendants could not have disclosed anything further about these opinions or recommendations without violating these regulations. *See* MSJ at 32. Defendants point to their expert report (Grice Rpt.), which concluded that the bank-examination privilege "would strictly limit M&T's ability to disclose the specifics of the ongoing regulatory investigations of its BSA/AML compliance program and its remedial efforts." Defendants' Ex. 14 (Grice Rpt.). Because of these confidentiality concerns, Defendants argue that they simply had no more information they could have disclosed in the Joint Proxy without violating the privilege, and therefore there is no genuine dispute of material fact about whether the disclosures were adequate under Item 105. *See* MSJ at 33–36.

**3.** **Plaintiffs contend that there is a dispute of material fact about whether Defendants made material misrepresentations or omissions in the proxy materials.**

Plaintiffs contend that there is a dispute of material fact about whether Defendants made material misrepresentations or omissions in the proxy materials because 1) Item 105 requires more than a generic description of possible risks and Defendants knew of regulatory issues surrounding BSA/AML compliance and free checking before the issuance of the proxy materials, 2) the disclosure of this information could have an impact on how reasonable shareholders voted, and 3) further disclosures were not barred by the bank examination privilege.

**a)** **Plaintiffs contend, citing the Third Circuit's decision, that M&T made only generic statements about BSA/AML compliance that are inadequate under the requirements of Item 105.**

Plaintiffs contend that Defendants had a duty to disclose all material risks to the merger, including [certain FRB matters] *See* Opposition to MSJ at 32–34.  Plaintiffs also contend that M&T knew or could have ascertained through due diligence that regulatory risks threatened approval of the merger.  *Id.* at 35. Plaintiffs point to evidence showing that the SEC had previously informed M&T that the risk disclosures were insufficiently specific.  *Id.* at 35; *see, e.g.*, Plaintiffs' Ex. 31 at MTB00038584–85; Plaintiffs' Ex. 35 at MTB00296109 ("Regulatory Approvals Required for the Merger"); Plaintiffs' Ex. 36 at MTB00181272–73.  Plaintiffs contend "BSA/AML compliance was one of M&T's top compliance concerns throughout 2012," citing to 2012 Compliance Risk Overview presentations.  Opposition to MSJ at 35; Plaintiffs' Ex. 48.  Plaintiffs

point to evidence showing that M&T had been informed by the Federal Reserve

███ [of certain matters] ████████████████████████████

██████████████████████████████████ Plaintiffs contend that the Joint Proxy

failed to disclose these risks and only provided "boilerplate generality concerning regulatory

risks and approvals." Opposition to MSJ at 36.

> **b)** **Plaintiffs contend that the disclosure of information about the BSA/AML deficiencies and the Consumer Violations could impact how a reasonable shareholder voted, making this information "material."**

Plaintiffs contend that "the ability of the Merger to close in a timely manner (or at all)

would clearly be material to a reasonable shareholder in deciding whether to approve the

Merger." Opposition to MSJ at 37. Plaintiffs also contend that the existence of consumer

violations, i.e., misleading "free" checking accounts, would impact a shareholder's vote given

the significant role of checking accounts at M&T. *Id.* at 40.

> **c)** **Finally, Plaintiffs contend that the bank examination privilege and rules governing the disclosure of CSI do not apply to the Defendants and do not bar further disclosures.**

Plaintiffs argue that the bank examination privilege cannot insulate Defendants from

Section 14(a) claims, and the privilege belongs only to government regulators. *See* Opposition to

MSJ at 42. Plaintiffs also contend that rules regarding the disclosure of CSI also do not protect

Defendants from further disclosures because the definition of CSI does not include documents

prepared for business purposes in M&T's possession, and that the "bald assertion that they could

not do so without revealing CSI is not a sufficient basis for summary judgment." Opposition to

MSJ at 43–44. Plaintiffs contend that Defendants' disclosures are not limited based on the privilege because it does not apply in the context of Section 14(a) claims or risk disclosures, and only arises in the discovery context, "when a litigant seeks the production of documents from a banking regulator." Oppositions to MSJ at 42. Plaintiffs further contend that the privilege only belongs to government regulators, and not to banks, therefore not precluding Defendants from making further disclosures. *Id.* Plaintiffs contend that, even with a broad definition of "confidential supervisory information" (or "CSI"), the information Plaintiffs request does not fit within this definition, because they are only asking Defendants to provide a concise and plain discussion of the regulatory review. *Id.* at 43–44. Finally, Plaintiffs also contend that "factual" information is not barred by the privilege, and even when relevant, the privilege only bars agency opinions and recommendations, and not factual disclosures. *Id.* at 43.

4. **Certain disclosure in the proxy materials would have disclosed confidential supervisory information ("CSI") and violated the bank examination privilege.**

This Court agrees with Defendants that their disclosures were properly subject to, and thus limited by, the bank examination privilege and regulations governing the disclosure of CSI; M&T was therefore barred as a matter of law from certain disclosures. The bank examination privilege is a qualified privilege that protects agency opinions, agency recommendations, and banks' responses from disclosure. *In re Wilmington Tr. Sec. Litig.*, No. CV 10-990-SLR-SRF, 2016 WL 9753979, at *4 (D. Del. Aug. 16, 2016). "The purpose of the privilege is to preserve candor in communications between bankers and examiners, which is essential to the effective supervision of banking institutions." *Id.* The privilege specifically protects confidential supervisory information, or "CSI," from disclosure under federal regulations. 12 C.F.R. § 261.2.

CSI is "information that is or was created or obtained in furtherance of the Board's supervisory, investigatory, or enforcement activities . . . relating to any supervised financial institution, and any information derived from or related to such information" and includes "reports of examination, inspection, and visitation." *Id.*

Plaintiffs are correct that the privilege belongs to government regulators and not to banks, and Defendants do not dispute this. *See* D.I. 301 at 12–13 (hereinafter, "Defendants' Reply" or "Reply ISO MSJ"). However, as Defendants persuasively argue in their Reply Brief, this is the exact limitation they faced: M&T could not publicly disclose privileged information given to them by federal regulators without violating the privilege and eroding the purpose of the privilege. *Id.* The Court disagrees with Plaintiffs that the bank examination privilege does not apply in the Section 14(a) context. Given the goal of the privilege, "to preserve candor in communications between bankers and examiners," there is no basis to conclude that otherwise privileged information should be disclosed publicly in a proxy. *In re Wilmington Trust*, 2016 WL 9753979 at *4. If Defendants did what Plaintiffs ask and disclosed agency opinions and recommendations, they would have violated the privilege and federal regulations protecting disclosure of CSI.

The Court also agrees with Defendants that much of the agency opinions and reports discussing [certain matters] constitute CSI. Defendants argue, and Plaintiffs do not dispute, that CSI is defined "fairly broadly." Reply ISO MSJ at 12; Opposition to MSJ at 42–43. CSI includes "confidential operating and condition reports; supervisory assessments; investigative requests for documents or other information; and supervisory correspondence or other supervisory communications," as well as "any portion of a document . . .that contains or would reveal confidential supervisory information." 12 C.F.R. § 261.2. This definition

encompasses information given to M&T by regulatory bodies including the FRB and would limit the disclosure of public information about these supervisory opinions. While Defendants offer expert testimony stating that their disclosures were significantly limited by the privilege, Plaintiffs offered no rebuttal expert testimony. *See* Defendants' Ex. 14 ("Grice Report") ¶ 97 ("[Bank examination privilege] strictly restricts disclosure of communications between financial institutions and their supervising agencies. The discretion to make public disclosures resides with the regulators that have identified issues, rather than with examined banks. . . Based on my experience, BEP would strictly limit M&T's ability to disclose the specifics of the ongoing regulatory investigations of its BSA/AML compliance program and its remedial efforts.").[3] Plaintiffs do not address the Grice Report in their Brief nor explain how M&T could have disclosed information regarding its BSA/AML examination without violating the privilege and CSI disclosure regulations. *See* Reply ISO MSJ at 13. Because Plaintiffs fail to adequately respond to Defendants' arguments and evidence and do not provide any alternative way Defendants could have made disclosures about the BSA/AML examination without violating the bank examination privilege or revealing CSI, Plaintiffs have not met their burden to show that a genuine dispute of material fact exists regarding the question of whether Defendants could have made further disclosures without violating privilege. Without evidence from Plaintiffs, Defendants' evidence demonstrates they were barred as a matter of law from further disclosures, leaving no dispute of material fact as to whether Defendants lack of disclosing the CSI was improper.

---

[3] Defendants' Ex. 14 ("Grice Report") was prepared by Charles H. Grice, co-founder and Managing Director and Principal of CRI Compliance. Mr. Grice has over 30 years of experience in the banking industry working as a consultant on regulatory and risk management matters.

**5.    There is no genuine dispute of material fact whether Defendants' disclosures in the proxy materials met the requirements of Item 105 for disclosure of risk factors facing the merger.**

Notwithstanding summary judgment based on confidentiality and privilege, there also is no genuine dispute of material fact about whether the proxy materials were sufficient under Item 105, because Defendants made no misleading or omissive statements and fully disclosed the possibility that the merger would take longer than anticipated to close.

To show that a genuine dispute of material fact exists about whether more significant disclosure was required under Item 105, a known risk factor must have existed at the time of the offering. *Jaroslawicz*, 962 F.3d at 713 (citing *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013)). The disclosure of a risk factor need not be all-inclusive and need not list "speculative facts or unproven allegations." *Id.* (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)). Yet, if a known risk factor existed that could impact the timely closure of the merger, there would be a duty to disclose it under Item 105. *See id.* at 713–714.

Plaintiffs point to facts showing that Defendants knew of issues with  [raised by the Federal Reserve]

*See* Plaintiffs' Brief at 8; Plaintiffs' Ex. 61 at MTB00296135. However, Defendants contend that ▮▮▮ with the FRB, ▮▮▮ . . . , was "preliminary" and the identification of these issues did not mean [they] would inevitably delay the merger and therefore does not show that Defendants knew the . . . issues would affect the merger during the relevant time period. *See* Defendants' Brief at 13, 34; *see* Defendants' Ex. 14 ¶ 48 ("Grice

Report") ("It is important to note that the identification of issues by examiners does not necessarily mean a bank's ▮▮▮ program has failed the examination or that the ▮▮▮ program is inadequate."). ▮▮▮▮▮▮▮▮ did not mean that Defendants were made aware that these preliminary deficiencies would necessarily extend the merger, as "the FRB did not provide any indication at the soft close meeting that the issues identified could jeopardize M&T's application to acquire Hudson City." MSJ at 13. While Defendants continued to address possible ▮▮▮ deficiencies throughout the end of 2012 and early 2013, they were not aware of the full extent of these issues until [date] , when the ▮▮▮ with the FRB occurred. *See* MSJ at 16.

Defendants met the requirements of Item 105 as a matter of law, leaving no genuine dispute of material fact. In the Joint Proxy, Defendants made various statements discussing the regulatory approval required for the merger and cautioning that "[t]here can be no assurances that the regulatory approvals discussed above will be received on a timely basis." Defendants' Ex. 1 at 101; *see* MSJ at 14–15. M&T also cautioned that "M&T expects to face increased regulation of its industry . . . M&T also expects more intense scrutiny in the examination process and more aggressive enforcement of regulations on both the federal and state levels." Defendants' Ex. 1 at 34; *see* MSJ at 15. Based on the evidence above, these warnings were sufficient under Item 105, given what M&T knew at the time of the Joint Proxy's issuance about regulatory risks to the merger.

Furthermore, the proxy materials made no misleading or omissive statements incorrectly giving Plaintiffs the impression that the merger would *necessarily* close by the originally anticipated date. The Joint Proxy stated that, while Defendants expected that the merger would be completed during the second quarter of 2013, "[n]either M&T nor Hudson City can predict,

however, the actual date on which the merger will be completed because it is subject to factors beyond each company's control, including whether or when the required regulatory approvals will be received."  Defendants' Ex. 1 ("Joint Proxy") at 3.  In the "Risk Factors" section of the Joint Proxy, shareholders were informed that "various approvals must be obtained from the bank regulatory and other governmental authorities" and that these "may not be received at any time, may not be received in a timely fashion, and may contain conditions on the completion of the merger." *Id.* at 29.  In these materials given to shareholders, no promises were made that the merger would necessarily close by a specific time, and shareholders were informed multiple times that the merger's close was dependent on regulatory approval.

Defendants learned that the FRB had identified serious        [issues]

███████████████████████████████████ during the ████████████████, several weeks after the Joint Proxy was declared effective on February 22.  MSJ at 16.  Following several board meetings, the Board voted on April 9 to extend the Merger Agreement after learning that the issues identified by the FRB could impact the regulatory approval process for the merger.  MSJ at 18.  After the Board voted to extend, M&T and Hudson City issued a press release and Supplemental Disclosure informing shareholders that the merger would be delayed.  MSJ at 18; *see* Defendants' Ex. 2 (D.I. 252 at 145–48).  The press release told shareholders that the "Federal Reserve has identified certain regulatory concerns with M&T's procedures, systems and processes relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program" and that "M&T and Hudson City believe that the timeframe for closing the transaction will be extended substantially beyond the date previously expected."  Defendants' Ex. 2 (D.I. 252 at 145).

These disclosures were sufficient to make shareholders aware of potential risks to the merger and disclose Defendants' understanding of changes to the merger's timeline once they were made aware of the full extent of BSA/AML compliance concerns. M&T made no statements giving the impression the merger would necessarily close earlier than when they knew it would; in fact, they largely refrained from making any statement about a specific closing date. When asked about the delay on the April 15, 2013 Earnings Call, M&T Chief Financial Officer Rene Jones did not give an estimated date for the merger's close, stating that "it really seems prudent for us to really not to engage in that discussion until maybe later towards the end of the summer and we've made progress on our own things and at that point if we have better clarity, we'll do it." Defendants' Ex. 35 (D.I. 252 at 357); Reply ISO MSJ at 16–17.

Plaintiffs' counsel, considering this very quote from Mr. Jones during oral argument, argued that M&T expressed a misleadingly low degree of uncertainty about the merger case— specifically, a difference of 12 months that should have been expressed as 19 months, according to Plaintiff's counsel.

> [W]hat they were doing every time they made a disclosure -- for example, they say, you know, we're going to try to do it in a year. We're going to -- They're saying all of that when their internal documents tell them that's not possible. Their internal documents tell them they're spending a fortune. They're hiring more staff, and this process could take 19 months or much longer. And at the time when they're throwing out one year, they know that's impossible.

D.I. 313 (hereinafter, "Oral Arg. Tr.") 55:19–56:7. Plaintiffs argue that whether the Supplemental Disclosures solved the problem should be a fact question for the jury. Oral Arg. Tr. 56:14–19. Defendants at Oral Argument responded to this very point by noting that "even Plaintiffs' expert, Dr. DeRosa, in talking about the Supplemental Disclosures, said that the information within them would be immediately knowable to the market." Oral Arg. Tr. 70:17–21; *see also* MSJ at 39.

The presence of remediation efforts did not entirely foreclose the possibility that the merger would close sooner, meaning that remediation efforts alone did not provide Defendants with knowledge that the merger would be significantly extended.[4] It is a matter of undisputed fact that none of the statements in the proxy materials misrepresented the timeline for the merger's close. Thus there is no genuine dispute of material fact as to whether Defendants made misleading or omissive statements in the proxy materials. In none of the proxy materials did Defendants make unrealistic or omissive promises or suggestions about the date of the merger's close. On the contrary, Defendants frequently raised the caveat that the merger would require regulatory approval, and that Defendants were unable to provide even an estimated date for the merger's close. Plaintiffs fail to point to any genuine issue of material fact regarding a statement in the proxy materials that lead them to believe the merger would necessarily close earlier than when Defendants knew it would, and likewise fail to show that Defendants clearly omitted information about the regulatory landscape and regulatory threats to the merger once the full extent of the regulatory deficiencies was known.

### 6.      Plaintiffs' reliance on the 2020 Third Circuit Opinion is misplaced.

Plaintiffs rely heavily on the June 18, 2020, Third Circuit Opinion to argue that Defendants' disclosures were lacking material information about regulatory threats to the merger. *See* Opposition to MSJ at 32–34. However, the Third Circuit was not considering the veracity of Plaintiffs' claims; they were only considering the allegations at the pleading stage, and making all inferences in the Second Amended Complaint in favor of Plaintiffs, and assuming

---

[4] There was still remediation work ongoing when the merger was approved in September 2015, and the remediation work was not terminated by the FRB until July 2017. Reply ISO MSJ at 17 (citing Pls. Ex. 131 at 42). The presence of remediation work did not mean that the merger necessarily could not close until its conclusion.

the allegations in the Second Amended Complaint were true.  These factual allegations have not been sufficiently supported by discovery to raise a genuine issue of material fact sufficient to defeat summary judgment.[5]  The Third Circuit decision stated that the "Second Amended complaint plausibly alleges that the BSA/AML deficiencies and consumer checking practices posed significant risks to the merger before M&T issued the Joint Proxy." *Jaroslawicz*, 962 F.3d at 717.  However, as the Third Circuit reiterated, "that the Shareholders have adequately pleaded facts that, if true, might warrant remedy naturally says nothing at this stage of the litigation about their ultimate truth." *Id.* at 718.  As noted above, Plaintiffs do not point to any evidence in the record that raises a fact issue that Defendants *knew* that the merger would *necessarily* be extended to November 2015, or that they intentionally misled shareholders or omitted this information from any of the proxy materials.  Likewise, Plaintiffs do not point to evidence in the record showing a genuine issue that Defendants *knew* the merger would be substantially extended because of regulatory deficiencies before the issuance of the proxy materials or that they omitted or provided misleading information.  Plaintiffs, thus, do not meet their burden and cannot rely on the Third Circuit's conclusion from the pleading stage.

Plaintiffs try to use the Third Circuit Opinion to argue that the Joint Proxy was already held to be deficient.  *See* Opposition to MSJ at 32–34.  However, at the pleading stage, the Third Circuit Opinion was based on alleged facts *taken to be true*.  As noted above, these allegations have not resulted in genuine issues of material fact after discovery.  Plaintiffs could point neither

---

[5] To be clear, although the Third Circuit has held: "[t]he non-movant's allegations are to be taken as true," it has explained that in a motion for summary judgment, *the non-moving party must "go beyond the pleadings* and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) (citations omitted) (emphasis added).

to genuine issues of fact that Defendants necessarily knew the regulatory issues would delay the merger when the Joint Proxy was issued, nor to any issue that the proxy supplement did not cure purported deficiencies once Defendants were made aware of the serious regulatory deficiencies. Given that the bank examination privilege precludes disclosure on conversations between regulatory agencies and banks and that Plaintiffs fail to point to genuine disputed material-fact issues that Defendants knew more than what they disclosed, the allegations the Third Circuit upheld at the pleading stage are not, by themselves, enough to defeat summary judgment. There is no genuine dispute of material fact about whether Defendants sufficiently disclosed risk factors under Item 105.

> **7.      There is no genuine dispute of material fact about whether the alleged misrepresentations or omissions would have affected the shareholders' votes on the merger.**

Finally, any alleged misrepresentation or omission would not have been material as a matter of law since it would not have played a substantial role in a reasonable shareholder's decision on how to vote. Even if a fact was omitted from the proxy materials, it is only material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc*, 426 U.S. 438, 449 (1976). In *TSC Industries* the Supreme Court held that proving materiality "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote" but only a showing that "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* at 449. A fact is material is there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Shaev v. Saper*, 320 F.3d 373, 379 (3d

Case 1:15-cv-00894-WHP Document 314 *SEALED* Filed 04/06/16 Page 25 of 56
Case 1:15-cv-00894-WHP Document 318 Filed 04/12/16 Page 25 of 56
PageID #: 8251

Cir. 2003).  The issue of materiality "may be characterized as a mixed question of law and fact" and requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *TSC Industries*, 426 U.S. at 450.  Plaintiffs need not show that the omitted fact would have necessarily changed the outcome of the vote, but only that the inclusion of the fact would have played an actual role in shareholders' deliberations.  Under *TSC Industries*, Plaintiffs are not required to prove that the disclosure of the omitted fact would have necessarily caused a reasonable shareholder to change his vote.  Instead, Plaintiffs must only show that the disclosure of the omitted fact would have "significantly altered the 'total mix' of information made available."  *Id.* at 449.

Plaintiffs argue that, following *TSC Industries*, the determination of materiality is based on assessments that are "peculiarly ones for the trier of fact."  Opposition to MSJ at 36–37 (quoting *TSC Industries*, 426 U.S. at 450). Plaintiffs argue that materiality is (at least partially) a determination that should be reserved for the factfinder and therefore cannot be resolved at the summary judgment stage.  Plaintiffs' argument is that the question of whether additional information provided about the merger delay and regulatory deficiencies would have a substantial impact on a reasonable shareholders' vote should be left for the jury.  However, given that this information *was* disclosed (in the Supplemental Disclosures) and Defendants did not have enough information at the time to disclose specifics regarding the timeline, "reasonable minds cannot differ on the question of materiality" and additional information would be immaterial as a matter of law.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n.11 (3d Cir. 1992).  Plaintiffs failed to show a specific piece of information that should have been included in

a manner that would not break privilege. Thus, any additional information would be immaterial as a matter of law and there is no genuine dispute of material fact.

Plaintiffs fail to show that further disclosure would "significantly alter[] the 'total mix' of information made available," especially given the disclosure restrictions Defendants faced. *TCS Industries*, 426 U.S. at 449. First, the Supplemental Disclosures, issued *before* the shareholder vote even occurred, alerted shareholders to the regulatory concerns and gave them time to change their votes after news of the BSA/AML deficiencies and the merger delay was made public. *See* MSJ at 18–19. After the Supplemental Disclosures were issued, shareholders were aware that the merger would be delayed due to M&T's BSA/AML regulatory deficiencies. Any additional information with more specifics (if M&T even had any knowledge of the specifics) would not have altered the total mix of information available and would not have been significant to shareholders. Even before the issuance of the Supplemental Disclosures, the Joint Proxy fully disclosed that the merger was subject to regulatory approval that might not be received on time or at all. When the Supplemental Disclosures were issued, shareholders were made aware of the delay due to regulatory deficiencies. Further details regarding the specifics of the AML/BSA deficiencies and the FRB's examination would not alter the "total mix" of information available to stockholders. Thus, these alleged omissions or misrepresentations were immaterial as a matter of law.

**8.      There is no genuine dispute of material fact about whether the proxy materials were materially misleading or omissive regarding free checking and consumer violations.**

Plaintiffs also contend that Defendants failed to disclose the regulatory risks related to the Consumer Violations involving M&T's "free" checking practices. Opposition to MSJ at 40.

Plaintiffs contend that M&T was aware of the regulatory risks posed by this practice before the Joint Proxy was issued. *Id.* Plaintiffs contend that information regarding these Consumer Violations would be material because it "caught the attention of the Federal Reserve Board" when it cited the Consumer Violations as one of the reasons for the merger delay. Opposition to MSJ at 41. Moreover, Plaintiffs argue, "compliance issues causing the Federal Reserve to delay approval of the Merger would certainly be material information to a reasonable shareholder . . . ." *Id.*

Defendants argue that there was simply no risk from the Free Checking Practice for Defendants to disclose, and no reason why M&T would expect the Free Checking Practice would or could impact the merger's approval. Reply ISO MSJ at 18. They say M&T ended the Free Checking Practice before the merger application was underway, the CFPB was not one of the regulators required to approve the merger, and that M&T had identified this practice as an area of improvement shows it was not a risk factor to the merger that required disclosure in the proxy statements. Reply ISO MSJ at 19. In October 2014, M&T entered a Consent Order with the CFPB and agreed to pay a settlement of $3 million, which Defendants argue was entirely irrelevant to what M&T could have known in February 2013. Reply ISO MSJ at 20.

Defendants are factually correct. There was no evidentiary showing that in February 2013, prior to the issuance of the Joint Proxy, M&T knew or should have known that the Free Checking Practice posed an independent regulatory risk to the merger. *See* Reply ISO MSJ at 21. Plaintiffs again attempt to use the June 18, 2020 Third Circuit Opinion to argue the materiality of the lack of disclosures regarding the consumer violations, however, as discussed above, the Third Circuit issued its holding assuming the truth of Plaintiffs' Complaint. *See* Opposition to MSJ at 41. Now, after discovery, Plaintiffs can point to no evidence that raises a

genuine issue of material fact that Defendants knew that the Consumer Violations posed an

independent risk to the regulatory approval of the merger and therefore triggered the need for

disclosure under Item 105.[6]  Therefore, there is no genuine dispute of material fact about

whether there was a material misrepresentation or omission regarding M&T's consumer

violations and free checking practice.

>   **B.**     **There is no genuine dispute of material fact whether Plaintiffs suffered an**
>
>   **economic loss proximately caused by the alleged misrepresentation or**
>
>   **omission.**

>   **1.**     **Legal standard for loss causation**

Loss causation generally requires Plaintiffs to prove economic loss as well as proximate

cause.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  Loss causation frequently

arises in 10(b) securities fraud claims and is analyzed according to a substantial factor test

considering causal connection between the economic loss and the alleged fraud, using "general

principles of causation, such as materiality, directness, foreseeability, and intervening causes."

*Pure Earth, Inc. v. Call*, 618 F. App'x. 119, 123 (3d Cir. 2015); *see also Dura Pharms., Inc.*, 544

U.S. at 341–42; *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 424 (3d Cir. 2007).  While the

Third Circuit has not yet held that loss causation as defined in 10(b) claims applies to 14(a)

claims, many other circuits have applied the loss causation standard equally in both.  *See, e.g.*,

---

[6] This holding is specific to this case, its current posture at summary judgment, and the evidence adduced by the parties therein.  Defendants argue that the settlement with the CFPB was "de minimis."  MSJ at 41.  The implication of Defendants' argument, that a low monetary value of a settlement with the CFPB, alone and as a matter of law, could preclude issue from being material to disclosure under Item 105, is unsupported.  Defendants' cited case of *Topley* concerned a "de minimis" conflict of interest, and is inapplicable.  MSJ at 41 (citing *Topley v. SemGroup Corp.*, 2021 WL 1172622 (S.D.N.Y. Mar. 29, 2021)).

*Karp v. First Connecticut Bancorp, Inc.*, 69 F.4th 223, 235 (4th Cir. 2023) ("[L]oss causation requires that a plaintiff prove that the challenged misrepresentations or omissions caused her economic loss.") (internal quotation marks omitted); *McCabe v. Ernst & Young, LLP.*, 494 F.3d at 430 ("The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement.") (internal quotation marks omitted).

In *Dura Pharmaceuticals*, the Supreme Court considered loss causation in the 10(b) context, holding that plaintiffs need to prove proximate cause and economic loss for recovery on securities fraud claims. *Dura Pharms., Inc.*, 544 U.S. 336, 345 (2005). In *Dura Pharmaceuticals* a single inflated purchase price was insufficient to satisfy the required causal connection between the misrepresentation and the economic loss, because "[w]hen the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharms., Inc.*, 544 U.S. 336, 342–43 (2005). Under *Dura*, there needs to be a close causal connection between the economic loss and the misrepresentation; only if Plaintiffs can show a genuine dispute of material fact as to an economic loss and can show a genuine dispute of material fact that the alleged misrepresentations or omissions caused this loss can they defeat summary judgment on the loss causation element.

### 2.    "Benefit-of-the-bargain" damages are available as a matter of law, though not attained by Plaintiff here.[7]

Plaintiffs attempt to prove economic loss using a "benefit-of-the-bargain" damages theory, arguing that there are genuine issues of material fact concerning whether Hudson shareholders received the benefit they were promised had the merger not been delayed due to regulatory deficiencies. *See generally* Opposition to MSJ. Defendants contend that benefit-of-the-bargain claims are unavailable for Section 14(a) claims as a matter of law. *See* Defendants' Brief at 59.

Defendants contend that the only proper theory of damages for a Section 14(a) claim was articulated in *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *2 (D. Del. Feb. 1, 2021), where this Court dismissed a complaint alleging Section 14(a) damages resulting from the Board's failure to secure a better deal for shareholders after filing an allegedly incomplete Proxy statement to solicit shareholder votes. 2021 WL 327385 at *1–2. Defendants contend that this Court's holding in *Resolute* and the Third Circuit's non-precedential affirmation precludes benefit-of-the-bargain damages for Section 14(a) claims, and requires Plaintiffs allege an out-of-pocket loss caused by the misrepresentation or omission to establish loss causation. MSJ at 58. Plaintiffs contend that Defendants wrongly interpret *Resolute* in a way that conflicts with Third Circuit precedent that allows for benefit-of-the-bargain damages for 14(a) claims if they are not

---

[7] This Court previously held that Plaintiffs' "benefit-of-the-bargain" damages were viable and held that economic loss under Section 14(a) claims was not limited to out-of-pocket loss. Feb. 7 Decision at *16. Defendants now maintain their argument that "benefit-of-the-bargain" damages are unavailable to Section 14(a) claims as a matter of law. MSJ at 58–59 (citing *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385 (D. Del. Feb. 1, 2021)). This court previously rejected this argument, and again holds that "benefit-of-the-bargain" damages are available for 14(a) claims if they are not "wholly speculative." *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976).

wholly speculative. Opposition to MSJ at 58 (citing *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976)).

The Court agrees with Plaintiffs that this case can be distinguished from *Resolute* and that *Resolute* does not completely bar benefit-of-the-bargain damages. Unlike in *Resolute*, where this Court considered Plaintiffs' theory that the Board should have hypothetically made a better bargain to benefit Plaintiffs, Plaintiffs here allege damages based on a bargain that *did* exist, alleging that they did not receive the full benefit, making the hypothetical bargain in *Resolute* more attenuated than the actual bargain in this case. Furthermore, the Third Circuit has held that "recovery [in 14(a) actions] is not limited to out of pocket loss . . . but may include loss of a possible profit or benefit . . . unless the loss is wholly speculative." *Gould*, 535 F.2d at 781; *see also Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 218 (3d Cir. 2002). In *Gould*, the court permitted recovery based on "lost opportunity" damages, holding that without them, "section 14(a) could be violated with impunity in any situation in which the violation does not cause out of pocket loss." *Gould*, 535 F.2d at 782. The court held that while "recovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit . . . unless the loss is wholly speculative." *Id.* at 781. Therefore, under *Gould*, "lost opportunity" recovery *is* permitted for Section 14(a) claims. *Gould*, 535 F.2d at 781; *see also Tse*, 297 F.3d at 218. However, the Plaintiff must prove that their alleged "lost opportunity" damages are not speculative but instead are grounded in fact and causation. *Gould*, 535 F.2d at 781.

The Third Circuit confirmed the existence of a claim for lost opportunity damages in *Tse v. Ventana Medical Systems*, explaining that for Section 14(a) claims and Rule 10b-5 claims, "plaintiffs may proceed on a theory of 'lost opportunity' without demonstrating any actual loss."

*Tse*, 297 F.3d at 218 (quoting *Gould*, 535 F.2d at 781).  However, they must demonstrate

economic loss that is not wholly speculative (which the *Tse* plaintiffs fail to do).  *Tse*, 297 F.3d

at 219.  In *Tse*, plaintiffs argued that if they had known details of the package they voted to

approve, they would have negotiated a better exchange rate in the merger deal in question.  *Id.* at

220.  The *Tse* court considered four events in that case which this alleged lost opportunity would

hinge.  *Id.* at 221.  The *Tse* Court articulated the four events in that case as follows:

> [T]here are at least four events upon which the plaintiffs' alleged lost opportunity
> would hinge.  First, the plaintiffs would have had to vote against the proposed
> merger, and recruit at least some other shareholders to oppose it with them (they
> held 9.12% of the shares and would need 10% to prevent the merger).  Second,
> Biotek would have had to negotiate a more favorable exchange rate at which its
> shareholders could exchange Ventana Exchange Notes for Ventana common stock.
> Third, the plaintiffs would have to have chosen to exchange their notes for common
> stock.  Fourth, the plaintiffs would have to have chosen to have sold Ventana
> common stock following the IPO at a profit (i.e., in order to do better than the return
> that they got on their promissory notes).

*Tse v. Ventana Med. Sys*, 297 F.3d at 221.  The *Tse* court held that the alleged damages were

"wholly speculative" and did not support recovery.  *Id.*

### 3. Plaintiffs' alleged trading and closing damages are "wholly speculative" and there is no genuine dispute of material fact regarding economic loss.

Defendants contend that, even if Plaintiffs' damages are viable as a matter of law,

summary judgment should be granted because Plaintiffs' alleged damages are speculative and

not proximately caused by Defendants' misrepresentations or omissions in the proxy materials

and therefore leave no genuine dispute of material fact.  *See* MSJ at 41–42.  Defendants contend

that Plaintiffs' calculation of "trading" and "closing" damages is "wholly speculative" and relies

on a flawed methodology in Dr. DeRosa's event study.  Defendants argue the DeRosa Study fails

to explain the selection of the specific dates chosen for the study and does not consider the

Board's discretionary actions to extend the Merger termination date.  *See* Defendants' Brief at 44–45.

For background, the DeRosa Event Study purports to estimate the per-share impacts from Plaintiffs' alleged damages, and analyzes four instances, or "events," (delineated in detail below) where M&T stock price declined following M&T's disclosures about their regulatory challenges. *Feb. 7 Decision*, 2024 WL 474846, at *9.  The Event Study estimates the per-share damages associated with each event based on these stock price declines, calculating "trading damages" for shareholders who sold their Hudson City shares prior to the close of the merger and "closing damages" for those who held their shares through the merger's close.  *Id.* at *8–9.  Notably, the price drop for each date has three amounts in the analysis for each date: first, the price that M&T's stock literally declined on a given day; second, the "unexplained" drop in M&T's share price that cannot be explained even after controlling for the Standard and Poor's Specialty Banking Index on that day; and third, Dr. DeRosa's calculation of how a given day's M&T drop corresponds to a loss of Hudson share value that is found by multiplying by "the merger ratio," which is "the agreed-upon exchange ratio in the Proposed Merger."  Defendants' Ex. 15A ¶ 17 n.16 (Expert Report of Dr. Denis (the "Denis Rpt.")); *see also* Defendants' Ex. 65 / Plaintiffs' Ex. 5 (Keath/DeRosa Rpt.) ¶ 103 n.47.  These dates and prices, which will also be discussed more throughout this section, are below:

(i) April 12, 2013, the date of the Joint Press Release and Proxy Supplement. "**MTB dropped $4.68** from a close of $104.92 on April 11, 2013, to a close of $100.24 on April 12, 2013." Defendants' Ex. 65 / Plaintiffs' Ex. 5 (Keath/DeRosa Rpt.) ¶ 102. "This meant that **$3.64 of the decline was unexplained** by the decline in the index." *Id.* ¶ 103. "Multiplying this by the merger ratio equals **$0.31 per HCBK** share." *Id.*

(ii) October 17, 2014, the date of M&T's quarterly earnings call disclosing further negative information related to the regulatory issues. "**MTB dropped $3.30** from a close of $116.16 on October 16, 2014, to a close of $112.86 on October 17, 2014." *Id.* ¶ 111. "This meant that MTB experienced an **unexplained decline of $3.67. Multiplying this by the merger ratio equals $0.31 per HCBK share."** *Id.* ¶ 112.

(iii) April 6, 2015, the date on which M&T disclosed the Federal Reserve would further delay acting on the Merger application. "**MTB dropped $3.45** from a close of $127.21 on April 2, 2015, to a close of $123.76 on April 6, 2015." *Id.* ¶ 116. "This meant that MTB experienced an **unexplained decline of $3.09.** Multiplying this by the merger ratio equals **$0.26 per HCBK share**." *Id.* ¶ 117.

(iv) September 30, 2015, the date on which M&T disclosed that the Federal Reserve approved the merger but placed important new restrictions on M&T's business activities. "**MTB dropped $4.80** from a close of $121.95 on September 30, 2015 to a close of $117.15 on October 1, 2015." *Id.* ¶ 121. "This meant that MTB experienced an **unexpected decline of $4.88**. Multiplying this by the merger ratio **equals $0.41 per HCBK share**." *Id.* ¶ 122.

*See generally* Defendants' Ex. 65 / Plaintiffs' Ex. 5 (Keath/DeRosa Rpt.) ¶¶ 98–125.

Plaintiffs contend that their alleged trading and closing damages are not "wholly speculative" because the fact of injury is certain, given the stock downdraft prices at each of the four dates in Dr. DeRosa's event study. *See* Plaintiffs' Brief at 50–52. Plaintiffs argue that although this court previously found trading and closing damages to be "wholly speculative," this Court only addressed the *calculation* of damages to be speculative, and not the *fact* that loss occurred, and the latter is what now matters. Plaintiffs' Brief at 50–51 (quoting *February 7 Decision*, 2024 WL 474846, at *17). Plaintiffs base their argument in their reading of *Tse* and *Gould*, reading both to say that the *amount of damages* to be awarded is the duty of the fact finder as long as the *fact of loss* is certain. *Id.* at 51 (first citing *Tse*, 297 F.3d at 220, then citing *Gould*, 535 F.2d at 782).

This is not the correct inquiry under *Tse*. Instead of merely pointing to four dates on which the share price dropped, Plaintiffs instead must show that they ended up earning less

because of those share price impacts than they would have had the Joint Proxy included the allegedly omitted information.  *See* Reply ISO MSJ at 26 (citing *Tse*, 297 F.3d at 221–23).

To address the parties' dispute about the proper interpretation of *Tse*.  The necessary inquiry is whether Plaintiffs truly would have *earned more* had the proxy materials contained different information; "post hoc declarations are inevitably suspect." *Tse*, 297 F.3d at 222.  In *Tse*, plaintiffs were required to prove that had the full information been available they would have both voted against the merger and would have negotiated for a more favorable exchange rate.  *Id.* at 221.  It is insufficient for Plaintiffs to merely point to four dates on which their stock price decreased.  Instead, under *Tse*, they must show that they *would* have been able to receive more in their stock sale had Defendants made different disclosures in the proxy materials.  *Tse* rejected a speculative argument that the shareholders would have rejected the merger offer.  *Id.* ("[P]laintiffs have presented substantial evidence that they could have rejected the Ventana merger on the terms on which it ultimately took place[.] [W]e believe that it is highly speculative that they would have done so, even if they had known the terms of the compensation package, given" the circumstances in that case.).  *Tse* adds that "even if we were certain that the plaintiffs would have voted against the merger if the compensation information had been disclosed, the record renders it unlikely that they could have negotiated a better deal." *Id.*

For the reasons discussed herein, Plaintiffs fail to show that their total earnings would be higher had the proxy materials included more disclosures, therefore failing on the question of economic loss for their Trading and Closing Damages theories.

When the merger closed on November 1, 2015, both M&T's and Hudson City's stock rose significantly.  M&T's stock closed at $120.27 on November 2, and Hudson City's stock price was $10.12 on October 30, the last day of trading before the merger closed.  This was a

significant increase from Hudson City's stock price of $6.44 on August 24, 2012.  *See* Defendants' Brief at 25.  As Defendants note, the Belinas, who allege Trading Damages, earned a 47% return on their investment, while Mr. Krublit, who alleges Closing Damages, earned a 61% return on his.  *See* Defendants' Brief at 3; Defendants' Reply at 24.  Plaintiffs contend that they did not make as much as they should have on these investments.  Plaintiffs' Brief at 50–52.  However, this contention is based solely on the Event Study and its arbitrary selection of only four dates to assume that the losses on these four dates necessary impacted their total earnings once the merger closed.  The Event Study is insufficient as a matter of law to create a genuine issue of material fact.

> **a)** **That the DeRosa Event Study was admitted at the *Daubert* stage of the case does not, by itself, mean the Study raises a genuine dispute of material fact**

This Court held at the class certification stage that the DeRosa Event Study portion of the Keath/DeRosa Report was sufficient on its own to satisfy *Daubert*, and that "a determination that the Keath Trading Model is unreliable under *Daubert* does not require exclusion of the entire Report." *Feb. 7 Decision*, 2024 WL 474846 at *9.  The Keath Trading Model was found to be unreliable for purposes of class certification, but this Court found that this did not preclude admission of the DeRosa Event Study.[8]  *Id.*  The Keath Trading Model purported to estimate the

---

[8] M. Travis Keath and David F. DeRosa prepared the "Keath/DeRosa Expert Report" which includes a Trading Model prepared by Mr. Keath and an Event Study prepared by Dr. DeRosa, purporting damage calculations.  Mr. Keath is a financial analyst specializing in business and securities valuation and capital markets.  Dr. DeRosa is the President and owner of DeRosa Research and Trading, Inc, which provides expert witness and litigation support services.  He has a Ph.D. in finance and economics.

total number of Hudson City shares impacted by Plaintiffs' alleged damages between February 2013 and the close of the merger on October 30, 2015. *Id.* at *3.

This court held that the DeRosa Event Study is sufficient on its own to satisfy the *Daubert* requirement, as "event studies are a generally accepted methodology for computing the value of stock price declines associated with adverse events, and Dr. DeRosa had 'good grounds' for his choices in implementing his Event Study." *Id.* at *11.

Plaintiffs rely on this Court's February 7 decision to argue the validity of the DeRosa Event Study because this Court held that the Event Study "'may present a reliable methodology' for determining share price impacts '*on that day*.'" Opposition to MSJ at 51 (quoting *Feb. 7 Decision*, 2024 WL 474846 at *17) (emphasis in original). However, while this Court did find the Event Study admissible for *Daubert* purposes because it uses a generally accepted methodology and its choices are based on "good grounds," it is not sufficient for Plaintiffs to prove loss causation, or the causal connection between the alleged omissions or misrepresentations and the economic loss because it fails to present sufficient evidence of non-speculative damages proximately caused by the alleged misstatement and omissions in the proxy materials. *See* MSJ at 43–45; Reply ISO MSJ at 25–26.

Tellingly, this Court previously held that the Event Study does not offer any discussion for how share price declines on a single day are sustained within the share price on a later date and found the assumption that these share price downdrifts were retained and internalized to be "wholly speculative." *Feb. 7 Decision*, 2024 WL 474846 at *17. Plaintiffs still rely wholly on the same DeRosa study to show causation and economic loss, but they fail to explain how the share price impacts on these four individual dates (delineated in detail below) can be construed to show that Plaintiffs earned less from this merger than they would have had further disclosures

been made in the proxy materials.  This Court previously held that all trading and closing damages were "wholly speculative." *Feb. 7 Decision*, 2024 WL 474846 at *17.  Now, Plaintiffs contend that this Court used the wrong standard, because, in their argument, the fact of loss is certain.  However, they argue only that because this Court previously held that the calculation of share price impacts on those specific dates was *admissible*, the fact of loss is certain.  Opposition to MSJ at 51.  To the contrary, as discussed above, this argument misconstrues the idea from *Tse* that Plaintiffs must only show the fact that loss occurred.

Although found to be admissible over a *Daubert* motion, the DeRosa Event Study does not, therefore, meet Plaintiff's burden under summary judgment to sufficiently raise a genuine dispute of material fact.

> **b)      The DeRosa Event Study fails to show that the alleged misrepresentations or omissions in the proxy materials were the proximate cause of any purported economic loss.**

The Event Study is based on only four dates, selectively picked right after M&T's disclosures of regulatory challenges and does not consider any other market changes or intervening causes that could have affected the share price *other* than these disclosures. *See* Opposition to MSJ at 52–53; MSJ at 44–45; Plaintiffs' Ex. 5 at 26.

Defendants contend that Plaintiffs fail to raise a genuine issue of material fact by failing to consider if there were intervening factors that *might have* functioned as intervening causes on any of the four days he did study (which will be discussed, below, in separate detail for each day), thereby attenuating the chain of causation between the merger agreement and the alleged damages.  MSJ at 44–46 (first citing Ex. 64 (DeRosa Tr.) at 97:17–98:19; 102:17–103:1; 106:8–109:9–16; then citing Denis Rebuttal Rpt. ¶ 24) (arguing Dr. DeRosa did no work to

disaggregate merger-related impacts from any other M&T or Hudson City news that was issued on the same day).  Plaintiffs argue that a lack of consideration of "intervening events or confounding factors" does not entitle Defendants to summary judgment; instead, they say, there is a genuine issue of fact as to whether the purported damages are supported by the preponderance of the evidence.  Plaintiffs' Brief at 53.  Plaintiffs can show that on the four date-ranges examined in the Event Study the share price did decrease, but Plaintiffs only speculate and offer no cognizable evidence that individualized loss on these four dates was sustained and internalized, resulting in a final loss (either at the merger's close for closing damages or when Plaintiffs sold their shares for trading damages).  This evidence directly simply shows that on these four dates, share prices decreased, but it shows nothing else.

Defendants further contend "Dr. DeRosa also entirely ignores that the Hudson City Board took discretionary action to extend the Merger termination date" on four separate occasions, April 13, 2013, December 16, 2013, December 8, 2014 and April 16, 2015.  MSJ at 45.  Plaintiffs contend that these discretionary extensions did not attenuate the chain of causation because they were "extensions of the same agreement previously approved by the shareholders, not new transactions that broke the chain of causation for purposes of summary judgment."  Opposition to MSJ at 51.  The Court agrees with Defendants: each discretionary extension of the merger attenuates the chain of causation, leaving no genuine issue of material fact about causation.  *See* Reply ISO MSJ at 27.

   **c)**  **Each of the dates in the DeRosa Event Study have intervening**

       **factors, or an attenuated chain of causation, which preclude**

       **raising genuine issues of material facts.**

Defendants identified intervening factors, or an attenuated chain of causation, or both, on each of the dates in the DeRosa Event Study. Each of these dates and these intervening factors are discussed below. Overall, the result of this is that Plaintiffs have failed to raise a genuine issue of material fact.

       **(i)**  **April 12, 2013**

The first event in the Event Study is April 12, 2013, the date on which M&T and Hudson City released the Supplemental Disclosures, which were followed by MTB dropping $4.68 from a close of $104.92 on April 11, 2013, to a close of $100.24.[9] MSJ at 46; Plaintiffs' Ex. 5 at 31–32.

While Defendants do not identify specific intervening factors on this day, Defendants' deposition of Dr. DeRosa showed that he did not attempt to determine if other news happened on that date that would have caused the downdraft. Ex. 64 (DeRosa Tr.) at 109:14–18. Moreover, even conceding the market absorbed the news of the Supplemental Disclosures with a loss in M&T share price, Defendants argue there can be no genuine dispute of material fact about whether Plaintiffs suffered any damages under their benefit-of-the-bargain theory caused by the April 12, 2013 disclosures because it was made *before* the very first shareholder vote to approve

---

[9] As explained above, on April 12, 2013, MTB dropped $4.68 from a close of $104.92 on April 11, 2013, to a close of $100.24 on April 12, 2013. Defendants' Ex. 65 / Plaintiffs' Ex. 5 (Keath/DeRosa Rpt.) ¶ 102. Standardized based on how the Standard and Poor's Specialty Banking Index performed that day, "$3.64 of the decline was unexplained by the decline in the index." *Id.* ¶ 103. Dr. DeRosa equates this to a $0.31 drop in Hudson City stock. *Id.* ¶ 103.

the Merger on April 18, 2013.  *See generally* Opposition to MSJ at 15 ("The Hudson shareholder vote was held on April 18, 2013 as scheduled, and the Merger was approved based on facts disclosed at the time.").  Defendants' expert goes into detail about how the market likely absorbed the news by the end of trading on April 12, 2013, but certainly no later than April 18, 2013, including by identifying forty-six articles from local and national news publications discussing the Merger-related news, from April 12, 2013, to April 17, 2013, twenty were published on April 12 or April 13, 2013.  *See, e.g.*, Ex. 15A ¶ 19.  Indeed, shareholders voted for the merger (and overwhelmingly approved it) with knowledge of these disclosures.  *See* MSJ at 46.  Defendants' expert explains:

> Hudson City shareholders who voted prior to the April 12, 2013, announcement had the ability to change their vote before the April 18, 2013, Hudson City Shareholders Meeting. With full knowledge that the termination date had been extended to January 31, 2014, 94 percent of Hudson City's shareholders still voted to approve the Merger.

Ex. 15A ¶ 13 (Denis Rpt.).

### (ii)     October 17, 2014

The second date in the Event Study is October 17, 2014, when Dr. DeRosa calculated an unexplained decline of $3.67.  He attributed the decline to M&T's disclosure on October 17 that the scope of M&T's BSA/AML regulatory compliance review had expanded to all customers, not just high-risk customers.[10]  *See* MSJ at 47; Plaintiffs' Ex. 5 at 34.

Defendants identify a specific intervening factor on this day that could have contributed to the price drop, that Dr. DeRosa admitted in his deposition he failed to consider: M&T's Third

---

[10] As discussed above, on October 17, 2014, MTB dropped $3.30 from a close of $116.16 on October 16, 2014, to a close of $112.86 on October 17, 2014.  Defendants' Ex. 65 / Plaintiffs' Ex. 5 (Keath/DeRosa Rpt.) ¶ 111.  Controlling for how the Standard and Poor's Specialty Banking Index performed that day, "MTB experienced an unexplained decline of $3.67. Multiplying this by the merger ratio equals $0.31 per HCBK share."  *Id.* ¶ 112.

Quarter 2014 earnings call which concurrently announced unexpectedly negative financial results.  MSJ at 47.  Defendants point to the Q3 2014 Earnings Call Transcript of M&T, released on October 17th, 2014, which stated "Gap earnings per share were down quarter over quarter.  Net income was down."  Ex. 64 (DeRosa Tr.) at 106:21–108:1; MSJ at 47.  Dr. DeRosa testified that he was not even aware of the Earnings Call, and he did not take it into account in his Events Study.  Ex. 64 (DeRosa Tr.) at 102:17–103:1, 107:2–108:1.  Besides that specific intervening factor, Defendants also point to Dr. DeRosa's admission in deposition that he was not aware of any other negative financial news announced that same day and did not work to disaggregate any other possible causes to the share price downdraft.  *See* MSJ at 47–48; Defendants' Ex. 64 (DeRosa Tr.) at 107:2–108:1.

Plaintiffs respond that M&T's Third Quarter 2014 earnings call, which Defendants argue Dr. DeRosa ignored, relate to ongoing BSA/AML remediation efforts and thus are part of exactly what Dr. DeRosa undisputedly *did* consider occurring that day—M&T's disclosure on October 17 that the scope of M&T's BSA/AML regulatory compliance review had expanded to all customers, not just high-risk customer.  Opposition to MSJ at 54; Plaintiffs' Ex. 6 (DeRosa Rebuttal Report) at ¶¶ 37–38.  Plaintiffs contend that this conflict between experts and these "questions about how much of the decline should be attributable to certain disclosures are for the jury [to] resolve."  Opposition to MSJ at 54.

Defendants' identification of a specific, relevant intervening factor on October 17, 2014 (the Third Quarter Earnings Call), coupled with Plaintiffs' expert's admitted failure to consider the Earnings Call or any other factors that could have been intervening, is sufficient to conclude that the Event Study on October 17, 2024, did not raise a genuine issue of material harm as to trading and closing damages.

A material fact is that which "might affect the outcome of the suit," and those "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, even assuming arguendo that the October 17 decline *was* caused by the BSA/AML disclosure (in other words, ignoring the identified intervening factor of the Third Quarter Earnings Call), it would be irrelevant given Plaintiffs' failure to offer any evidence to show that this particular decline caused them *final* economic loss. Plaintiffs argue that the only necessary inquiry is whether "the *fact* of the loss [i]s not wholly speculative." Opposition to MSJ at 50–51 (alteration in original) (emphasis in original) (citing *Tse*, 297 F.3d at 220). However, that the DeRosa study did not account for the "passage of time" (or the internalization of the share price impacts *after* the day in question), results in a failure to raise a genuine issue of *material* fact. Plaintiffs have the burden of showing that there is a genuine dispute of material fact whether, without the alleged misrepresentations or omissions, their share prices would have been higher at the times Plaintiffs sold their shares, or the merger closed.

Without this showing (which the study in its entirety ignores) a factual dispute about loss at one particular day is immaterial.

### (iii)    April 6, 2015

The third date in the study is April 6, 2015, on which Dr. DeRosa calculated that M&T shares dropped by $3.45, and attributed the unexpected decline to M&T's disclosure that the Federal Reserve would further delay acting on the merger application. MSJ at 48; Plaintiffs' Ex. 5 at 34.[11]

---

[11] As discussed above, on April 6, 2015, MTB dropped $3.45 from a close of $127.21 on April 2, 2015, to a close of $123.76 on April 6, 2015. Defendants' Ex. 65 / Plaintiffs' Ex. 5 (Keath/DeRosa Rpt.) ¶ 116. Controlling for how the Standard and Poor's Specialty Banking Index performed that day, "MTB experienced an unexplained decline of $3.09. Multiplying this by the merger ratio equals $0.26 per HCBK share." *Id.* ¶ 117.

Defendants do not identify specific intervening factors on this day, but in Defendants' deposition of Dr. DeRosa, he testified that he did not attempt to determine if other news happened on that date that would have caused the downdraft. MSJ at 48–49 (citing Ex. 64 (DeRosa Tr.) at 109:14–18). Defendants argue it is Plaintiff's burden to "account for and disaggregate other factors." MSJ at 48–49 (citing *Dura*, 544 U.S. at 345–46).

Defendants argue that even if this stock price decline *was* attributable to the extension of the merger, Plaintiffs failed to show causation between the allegedly omissive proxy materials and this stock decline. MSJ at 49. "Plaintiffs have not provided evidence that this specific delay in April 2015 was foreseeable such that it could have been, but was not, disclosed two years earlier, before" the Merger was approved on April 18, 2013. MSJ at 49. Moreover, between the shareholder vote to approve the Merger on April 18, 2013, and the April 6, 2015 disclosure, the Board twice (on December 16, 2013 and December 8, 2014) took discretionary action to extend the Merger Agreement, and did so once again *after* the April 6, 2015 disclosure (on April 16, 2015), thus breaking the chain of causation between the Proxy Materials and the final economic value of Plaintiffs' shares.

Plaintiffs respond that the question of "confounding" information or intervening causes should be left as a factual question for the jury to decide, and that there are genuine issues of fact concerning M&T knowledge at the time. Opposition to MSJ at 55.

Plaintiffs' argument fails, because the Boards' discretionary extensions of the merger agreement constituted intervening actions breaking the chain of causation. Because these extensions were fully discretionary, Plaintiffs cannot establish that the alleged omissions and misrepresentations in the proxy materials *caused* the decline, as required by loss causation. In

other words, Plaintiffs cannot establish that *but for* the alleged misstatements, Plaintiffs would

not have suffered the purported loss on April 6, 2015.

Even if there was a disputed fact about the question of confounding information and

intervening causes, it would not be *material*, because, as stated for the other dates, Plaintiffs still

fail to allege how this particular *day's* stock decline led to an internalized, *final* loss.

### (iv)    September 30, 2015

The final date in the study is September 30, 2015, the date on which "the Federal Reserve

approved the Merger but placed new restrictions on M&T's activities."  Opposition to MSJ at 55;

*see also* MSJ at 49.[12]

Defendants contend that the September 30 announcement occurred mid-day (12:30 PM

from the Federal Reserve, and 1:00 PM from M&T's own announcement) and the "market fully

reacted to the September 30 news on September 30, not later."  MSJ at 50; Ex. 15B (Denis

Rebuttal Report).  In Defendants' rebuttal report, Dr. Denis shows that M&T's stock price

reacted immediately to the September 30 news, with a large increase in trading volume on

September 30 but by the end of the day M&T's stock price closed higher than the previous day.

MSJ at 50; Ex. 15B ¶ 38 (Denis Rebuttal Report) ("from $120.10 at closing on September 29,

2015, to $121.95 at closing on September 30, 2015").  On October 1, the trading volume was

lower.  Ex. 15B Ex. 3.  Defendants contend that the fact on October 1, the M&T stock Price

closed at $117.15, lower than it had closed on September 30, is not related to the September 30

mid-day announcement.

---

[12] As discussed above, on September 30, 2015, MTB dropped $4.80 from a close of $121.95 on
September 30, 2015 to a close of $117.15 on October 1, 2015.  Defendants' Ex. 65 / Plaintiffs'
Ex. 5 (Keath/DeRosa Rpt.) ¶ 121.  Controlling for how the Standard and Poor's Specialty
Banking Index performed that day, "MTB experienced an unexpected decline of $4.88.
Multiplying this by the merger ratio equals $0.41 per HCBK share."  *Id.* ¶ 122.

The relationship for which Plaintiff argues is spurious.  Plaintiffs and their expert did not substantially engage with Dr. Denis' rebuttal and did not offer significant support for their choice to analyze the stock price on October 1, when the market had reacted to the merger news by the end of the day on September 30 (such that it closed higher than on September 29).[13]  By failing to fully engage with Defendants' claims and expert rebuttal and providing no explanation of why the downdrift on October 1 was selected instead of September 30, Plaintiffs do nothing to factually dispute the conclusion that Dr. DeRosa cherry-picked these dates without substantial basis.

Therefore, Plaintiffs have not met their burden to show there is genuine dispute of material fact about whether the alleged disclosures proximately caused the share price downdrift on October 1, because without more there is nothing that would permit a reasonable jury to return a verdict for the nonmoving party.  *See Anderson*, 477 U.S. at 248.

> **(v)     In sum, each of the dates in the DeRosa Event Study (discussed above) have intervening factors, or an attenuated chain of causation, which preclude the existence of genuine issues of material facts.**

Plaintiffs failed to meet this burden, and Defendants are therefore entitled to summary judgment.  All Plaintiffs show is that their stock prices decreased on four distinct dates.  The Court cannot infer that these decreases had any continuing relevant impact, and Plaintiffs offer

---

[13] Plaintiffs' failure to rebut is evident.  Plaintiffs' expert acknowledged that Hudson City's stock traded on an efficient market that would have absorbed public information almost immediately. Defendants' Ex. 64 DeRosa Tr. 39:16–40:4; 78:4–7.  Plaintiffs do not rebut the assertion in Defendants' Brief that "M&T's and Hudson City's stock prices reacted to the Supplemental Disclosures, demonstrating that the merger delay news was widely known to the market and incorporated into Hudson City's stock price the same day."  MSJ at 39–40 (citing Ex. 65 (Keath/DeRosa Rpt.) ¶¶ 98–108).

no cognizable evidence that they did.  Given that Plaintiffs clearly benefited from the merger, MSJ at 25, and that Plaintiffs do not point to any evidence that their share prices, when sold, would have necessarily been higher had the proxy materials contained more robust disclosures, they have not sufficiently demonstrated a genuine dispute of material fact concerning economic loss, and their alleged damages are "wholly speculative."

### 4. The PLSRA limits Plaintiffs' damages as a matter of law

Finally, regarding Plaintiffs' damages calculations, Defendants argue that all Trading and Closing damages are subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and Dr. DeRosa's calculation fails requirements of the PSLRA.  Defendants argue that the PSLRA-imposed statutory formula for calculating damages is subject to a 90-day look back period which limits Plaintiffs damages to "the difference between the purchase price and the mean trading price of a security during the 90-day period following a corrective disclosure." MSJ at 50–51 (citing 15 U.S.C. § 78u-4(e)(1)).  Therefore, according to Defendants, Plaintiffs should have considered the purchase price of the Hudson City stock as well as the mean trading price following the alleged corrective disclosures (i.e. the disclosures on the four dates used in the DeRosa event study).  *Id.*  Defendants further argue that even if Plaintiffs *had* complied with the PSLRA, there would still be no damages because the mean trading prices after the disclosures was greater than the purchase price, and both the Belinas (alleging Trading Damages) and Mr. Krublit (alleging Closing Damages) profited from the transaction.  MSJ at 52.

Plaintiffs respond that the 90-day "bounce-back" provision of the PSLRA does not apply and does not bar Plaintiffs' damages.  Opposition to MSJ at 56.  Plaintiffs contend that it operates as a cap only on traditional "out-of-pocket" loss and does not fit a merger proxy case where there was no direct purchase of shares (arguing, as here, there was no purchase of M&T

shares, and any "purchase" occurred on the date of the merger's close.).  *Id.* at 57.  Finally, Plaintiffs contend that the provision has not been applied in a section 14(a) case and only fits in the 10(b) context involving an inflated purchase price.

The PSLRA "bounce back" cap governs here.  The 90-day "bounce back" period applies "in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security."  15 U.S.C. § 78u-4(e)(1).  Plaintiffs maintain that this only covers 10(b) out-of-pocket loss situations.  Opposition to MSJ at 56.  Defendants note, however, that "the key consideration for the PSLRA is how a plaintiff purports to measure damages: if the yardstick is the market price, as it undeniably is here, the cap applies."  Reply ISO MSJ at 29.  There is nothing in the statutory text limiting PSLRA application to 10(b) claims or out-of-pocket losses.  This concern is not unique to out-of-pocket damages, as Plaintiffs argue.  Rather, benefit-of-the-bargain damages can also be overestimated, if other market factors are not considered.  The PSLRA legislative history clearly favors limiting excessive securities claims and damages.[14]  Where, as here, the mean trading price after the alleged misrepresentations and omissions was *higher* than the original purchase price, Plaintiffs cannot recover.  As Defendants correctly state, "a 14(a) plaintiff could still recover benefit-of-the-bargain damages after applying

---

[14] The PSLRA's legislative history indicates that Congress imposed a limitation—where, if the mean trading price during the 90-day period is less than the plaintiff's purchase price, then the plaintiff may recover out-of-pocket damages up to the difference between her purchase price and the mean trading price—because it believed that "[c]alculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) (quoting S. Rep. No. 104–98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699).  It intended the "bounce back" provision to have the effect of "limiting damages to those losses caused by the fraud and not by other market conditions." *Id.* (quoting S. Rep. No. 104–98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699).

the PSLRA cap if the corrective disclosure actually pushed down the mean trading price of the security at issue, but here it did not do so." Reply ISO MSJ at 29–30.

**5.        Plaintiffs' alleged dividend damages are not viable as a matter of law.**

Defendants contend that Plaintiffs' "dividend damages" fail as a matter of law because 1) they were the result of entirely discretionary actions taken by the board to reduce dividends and 2) they were never promised as part of the Merger and therefore cannot be a "benefit of the bargain" for Plaintiffs. *See* MSJ at 53, 56. Plaintiffs also measure dividend damages using the Event Study, which took Hudson City's quarterly dividends distributed to shareholders from April 12, 2013, to August 10, 2015, and compared them with the quarterly dividends prior to this period of $0.08 per share. *Feb. 7 Decision*, 2024 WL 474846 at *3.

Plaintiffs contend that their dividend damages are viable because dividends at a certain level were implied in the merger agreement, and because there is a genuine dispute of material fact about whether the discretionary actions the Board took were caused by the proxy deficiencies and the merger delay. *See* Opposition to MSJ at 45. Plaintiffs contend that although the Joint Proxy did not explicitly promise continued dividends in a certain amount, it "gave the impression" that certain dividends "could be expected." Opposition to MSJ at 46. Plaintiffs support their argument by arguing that "the importance of dividends to the merger" is supported by the 184 times the word "dividend" is "mentioned" in the Proxy materials. Oral Arg. Tr. at 45:5–8, 48:13–49:2; Opposition to MSJ at 22–23. Further, Plaintiffs argue that a jury could find "'[d]ividends per share of $0.32 annually' were included as the dividend assumption" in J.P. Morgan's Opinion valuing Hudson City in Appendix B of the Joint Proxy "because that is what the dividends had been for the year preceding the Merger agreement." Opposition to MSJ at 46.

Plaintiffs conceded at oral argument, however, that a reasonable shareholder would understand "past results do not guarantee future expectations."  Oral Arg. Tr. at 46:14–19.

Plaintiffs fail to show as a matter of law that dividend damages can fit with their "benefit-of-the-bargain" damages theory, and any change in dividends that purportedly harmed Plaintiffs is too attenuated as a matter of law to have been proximately caused by alleged omissions or misrepresentations in the proxy materials.  As Defendants contend, dividends at a certain level were nowhere promised or guaranteed in the Joint Proxy.  MSJ at 55.  Plaintiffs do not dispute this, instead arguing that "continued dividends could be expected."  Opposition to MSJ at 46. They provide no cognizable evidence to support that proposition.  Plaintiffs can point to no part of the text of the proxy materials which promises or implies dividends, and therefore Plaintiffs cannot claim that the "benefit" they were promised includes dividends at a certain level. Plaintiffs cannot allege dividend damages under their "benefit-of-the-bargain" damages theory as a matter of law if they were not included as a benefit in the bargain to which they agreed.

C.       **There is no genuine dispute of material fact that the merger transaction as approved by shareholders did not proximately cause Plaintiffs' injury.**

1.       **Legal standard for transaction causation**

Transaction causation requires that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970).  In the Third Circuit, this means the transaction must be the "direct cause of the pecuniary injury for which recovery is sought."  *Gen. Elec. Co.*, 980 F.2d at 933.  To meet this burden, Plaintiffs must prove that the merger, as it was approved by shareholders, directly caused their alleged damages.  *Id.*

*Mills* considered the question of transaction causation in Section 14(a) actions. *See Mills*, 396 U.S. at 377. The *Mills* court held that proof that the alleged defect in the solicitation materials actually had a decisive effect on the voting is not necessary for 14(a) claims; instead, once a defect is found to be material, the shareholder need only prove "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Id.* at 385. That is, reliance is not necessary for 14(a) actions, but there must be a direct causal chain between the proxy solicitation and the transaction at issue, in this case the completion of the merger. *General Electric* also considered the transaction causation element, adding that, in addition to the *Mills* rule, "damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought." *Gen. Elec. Co.*, 980 F.2d at 933. *General Electric* concluded that omissions in proxy materials related to board elections about criminal activity and misconduct of certain board members only indirectly led to financial loss, and did not "create a sufficient nexus" to support recovery under 14(a). *See id.* Under the *General Electric* rule, Plaintiffs must show a direct causal relation, without overwhelming intervening factors that might attenuate the causal chain, between the transaction and the injury, or, in this case, between the merger *as authorized by shareholders* and the alleged economic damages.

Courts have found that discretionary actions or management decisions taken by boards are not directly caused by the shareholder votes and proxies that elected them. *Gen. Elec. Co.*, 980 F.2d at 933 (holding that a shareholder vote electing a director did not cause loss resulting from the director's mismanagement and misconduct); *In re Gen. Tire & Rubber Co. Sec. Litig.*,

726 F.2d 1075, 1082 (6th Cir. 1984) (holding that a transaction authorized by shareholders through the proxy process did not directly cause alleged improprieties); *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 797 (11th Cir. 2010) (holding that shareholders' injuries were not caused by policies they approved via proxy but instead by management's failure to follow those policies). Under this analysis, discretionary actions break the chain of causation, and mean that the original transaction, as approved by shareholders, does not directly cause the resulting injury. Instead, these resulting injuries are caused by the discretionary actions or management decisions, and not by the shareholder-approved transaction, and thus transaction causation is not established.

> **2.    The merger transaction as approved by shareholders did not directly cause the alleged trading and closing damages.**

Here, there is no genuine dispute of material fact regarding transaction causation because the alleged economic loss is too attenuated from the merger as authorized by shareholders to have been directly caused by it. While the Plaintiffs' alleged economic losses might be tangentially *related* to the proxy solicitation, in that they resulted from a situation which the proxy solicitation discussed broadly, the Boards' four extensions of the merger attenuated this causal chain, and their discretionary decisions became the *but for* cause of any alleged loss. Similar to *General Electric*, where the court held that economic loss was directly caused by a director's mismanagement and misconduct and not by the proxy solicitation electing the director, here, the alleged economic loss could have been directly caused by the board's actions to extend the merger, but not the merger as authorized by shareholder vote.

Defendants contend that, similar to the loss causation element, the DeRosa Event Study does not take into consideration any intervening or confounding factors and ignores the fact that

the Board took discretionary action to extend the merger termination on four separate occasions, therefore failing to prove a direct causal connection between the merger as authorized from proxy solicitation and the alleged economic loss. MSJ at 44–45. Plaintiffs, however, contend that the discretionary extensions of the merger agreement by the board were extensions of the same agreement, and thus not new transactions that broke the chain of causation. Opposition to MSJ at 51.

Defendants are correct that direct causation for transaction causation is undermined by intervening causes. The *General Electric* rule requires the merger transaction as it was authorized by shareholders to be the direct cause of the pecuniary injury. *See Gen. Elec. Co.*, 980 F.2d at 933. Plaintiffs do not disagree that the Board's extensions of the merger were discretionary actions, but they do contest Defendants' argument that these broke the chain of causation between the proxy solicitation for the merger and the alleged injury. The alleged injuries, however, were not directly caused by the merger as authorized by proxy solicitation. The inquiry here is whether, *but for* the proxy solicitation authorizing the merger, would the injury still have occurred? The alleged trading and closing damages would have allegedly resulted from the *extensions* of the merger, not from the merger *as originally approved by shareholders*. Plaintiffs have offered no evidence that, had more significant disclosures been made at an earlier time, the Board would not have extended the merger four times, and the four stock downdrafts studied in the Event Study would not have occurred. Because the merger as approved by shareholders cannot have directly caused the alleged injuries due to the Board's intervening and discretionary extensions, Plaintiffs raise no genuine dispute of material fact and Defendants are entitled to Summary Judgment.

**3.   There is no genuine dispute of material fact as to whether the merger transaction as approved by shareholders directly caused dividend damages.**

No genuine dispute of material fact exists as to transaction causation on the issue of dividend damages because Plaintiffs cannot satisfy the *General Electric* rule that the merger transaction authorized by shareholders directly caused dividend damages. Plaintiffs' alleged dividend damages are too attenuated from the merger as a matter of law to have been caused by the merger transaction. Dividends are discretionary and determined entirely by the board and promised to Plaintiffs no specific dividend level; and indeed, no dividends at all were mentioned in the Joint Proxy. *See* Opposition to MSJ at 46–47; MSJ at 53. To defeat a summary judgment motion on the transaction causation element for dividend damages, Plaintiffs must show that the transaction approved by shareholders was the "direct cause of the pecuniary injury." *Gen. Elec. Co.*, 980 F.2d at 933. In other words, Plaintiffs must show that a genuine dispute of fact exists as to whether the merger shareholders approved directly caused lower dividends that shareholders had been promised. That they cannot do.

Defendants contend that as a matter of law the merger approved by shareholders could not have directly caused alleged dividend damages because dividends were never promised in the Joint Proxy and were therefore never part of the transaction as approved by shareholders. Defendants contend, based on this Court's Feb. 7 and June 13 decisions, that the only relevant question is whether there was "some dimension of the Joint Proxy or Merger Agreement that shareholders approved that bound the discretion of the Hudson City Board Regarding its dividend decisions." Reply ISO MSJ at 22 (quoting *June 13 Decision*, 2024 WL 2975766, at *18). Defendants argue that because the Joint Proxy did not promise dividends, Plaintiffs

cannot prove transaction causation as a matter of law with respect to dividend damages. *See id.* at 22–23. Plaintiffs contend that dividends were implied in the Joint Proxy, and the question about whether the "reasonable investor" would have believed they were part of the "bargain" being approved should be left for the jury as a question of fact. Opposition to MSJ at 45–47. They recognize, however, that the Joint Proxy did not explicitly promise continued dividends in a certain amount. *Id.* at 46.

That the Joint Proxy did not explicitly promise continued dividends as part of the transaction approved by shareholders concludes the transaction causation inquiry for dividend damages. Because dividends were not promised in the transaction approved by shareholders, the transaction could not be "the direct cause of the pecuniary injury." *Gen. Elec. Co.*, 980 F.2d at 933. The Joint Proxy was not an "essential link in the accomplishment of the transaction" for these dividends, given it made no promises for dividends, and therefore the dividends were not part of the "transaction" shareholders authorized through the vote. *Mills*, 396 U.S. 375, 385. Because dividends were not promised in the "bargain", any dividend damages could not have been caused by the transaction approved by shareholders as a matter of law, and Defendants are entitled to summary judgment.

## VI. Conclusion

The Court concludes that Defendants met their burden for Summary Judgment and grants Summary Judgment for Defendants. Plaintiffs failed to show that a genuine dispute of fact remains on any element of their claim.

For the above reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (D.I. 249) is, hereby **GRANTED**, and

2. Summary Judgment in favor of Defendants and against Plaintiffs be, and hereby is, granted on all remaining issues in this case, and

3. Because no final issues of fact or law remain in the case, the Clerk of Court is directed to **ENTER A FINAL JUDGMENT** in favor of Defendants and against Plaintiffs; and

4. The Clerk of Court is directed to **CLOSE** the case.

**IT IS SO ORDERED.**

March 24, 2026

_/s/ Evan J. Wallach_

EVAN J. WALLACH

CIRCUIT JUDGE, SITTING BY DESIGNATION